**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
and SIERRA CLUB,

                Plaintiffs,

v.                                       CIVIL  ACTION  NO.  3:09-1167

HOBET MINING, LLC,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Plaintiffs' Motion for Summary Judgment, Declaratory Relief, and Injunctive Relief (Doc. 7) and Defendant's Motion to Dismiss (Doc. 18).  For reasons appearing to the Court, a hearing on these motions is **SCHEDULED** for **March 31, 2010 at 10:00 a.m.**  As explained below, the Court has already decided that Plaintiffs have standing to pursue this case.  Consequently, Plaintiffs' motion for summary judgment is **GRANTED** and Defendant's motion to dismiss is **DENIED** insofar as the standing issue is concerned.

**Background**

Plaintiffs are three environmental organizations: the Ohio Valley Environmental Coalition ("OVEC"), the West Virginia Highlands Conservancy ("WVHC"), and the Sierra Club.  Two of these organizations, OVEC and WVHC, have a strong presence in West Virginia and a concern for the State's environment.  OVEC is comprised of approximately 1,500 members, with its principal place of business in Huntington, West Virginia.  It was organized to improve and preserve the

environment through education, organizing, leadership, and outreach. The organization achieves these objectives, at least in part, by focusing on water quality and water pollution issues in West Virginia. WVHC is a non-profit organization incorporated in West Virginia and comprised of approximately 2,000 members. WVHC is focused on the conservation and wise management of West Virginia's natural resources. The Sierra Club is a non-profit corporation based in California, with more than 1.3 million members and supporters nationwide. Approximately 1,900 of these members reside in West Virginia and belong to the organization's West Virginia Chapter. The Sierra Club is dedicated to exploring, enjoying and protecting the Earth's wild places, through the practice and promotion of responsible use, education, and restoration. The Sierra Club uses all lawful means to carry out its objectives, including the exploration, enjoyment and protection of West Virginia's surface waters.

Together, OVEC, WVHC and the Sierra Club argue that Hobet Mining Company, LLC ("Hobet"), a subsidiary of the Patriot Coal Corporation ("Patriot"), has discharged selenium in amounts that violate state and federal law. Specifically, Plaintiffs contend that Hobet has and continues to violate the effluent limitations for selenium found in WV/NPDES Permit 1022911 and WV SMCRA Permit Number S500806, both of which were issued in association with the company's Surface Mine No. 22. Although selenium is a naturally occurring element, it is harmful when present in high concentrations. Surface mining may contribute to high selenium levels because it exposes selenium bearing rock and soil to weathering. As a result, selenium is subject to regulation under federal and state versions of the Clean Water Act ("CWA") and the Surface Mining Reclamation and Control Act ("SMCRA").

Defendant raises several arguments for dismissal, contending the Court should not hear this

2

action because: (1) Plaintiffs lack standing; (2) the Notice of Intent ("NOI") Plaintiffs filed was insufficient; (3) Plaintiffs fail to state a claim upon which relief can be granted; (4) Plaintiffs failed to join an indispensable party, the W.V. Department of Environmental Protection ("WVDEP"); and (5) the Court should abstain from exercising its jurisdiction pursuant to *Younger v. Harris* and *Colorado River*. Finally, Hobet contends that, if it is allowed to proceed, this action should be consolidated with the "related federal enforcement action pending in the Charleston Division," 3:09-cv-099.

The majority of the issues raised by Hobet remain pending, as do Plaintiffs' claims for summary judgment. These issues will be the subject of the hearing on March 31, 2010. Defendant's challenge to Plaintiffs' standing, however, is addressed here.

In their Complaint, Plaintiffs contend their members suffer injuries to their aesthetic, recreational, environmental and/or economic interests as a result of Hobet's unlawful discharges of selenium from its Surface Mine No. 22 into Berry Branch of the Mud River – a navigable water of the United States. Plaintiffs support their argument for standing using four affidavits, by: (1) Anita Miller, (2) Cindy Rank, (3) Versie Sims, and (4) Vivian Stockman.

