**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
and SIERRA CLUB,

               Plaintiffs,

v.                                  CIVIL  ACTION  NO.  3:09-1167

HOBET MINING, LLC,

               Defendant.

**MEMORANDUM OPINION AND ORDER**

This suit, brought on October 23, 2009, and as amended November 9, 2009, seeks declaratory judgment and injunctive relief based on alleged violations of: (1) the effluent limits for selenium in WV/NPDES Permit 1022911, and (2) the performance standards and terms and conditions of surface mining permit S-5008-06.  Pending before the Court are Plaintiffs Ohio Valley Environmental Coalition, Inc., West Virginia Highlands Conservancy, Inc., and Sierra Club's ("Plaintiffs") Motion for Summary Judgment, Declaratory Relief, and Injunctive Relief (Doc. 7) and Defendant Hobet Mining LLC's ("Hobet") Motion to Dismiss (Doc. 18).

In its motion, Hobet raised several arguments for dismissal, including: (1) Plaintiffs lacked standing; (2) the notice of intent was insufficient to establish subject matter jurisdiction; (3) Plaintiffs could not state a claim upon which relief could be granted because their Surface Mine Control and Reclamation Act ("SMCRA") claims did not arise under the federal statute, but under state law; and (4) at a minimum, that the claims raised by Plaintiffs should be consolidated with

those addressed in *United States v. Patriot Coal Corporation* (2:09-cv-0099). Hobet also contends that: (1) Plaintiffs cannot state a claim upon which relief can be granted because events in the Circuit Court of Boone County have rendered this action moot; (2) this action must be dismissed because Plaintiffs failed to join an indispensable party, the West Virginia Department of Environmental Protection ("WVDEP"); and (3) for prudential reasons, the Court should abstain from exercising its jurisdiction in accordance with *Younger* and *Colorado River*.

The Court addressed Hobet's arguments regarding standing, the notice of intent, Plaintiffs' SMCRA claims, and consolidation, in two prior decisions, issued on March 10, 2010, and March 29, 2010. In those decisions, the Court ruled in favor of Plaintiffs on each claim. *See* Docs. 34 & 36. Accordingly, the only remaining issues the Court must address before it can reach the merits of Plaintiffs' claims are: (1) whether the Court cannot (or should not) address Plaintiffs' claims because the issues have been adequately resolved by the Boone County Circuit Court, and (2) whether Plaintiff's action must be dismissed for failure to join an indispensable party, the WVDEP.

For the reasons set forth below, Plaintiffs' motion (Doc. 7) is **GRANTED** and Defendant's motion (Doc. 18) is **DENIED.** A hearing to address the scope and terms of the injunctive relief shall be held **August 9, 2010,** at **1:30 p.m.** in **Huntington.**

**Background**

This is a citizen suit brought pursuant to 33 U.S.C. § 1365, the citizen suit provision of the Clean Water Act ("CWA"), and 30 U.S.C. § 1270, the citizen suit provision of SMCRA. Plaintiffs, three environmental groups suing on behalf of their members, seek declaratory judgment and injunctive relief for alleged violations of: (1) the effluent limitations contained in Defendant Hobet's WV/NPDES permit for its Surface Mine No. 22 (WV/NPDES Permit 1022911), and (2) performance standards under SMCRA and the terms and conditions of the surface mining permit for the No. 22 mine (WV SMCRA Permit Number S-5008-06).

At first glance, this case appears straightforward. A coal mining company is alleged to be in violation of an effluent limit in a National Pollution Elimination Discharge System ("NPDES") permit for one of its surface mining operations, and a citizen group sues for declaratory judgment and injunctive relief. Thus, all that appears to be required is that the citizen group make a good-faith allegation that the defendant is in continuing violation of the CWA and SMCRA, *see Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.* ("*Gwaltney*"), 484 U.S. 49, 64 (1987), and, if such violation is established, the company be held liable and injunctive relief imposed. *See Student Pub. Interest Group of N.J. v. Monsanto, Co.* ("*Student Pub. Interest*"), 600 F.Supp. 1479, 1483 (D.N.J. 1985) ("All the court ... is called upon to do is compare the allowable quantities of pollution listed in the permits with the available statistics on actual pollution."); *see also* 33 U.S.C. § 1311(a).

This case is not so simple, however. Instead, as recognized by this Court in *Ohio Valley Environmental Coalition, Inc. v. Hobet Mining, LLC* ("*Hobet I*"), the enforcement of effluent limits found in NPDES permits for surface mining operations in West Virginia can be complicated. *See* No. 3:08-cv-0088, 2008 WL 5377799, at *4 (S.D. W.Va. Dec. 18, 2008) ("The timing of Plaintiffs'

3

complaint, the posture of the case at the time of filing, and the final Consent Decree create a unique situation."). Coal companies, and often individual NPDES permits, can be subject to a patchwork of federal, state and citizen-driven enforcement actions, such as Hobet and WV/NPDES Permit 1022911 are here.

## I.      Factual Background

### A.      WV/NPDES PERMIT 1022911 AND SURFACE MINING PERMIT S-5008-06

In practical terms, the issuance of WV/NPDES Permit 1022911 and surface mining permit S-5008-06 allowed for the extension of Hobet's then-existing mining operations, along the border of Boone and Lincoln Counties, north and west.  WV/NPDES Permit 1022911 and  S-5008-06 are two of a number of permits held by Hobet in the area, where the company has mined coal – predominately by surface methods – since the 1970s.  The area to the south and east of the permits, where Hobet has been mining for decades, is commonly referred to as Hobet's Surface Mine No. 21.  Accordingly, the extension area covered by WV/NPDES Permit 1022911 and S-5008-06 is referred to as Surface Mine No. 22.

WV/NPDES Permit 1022911 was issued by the WVDEP on May 5, 2007.  The permit regulates two "outlets" or "outfalls," discharging pollutants into Berry Branch, a tributary of the Mud River.  Below Berry Branch, the Mud River flows into the Mud River Reservoir.  Thus, any pollutants discharged from the outfalls regulated under WV/NPDES Permit 1022911 ultimately flow into the Mud River Reservoir.  The Mud River watershed is subject to a Total Maximum Daily Load ("TMDL") for selenium of 5 µg/l and the reservoir has been identified as an area of concern by the WVDEP because the water contains elevated levels of the pollutant.

When issued, WV/NPDES Permit 1022911 did not contain effluent limitations for selenium.

Instead, the permit only contained monitoring and reporting requirements.  Surface mining permit S-5008-06, however, does contain a "material handling plan" for selenium, which has been in place since its issuance.  Under the plan, Hobet is required to: identify the geologic strata around its coal seams likely to leach selenium; isolate this strata by burial; and, therefore, prevent the leaching of selenium into the surrounding watersheds.

Effluent limits for selenium were added to WV/NPDES Permit 1022911 as the result of a negotiated settlement agreement in *Ohio Valley Environmental Coalition, Inc. v. U.S. Army Corps of Engineers* (3:08-cv-0979), a separate action brought by Plaintiffs before this Court.  According to the settlement, Hobet agreed to request that the WVDEP modify WV/NPDES Permit 1022911 "as soon as possible to include water quality based effluent limits on selenium of 4.7 µg/l monthly average and 8.2 µg/l daily maximum." *Pls.' Exhibits* (Doc. 8-3).  In conformity with the settlement, Hobet made this request in August 2008 and WVDEP granted the request, modifying WV/NPDES Permit 1022911 to include selenium limits of 4.7 µg/l monthly average and 8.2 µg/l daily maximum, on October 28, 2008.  These limits were effective immediately.  In exchange for these immediately effective limits, Plaintiffs agreed not to seek civil penalties for any violations for one year from the effective date. *Id.*  WV/NPDES Permit 1022911 is set to expire on May 31, 2012.

B.   THE PATCHWORK OF ENFORCEMENT ACTIONS HOBET IS SUBJECT TO,
     IN STATE AND FEDERAL COURT

Hobet, a Patriot Coal Corporation ("Patriot Coal") subsidiary, is subject to a number of enforcement actions under the CWA and SMCRA, including enforcement actions brought by citizen groups, the WVDEP, and even the U.S. Environmental Protection Agency ("EPA"). Each of these cases has some bearing on the instant litigation and, as a result, a brief review of the Hobet cases is appropriate.

First is *United States v. Patriot Coal Corporation* (2:09-cv-0099), an action pending before the Honorable John T. Copenhaver, Jr., in this District Court in Charleston. There, the EPA brought suit to enforce all effluent limitations (excepting those for selenium) contained in NPDES permits held by Patriot Coal subsidiaries in West Virginia. The case was filed on February 5, 2009, and resolved by consent decree on April 30, 2009. It warrants mentioning because it includes claims arising out of WV/NPDES Permit 1022911. However, the *Patriot Coal* case does not ultimately affect this Court's jurisdiction, because – as discussed in the Court's March 29, 2010 Order – it specifically excepts claims related to effluent limits for selenium.[1]

_____

[1]As identified by Hobet's counsel at oral argument on March 31, 2010, in its March 29, 2010 Order, the Court mistakenly emphasized certain documents attached to the EPA's complaint in the Charleston matter, when drawing its conclusion that the Charleston case did not extinguish Plaintiffs' February 18, 2009, notice of intent. At argument, counsel clarified that the reason that WV/NPDES Permit 1022911 was absent from the violation reports attached to the complaint was not because the federal agency had not included the permit in its enforcement action, but rather because the outfalls regulated by WV/NPDES Permit 1022911 had not yet been constructed. Accordingly, there were no violations for the EPA to report (or attach) at the time of filing. Although helpful, the clarification does not affect the Court's ultimate determination, which is apparent in its March 29, 2010 Order, that the reason the Charleston action did not extinguish Plaintiffs' notice of intent is because that case does not address violations related to selenium. *See March 29 Order* (Doc. 36), 13 (finding that the Charleston consent order "is not intended to impose injunctive relief or other legal sanctions with respect to that pollutant").

6

In addition to *Patriot Coal*, Hobet is (or has been) subject to several citizen suits before this Court, including *Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Company, LLC* ("*Apogee*") (3:07-cv-0413), filed on June 29, 2007; *Ohio Valley Environmental Coalition, Inc. v. Hobet Mining, LLC* ("*Hobet I*") (3:08-cv-0088), filed on February 7, 2008; *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers* ("the § 404 case") (3:08-cv-0979), filed on August 7, 2008; and this case, filed on October 23, 2009.

In *Apogee,* Plaintiffs brought claims for violations of effluent limits contained in six NPDES permits, one held by Apogee Coal Company, LLC ("Apogee"), another subsidiary of Patriot Coal (WV/NPDES Permit 1013599), and five held by Hobet (WV/NPDES Permits 0099392, 1016776, 1020889, 1021028 and 1017225). The case was brought on June 29, 2007, and shortly thereafter, on July 18, 2007, Plaintiffs voluntarily dismissed their claims related to WV/NPDES Permits 0099392, 1016776, 1020889 and 1021028. The claims were dismissed in response to a state enforcement action in the Boone County Circuit Court, where the WVDEP sought to require compliance with the same effluent limits.[2] *See Hobet I,* 2008 WL 5377799, at *3. Claims related to WV/NPDES Permit 1017225 were then dismissed, on March 10, 2008, by joint motion of the parties. It is the Court's understanding that WV/NPDES Permit 1017225 claims were dismissed because Hobet was in compliance with the effluent limits in that permit.