In her affidavit, Anita Miller, a resident of Alkol, Lincoln County, West Virginia, who grew up along the Mud River and frequently used and enjoyed Berry Branch as a child, describes the effects she suffers as the result of Hobet's selenium discharges. Ms. Miller, a member of OVEC and the Sierra Club, has and continues to visit a family cemetery located in the headwaters of Berry Branch. She also passes the mouth of Berry Branch to visit her garden upstream and uses the Mud River Dam area as a boat dock, swimming beach and picnic area. Ms. Miller takes her grandchildren to the Mud River Dam area and, in her affidavit, describes her enjoyment taking them

there and watching the fish and other wildlife there.  Ms. Miller attests that her knowledge that Hobet is violating the selenium limits in WV/NPDES 1022911 has lessened her aesthetic and recreational enjoyment of Berry Branch and the Mud River Dam area.  She describes "sadness over the destruction that has occurred from mining[,]" *Miller Affidavit* (Doc. 8-6), Ex. 6, ¶ 6, noting that "[a]s I drive by I think of all the things we have lost due to the mining in the Mud River watershed including the toxic water pollution caused by selenium discharges from the mines.  It is really depressing to me." *Id.* at ¶ 8.  Additionally, Ms. Miller explains that she has "great concerns" over the effect of selenium on the fish in the Mud River Reservoir, as well as on the fish, waterfowl and other wildlife in the Mud River.  Ms. Miller states that she "no longer allow[s] [her] grandchildren to swim at the Mud River Dam ... [does] not swim there anymore ... [and] [a]s a grandparent, [hates] to disappoint [her] grandkids." *Id.* at ¶¶ 13 & 14.  "If the water at Mud River Dam were clean," Ms. Miller continues, "I would take my grandchildren swimming there again and really enjoy it." *Id.* at ¶ 14.

The claims made by Cindy Rank, Versie Sims and Vivian Stockman are similar to the claims made by Anita Miller.  In her affidavit, Cindy Rank, a resident of Rock Creek, West Virginia, and long-time member of the three organizations seeking standing,[1] describes her own injuries resulting from Hobet's violations of effluent limitations for selenium.  Ms. Rank explains her knowledge of various studies regarding the harmful effects of excess selenium concentrations and attests that such studies, combined with her knowledge of the high levels of selenium in the Mud River area, "cause [her] great concern." *Rank Affidavit* (Doc. 9-2), Ex. 8, ¶ 9.  Ms. Rank is concerned about the effects

---

[1]Ms. Rank is also a former President of WVHC and current Chair of the organization's Mining Committee.

of selenium on human and non-human communities in the area, stating that she travels to the Mud River area one to two times a year and is "saddened and angry to know the river has been polluted with selenium." *Id.* at ¶ 10. As a result, Ms. Rank's enjoyment of the streams in the area, including Berry Branch, which she likes to visit to "look at the wildflowers and plants in and around the water and look for fish, birds, and other wildlife[,]" is diminished. *Id.* at ¶ 13; *see generally id.*

Versie Sims, a member of OVEC, owns a home in Lincoln County, West Virginia, along a tributary of the Left Fork of the Mud River, just upstream from the Mud River Reservoir. Ms. Sims is engaged in several organizations focused on bettering the environment and specifically the waters of Lincoln County, where she grew up. Although now a resident of Ohio, Ms. Sims attests that she visits her home in Lincoln County at least once per month and is aware of the selenium pollution coming from the mines in the area into the Mud River watershed. Specifically, Ms. Sims attests that she is aware Hobet holds WV/NPDES 1022911 and "is now violating the selenium discharge limits in the permit polluting Berry Branch and downstream reaches of the Mud River." *Sims Affidavit* (Doc. 9-1), Ex. 7, ¶ 9. Ms. Sims attests that she is concerned about the excess selenium being discharged into the Mud River. She cites her concern over selenium's effects on the shallow drinking-water wells along the lower reaches of the river. She also describes her enjoyment watching the birds and other wildlife along the river and the negative effects her knowledge of the selenium violations has on such enjoyment. *See generally id.* Finally, Ms. Sims explains, "[a]s a result of my concerns about selenium, neither I nor anyone in my family wade or swim in the left Fork of the Mud River near my property[,]" and "[i]f the river was cleaned up we would like to wade or swim in the water again." *Id.* at ¶ 12.