After the March 10, 2008 dismissal, the only claims remaining in *Apogee* were those related to WV/NPDES Permit 1013599. These claims were resolved by consent decree, one year later, on March 19, 2009.[3] According to the consent decree, Apogee agreed: (1) to comply with its effluent

---

[2]This state enforcement action will be discussed in more detail *infra.*

[3]A motion to modify this consent decree is currently pending. However, the motion does not affect the instant decision. Thus, for the purposes of this Opinion and Order, the *Apogee*

7

limitations for selenium on Outfalls 001, 002 and 003 of the permit no later than April 5, 2010; (2) to conduct certain pilot treatment projects or supplemental environmental projects ("SEPs") related to selenium at a cost of no less than $350,000; (3) to submit five status reports, on dates certain, evaluating these SEPs and providing information on additional Patriot Coal efforts to control selenium pollution; (4) to provide Plaintiffs with copies of specified documents, including all discharge monitoring reports ("DMRs") for WV/NPDES Permits 1013599, 0099392, 1016776, 1020889, and 1021028; and (4) to pay civil penalties of $50,000. *See Apogee* (3:07-cv-0413), Doc. 142. In exchange for this $50,000 payment, Plaintiffs agreed to discharge Hobet and Apogee from liability for: (1) any prior violations of WV/NPDES Permits 1013599, 0099392, 1016776, 1020889, and 1021028, and (2) any violations of the permits' selenium limits that may occur between the date of entry of the consent decree and April 4, 2010. *Id.*

The next Hobet case to consider is *Hobet I. Hobet I*, filed in this Court on February 7, 2008, was effectively a continuance of *Apogee*. In *Hobet I*, Plaintiffs again raised allegations of violations of the selenium limits in WV/NPDES Permits 0099392, 1016776, 1020889, and 1021028 (the four Hobet permits dismissed from *Apogee* on July 18, 2007). Plaintiffs reasserted these claims on the grounds that the Boone County action, which had laid dormant for more than a year at the time of filing, failed to qualify as a diligent prosecution sufficient to preclude their claims. Initially, this Court agreed. *Hobet I*, 2008 WL 5377799, at *5-6. Accordingly, the Court found it had jurisdiction to hear *Hobet I* at the time of filing. *Id.* This jurisdiction was short lived, however, because, following the filing of *Hobet I*, the WVDEP entered into a consent decree with Hobet in the Boone

case is treated as resolved.

County action which rendered the majority of Plaintiffs' claims moot. *See id.* at *6-10.[4] Plaintiffs' claims were rendered moot because, following the entry of the consent order, the Court found there was no realistic prospect that the violations complained of would continue. This finding will be discussed in more detail *infra*.

The third case before this Court that warrants discussion is *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers* (3:08-cv-0979) ("the § 404 case"). In this case, filed on August 7, 2008, Plaintiffs challenged the issuance of a § 404 permit for the discharge of dredged and fill material in conjunction with S-5008-06, the surface mining permit for Hobet's Surface Mine No. 22. Plaintiffs claimed that the U.S. Army Corps of Engineers ("the Corps") issued the permit in violation of the CWA and the National Environmental Policy Act ("NEPA"). Shortly after filing, on August 11, 2008, Plaintiffs received a temporary restraining order ("TRO"), which suspended the § 404 permit. Insofar as this case is concerned, however, *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers* is not directly related here. Instead, the case plays a role in this action because of how it was resolved. On August 19, 2008, Plaintiffs agreed to withdraw their motion for a TRO and preliminary injunction and to dissolve the recently issued TRO, in exchange for Hobet's promise to request that WV/NPDES Permit 1022911 be modified to include selenium limits. The request was made and the permit modified on October 28, 2008. At that time, the WVDEP included effluent limits for selenium of 4.7 µg/l monthly average and 8.2 µg/l daily maximum in WV/NPDES Permit 1022911, effective immediately. These selenium limits are the

---

[4]Any claims remaining in *Hobet I* after the entry of the Boone County consent order were addressed in the consent decree entered, on March 19, 2009, in *Apogee* (discussed above). Therefore, the motion to modify the consent decree discussed in note 2 *supra* affects *Hobet I*. As noted, however, the motion does not affect this decision and, for the purposes of this Opinion and Order, *Hobet I* is treated as resolved.

basis of Plaintiffs' current claims.

Last but not least, the final enforcement action the Court must review before continuing to the merits of the parties' claims is *West Virginia Department of Environmental Protection v. Hobet Mining, LLC* (07-C-3). This case, filed on January 7, 2007, in the Circuit Court of Boone County, is a state enforcement action under the CWA and SMCRA. The WVDEP sued Hobet for: (1) violations of effluent limitations contained in four Hobet permits (WV/NPDES Permits 0099392, 1016776, 1020889 and 1021028), and (2) the performance standards and terms and conditions of the corresponding surface mining permits. As noted, the Boone County action lay dormant for more than a year after the amendment of the WVDEP's complaint, on May 30, 2007. The case was re-activated during the summer of 2008, however, and resolved by consent decree, on September 5, 2008. The September 5, 2008 consent decree, as modified in December 2009, lies at the heart of Hobet's motion to dismiss. Accordingly, it should be reviewed.

When entered on September 5, 2008, the Boone County consent order did the following: (1) assessed civil penalties against Hobet for violations of effluent limits occurring between 2003 and March 31, 2008, in the amount of $4,088,315; (2) allocated up to $2,600,000 of this penalty to fund SEPs intended to address Hobet's selenium problem; (3) instituted interim limits for selenium; (4) established a system of stipulated penalties for future violations of the interim limits; (5) set a deadline for the installation of selenium treatment systems at all applicable outfalls (December 31, 2009); and (6) set a deadline for Hobet's final compliance with the permit's selenium limits (April 5, 2010).

Hobet moved to modify the September 2008 consent decree, on August 10, 2009. The motion was granted and a modified consent decree entered on December 3, 2009. As modified, the

consent decree: (1) reallocates a portion of the funds set aside to conduct certain SEPs to other pilot treatment projects (or as a civil penalty); (2) extends the application of the stipulated penalty provision in the original consent decree to July 1, 2012; (3) extends the deadline for the installation of selenium treatment systems at all applicable outlets to December 30, 2011; (4) extends the deadline for final compliance with selenium limits to July 1, 2012; and (5) adds WV/NPDES Permits 1022890 and 1022911 to the consent decree, applying all terms and modifications of the consent decree to each permit.

The primary issue raised by Hobet's motion to dismiss is the effect of this modification on the instant litigation. Hobet argues that because WV/NPDES Permit 1022911 is now "subject to precisely the same requirements of the injunction order and the same penalty sanctions as the original four permits," *Hobet's Mem. of Law* (Doc. 19), 26, the modification of the Boone County order has mooted this case, just as the entry of the original order mooted *Hobet I* in September 2008. This is the question the Court must address before it can resolve Plaintiffs' claims. Therefore, a brief review of selenium and of the relevant regulatory background is helpful.

C.        SELENIUM

Selenium is a naturally occurring element, common in the environment.  It is problematic only in high concentrations, but at certain levels has toxic effects.  Selenium impacts the reproductive cycle of many aquatic species, can impair the development and survival of fish, and can even damage gills or other organs of aquatic organisms subjected to  prolonged exposure.  It can also be toxic to humans, causing kidney and liver damage, and damage to the nervous and circulatory systems.

Federal and state regulators have recognized the toxic nature of selenium for some time (the first water quality standards were effective in 1987) but they did not identify it as a problem related to surface mining until 2003.  As it turns out, surface mining activities can increase the concentration of selenium in the environment by exposing selenium bearing rock and soil to weathering processes.  Selenium leaches out of the exposed material and is carried by surface runoff to downstream lakes, reservoirs, and waterways.  Selenium pollution is a matter of concern in and around the Mud River Reservoir, including the area to be mined under S-5008-06, because selenium naturally occurs in some of the coal seams and associated strata there.  As a result, the Mud River Reservoir, into which Berry Branch drains, suffers from elevated levels of the pollutant.

Regulatory and enforcement actions related to selenium are relatively new in West Virginia. Accordingly, Hobet's first effluent limits for selenium did not become effective until November 2006; WV/NPDES Permit 1022911 did not contain effluent limits for selenium when issued in May 2007; and selenium-related enforcement actions often present novel questions for regulatory agencies, and for the courts.

12

## II.  Regulatory Structure

### A.  GENERAL BACKGROUND

The purpose of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  At the heart of the CWA lies 33 U.S.C. § 1311, which generally prohibits the "discharge of any pollutant by any person" into the waters of the United States.  The primary exception to this prohibition is the NPDES, established in 33 U.S.C. § 1342.  Under NPDES, the EPA or an authorized state agency can issue a permit for the discharge of any pollutant, provided that such discharge complies with the conditions of the CWA.  *See* 33 U.S.C. § 1342(a)(1) ("[T]he Administrator may ... issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon conditon that such discharge will meet either (A) all applicable requirements under ... this title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this Chapter.").  Essentially, the NPDES program was created to transform generally applicable provisions of the CWA into specific obligations on the part of the individual polluter.  *Envtl. Prot. Agency v. Cal. ex rel. State Water Res. Control Bd.* ("*Cal. ex rel.*"), 426 U.S. 200, 205 (1976) ("An NPDES permit serves to transform generally applicable effluent limitations and other standards including those based on water quality into the obligations (including a timetable for compliance) of the individual discharger[.]").  When creating an NPDES permit, the issuing authority must take into account two central concepts: (1) "effluent limitations that reflect the pollution reduction achievable by using technologically practicable controls and (2) any more stringent pollutant release limitations necessary for the waterway receiving the pollutant to meet 'water quality standards.'"  *Piney Run*

13

*Pres. Ass'n v. County Comm'rs of Carroll County, Md.* ("*Piney Run I*"), 268 F.3d 255, 265 (4th Cir. 2001).[5]

Plaintiffs' complaint includes counts alleged under SMCRA and WV SCMRA (the state version of SMCRA).  Each permit issued under SMCRA and WV SCMRA contains specific performance standards.  One standard mandated by the acts is that mining activities be conducted to "prevent material damage to the hydrologic balance outside the permit area."  38 C.S.R. § 2-14.5; *see also* 30 C.F.R. §§ 816.41(a) & 817.41(a).  Another mandatory performance standard is that "[d]ischarge from areas disturbed by mining shall not violate effluent limitations or cause a violation of applicable water quality standards."  38 C.S.R. § 2-14.5.b; *see also* 30 C.F.R. §§ 816.42 & 817.42.  Additionally, a general condition of every WV SCMRA permit is that it must meet all applicable performance standards.  38 C.S.R. § 2-3.33.c.

In West Virginia, the CWA and SMCRA operate through systems of "cooperative federalism" between the state and federal governments.  Under each act, a state may be authorized to take the primary regulatory role.  *See* 33 U.S.C. § 1342; 30 U.S.C. § 1253.  The exact relationship between the relevant state and federal regulations, however, varies for each statute.  Under the CWA, state regulations are incorporated "into the unitary federal enforcement scheme," with federal provisions remaining in effect.  *Bragg v. West Virginia Coal Ass'n,* 248 F.3d 275, 294 (4th Cir. 2001) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 109 (1992)).  SMCRA, on the other hand, exhibits greater deference to the states.  *See id*.  Under SMCRA, once a state receives primary regulatory

---

[5]An "effluent limitation" is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological and other constituents which are discharged from point sources into navigable waters[.]" 33 U.S.C. § 1362(11).  "Such direct restrictions on discharges facilitate enforcement by making it unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated." *Cal. ex rel.,* 426 U.S. at 204.

authority, federal standards effectively "drop out" and the state SMCRA regulations become the operative law. *Id.* at 295.

### B.   ENFORCEMENT AND THE CITIZEN-PLAINTIFF

The enforcement schemes established by both the CWA and SMCRA involve citizens.  A citizen may bring suit in federal court against any violator of state or federal standards of the CWA. 33 U.S.C. § 1365.  A citizen may also initiate suit for SMCRA violations.  30 U.S.C. § 1270; *see also Ohio Valley Envtl. Coalition, Inc. v. Apogee Coal Co.,* 531 F.Supp.2d 747, 760-64 (S.D. W.Va. 2008).