Plaintiffs' final affidavit comes from Vivian Stockman. Vivian Stockman, a resident of

Roane County, West Virginia, is a long-time member of and project coordinator for OVEC.  In her affidavit, Ms. Stockman describes the aesthetic and recreational enjoyment she derives from observing and using West Virginia's streams.  Ms. Stockman attests that she "enjoy[s] engaging in outdoor activities along West Virginia's streams such as hiking, nature observation, wading, bird watching, and especially nature photography."  *Stockman Affidavit* (Doc. 9-3), Ex. 9, ¶ 4.  Ms. Stockman links these activities to her "emotional and spiritual well-being" and states that they "have given [her] hours of joy."  *Id.* at ¶¶ 5 & 6.  In her affidavit, Ms. Stockman explains that she has "tremendous concern about toxic pollution such as selenium and what it might be doing to the creatures that live in the streams or to people who drink the water."  *Id.* at ¶ 8.  Additionally, she describes the connection to nature her job requires and how, through her job, she has created a specific connection to Berry Branch and the Mud River area.  According to Ms. Stockman, she has traveled to the Mud River Reservoir downstream from Berry Branch, for her job, approximately three times.  Ms. Stockman attests that she is aware of the high selenium levels in the Reservoir and explains, "[w]hen I go to the Reservoir, I look at the water and I am very upset that toxic levels of selenium are lurking beneath the waters and harming the critters.  This prevents me from enjoying the beauty of the area.  I intend to return to the Reservoir in the future and I hope something can be done about the selenium pollution so that I can really enjoy my trips."  *Id.* at ¶ 15.

## Analysis

The United States Constitution limits the jurisdiction of federal courts to the adjudication of "cases" and "controversies."  *See, e.g., Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 153 (4th Cir. 2000) ("*Gaston Copper*"); U.S. Const. art. III § 2 cl. 1.  This threshold requirement is "perhaps the most important condition of justiciability[,]" for, it "ensures that a

plaintiff has a sufficient personal stake in a dispute to render judicial resolution appropriate." *Gaston Copper,* 204 F.3d at 153 (citing *Allen v. Wright,* 468 U.S. 737, 750 (1984)). "The standing requirement also 'tends to assure that the legal questions presented to the court will be resolved, not in the rarefied atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.'" *Id.* at 153-54 (quoting *Valley Forge Christian Coll. v. Americans for Separation of Church and State, Inc.* 454 U.S. 464, 472 (1982)).

An association has standing to sue on behalf of its members when: (1) at least one of it members would have individual standing to sue in his or her own right, (2) the interests the organization seeks to protect are germane to its purpose, and (3) there is no need for the direct participation of individual members in the action. *See, e.g., Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 423 U.S. 333, 343 (1977)); *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Maryland*, 268 F.3d 255, 263 (4th Cir. 2001). To meet the constitutional minimum for individual standing, the member(s) an organization sues on behalf of must establish three elements: (1) injury in fact, (2) traceability, and (3) redressability. *See, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992); *Gaston Copper,* 204 F.3d at 153; *Am. Canoe,* 326 F.3d at 517. "The injury in fact prong requires that a plaintiff suffer an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Gaston Copper,* 204 F.3d at 154 (citing *Lujan,* 540 U.S. at 560). "The traceability prong means it must be likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court[,]" *id.*, and "the redressability prong entails that it must be likely, and not merely speculative, that a favorable decision will remedy the injury." *Id.*

Because it is the party seeking to invoke federal jurisdiction, the plaintiff bears the burden of establishing each standing element.  *See Lujan*, 540 U.S. at 561.  Further, "the elements of standing are not mere pleading requirements," but rather must be supported by sufficient evidence, as required at the successive stages of the litigation.  *Id.*; *see also Piney Run*, 268 F.3d at 263.  Finally, "[w]hile each of the three prongs of standing should be analyzed distinctly, their proof often overlaps." *Gaston Copper,* 204 F.3d at 154.

The defendant in the instant action appears to concede that Plaintiffs have established the latter two elements of representational standing: that OVEC, WVHC and the Sierra Club seek to protect interests that are germane to their purposes, and that neither the claims asserted nor the relief requested require the participation of individual members in the lawsuit.  The Court agrees with this apparent concession and therefore finds these elements are met.