Under the CWA and SMCRA, "[t]he citizen-suit provision is a critical component of the [statutory] enforcement scheme, as it permits citizens to abate pollution when the government cannot or will not command compliance."[6] *Envtl. Conservation Org. v. City of Dallas* ("*City of Dallas* "), 529 F.3d 519, 526 (5th Cir. 2008)  (citing *Gwaltney*, 484 U.S. at 62) (internal quotations omitted); *Piney Run Pres. Ass'n v. County Comm'rs of Carroll County, Md.* ("*Piney Run II*"), 523 F.3d 453, 456 (4th Cir. 2008) (same).  "It reflects Congress's recognition that '(c)itizens can be a useful instrument for detecting violations and bringing them to the attention of the enforcement agencies and courts alike.'"  *Natural Res. Def. Council v. Train*, 510 F.2d 692, 699-700 (D.C. Cir. 1974) (citing  S. Rep. No. 1196, 36-38 (1970)) (other citations omitted).  Accordingly, "the citizen-suit

---

[6]The citizen suit provisions found in the CWA and SMCRA are almost identical.  *See* 33 U.S.C. § 1365; 30 U.S.C. § 1270.  As a result, the same standards and reasoning apply to each provision and Hobet's argument is addressed using primarily CWA cases and analysis. *See, e.g., Hallstrom v. Tilamook County*, 493 U.S. 20, 22-23, n. 1 (1989) (finding that the 60-day notice and delay requirement in many environmental statutes are modeled after that of the Clean Air Act ("CAA") and that these provisions are therefore subject to the same analysis) (applying CWA and CAA cases to determine the sufficiency of a notice of intent provided under the Resource Conservation and Recovery Act's ("RCRA") notice provision); *Gwaltney*, 484 U.S. at 62 (noting that the citizen suit provision in the CWA is modeled after that of the CAA and analyzing the provision using CAA materials).

provision confers standing to enforce [the CWA or SMCRA] to the full extent allowed by the Constitution." *City of Dallas*, 529 F.3d at 526 (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper*"), 204 F.3d 149, 152 (4th Cir. 2000) (en banc)).

Nonetheless, the citizen suit is not the preferred mechanism to enforce either statute. To the contrary, "the citizen suit is meant to supplement rather than to supplant government action." *Gwaltney*, 484 U.S. at 60. Therefore, "citizen suits are proper only if Federal, State, and local agencies fail to exercise their enforcement responsibilities." *Id.* (citing S. Rep. No. 92-414, 64 (1971)) (internal quotations omitted); *see also City of Dallas*, 529 F.3d at 528 ("The primary function of a citizen suit is to spur agency enforcement of the law.") (citing *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988)); *Piney Run II*, 523 F.3d at 456 (same).

As a result, Congress created a number of statutory restrictions on the CWA and SMCRA's citizen suits. First, each statute requires that a defendant be "alleged to be in violation" of the pertinent Act, or of some order, rule, regulation, permit or effluent limitation issued under it. *See* 33 U.S.C. § 1365(a)(1); 30 U.S.C. § 1270(a)(1); *see also Gwaltney,* 484 U.S. 49 (holding that citizen suits cannot be maintained for "wholly past" violations). Second, a citizen may not commence suit prior to sixty days after giving notice of the alleged violation to the appropriate governmental authority and the alleged violator. *See* 33 U.S.C. § 1365(b)(1)(A); 30 U.S.C. § 1270(b)(1)(A). Third, no citizen suit may be brought if the federal government or State "has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the provisions of [the Act]." 30 U.S.C. § 1270(b)(1)(B); *see also* 33 U.S.C. § 1365(b)(1)(B). These restrictions are intended "to strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of

citizens suits." *Hallstrom v. Tilamook County*, 493 U.S. 20, 29 (1989).  Moreover, the restrictions preserve the primacy of government enforcement by "allow[ing] Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits." *Id.* (citing *Gwaltney*, 484 U.S. at 60).

In addition to being precluded by government enforcement, a citizen suit may be mooted by government action taken *after* the citizen-plaintiff has filed suit.  *See, e.g., Chesapeake Bay Found. v. Am. Recovery Co., Inc.* ("*Chesapeake Bay*"), 769 F.2d 207, 209 (4th Cir. 1985) (subsequent government settlement mooted properly-filed citizen suit).  The CWA and SMCRA "[are] silent as to which mechanisms may be invoked to dispense with citizen suits ... that have been properly filed." *City of Dallas*, 529 F.3d at 526.  However, the courts have stepped in to provide a standard. A subsequently filed governmental enforcement action will moot a citizen suit, unless the citizen-plaintiff "proves that there is a realistic prospect that the violations alleged in its complaint will continue notwithstanding [government enforcement]."  *City of Dallas*, 529 F.3d at 528; *see also Comfort Lake Ass'n v. Dresel Contracting, Inc.* ("*Comfort Lake*"), 138 F.3d 351, 355 (8th Cir. 1998) (same);  *Atl. States Legal Found. v. Eastman Kodak Co.* ("*Eastman Kodak* "), 933 F.2d 124, 128 (2nd Cir. 1991) (same); *Hobet I,* 2008 WL 5377799, at *7 (adopting the realistic prospect standard).

**III.     Hobet's Motion to Dismiss**

Hobet's motion, as filed, raised a litany of arguments for dismissal.  However, as noted *supra*, many of these arguments were addressed by the Court in its March 10, 2010, and March 29, 2010 Orders, where the Court ruled in favor of Plaintiffs on a number of Hobet's claims.  *See* Docs. 34 & 36.  As a result, Hobet has only three arguments for dismissal remaining.  They are: (1) that Plaintiffs cannot state a claim upon which relief can be granted because events in the Boone County Circuit Court have rendered this action moot; (2) that this action must be dismissed because Plaintiffs failed to join an indispensable party, the WVDEP; and (3) that, for prudential reasons, the Court should abstain from exercising its jurisdiction in accordance with *Younger* and *Colorado River*.

A.     STANDARD OF REVIEW

"To survive a Rule 12(b)(6) motion to dismiss, the facts alleged must be enough to raise a right to relief above the speculative level and must provide enough facts to state a claim to relief that is plausible on its face."  *Robinson v. Am. Honda Motor Co., Inc.*, 551 F.3d 218, 222 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)) (internal quotations omitted).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal citations omitted); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) ("[T]he Rule does call for sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.").

When considering a motion to dismiss, a court "accept[s] as true all well-plead allegations

18

and view[s] the complaint in the light most favorable to the plaintiff." *Sec. of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *see also Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991). A court "may consider documents attached to the complaint as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Trimble*, 484 F.3d at 705 (internal citations omitted). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Iqbal*, 129 S.Ct. at 1950.

### B. THE DECEMBER 2009 MODIFICATION OF THE BOONE COUNTY CONSENT DECREE DOES NOT PRECLUDE OR MOOT PLAINTIFFS' CLAIMS

Hobet moves to dismiss Plaintiffs' claims on the grounds that, by adding WV/NPDES Permit 1022911 and "subject[ing] [the permit] to precisely the same requirements of the injunction order and the same penalty sanctions as the original four permits," *Hobet's Mem. of Law* (Doc. 19), 26; *see also Hobet's Reply* (Doc. 28), 5-6, the modification of the 2008 consent decree in the Boone County action rendered this case moot.

In its briefing, Hobet characterizes its argument as a mootness claim, citing exclusively to cases that apply the realistic prospect standard described above, *see Hobet's Mem. of Law* (Doc. 19), 25-28; *Hobet's Reply* (Doc. 28), 6-8, and contending that "Plaintiffs have 'not pointed to specific facts ... that would support an inference that [Hobet] will continue to engage in violations that were alleged in [their] citizen suit but not addressed by the consent decree." *Hobet's Reply* (Doc. 28), 6-8 (citing *City of Dallas*, 529 F.3d at 529). Nonetheless, Hobet's position is not entirely clear. In addition to citing to mootness cases, and characterizing its argument as one of mootness, Hobet asserts facts and argument that appear to implicate the diligent prosecution bar established in 33 U.S.C. § 1365(b)(1)(B) and 30 U.S.C. § 1270(b)(1)(B). For example, Hobet notes that "30 U.S.C.

19

§ 1270 does not allow a suit to *commence* when a state is diligently prosecuting a civil or criminal

action in state court." *Hobet's Mem. of Law* (Doc. 19), 25 (emphasis supplied).  Additionally, the

company provides that:

> [It] moved the Boone County Circuit Court to modify the existing settlement and consent
> order in August 2009 when Hobet identified that it was discharging selenium in excess of
> its permitted limits.  Discussions were conducted with DEP, a hearing conducted before the
> court, and a proposed order submitted for public comment *before* the Plaintiffs even filed
> their complaint in this action." *Id.* at 26 (emphasis in original).

These statements create some confusion regarding Hobet's argument because the diligent

prosecution (preclusion) and realistic prospect (mootness) standards apply at different junctures in

a citizen suit.  The diligent prosecution standard bars a citizen action if the citizen-plaintiff seeks to

file suit *after* a governmental enforcement action has been commenced.  To avoid preclusion, the

citizen-plaintiff must prove that the prior-filed government action is not diligent.  *See* 33 U.S.C. §

1365(b)(1)(B); 30 U.S.C. § 1270(b)(1)(B); *see also  Piney Run II*, 523 F.3d at 456, 459; *Chesapeake

Bay*, 769 F.2d at 208.  The realistic prospect standard, on the other hand, applies if government

enforcement action is taken *after* a citizen suit is filed.  It is used to determine whether the prior-filed

citizen suit can proceed in light of the subsequent government activity.  *See, e.g., Hobet I*, 2008 WL

5377799 at *6 (citing  *Chesapeake Bay,* 769 F.2d 207).

The briefing is ambiguous as to which standard Hobet is arguing applies.  Consequently, the

Court finds that, as a threshold matter, it must determine whether the diligent prosecution bar

established in 33 U.S.C. § 1365 and 30 U.S.C. § 1270 is implicated here.   "This evaluation is based

upon the status of the state court proceeding at the time [Plaintiffs'] citizen suit [was] filed."  *Hobet

I,* 2008 WL 5377799, *5 (citing *Conn. Fund for the Env't v. Contract Plating Co.* ("*Conn. Fund*"),

631 F.Supp. 1291, 1293 (D.Conn. 1986)); *see also Chesapeake Bay*, 769 F.2d at 208 ("jurisdiction

is normally determined as of the time of the filing of a complaint").  Accordingly, the facts are as follows.  At the time Plaintiffs filed this suit, on October 23, 2009, Hobet had moved to modify the September 2008 consent order; the WVDEP had responded to Hobet's motion; and both parties had participated in a hearing on the modification in the Boone County Circuit Court, in August 2009.  Additionally, the proposed modified consent decree – which included the addition of WV/NPDES Permit 1022911 – had been released for public notice and comment in early October 2009.  *See Oct. 20, 2009 Letter* (Doc. 10-2).

Title 33 U.S.C. § 1365(b)(1)(B) and 30 U.S.C. § 1270(b)(1)(B) provide that "no [citizen] action may commence ... if the [federal government] or the State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with that standard."  33 U.S.C. § 1365(b)(1)(B); *see also* 30 U.S.C. § 1270(b)(1)(B*).  Consequently, the first question the Court must ask is whether the actions taken by the WVDEP, prior to October 23, 2009, qualified as an action "commenced ... in a court" with regard to the permit.