With respect to the first requirement for association standing – the individual standing of at least one member of the organization, Hobet also appears to concede that Plaintiffs have satisfied the injury in fact and traceability elements.  As discussed below, the Court agrees with this concession.

To establish injury in fact, a plaintiff must show that he or she suffers from a concrete and particularized invasion of a legally protected interest, which is actual or imminent.  *See, e.g., Gaston Copper*, 204 F.3d at 154.  As recognized by this Court in *Ohio Environmental Coalition v. Apogee Coal Co., LLC*, 3:07-cv-0413, "the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for the purposes of standing." *Lujan*, 504 U.S. at 562-63 (cited in 3:07-cv-413, Doc. 67, 5); *see also Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) ("We do not question that this type of harm may amount to an 'injury in fact'

8

sufficient to lay the basis for standing."). Thus, as argued by Plaintiffs in the instant action, a plaintiff seeking to establish injury in fact based upon an aesthetic or recreational interest in a body of water, "need only show that he used the affected area, and that he is an individual for whom the aesthetic and recreational values of the area [are] lessened" by the defendant's activity. *See Piney Run*, 268 F.3d at 263. In their affidavits, Anita Miller, Cindy Rank, Versie Sims and Vivian Stockman establish such an interest and injury. As a result, these affidavits are sufficient to satisfy this standing element.

Furthermore, the Court finds the injury in fact prong satisfied in this case because: (1) Plaintiffs have provided sufficient evidence to establish that Hobet has and continues to violate the effluent limitations found in WV/NPDES Permit 1022911 and WV SMCRA Permit Number S500806, and (2) "Congress has identified NPDES violations, however trifling, as injurious to persons such as plaintiffs' members, who use bodies of water into which a permitee's effluents flow." *Student Pub. Interest Research Group of New Jersey, Inc. v. Georgia-Pacific Corp.*, 615 F.Supp. 1419, 1424 (D.N.J. 1985); *see also Gaston Copper,* 204 F.3d at 156-57.

The second individual standing prong is also satisfied, because Plaintiffs have established that the injuries described above are fairly traceable to Hobet's permit violations. Again, as discussed in *Ohio Environmental Coalition v. Apogee*, "the relevant showing for standing is not injury to the environment, but injury to Plaintiffs." 3:07-cv-413 (Doc. 67), 7 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("*Laidlaw*"). Because the discharges of selenium at issue would be reasonably expected to cause Plaintiffs' members to curtail their use of Berry Branch and the Mud River area, thus diminishing Plaintiffs' enjoyment of the area, and because Plaintiffs' fear that selenium discharges may result in harm to themselves and

to area wildlife is reasonable, Plaintiffs have satisfied the traceability requirement for standing.  *See,*
*e.g., Am. Canoe*, 326 F.3d at 520 ("In order to satisfy the traceability requirement, rather than
pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant
discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific
geographic area of concern.") (citing *Gaston Copper*, 204 F.3d at 161); *see also Piney Run*, 268 F.3d
at 263-64.

The pertinent question remaining, therefore, is whether Plaintiffs have established
redressability.  Satisfaction of the redressability prong of individual standing requires that a plaintiff
show that it is "likely, and not merely speculative, that a favorable decision will remedy the injury."
*See, e.g., Gaston Copper*, 204 F.3d at 154.  As remedies, Plaintiffs seek: (1) a declaration that Hobet
is in violation of the effluent limitations for selenium found in WV/NPDES 1022911, and (2)
corresponding  injunctive relief.

Hobet argues that, even if they obtain declarative and injunctive relief, Plaintiffs cannot meet
the redressability requirement for standing, (1) because "the unusual facts of the cases litigated,
settled and pending against Hobet, surface water drainage that meets the permitted selenium limit
of 4.7 ppb from WV 1022911 will not relieve the Plaintiffs of the injuries described by affiants[,]"
*Def.'s Mem. in Support of Mot. to Dismiss* (Doc. 19), 12, and (2) because Plaintiffs have otherwise
"failed to identify how the injunctive relief requested redresses their claimed injuries."  *Id.* at 11-12.
Said differently, Hobet claims a favorable decision would not redress Plaintiffs' injuries because:
the company holds several permits allowing it to discharge selenium in Berry Branch and the Mud
River; these permits are the subject of various settlement or consent decrees; and, pursuant to these
settlements or consent decrees, selenium discharges into Berry Branch and the Mud River will

continue, and selenium levels in the area will remain above the U.S. Environmental Protection Agency's ("U.S. EPA") water quality limit for selenium of 5 ppb, regardless of whether Plaintiffs obtain injunctive relief regarding WV/NPDES 1022911. *See id.* at 11-19. Accordingly, Hobet argues Plaintiffs' injuries will continue, even in the case of a favorable decision.