The Seventh Circuit's opinion in *Friends of Milwaukee's Rivers v. Milwaukee Metropolitan Sewerage District* ("*Friends of Milwaukee's Rivers*") provides some guidance.  *See generally* 382 F.3d 743 (7th Cir. 2004)*.  There, the circuit court considered whether certain State administrative actions, including meetings between violators and state and federal representatives, information requests, and the issuance of an informal notice of non-compliance, amongst others, constituted "commencement" sufficient to trigger the diligent prosecution bar in 33 U.S.C. § 1319(g).  *Id.* at 755-57.  *Friends of Milwaukee's Rivers* does not present the exact scenario as the facts before this Court, because that case dealt specifically with whether a State agency had "commenced" and was "diligently prosecuting" a State administrative action under a State law pursuant to 33 U.S.C. §

1319(g).  Nonetheless, the decision is informative here because the language used in 33 U.S.C. §

1319(g) is the same as that of 33 U.S.C. § 1365.  *See* 33 U.S.C. § 1319(g) (a violation shall not be

the subject of civil penalties if "a State has commenced and is diligently prosecuting an action"

under a comparable State law).  In *Friends of Milwaukee's Rivers*, the court held that the State

administrative actions described above did not qualify as "commencement," reasoning that "an

administrative action 'commences' at the point when notice and public participation protections

become available to the public and interested parties."  *Id.* at 756.  A similar conclusion was reached

by the Eighth Circuit in *Arkansas Wildlife Federation v. ICI Americas, Inc.  See* 29 F.3d 376, 379-80

(8th Cir. 1994) (finding action to be "commenced" for the purposes of  33 U.S.C. § 1319(g) when

interested third parties had a right to intervene and notice and hearing procedures became available).

Applying the reasoning from *Friends of Milwaukee's Rivers* and *Arkansas Wildlife

Federation*, the WVDEP had arguably "commenced" an enforcement action with regard to

WV/NPDES Permit 1022911, prior to the filing of Plaintiffs' complaint on October 23, 2009, when

the agency released the proposed modified consent order in the Boone County action for notice and

comment.[7]  Therefore, in an abundance of caution, and notwithstanding the absence of a clear

argument on the point, the Court  considers whether the WVDEP's pre-complaint enforcement

activity was sufficiently diligent to preclude this suit.

---

[7]This conclusion is based upon: (1) the relationship between "commencement" and public participation articulated in *Friends of Milwaukee's Rivers* and *Arkansas Wildlife Federation* and (2) the Court's understanding that the first time WV/NPDES Permit 1022911 was incorporated into the Boone County action was when the proposed modified consent order was issued for notice and comment.  The Court notes, however, that Plaintiffs had a right to intervene in the Boone County action prior to that date and, thus, if that case did include WV/NPDES Permit 1022911 at an earlier point, such inclusion would have qualified as "commencement."

1.    THE WVDEP'S PRE-COMPLAINT ENFORCEMENT OF WV/NPDES PERMIT
      1022911 WAS NOT DILIGENT

The burden of proving non-diligence is heavy.  *Piney Run II*, 523 F.3d at 459 (diligence is

presumed); *Friends of Milwaukee's Rivers*, 382 F.3d at 760 (same); *Conn. Fund*, 631 F.Supp. at

1293 (same).   Consequently, a governmental enforcement action will ordinarily be considered

diligent so long as it "is capable of requiring compliance with the Act and is in good faith calculated

to do so."  *See, e.g., Piney Run II*, 523 F.3d at 459 (quoting *Friends of Milwaukee's Rivers*, 382

F.3d at 760).

Although a federal court must be deferential to a state court proceeding, however, the

deference owed is not unlimited.   "[A] diligent prosecution analysis requires more than mere

acceptance at face value of the potentially self-serving statements of a state agency and the violator."

*Friends of Milwaukee's Rivers*, 382 F.3d at 760.   It requires "that the State *try*, diligently[,]" to

achieve compliance.  *Id.* at 759 (emphasis supplied).   In reviewing diligence, a federal court may

rely on evidence from the state court docket to determine "the prospects that the state suit would

proceed expeditiously to a final resolution."  *Hobet I*, 2008 WL 5377799, at *5 (citing *Conn. Fund,*

631 F.Supp. at 1293).   The court must also consider the context surrounding the state prosecution.

*Id.* (citing *Student Pub. Interest Research Group of N.J., Inc. v. Fitzsche, Dodge, & Olcott, Inc.*

("*Fitzsche*"), 579 F.Supp. 1528, 1535 (D. N.J. 1984) ("An evaluation of 'diligence' measures

comprehensively the process and effects of agency prosecution.")).   If the federal court finds that

the state action was not capable of requiring compliance or was not in good faith calculated to do

so, it should not hesitate to allow a citizen suit to proceed.  *See id.* (citing *Friends of Milwaukee's*

*Rivers*, 382 F.3d 743); *see also Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc.*

("*Friends of the Earth*")*,* 890 F.Supp. 470 (D. S.C. 1995).

Considering the context surrounding the WVDEP's state prosecution of WV/NPDES Permit 1022911, the Court finds that WVDEP was not diligent prior to Plaintiffs filing suit on October 23, 2009, for several reasons.  First, the WVDEP failed to include selenium limits in the May 2007 permit despite the fact that the agency was aware of the selenium problem in the Mud River watershed (when WV/NPDES Permit 1022911 was issued in May 2007 the Mud River watershed was subject to a TMDL of 5 µg/l for selenium).  Second, the WVDEP took no action to prosecute Hobet for (or otherwise address) the company's violations of its selenium limits until the company itself moved to modify the 2008 consent decree, in August 2009, and add WV/NPDES Permit 1022911.  Third, the consent decree, as modified in December 2009, does little to address – or prevent – selenium concerns related specifically to WV/NPDES Permit 1022911.

Looking first at the process by which selenium limits were added to WV/NPDES Permit 1022911, and the circumstances resulting in the WVDEP's prosecution of Hobet, the Court is struck by the similarity between the facts of this case and that of *Hobet I*.  In *Hobet I*, this Court found that the WVDEP's prosecution of four Hobet permits had not been sufficiently diligent to preclude Plaintiffs' citizen suit because, following the amendment of the WVDEP's complaint, the agency allowed the enforcement action to lay dormant for more than a year. Thus, the Court held that the Boone County case was not proceeding expeditiously to a final resolution and, ultimately, that it impeded the citizen suit, which may have progressed more quickly.  In reaching this conclusion, the Court looked at the time the agency had allowed Hobet to remain in non-compliance before taking any action; the agency's practice of granting deadline extensions for selenium compliance; and the agency's failure to require meaningful compliance schedules for the pollutant.

Each of these factors is equally applicable here.  To begin with, the WVDEP has allowed

24

(and continues to allow) Hobet to remain out of compliance with both the Mud River watershed's TMDL for selenium and WV/NPDES Permit 1022911's selenium limits, apparently only requiring action related to these limits when prompted by the company itself.  First, the WVDEP ignored the Mud River watershed's TMDL for selenium and failed to establish effluent limits for the pollutant, until Plaintiffs were able to force Hobet to request such limits in the settlement agreement in *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers* (3:08-cv-0979).  Similarly, the agency took no action to force Hobet to comply with the limits added in October 2008, until Hobet moved for the modification of the Boone County consent decree and for the addition of WV/NPDES Permits 1022911 and 1022890 to that order.  Thus, in both cases, the WVDEP failed to require compliance of its own accord and only acted once prompted (and as prompted) by the coal company.

A review of the terms of the modified consent order leads to a similar finding: namely, that – prior to Plaintiffs filing suit on October 23, 2009 – the WVDEP failed to act in a manner reasonably calculated to require compliance with Hobet's selenium limits.[8]  *See, e.g., Piney Run II,* 523 F.3d at 459.  This failure is reflected by: (1) the fact that, when it added WV/NPDES Permit 1022911 to the Boone County consent decree in December 2009, the agency sought to extend the once-effective deadline for compliance to July 1, 2012, without providing a meaningful schedule or remedial plan for compliance, and (2) the fact that the stipulated penalty provision of the modified decree, as applied to WV/NPDES Permit 1022911, was not reasonably calculated to require compliance.  First, the compliance schedule and remedial plan are insufficient to establish compliance, in large part, because the modified consent decree provides that no effective,

---

[8]Although the modified consent order was not entered before Plaintiffs filed suit, the proposed modifications had been released for public notice and comment and thus the terms of the modification are relevant to the Court's analysis of non-diligence.

economically viable treatment option exists for selenium.  *See Friends of Milwaukee's Rivers*, 382 F.3d at 764 (government action "aimed at reducing, not eliminating, violations are insufficient to indicate a diligent prosecution" ... for such actions are "a stalling tactic rather than a compliance strategy").  Moreover, the stipulated penalty provision in the modified order is evidence of non-diligence because it would limit Hobet to penalties of approximately $2,000 per/month, and up to $65,000 over the lifetime of the interim limits, and such penalties appear inadequate to remove the economic benefit of non-compliance.  *See Friends of the Earth,* 890 F.Supp. at 491 ("A lenient penalty that is far less than the maximum penalty may provide evidence of non-diligent prosecution.").  Thus, to sum up, the conclusions the Court reached in *Hobet I* are equally applicable here: "[t]oo much time has been wasted and too little has been done to address the problem," *Hobet I*, 2008 WL 5377799, at *5 (quoting *West Virginia Highlands Conservancy et. al v. McClung*, Appal Nos. 07-10 and 07-12 EQB, Final Order at 28 (W. Va. Envtl. Quality Bd. June 12, 2008)), and "[i]n this regulatory climate, where the WVDEP responded to selenium violations with compliance extensions and weak performance schedules, a defendant subject to the type of lackadaisical suit brought in Boone County would not feel compelled to comply with its permit limits." *Id.*

2.  PLAINTIFFS HAVE DEMONSTRATED A  REALISTIC PROSPECT THAT HOBET'S VIOLATIONS WILL CONTINUE DESPITE THE MODIFIED CONSENT ORDER

The Court's finding that it had jurisdiction when Plaintiffs filed their complaint does not settle the question of the Court's current jurisdiction.  Instead, the Court must now determine whether agency action subsequent to Plaintiffs' filing has mooted the action.

Article III of the United States Constitution mandates that a court hear only continuing cases

and controversies. *See United States v. Ala. S.S. Co.,* 253 U.S. 113, 116 (1920). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the out-come." *Incuma v. Ozmint,* 507 F.3d 281, 286 (4th Cir. 2007) (quoting *Powell v. McCormack,* 395 U.S. 486, 496 (1969)). "The requisite personal interest that must exist at the commencement of litigation ... must continue throughout its existence." *Id.* (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997)) (ellipses in original). "If a case has been rendered moot, a federal court has no constitutional authority to resolve the issues that it presents." *City of Dallas,* 529 F.3d at 525 (citing *In re Scruggs,* 392 F.3d 124, 128 (5th Cir. 2004)).

Developments subsequent to the filing of a citizen suit may moot the citizen's case. *See, e.g., Chesapeake Bay,* 769 F.2d at 209. In the case of voluntary compliance, the mootness standard is high. "The defendant must demonstrate that it is *absolutely clear* the alleged wrong behavior could not reasonably be expected to recur." *Gwaltney,* 484 U.S. at 66 (internal quotations omitted) (emphasis in original). The standard for evaluating the effect of a mandatory consent decree, however, is more lenient. In such cases, the subsequently filed consent decree will moot the citizen suit, *unless* the citizen-plaintiff "proves that there is a realistic prospect that the violations alleged in its complaint will continue notwithstanding [government enforcement]." *City of Dallas*, 529 F.3d at 528; *see also Comfort Lake*, 138 F.3d at 355 (same); *Eastman Kodak* , 933 F.2d at 128 (same); *Hobet I,* 2008 WL 5377799, at *7 (adopting the realistic prospect standard).

The WVDEP has entered into a mandatory consent decree in the Boone County Circuit Court. Thus, it is the latter – realistic prospect – standard that applies here. The question the Court must therefore resolve is whether "the state enforcement proceeding has caused the violations alleged in the citizen suit to cease without any likelihood of recurrence – has eliminated the basis

for the citizen suit[.]" *Eastman Kodak*, 933 F.2d at 127.[9]

Hobet argues the modification of the settlement and consent order in the Boone County action renders Plaintiffs' claims moot because "[w]ith the entry of the order of December 3, 2009 by the circuit court, [WV/NPDES Permit 1022911] is subject to the precisely the same requirements of the injunction order and same penalty sanctions as the original four permits." *Hobet's Mem. of Law* (Doc. 19), 26. Therefore, Hobet contends that the Court should reach the same conclusion it did in *Hobet I* and reject Plaintiffs' claims as moot. Plaintiffs disagree, however, arguing that the modified consent order does not eliminate the realistic prospect of Hobet's non-compliance because: (1) the consent order lacks a clear remedial plan for selenium; (2) the timetables established by the consent order are unreasonable; (3) the modified consent order does not impose any penalties or obligations that Hobet was not bound to perform before its entry; and (4) Hobet's poor track record with selenium – particularly its failure to keep its commitment to the Court that it would comply with selenium limits by April 5, 2010 – establishes a likelihood that the modified consent order will not succeed.