Conversely, Plaintiffs contend that, in the instant case, "injunctive relief can redress the injuries caused by violations of effluent limitations by preventing future limitations." *Pls.' Mem. in Support of Mot. Summ. J.* (Doc. 11), 5 (citing *Laidlaw*, 528 U.S. at 174; *Gaston Copper*, 204 F.3d at 162-63). In response to Hobet's argument "that, because Plaintiffs cannot correct all of the selenium problems in Berry Branch at once, they should be permitted to continue contributing to the problem[,]" *Pls.' Resp. in Opp. to Def.'s Mot. to Dismiss* (Doc. 23-2), 18, Plaintiffs assert that Hobet's "view is contrary to well-settled Clean Water Act standing law[.]" *Id.*

The Court agrees with Plaintiffs. "A plaintiff seeking injunctive relief shows redressability by alleging a continuing violation or the imminence of a future violation of the statute at issue." *Gaston Copper*, 204 F.3d at 162 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998) (internal quotations omitted)). "The Constitution requires only that the relief sought *may* redress an injury allegedly caused by defendant, not that the relief sought may correct all related harm jointly caused by a series of actors [or permits]." *Student Pub. Interest*, 615 F.Supp. at 1424 (emphasis supplied). As a result, "Plaintiffs need not show that this lawsuit will restore [the Mud River area and Berry Branch] to a pristine state, only that defendant's role in polluting the river may be lessened thereby." *Id.* Here, injunctive relief would provide a reduction in selenium pollution and, thus, is sufficient to establish redressability.

Contrary to Hobet's assertion, this finding is consistent with the Fourth Circuit's holding in

11

*Natural Resources Defense Council, Inc. v. Watkins*, 954 F.2d 974 (4th Cir. 1992) ("*Watkins*"), where the circuit court reversed a district court's grant of summary judgment to a defendant, when the decision granting summary judgment was based, at least in part, on the district court applying a "but-for" test with regard to redressability.[2]  *See* 954 F.2d at 979-80.  In *Watkins*, the Fourth Circuit held "the 'but-for' standard employed by the district court is inappropriately stringent for determining standing under the Clean Water Act.  To establish standing to redress environmental injury, plaintiffs need not show that a particular defendant [or permit] is the only cause of their injury, and that, therefore, absent the defendant's activities, the plaintiffs would enjoy undisturbed use of a resource." *Id.* at 980.  Instead, the Fourth Circuit explained that, similar to traceability, redressability merely requires a plaintiff show that a favorable decision will lessen or reduce the pollution released into of a body of water. *Id.*  According to *Watkins*, such a reduction is a value in and of itself because it mitigates, even if only in part, the defendant's interference with the plaintiff's use of the water body at issue. *Id.*  Moreover, this Court finds that the *Watkins* analysis supports the conclusion that Plaintiffs have established redressability in the current case because, as the Fourth Circuit stated in *Gaston Copper*, "[w]hile each of the three prongs of standing should be analyzed distinctly, their proof often overlaps."  204 F.3d at 154.  Thus, the prevention of an even trifling violation which is sufficient to establish injury and traceability is likely to satisfy redressability.

---

[2]Hobet claims Plaintiffs' reliance on *Watkins* is misplaced because *Watkins* addressed the traceability, not redressability, prong of standing.  Additionally, Hobet distinguishes *Watkins* on the ground that it dealt with a singular source of thermal pollution, a nuclear reactor's cooling water discharge, into a body of water, whereas, this case concerns one of several permitted discharges of selenium into a singular water body.  As a result, Hobet suggests *Watkins* is not applicable because, in the current case, injunctive relief could not relieve Plaintiffs of any injury, *id.* at 4 (citing *Larson,* 456 U.S. at 243 n. 15) (emphasis in original), for, even if the WV/NPDES 1022911 injunction is granted, Berry Branch and the Mud River will still suffer from excessive levels of selenium.