The Court agrees with Plaintiffs. The focus of the realistic prospect standard is not on the intentions or effort of the state agency, or on the intentions or effort put forth by the alleged violator. Conversely, the realistic prospect standard focuses exclusively on whether the violations complained of are reasonably likely to continue notwithstanding the provisions of a mandatory consent decree.

---

[9]When considering whether a citizen suit has been mooted by government action, a court should consider injunctive relief separate from civil penalties. *See Hobet I,* 2008 WL 5377799, at *7; *City of Dallas*, 529 F.3d at 531; *Comfort Lake*, 138 F.3d at 356-57. In settling *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers* (3:08-cv-0979), Plaintiffs waived civil penalties for violations of the selenium limits imposed in WV/NPDES Permit 1022911 for one year from the effective date (October 28, 2008). Accordingly, the October 23, 2009 complaint does not include a claim for civil penalties. The mootness question raised is therefore limited to Plaintiffs' claim for declaratory and injunctive relief.

*See Hobet I*, 2008 5377799, at *7 (citing *City of Dallas*, 529 F.3d at 530 (a court "determine[s] whether violations will 'continue' in the sense that the violations will not be cured even after the remedial plan imposed by the consent decree has been fully implemented in accordance with reasonable timetables.")).  Accordingly, when determining whether a realistic prospect of non-compliance now exists, the Court first considers any and all changes in circumstance since the Court resolved the mootness question in *Hobet I*.

In *Hobet I*, Plaintiffs argued that the Court should find a realistic prospect of continued non-compliance, despite the entry of the September 2008 consent decree, because: (1) Hobet's then-unproven treatment technology could not succeed in meeting the required selenium limits in the mandated time-frame, and (2) the Court could infer from Hobet's poor track record that violations would continue despite the consent order.  At that time, the Court disagreed, finding that there was no realistic prospect Hobet would still be in violation of its selenium limits on April 4, 2010, because:(1) Hobet's failure to offer a proven technology at the time of the consent decree did not undermine the order because the decree did not bind the company to a particular technology, but rather required that it install *some form* of treatment system by the mandated deadline; (2) the interim limits and their defined penalties were enforceable regardless of whether Hobet's preferred technology proved effective; (3) the compliance deadline was not contingent upon the success of any particular method of treatment; and (4) because the consent order "[was] not simply an agency issued permit or compliance order ... even considering Hobet's past non-compliance, there [was] little reason to believe that Hobet [would] take the [court-ordered] Consent Decree lightly."  *Hobet I*, 2008 WL 5377799, at *8.

Hobet argues that the addition of WV/NPDES Permit 1022911 to the Boone County action

is part of a considered decision, on the part of the WVDEP, to address all of the company's selenium limit violations in a single proceeding. Thus, relying on the primary role state proceedings play in CWA and SMCRA enforcement, Hobet argues the Court should reach the same conclusion here that it did in *Hobet I*. In the year and a half since *Hobet I* was issued some significant facts have changed, however.

To begin with, Hobet no longer supports a particular treatment technology, nor argues that this preferred system can be in place by a date certain. In the affidavit evidence presented to the Court before its *Hobet I* decision, the company's expert John Sawyer, Ph.D., attested that it was likely compliance "[could] be achieved" by June 30, 2009, using zero valent iron foam technology. *See Sawyer Affidavit* (Doc. 24-7), ¶ 2; *see also Sawyer Affidavit* (Doc. 24-8), ¶ 7 (confirming the "target date" for compliance was June 30, 2009). In contrast, the affidavit evidence Hobet submits in support of its pending motion to dismiss attests that, insofar as the company defines the terms, no "effective" or "economically viable" treatment technology exists for selenium. *See McHale Affidavit* (Doc. 9-5), ¶ 4 ("Although at least two treatment systems have been identified that show promise, neither of them meet the [company's] definition for an effective and economically viable treatment")*; id.* at ¶ 14 ("I cannot conclude that any treatment system that has been identified is both effective and economically feasible for application at all outlets."). The Court finds this distinction significant. For, instead of providing promise, a commodity often more readily available at the outset of experimental treatment, the McHale Affidavit indicates that the SEPs currently undertaken by Hobet appear to only demonstrate what does *not* work, rather than what works. A key factor the Court relied on in *Hobet I* is therefore missing. There is no longer an assurance that *some form* of

treatment technology will provide compliance by the mandated deadline.[10]

Without a preferred, or even an admittedly promising, treatment technology in mind, the Court finds the time-frames established in the December 2009 consent decree for the installation of treatment technology and the compliance with selenium limits *are* unreasonable. Essentially, when viewed in light of the company's assertion that *no* technology works, these extensions look more like stalling tactics, than like real attempts at compliance. *See Friends of Milwaukee's Rivers*, 382 F.3d at 764 ("While [government action] will hopefully result in fewer and smaller violations after the mandated projects are completed, it is still, when all is said and done, a stalling tactic rather than a compliance strategy."); *City of Dallas*, 529 F.3d at 528 ("[T]he 'realistic prospect' mootness standard that we employ today comports with Congress's policy that 'diligent prosecutions' preempt citizen suits."). Further, the approximately two and a half year delay in the compliance deadline reduces the likelihood that a solution to the selenium problem will be found as soon as possible – as required by the modified consent order - because the delay, when combined with the minimal penalties for violations of the company's interim limits, substantially reduces Hobet's incentive to find a viable treatment technology in a timely manner. Moreover, the modified consent order lacks a clear remedial plan.

---

[10]The Court finds that, unlike the 2008 consent order, the modified consent decree does not eliminate the realistic prospect of continued violation, at least in part, because Hobet fails to point to a particular treatment technology the company expects to work. The Court is aware that the process of conducting SEPs, discovering which treatment technologies do *not* work and eliminating those options, is a necessary component of the process for developing effective treatment systems. Therefore, the Court is not criticizing Hobet for the results of its experimental projects. Nonetheless, the focus of the realistic prospect analysis is whether, based on the information available at a set point in a case, subsequent agency or company action has eliminated the realistic prospect of non-compliance. Hobet's inability to identify a promising treatment technology, or to assure the Court that some form of treatment will bring the company into compliance by the mandated deadline, is a contributing factor in the Court's determination that this case is not moot.

Taken together, these facts illustrate that the modified consent order weakens, not strengthens, the likelihood for compliance. Hobet, not the State, moved to modify the consent order to add WV/NPDES Permit 1022911; the WVDEP received little in exchange for Hobet's agreement to add the permit to the consent order; and there is no considered remedial plan incorporated into the decree. The 2008 consent decree charged Hobet with a $4,088,315 penalty for violations of four permits. It allowed the company to allocate $2,600,000 of this penalty to specific SEPs, which it described in a detailed "Corrective Action Plan." The 2008 consent order also imposed stipulated penalties for violations of the interim limits. Conversely, the 2009 consent decree imposes no new penalties nor SEP funding, and does not contain a "Corrective Action Plan." It merely extends the 2008 decree's stipulated penalty provision to July 1, 2012; thus limiting the penalty Hobet could incur for any violations of WV/NPDES Permit 1022911 to $65,000 over the lifetime of the interim limits, without subjecting Hobet to any penalty for past violations. Accordingly, without imposing civil penalties or requiring additional expenditure on SEPs, the 2009 consent decree does not establish the same financial incentive for compliance as was created by the 2008 order.[11] Further, without a clear corrective action plan, the modified consent decree does not establish the same likelihood that a treatment system will be developed and violations eliminated. Thus, when viewed objectively, the terms of the modified consent decree do not support a finding of mootness. *See, e.g., United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 529 (4th Cir. 1999) (civil penalties should "remove or neutralize the economic incentive to violate environmental regulations); *see also* 33

---

[11]Although Plaintiffs waived their rights to civil penalties for violations of WV/NPDES Permit 1022911's selenium limits in *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers*, the WVDEP is not required to acquiesce to such waiver. Therefore, the WVDEP could have demanded civil penalties for past violations in the modified consent decree. In this Court's opinion, the agency's failure to do so reflects poorly on the agency and is indicative of a lack of motivation to design a remedy reasonably calculated to eliminate non-compliance.

U.S.C. § 1319(d); *Friends of Milwaukee's Rivers*, 382 F.3d at 760, 764.

Finally, the Court finds a realistic prospect of non-compliance exists because there is no indication that the WVDEP intends to require Hobet comply with the consent order as modified in December 2009. Actually, a review of recent facts documents Hobet's track record of failing to comply with court-ordered decrees, a practice to which the WVDEP appears to acquiesce. First, the modification itself violates a court-approved settlement agreement. Selenium limits were added to WV/NPDES Permit 1022911, effectively immediately, in 2008, as a result of a settlement agreement Hobet voluntarily entered into with Plaintiffs in *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers* (3:08-cv-0979), and a subsequent permit modification by the WVDEP. The settlement agreement reached in *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers* provided the company with a year-long grace period, in which Plaintiffs agreed not to seek civil penalties and allow Hobet to come into compliance. However, instead of coming into compliance, or even experimenting with and installing treatment technologies at the outfalls covered by the permit, when faced with the impending deadline for compliance and the imposition of penalties, Hobet moved to add WV/NPDES Permit 1022911 to the Boone County consent decree, in August 2009.[12] In doing so, the company sought: (1) to apply the limited stipulated penalty provision of the Boone County consent decree to WV/NPDES Permit 1022911, and (2) to extend the deadline for then-effective limits to July 1, 2012. The WVDEP acquiesced. In this Court's opinion, the modification does not moot this action because it is not reasonably calculated to seek

_____

[12]It is the Court's understanding that, to date, no treatment technology (experimental or otherwise) has been installed at an outfall regulated by WV/NPDES Permit 1022911. To the contrary, the timetable for the installation of pilot treatment systems at the outfalls regulated by the Boone County consent order, submitted to the Court by Hobet on April 2, 2010, indicates that the company does not plan to install a control system at Outfall 001 until the Third Quarter of 2010. *See Timetable for Installation of Treatment Systems* (Doc. 38-3).

compliance.  Rather, by adding WV/NPDES Permit 1022911 to the Boone County action, Hobet avoids compliance with very little consequence.  In effect, the company uses a state court proceeding to preempt a requirement it agreed to, voluntarily, in a previous federal court action.  The Court finds this is evidence not only of a likelihood of continued non-compliance, but also of Hobet's likelihood of ignoring court-ordered decrees, a finding that is further supported by the company's apparent failure to comply with the Boone County consent order, as modified in December 2009.

Section IV, Paragraph 9.g of the modified consent order provides that Hobet "shall propose a strategy for controlling selenium discharged at all remaining outlets, shall identify treatment systems for those outlets, and shall, by March 31, 2010, establish a timetable for installation of those systems."  *See, e.g., Letter Accompanying Hobet's Timetable for Installation of Treatment Systems* (Doc. 38-3).  Hobet has not done so.  To the contrary, the company responded to the mandate, on March 31, 2010, by filing a single-page chart of "Proposed Selenium System Installations."  In this single-page chart, the company indicates in which quarter in 2010 or 2011 it intends to install a treatment system at the outlets governed by the modified decree.  However, the check-the-box chart does not identify the treatment system the company intends to install at each outlet, or provide any information on Hobet's "strategy" for compliance.  Accordingly, the submission neglects two of the three directives in Paragraph 9.g.  It is therefore evidence of Hobet's willingness to ignore court-ordered mandates.