Additionally, as suggested by Plaintiffs, the Court finds that the holding in *Watkins*, and a finding that injunctive relief provides redressability herein, is "consistent with long-standing United States Supreme Court precedent that holds that 'a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his <u>every</u> injury.'" *Pls.' Resp. in Opp. to Def.'s Mot. to Dismiss* (Doc. 23-2), 19 (citing *Larson v. Valente*, 456 U.S. 228, 243 n. 15 (1982) (emphasis in original)).[3]

Hobet, of course, disagrees. Hobet contests Plaintiffs' "every little bit helps" or "incremental redressability" doctrine, contending that, when it comes to redressability, "much more is needed." *Def.'s Reply* (Doc. 28), 3-4. Specifically, in the current case, Hobet argues standing is not appropriate because "Plaintiffs never complete the final link in th[e] causative chain between the described impairment of their uses and enhancement of their use that would arise if the Court entered the relief they request." *Id.* at 5.

Again, the Court is not convinced by Hobet's musings. What Hobet fails to realize – or possibly attempts to disguise – is that the question presented here with regard to redressability is not a question of causal connection, but rather a question of degree. Hobet is correct that injunctive relief relevant to WV/NPDES 1022911 may not alleviate all of Plaintiffs' injuries. Plaintiffs may continue to refrain from wading or swimming in Berry Branch and in the Mud River. Further, Plaintiffs may still suffer some of the fears and distress they describe in their affidavits regarding their aesthetic and recreational enjoyment of the Berry Branch/Mud River area. The area will likely remain polluted by selenium and Plaintiffs will likely continue to be aware of that pollution.

---

[3]Plaintiffs identify the relevant precedent as "the doctrine of incremental redressability," which they argue was "recently reaffirmed" in *Massachusetts v. U.S. Environmental Protection Agency*, 549 U.S. 497 (2007). *Id.*

13

Nonetheless, the availability of injunctive relief is sufficient to establish standing because it would reduce the amount of selenium discharged under the permit, which, in addition to having the positive environmental effects of bringing the particular permit into compliance, is likely to alleviate some of the distress, anger and fear Plaintiffs experience in relation to their knowledge of the selenium pollution in the Berry Branch/Mud River area.   This is because, notwithstanding the continued likelihood of selenium pollution in the Berry Branch/Mud River area, obtaining injunctive relief would likely increase Plaintiffs' aesthetic and recreational enjoyment of the geographic area in question, satisfying redressability.[4]

### Conclusion

Plaintiffs meet the letter and the spirit of the test for invoking standing.   Therefore, Plaintiffs' motion for summary judgment is **GRANTED** and Defendant's motion to dismiss is **DENIED** insofar as each is based upon standing.   A hearing on remaining issues related to the parties' motions is **SCHEDULED** for **March 31, 2010.**

---

[4]The Court finds this conclusion is consistent with *Massachusetts v. U.S. Environmental Protection Agency*, 549 U.S. 497 (2007), as well as with the cases cited by Hobet: *Nuclear Info. and Res. Serv. v. Nuclear Regulatory Cmm'n*, 457 F.3d 941 (9th Cir. 2006); *Glanton v. Advancepcs, Inc.*, 465 F.3d 1123 (9th Cir. 2006); and *Coal. for a Sustainable Delta v. Carlson*, 2008 WL 2899725 (E.D. Cal. July 24, 2008) ("*Carlson*").   First, as is the case here, in *Massachusetts v. U.S. Environmental Protection Agency*, it was the likelihood of a reduction of greenhouse gases, not the elimination of the risks associated with these gases, that sufficed to establish redressability.   *See* 549 U.S. at 525-26 ("While it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* it.") Such a reduction was sufficient to establish redressability, despite the fact that the specific injury Massachusetts complained of, the rise in sea level associated with global warming, could not be entirely redressed by a favorable decision.   *Id.*   Further, the Ninth Circuit and Eastern District of California cases cited are distinguishable because in each case the relevant court found the injury complained of was not redressable because of the existence of: (1) independent actors (*Glanton*), (2) independent factors (*Nuclear Info.*), or (3) both (*Carlson*).

14

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        March 10, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

15