In light of such willingness, and for the reasons stated above, the Court concludes that the December 2009 consent decree does not eliminate the realistic prospect of continued violations of WV/NPDES Permit 1022911's selenium limits.  Therefore, Plaintiffs' claims are not dismissed as moot.  *See City of Dallas,* 529 F.3d at 527 ("A case should not be declared moot as long as the

parties maintain a concrete interest in the outcome and effective relief is available to remedy the effect of the violation.") (quoting *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 227 (5th Cir. 1998)) (internal quotations omitted); *Gwaltney*, 484 U.S. at 66-67 ("Mootness doctrine ... protects plaintiffs from defendants who seek to evade sanction by predictable 'protestations of repentance and reform.'") (citing *United States v. Oregon State Medical Soc'y*, 343 U.S. 326, 333 (1952)).

## C. PLAINTIFFS' CLAIMS ARE NOT DISMISSED FOR FAILURE TO JOIN THE WVDEP

The WVDEP cannot be joined in this action because citizen suits under the CWA and SMCRA are permitted only to the extent allowed by the Eleventh Amendment, *see* 33 U.S.C. § 1365(a)(1)(ii); 30 U.S.C. § 1270(a)(1) & (2), and the WVDEP is immune to such suits as an arm of the State. *See, e.g., Virginia v. Reinhard*, 568 F.3d 110 (4th Cir. 2009); *Bragg*, 248 F.3d 275; *Westinghouse Elec. Corp. v. W.V. Dep't of Highways*, 845 F.2d 468 (4th Cir. 1988). Accordingly, Hobet argues that this suit must be dismissed pursuant to Federal Rule of Civil Procedure 19.

"Federal Rule of Civil Procedure 19 sets forth a two-step inquiry for a district court to determine whether a party should be joined in an action." *Nat'l Union Fire Insur. Co. of Pittsburg, PA v. Rite Aid of SC, Inc.*, 210 F.3d 246, 249 (4th Cir. 2000). "[C]ourts must first ask 'whether a party is necessary to a proceeding because of its relationship to the matter under consideration' pursuant to Rule 19(a)." *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 440 (4th Cir. 1999) (quoting *Teamsters Local Union No. 171 v. Keal Driveaway Co.*, 917-18 (4th Cir. 1999)). If the party is necessary, it will be ordered into the action. *Id.* If the party cannot be joined, however, "the court must determine whether the proceeding can continue in its absence, or whether it is indispensable pursuant to Rule 19(b) and the action must be dismissed." *Id.* "Only necessary persons can be indispensable, but not all necessary persons are indispensable." *Schlumberger Indus., Inc. v. Nat'l*

*Surety Corp.,* 36 F.3d 1274, 1286-87 (4th Cir. 1994).

"In determining whether a party is necessary and, then, indispensable, the court must consider the practical potential for prejudice in the context of the particular factual setting presented by the case at bar." *Id.* at 1286 (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1968)); *see also Owens-Illinois*, 186 F.3d at 441 ("Such a decision must be made pragmatically, in the context of the substance of each case, rather than by procedural formula.."). "[C]ourts are loathe to dismiss cases based on non-joinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result." *Id.* at 441; *see also Nat'l Union*, 210 F.3d at 250 ("Dismissal of a case is a drastic remedy ... which should be employed only sparingly.").

The Court first determines whether the WVDEP is a "necessary" party pursuant to Rule 19(a). Rule 19(a)(1) provides:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Hobet claims the WVDEP qualifies as a necessary party under Rule 19(a)(1)(B).[13]  The inquiry under Rule 19(a)(1)(B) is subject to a second two-part test.  First, the Court decides whether the non-joined party "claims an interest related to the subject of the action," *see* Fed.R.Civ.Pro.19(a)(1)(B), and, if so, the Court considers whether the absence of the non-joined party will either: (1) impede or impair that party's interest, *see* Fed.R.Civ.Pro.19(a)(1)(B)(i), or (2) leave an existing party subject

---

[13]As noted by Plaintiffs, although Hobet identifies its argument as a Rule 19(a)(2) claim, the portions of the Rule cited by Hobet were renumbered in 2007 as Rule 19(a)(1)(B).

to conflicting obligations.  *See* Fed.R.Civ.Pro. 19(a)(1)(B)(ii).  If the first and either of the second

parts of the test are satisfied, then the non-joined party is "necessary."  *See, e.g., Nat'l Union*, 210

F.3d at 250-52 (finding non-joined party necessary); *Owens-Illinois*, 186 F.3d at 441 (same).

Hobet argues that the WVDEP satisfies the initial portion of the Rule 19(a) test because the

agency has "an interest in protecting its sovereignty to enforce state law in the courts of the state,"

*Hobet's Mem. of Law* (Doc. 19), 29, which it has claimed by "bringing the original enforcement

action against Hobet in 2007, seeing the suit to conclusion with the entry of the settlement in

September 2008, and modifying it in December 2009." *Id.* at 29;  *Hobet's Reply* (Doc. 28), 8.

Plaintiffs disagree.  They contend that "[i]t is not enough for a legally protected interest to exist; the

absent party must actually assert the interest."  *Pls.' Resp. & Reply* (Doc. 27)*,* 27 (citing *United*

*States v. Bowen*, 172 F.3d 682, 689 (9th Cir. 1999)).  Thus, they argue that "[Rule 19(a)(1)(B)] is

'wholly inapplicable' here ... because the State of West Virginia has not <u>claimed</u> an interest in this

proceeding."  *Id.* at 26 (citing *Ass'n to Protect Hammersly, Eld, & Totten Inlets v. Taylor Res., Inc.*,

299 F.3d 1007, 1015 (9th Cir. 2002)) (emphasis in original).

The Court agrees with Hobet.  An interest does not qualify under Rule 19(a)(1)(B) unless

claimed.  Nonetheless, the interest referred to in the Rule is not  so  narrow as to require the non-

joined party attempt to intervene, or otherwise raise its interest in the case at bar.[14]  In December

---

[14]This finding is consistent with the cases cited by Plaintiffs.  For example, in *Bowen*, the
Ninth Circuit cites to *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1043-44 (9th
Cir. 1983), where the Court held that "the absent party – the government – was not 'necessary'
within the meaning of Rule 19, in part because the government 'has never asserted a formal
interest in either the subject matter of this action *or* the action itself.'"  172 F.3d at 689
(emphasis supplied).  The excerpt from *Northrop* indicates that there is more than one way for a
party to claim an interest in an action: it may claim an interest in the litigation itself, *or* it may
assert some other formal interest in the subject of the action in some other venue.  *See also Nat'l*
*Union*, 210 F.3d 246 (non-joined party held to claim an interest in a federal suit by filing parallel
suit in Pennsylvania state court).

2009, the WVDEP negotiated a settlement that added WV/NPDES Permit 1022911 and S-5008-06 to the Boone County consent decree, applying all the terms and conditions of the order to those permits.  WV/NPDES Permit 1022911 and S-5008-06 are at the heart of this matter.  Thus, by adding those permits to the Boone County action, the WVDEP claimed an interest related to the subject of this action.  Specifically, the WVDEP asserted its role as the primary enforcer of the CWA and SMCRA.  *See Gwaltney* 484 U.S. at 60; *Piney Run II*, 523 F.3d at 456; *City of Dallas*, 529 F.3d at 528; *see also Conolly Affidavit* (Doc. 21-1).

Because the WVDEP has claimed an interest related to this action, the next questions the Court must consider is whether resolving this litigation in the WVDEP's absence will: (1) impair or impede the WVDEP's ability to protect its interest, or (2) leave an existing party subject to a substantial risk of incurring multiple or inconsistent obligations.  *See* Fed.R.Civ.Pro. 19(a)(1)(B)(i) & (ii).  The Court finds neither will occur.  First, the Court finds that disposing of this action without the WVDEP will not impair or impede the WVDEP's interest because the agency has been (and remains) entitled to a range of procedures which preserve its role as the primary enforcer of the CWA and SMCRA.  In reaching this conclusion, the Court need only refer back to the objectives of the statutes' citizen suits and the Court's earlier discussion of diligent prosecution and mootness. Congress created the citizen suit to achieve the goals of the CWA and SMCRA by protecting the environment and abating pollution when the government could not or would not command compliance.  *See, e.g., Gwaltney*, 484 U.S. at 60, 62; *City of Dallas*, 529 F.3d at 526, 528.  Citizens therefore play a critical second-level role in environmental enforcement.

When developing the citizen suit, however, Congress was careful to protect State sovereignty.  It did so by establishing the diligent prosecution bar, which courts have further

interpreted to create the related realistic prospect standard for mootness. These protections have been (and remain) available to the WVDEP throughout the pendency of this litigation. Thus, stated simply, if the WVDEP had diligently prosecuted Hobet's alleged violations of WV/NPDES Permit 1022911 and S-5008-06, *or* if it had taken post-complaint action to eliminate the realistic prospect of continued non-compliance, then the agency could and would have avoided this litigation because it would have eliminated the basis for this suit. The WVDEP chose not to exercise these options, however. Because it finds the diligent prosecution and mootness standards were sufficient to protect the State's sovereignty, the Court finds the WVDEP is not "necessary" under Rule 19(a)(1)(B)(i).

Next, the Court looks to whether the WVDEP is a necessary party under Rule 19(a)(1)(B)(ii). This question is somewhat more difficult. A non-joined party will be necessary under Rule 19(a)(1)(B)(ii), if an existing party is subject to a substantial risk of incurring multiple or inconsistent obligations as a result of the absent party's interest. *See* Fed.R.Civ.Pro. 19(a)(1)(B)(ii). Here, Hobet argues that it will be subject to inconsistent obligations, if this case proceeds without the WVDEP, because it will be subject to injunctive relief and stipulated penalties under the Boone County consent order, meanwhile being subject to injunctive relief by this Court.

This issue deserves review because Hobet may be subject to injunctive relief imposed by two courts: the Boone County Circuit Court and this Court. Nonetheless, the Court finds that this fact, standing alone, does not qualify the WVDEP as a necessary party under Rule 19(a)(1)(B)(ii) because this Court can avoid subjecting Hobet to inconsistent obligations. First, the Court will not impose inconsistent obligations with regard to penalties because, consistent with their settlement in *Ohio Valley Environmental Coalition, Inc. v. U.S. Army Corps of Engineers* (3:08-cv-0979), Plaintiffs do not seek such relief. Next, the Court finds it can avoid inconsistency with regard to injunctive relief.

The specific terms and scope of Plaintiffs' injunctive relief will be addressed at the trial beginning on August 9, 2010, following this Court's review of the selenium treatment systems proposed by each party.  Still, the Court can assure Hobet that such relief will not be inconsistent with the terms of the modified consent order in the Boone County Circuit Court because the modified decree "reaffirm[s] that Hobet is required to comply with final effective effluent limits *as soon as possible but in no case later than July 1, 2012.*"  *Dec. 2009 Consent Decree* (Doc. 18-2), ¶ 9.d (emphasis supplied).  The modified consent order therefore subjects Hobet to two mandates: (1) a date certain for compliance, and (2) a general requirement that compliance be achieved as soon as technically feasible.  Any injunctive relief imposed by this Court will be consistent with the latter obligation. *See Owens-Illinois*, 186 F.3d at 442 (a district court can tailor its remedy to avoid prejudice and inconsistency).  As a result, the WVDEP is not a "necessary" party under Rule 19 (a)(1)(B)(i) or (ii).

Because the Court has concluded that the WVDEP is not a necessary party, it need not determine whether the agency is indispensable.  Nonetheless, and again in an abundance of caution, the Court reviews the indispensability test, determining that the WVDEP is not "indispensable."

Indispensability is determined by Rule 19(b), which provides a four-factor test.

> If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C)other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

"A Rule 19(b) analysis is not mechanical; rather it is conducted in light of the equities of the case at bar."  *Nat'l Union*, 210 F.3d at 252 (citing *Schlumberger*, 36 F.3d at 1287).

"The first Rule 19(b) factor asks to what extent a judgment rendered in the non-party's absence will prejudice that person or those already parties.  This factor addresses many of the same concerns as [Rule 19(a)(1)(B)]."  *Id.* (citing *Keal*, 173 F.3d at 919).  In reviewing Hobet's Rule 19(a)(1)(B) argument, the Court found that: (1) the statutory restrictions placed on citizen suits adequately protect the WVDEP's interest in preserving its primary authority to enforce the CWA and SMCRA, and (2) this Court can protect Hobet from prejudice and inconsistency by tailoring its remedy, accordingly.  For those same reasons, this factor weighs against a finding of indispensability.

"The second factor to consider under Rule 19(b) is whether a court can tailor relief to lessen or avoid the prejudice to the absent party or to those already parties."  *Id.* at 253.  Ultimately, this factor cannot be resolved until after the August trial.  Nonetheless, the Court finds, at this juncture, that it weighs against dismissal.

A primary dispute raised by this case is whether there is a generally accepted method for treatment of selenium discharges from coal mines in West Virginia.  Hobet claims no accepted method exists because no method has proven to be effective and economically viable.  "For this reason, [Hobet contends] the [Boone County] settlement and consent order was modified," *id.,* and the installation and compliance deadlines for selenium extended until July 2012.  *See, e.g., McHale Affidavit* (Doc. 9-5), ¶¶ 8 & 14.  Plaintiffs disagree.  In doing so, Plaintiffs point to the admission by Patriot Coal's Vice President of Environmental Engineering and Compliance, John McHale, that promising methods to treat selenium exist.  *See id.* at ¶ 4.  Further, Plaintiffs argue that Hobet simply refuses to pursue these methods because of cost.  *See id.*  ("economically viable" is defined as "a treatment that Patriot's subsidiaries can afford to install given the existing and reasonably forseeable

41

financial resources of the company").

Without resolving the parties' differences over the current state of selenium technology, the Court finds – when viewed in equity and good conscience – the dispute warrants not finding the WVDEP indispensable and proceeding with the trial set to begin August 9, 2010. *See, e.g., Nat'l Union*, 210 F.3d at 250 (viewing prejudice pragmatically and in light of the particular facts of the controversy at bar); *Owens-Illinois*, 186 F.3d at 441 (same). The trial should proceed for several reasons. First and foremost, a trial will benefit the parties, the WVDEP, and the Court by providing a venue to more fully evaluate the effectiveness and feasibility of various treatment systems, without prejudicing either party or the WVDEP. Additionally, the trial will provide a basis for the Court to determine how to fashion a remedy that: (1) avoids prejudice to parties and non-parties alike; (2) upholds the CWA and SMCRA's requirements for environmental protection, and (3) insures that any relief imposed is consistent with the modified consent decree's mandate that Hobet comply *as soon as possible*.

"The third [Rule 19(b)] factor is whether a judgment without the absent person will be adequate. This factor implicates the interest of the courts and the public in complete, consistent, and efficient settlement of controversies ... [and] promote[s] the public interest in avoiding piecemeal and inefficient litigation." *Nat'l Union*, 210 F.3d at 253 (internal quotations and citations omitted). Again, the Court finds this factor weighs against finding the WVDEP an "indispensable" party.

"The CWA plainly confers to citizens an opportunity to step in and sue alleged violators when government agencies fail to act." *Riverkeeper, Inc. v. Mirant Lovett, LLC*, 675 F.Supp.2d 337, 353 (S.D.N.Y. 2009); *see also Gwaltney*, 484 U.S. 49. Citizen enforcement is therefore adequate to address alleged violations without the participation of a state agency, and the question Rule

42

19(b)'s third factor presents, in this case, is whether resolving Plaintiffs' claims creates a sufficient danger of inefficiency or inconsistency to warrant dismissal. Inconsistency has been addressed above and the Court finds it does not warrant a finding of indispensability. The pertinent question is therefore one of efficiency.

"[The WVDEP] employs environmental experts and engineers far better suited to understand the [selenium] problem than this Court." *Hobet I*, 2008 WL 5377799, at *7. Accordingly, in *Hobet I*, the Court declined to "substitute its own plan for compliance in place of DEP's without evidence that the agency's plan was ill-conceived or developed in bad faith," *id.,* and found the action moot. Now, Hobet argues for the same result.

The principle articulated in *Hobet I* is equally applicable today, but the facts have changed. More than a year has passed and neither the WVDEP nor Hobet can provide evidence that the SEPs required under the 2008 consent decree have identified a feasible treatment plan for selenium. Moreover, Plaintiffs have demonstrated that there is a realistic prospect that Hobet's violations will continue, at this point, indefinitely. Consequently, the Court finds that – although parallel enforcement actions do result in some inefficiency – this Court should retain jurisdiction. The August 9, 2010 trial is not only necessary to the proper resolution of the claims pending here, but may also promote the public interest in the complete and efficient settlement of both cases, by advancing the parties' understanding of the selenium controversy.

"Finally, Rule 19(b) directs us to determine whether dismissal for nonjoinder will leave the plaintiff with an adequate remedy." *Nat'l Union,* 210 F.3d at 253; *see also* Fed.R.Civ.Pro. 19(b)(4). In light of its realistic prospect analysis, and for the reasons stated above, the Court is convinced that dismissal would leave Plaintiffs without a sufficient remedy. The Court finds that given the purpose

43

of the modified consent order to extend Hobet's deadlines for compliance and add WV/NPDES Permits 1022890 and 1022911, without providing additional incentives for compliance or monies to be expended on SEPs, there is no reason to believe that the modified consent order will protect Plaintiffs' interests. The modified decree does not eliminate the realistic prospect of continued violations. As a result, the Court finds it inadequate to resolve Plaintiffs' claims.

      D.      THE COURT WILL NOT ABSTAIN PURSUANT TO *YOUNGER* OR *COLORADO RIVER*

Hobet argues that the Court should abstain under two doctrines: (1) *Younger v. Harris*, 401 U.S. 37 (1971), and *Colorado River Water Association v. United States*, 424 U.S. 800 (1976). The company argues that *Younger* "articulates a strong policy against interference in ongoing state proceedings," *Hobet's Mem. of Law* (Doc. 19), 32, contending that "*Younger* requires a court to consider: 1) whether the proceedings constitute an ongoing state judicial proceeding; 2) whether the proceedings implicate important state interests; and 3) whether there is adequate opportunity to present the federal claims in the state proceeding." *Id.* (citing *Middlesex County Ethics Comm'n v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)). Hobet maintains that each of the *Younger* elements are met in this case because: (1) the WVDEP action against Hobet in the Boone County Circuit Court constitutes an ongoing state judicial proceeding; (2) there is an important state interest at issue in the Boone County action, namely, West Virginia's interest in protecting health and welfare by asserting its authority to enforce effluent limits in state-issued permits; and (3) Plaintiffs were afforded an adequate opportunity to preserve their claims in the Boone County action, because Plaintiffs had an opportunity to intervene in that action or, at a minimum, comment on the proposed modified decree. Accordingly, Hobet contends that Plaintiffs' preference for a federal venue should not dictate which forum adjudicates this matter and this Court should abstain.

Hobet raises similar arguments under *Colorado River*. Specifically, that, based on the potential overlap between the Boone County enforcement and the current action, "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation," *id.* at 34 (quoting *Colorado River*, 424 U.S. at 817), warrants abstention. According to Hobet, *Colorado River* carves out a broader abstention doctrine, unrelated to constitutional issues or state-federal relations, that is applicable here.

Plaintiffs oppose abstention, arguing that *Younger* does not apply here because: (1) the Boone Count action is no longer pending; (2) *Younger* is not implicated because Plaintiffs do not seek to restrain or directly interfere with the Boone County proceedings; and (3) abstention is inappropriate under *Younger* because the CWA and SMCRA explicitly contemplate concurrent state and federal enforcement actions. *Pls.' Resp. & Reply* (Doc. 27), 30-33. Additionally, Plaintiffs contest abstention under *Colorado River,* contending that such abstention has been rejected in the CWA context and "the absence of a pending state action is fatal to Defendant's arguments under the *Colorado River* doctrine." *Id.* at 34.

The Court agrees with Plaintiffs' general premise – that abstention is inappropriate in the instant case. To support this finding, the Court will review the basic requirements for each abstention doctrine proposed.

"The *Younger* doctrine expresses 'a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances.'" *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst* ("*Forst*"), 4 F.3d 244, 251 (4th Cir. 1993) (quoting *Middlesex County*, 457 U.S. at 431)). "The doctrine recognizes that state courts are fully competent to decide issues of federal law," *id.*, and sets forth a three-part test for abstention: "(1) is there an

45

ongoing state judicial proceeding; (2) do the proceedings implicate important state interests; and (3) is there an adequate opportunity in the state proceedings to raise federal claims." *Id.*; *see also Middlesex County*, 457 U.S. at 433.

Here, an ongoing state proceeding exists. Additionally, the State has clear interests implicated by the proceeding: (1) to protect the health and welfare of its citizens by enforcing CWA and SMCRA permits, and (2) to assert its primary authority with respect to such enforcement and, therefore, its interest in establishing a consistent state-wide approach to enforcement. Nonetheless, "[a]bstention is not necessarily appropriate in every civil action that meets the formal requirements of the *Younger* doctrine." *Forst*, 4 F.3d at 251. Plaintiffs do not seek to enjoin or otherwise interfere with the state proceeding. Rather, the relief Plaintiffs seek in this Court is consistent with the Boone County Circuit Court's mandate that Hobet comply with final effective effluent limits for selenium "as soon as possible." *See Dec. 2009 Consent Decree* (Doc. 18-2), ¶ 9.d. More importantly, the relief sought here is consistent with the statutory objective of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The statutory enforcement scheme clearly contemplates the existence of concurrent state and federal proceedings in cases where governmental enforcement is not adequate to bring a violator into compliance. *See* 33 U.S.C. § 1365; 30 U.S.C. § 1270; *see also City of Dallas*, 529 F.3d at 526 ("The citizen-suit provision is a critical component of the [statutory] enforcement scheme, as it permits citizens to abate pollution when the government cannot or will not command compliance.") (quoting *Gwaltney*, 484 U.S. at 62) (internal quotations omitted). As discussed *supra*, this is one of those cases. Accordingly, abstention under *Younger* is not appropriate.

Next, the Court looks to *Colorado River.* "Abstention from the exercise of federal

46

jurisdiction is the exception, not the rule.  The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River*, 424 U.S. at 813; *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of America*, 946 F.2d 1072, 1073 (4th Cir. 1991).  In *Colorado River*, the U.S. Supreme Court held that "[its] decisions ha[d] confined the circumstances appropriate for abstention to three main categories." *Colorado River,* 424 U.S. at 814.

> (a) Abstention is appropriate in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law (*Pullman* abstention) ... (b) Abstention is also appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar (*Buford* abstention) ... (c) Finally, abstention is appropriate where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings (*Younger* abstention).  *Id.* (internal citations and quotations omitted).

However, the Supreme Court then reasoned that there may be additional circumstances in which abstention is warranted.  Specifically, the Supreme Court held that "there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions[.]"  *Id.* at 817.  In such cases, the Supreme Court found that "considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation[,]" *id.* (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952)), may warrant abstention.

When conducting a *Colorado River* analysis, a court first determines whether state and federal proceedings are parallel.  *New Beckley Mining*, 946 F.2d at 1073.  "Suits are parallel if substantially the same parties litigate substantially the same issues in different forums."  *Id.*  The

court then considers a set of factors to determine whether the "exceptional circumstances" exist. "The factors to be considered include the following: (a) the assumption by either court of jurisdiction over property; (b) the inconvenience of the federal forum; (c) the desire to avoid piecemeal litigation; (d) the order in which the courts obtained jurisdiction; and (e) the source of applicable law." *Id.* at 1073-74; *see also Colorado River*, 424 U.S. at 818. "No one factor is necessarily determinative." *Colorado River*, 424 U.S. at 818. Rather, "a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling [sic.] against that exercise is required." *Id.* at 818-19; *see also New Beckley Mining,* 946 F.2d at 1073 ("Because federal courts have a virtually unflagging obligation ... to exercise the jurisdiction given them the existence of proceedings in state court does not by itself preclude parallel proceedings in federal court.") (internal quotations and citations omitted) (ellipses in original).

Here, the Court finds that, like the *Younger* standard, the *Colorado River* test is not satisfied. To the contrary, the Court finds that, in light of the Congressional directive establishing grounds for the citizen suit when governmental agencies are not diligently prosecuting enforcement actions, and based on this Court's finding that a realistic prospect of continued non-compliance exists, the Court should exercise its jurisdiction to resolve Plaintiffs' claims. *See, e.g.. Forst*, 4 F.3d at 253-54 ("A court's task is to ascertain whether, in light of the heavy presumption in favor of retaining jurisdiction, exceptional circumstances justify its surrender.").

## V.       Plaintiffs' Motion for Summary Judgment

### A.        STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper if "the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The availability of summary judgment therefore turns on whether a proper jury question exists in a pending case. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59 (1970).

When considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court considers the facts in the light most favorable to the nonmoving party, *Adickes,* 398 U.S. at 159, drawing any permissible inference from the underlying facts in a manner that supports the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The party opposing summary judgment, however, "must do more than simply show that there is some metaphysical doubt as to material facts." *Id.* at 586. It must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor[.]" *Anderson*, 477 U.S. at 256.

### B.        PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FIRST AND SECOND CLAIMS FOR RELIEF

The citizen suit provisions of the CWA and SMCRA provide that any person may commence a civil suit against any other person who is "alleged to be in violation" of the pertinent statute, or of some order, rule, regulation, permit or effluent limitation issued under the statute. 33 U.S.C. § 1365(a)(1); 30 U.S.C. § 1270 (a)(1). In *Gwaltney*, the U.S. Supreme Court held that this "alleged to be in violation" language authorized citizen suits so long as plaintiffs "make a good-faith

allegation of continuous or intermittent violations."  484 U.S. at 64 (finding citizen suits may not be premised on "wholly past" violations).  On remand, the Fourth Circuit elaborated on the Supreme Court's test, holding that, in order to establish jurisdiction, a citizen-plaintiff must prove, at trial, that an on-going violation of the Act had been occurring when the complaint was filed.  *See Chesapeake Bay Found., Inc. v. Gwaltney of Smithfiled, Ltd.* ("*Gwaltney II*"), 844 F.2d 170, 171 (4th Cir. 1988); *Am. Canoe Ass'n v. Murphy Farms*, 412 F.3d 536, 539 (4th Cir. 2005).  The Fourth Circuit held that "[c]itizen-plaintiffs may accomplish this [task] either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations."  *Id.* at 171-72; *see also Am. Canoe Ass'n*, 412 F.3d at 539.

An effluent limitation is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological or other constituents which are discharged from point sources into navigable waters[.]" 33 U.S.C. § 1362(11).  Title 33 U.S.C. § 1311(a) prohibits the discharge of any pollutant into the waters of the United States, unless such discharge is conducted in compliance with the Act.  This exception includes discharges authorized by the NPDES, which allows the discharge of pollutants at specific, permit-based effluent limitations.  *See, e.g.,* 33 U.S.C. § 1342(a)(1); *Cal. ex. rel.*, 426 U.S. at 204-05; *Piney Run I*, 268 F.3d at 265.  Each permit issued under SMCRA and WV SCMRA contains specific performance standards, including the requirement that: (1) mining activities be conducted to "prevent material damage to the hydrologic balance outside the permit area," 38 C.S.R. § 2-14.5; 30 C.F.R. §§ 816.41(a) & 817.41(a); (2) "[d]ischarge from areas disturbed by mining shall not violate effluent limitations or cause a violation of applicable water quality standards," 38 C.S.R. § 2-14.5.b; *see also*

50

30 C.F.R. §§ 816.42 & 817.42; and (3) every WV SCMRA permit must meet all applicable performance standards. 38 C.S.R. § 2-3.33.c.

There is no dispute that WV/NPDES Permit 1022911 includes water quality based effluent limits on selenium of 4.7 µg/l monthly average and 8.2 µg/l daily maximum, which have been effective since October 28, 2008. Thus, if Plaintiffs can show a continuing violation of these effluent limits, as of the date of their complaint, on October 23, 2009, then Plaintiffs are entitled to declaratory judgment with regard to their First and Second claims for relief – the claims for CWA and SMCRA violations of WV/NPDES Permit 1022911 and surface mining permit S-5008-06.

To resolve this issue, the Court turns to *Gwaltney II*. A citizen-plaintiff can establish a continuing violation sufficient to warrant declaratory relief by proving either violations that occur on or after the date of the complaint, or a likelihood of the continued reoccurrence of intermittent or sporadic violations. *Gwaltney II*, 844 F.2d at 171-72. Here, Plaintiffs have satisfied the first prong of the *Gwaltney II* test. Plaintiffs submitted Defendant Hobet's October 2009 DMRs to the Court, on January 11, 2010, which show that Hobet was in violation of the selenium limits in WV/NPDES Permit 1022911 in October 2009. *See Pls.' Exhibits* (Doc. 24-1), App. A. These DMRs constitute binding admissions on the part of Hobet. *See Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1115 n. 8 (4th Cir. 1988) (DMRs are binding admissions that may be used to establish liability) *vacated on other grounds by Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 149 F.3d 303 (4th Cir. 1998). Thus, they are sufficient to establish that the company is in violation of the CWA and SMCRA.[15] *See, e.g., Laidlaw*, 528 U.S. at 174 (a violation of the

---

[15]In its response to Plaintiffs' motion, Hobet's primary arguments against summary judgment were that Plaintiffs lacked standing; the notice of intent was defective; and the modified consent decree mooted this action. *See Hobet's Mem. of Law* (Doc. 19), 37. Each of these arguments have been addressed *supra*, or in a previous Opinion and Order entered by this

requirements of a NPDES permit is an automatic violation of the CWA); *Stoddard v. Western Carolina Regional Sewer Auth.*, 784 F.2d 1200, 1208 (4th Cir. 1986) (dischargers are strictly liable for permit violations); *Student Pub. Interest*, 600 F.Supp. at 1485 (same); 38 C.S.R. § 2-14.5.b; 30 C.F.R. §§ 816.42 & 817.42; 38 C.S.R. § 2-3.33.c.  Accordingly, the Court finds Hobet to have violated of WV/NPDES Permit 1022911 and surface mining permit S-5008-06.

Accordingly, the Court now turns to the question of injunctive relief.

## C.     PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

An injunction is an equitable remedy a court should issue  only where such intervention "is essential in order effectually to protect property rights against injuries otherwise irremediable." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)).  "[T]he basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies."  *Id.* (citations omitted).  Thus, a plaintiff is entitled to a permanent injunction only if it can demonstrate:

> (1) it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

---

Court.  In each case, the Court found in favor of Plaintiffs.  In its reply,  Hobet raised an additional argument against summary judgment.  The company asserted that the factual dispute regarding the efficacy of the various selenium treatment systems proposed "demonstrate[s] why summary judgment for the plaintiffs is not appropriate."  *Hobet's Reply* (Doc. 28), 3.  The Court disagrees.  This dispute of fact will be relevant when the Court determines the scope of the injunctive relief Plaintiffs are entitled to.  However, the dispute does not affect the question of Hobet's liability.  To the contrary, according to U.S. Supreme Court and Fourth Circuit precedent, the fact that Plaintiffs have established a continuing violation of the selenium limits in WV/NPDES Permit 1022911 is, standing alone, sufficient to warrant declaratory judgment.

First, Plaintiffs have established irreparable injury.  As noted, the EPA and the WVDEP acknowledge the toxic nature of selenium.  The Mud River watershed has been identified as an area of concern with regard to selenium and a TMDL of 5 µg/l has been established for the pollutant. In conformity with the TMDL, selenium limits were added to WV/NPDES Permit 1022911 on October 28, 2008.  Plaintiffs have demonstrated that Hobet is in continuing violation of these effluent limits.  Thus, Plaintiffs have shown that the company is contributing to the degradation of the Mud River watershed in the form of excess selenium pollution.  This is sufficient to establish irreparable harm.  *See Amoco Production Co. v. Village of Gambell, A.K.*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by monetary damages and is often permanent or at least of long duration, i.e., irreparable."); *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005) (same).  Moreover, other remedies at law, such as monetary damages, are inadequate to remedy such irreparable environmental injuries.  *Id.*

The balance of hardships also weighs in favor of the issuance on an injunction.  To begin with, "[i]f [environmental] injury is sufficiently likely ... the balance of harms will usually favor issuance of an injunction to protect the environment."  *Amoco Production,* 480 U.S. at 545. Furthermore, the particular facts of this case warrant injunctive relief for several reasons: (1) governmental enforcement has failed to bring Hobet into compliance and a realistic prospect of continuing violations exists notwithstanding the modification of the Boone County consent order; (2) Hobet's track record of non-compliance and the WVDEP's history of acquiescing to deadline extensions and other modifications to ease permit requirements suggest compliance is not likely without intervention on the part of this Court; (3) Hobet sought WV/NPDES Permit 1022911 and surface mining permit S-5008-06 at a time when it was aware of the selenium problem in the Mud

53

River watershed, as well as with the uncertainty concerning selenium treatment technologies (i.e., it assumed the risk); (4) Plaintiffs only agreed to settle *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers* (3:08-cv-0979) in exchange for Hobet's agreement to immediately effective selenium limits in WV/NPDES Permit 1022911 and Plaintiffs are entitled to the benefit of their bargain in that settlement; and (5) the imposition of injunctive relief directed at requiring compliance with the CWA and SMCRA is appropriate in light of the statutory objectives. *See, e.g.,* 33 U.S.C. § 1251(a) (the purpose of the CWA is to "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."); *Pub. Interest Research Group of N.J., Inc. v. Top Notch Metal Finishing Co.,* 26 E.R.C. 2012, 2015 (D.N.J. 1987) (The underlying substantive policy behind the CWA is "the preservation of the environment and the protection of mankind and wildlife from harmful chemicals."); *Amoco Production*, 480 U.S. at 544 (When fashioning an equitable remedy under an environmental statute, a district court should focus on "the underlying substantive policy the [statute] was designed to effect."); *Weinberger,* 456 U.S. at 320 ("[The CWA] permits the district court to order that relief it considers necessary to secure prompt compliance with the Act.").

Finally, the public interest will not be disserved by injunctive relief.  There is a clear public interest in environmental protection, including the protection of aquatic resources, which  is served by the citizen-suit and will be achieved through the issuance of an injunction. *See Train*, 510 F.2d at 699-700 ("[The citizen suit] reflects Congress's recognition that citizens can be a useful instrument for detecting violations and bringing them to the attention of the enforcement agencies and courts alike."); *see also Gwaltney*, 484 U.S. at 62; *Piney Run II*, 523 F.3d at 456.  Additionally, the scope and terms of the injunctive relief will not be determined until after the August 2010 trial and, at that

54

time, the Court will have sufficient information to fashion injunctive relief that preserves and promotes the public interest.

## VI. Conclusion

Hobet's motion to dismiss is **DENIED,** and Plaintiffs' motion for summary judgment **GRANTED**, as described *supra*. A hearing to address the scope and terms of the injunctive relief Plaintiffs are entitled to shall be held **August 9, 2010,** at **1:30 p.m.** in **Huntington.**

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:     June 14, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE