IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., and WEST
VIRGINIA HIGHLANDS
CONSERVANCY, INC.,

        Plaintiffs,

v.                     CIVIL ACTION NOS. 3:07-0413,
                              3:08-0088 & 3:09-1167

APOGEE COAL COMPANY, LLC, and
HOBET MINING, LLC,

                     Huntington, West Virginia
        Defendants.       August 31, 2010

TRANSCRIPT OF CLOSING ARGUMENTS
BEFORE THE HONORABLE ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:      JOSEPH MARK LOVETT, ESQ.
                           DEREK O. TEANEY, ESQ.
                           APPALACHIAN CENTER FOR THE
                           ECONOMY AND THE ENVIRONMENT
                           P. O. Box 507
                           Lewisburg, WV  24901

For the Defendants:      THOMAS J. HURNEY, JR., ESQ.
                           BLAIR M. GARDNER, ESQ.
                           JACKSON KELLY
                           P. O. Box 553
                           Charleston, WV  25322-0553

Also Present for Patriot:  RICHARD VERHEIJ, ESQ.

Court Reporter:                TERESA M. RUFFNER, RPR
                               P. O. Box 1570
                               Huntington, WV  25716
                               (304) 528-7583

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

1                        I N D E X

2                                                          <u>Page</u>

3   Closing Argument by Mr. Lovett                         15

4   Closing Argument by Mr. Hurney                         30

5   Rebuttal by Mr. Lovett                                 49

6   Surrebuttal by Mr. Hurney                              54

7   Court's Ruling                                         55

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Tuesday, August 31, 2010, at 1:00 p.m. in open court

2            THE COURT:  Well, my law clerk advises me that

3    you've contacted her this morning and explained that it

4    appears as of yesterday you were very close to having

5    everything worked out and now nothing is worked out, that

6    there's no agreement between the parties about any matter.  Is

7    that correct?

8            MR. LOVETT:  Unfortunately, it is correct, Your

9    Honor.

10           MR. HURNEY:  That's correct, Your Honor.

11           THE COURT:  Well, you know, normally when parties

12   are trying to settle a case, the judge probably should stay

13   out of it and not be concerned with the nature of the

14   negotiations between the parties, but this is an unusual

15   matter because both sides either requested or certainly

16   supported this Court deferring this case along for the last

17   couple of weeks following a hearing in order to give the

18   parties a chance to work things out, and we've had several

19   conversations since then; and at every stage, until apparently

20   this morning, it appeared that the parties were making

21   substantial progress and resolving a number of complicated

22   issues, and to our understanding as of yesterday perhaps there

23   was only one remaining issue that seemed to be dividing the

24   parties.

25           So with the unusual circumstances here, I'd feel

1    compelled to find out what happened.  What broke down here?

2                MR. LOVETT:  Your Honor, we called the Court on

3    Friday.  You were on the phone.  We had agreement on all

4    issues except for Hobet 22, the financial assurance, and maybe

5    an issue on timing.

6                THE COURT:  Right.

7                MR. LOVETT:  As I understand it, the defendants

8    called you on Friday afternoon and said the timing was

9    resolved, and so the only two remaining were Hobet 22 and

10   financial assurance.

11       Over the weekend we resolved -- or yesterday or over the

12   weekend, we resolved the financial assurance, called the

13   Court, told it that we only had one remaining issue, Hobet 22.

14       After that, the parties negotiated -- the negotiating was

15   basically finished.  We knew where we agreed and where we

16   didn't agree, believed the board of Apogee or Patriot had

17   approved the agreement.  Our clients had approved the

18   agreement in principle.  We were reducing it to writing,

19   making good progress.  Everything was in place.  I thought it

20   was done.  At 9:30 last night I got a call, talked to -- got a

21   call from Mr. Verheij telling me that they couldn't accept

22   anything anymore, without any explanation.

23       We really have no idea what happened, why they withdrew

24   all of the offers they had made; and we thought we were, you

25   know, inches from finishing the deal when it was withdrawn

1    without explanation.

2              THE COURT:  Well, what happened, Mr. Hurney?

3              MR. HURNEY:  Your Honor, I'm constrained to some

4    extent by attorney-client privilege.

5              THE COURT:  Well, would you use the microphone so I

6    can hear you.

7              MR. HURNEY:  Your Honor, I apologize.  This has been

8    a, I think, very intense negotiation; and I believe that over

9    the course of two weeks, there's been a lot of give and take

10   on both sides.  There's been a lot of discussion about things.

11   We would kind of get agreement with the lawyers and take back,

12   and it was a very fluid process in that sense.  In other

13   words, there weren't the traditional demand, respond, demand,

14   respond type settlement.

15       I don't know that I have a great explanation for the

16   Court other than to say that with the pressure of time,

17   knowing that we had to have the final papers finished in time

18   for this morning, that with issues -- you know, a lot of it

19   was kind of small stuff, like, you know, why are we agreeing

20   this, why not that, that it just got to the point last night

21   where our client informed us that they were content to, you

22   know, submit the matter to the Court.  And, you know, when

23   your client decides that they, you know, don't want to sign on

24   the dotted line with the settlement, it puts you in a

25   position.

1          I don't mean to avoid the Court, and I'll answer any

2     questions.  I will tell you that over the course of the

3     weekend, people worked a lot on this settlement.  There hadn't

4     been a day gone by with -- except for me; I took Saturday

5     off -- and a day goes by that we weren't working on this and

6     talking with the other side and talking with our client.  And

7     Mr. Verheij was in constant communication, and, you know, I

8     think sometimes -- I mean I've been down this road before

9     where you get, late at night, you get a paper signed, and I

10    think for whatever reason it just blew up on us.

11         To tell you that if we had -- you know, we've come to the

12    Court, and the Court has, I think, graciously extended time

13    for us to continue to talk, and we have done that.  We just

14    didn't get there, Judge.  And what Joe said is correct.  We

15    were, I thought, reaching and moving toward a final agreement,

16    but at the end of the day, you know, the communication from

17    the board of my client was that they, you know, weren't

18    willing to sign the final document.

19              THE COURT:  Well, is it your client's position now,

20    then, that in the absence of a total agreement, there is no

21    room for any partial agreement as to those matters that seem

22    to have been settled in principle through the prior

23    discussions?

24              MR. HURNEY:  Judge, I think there is.  I mean that's

25    what I'm trying to struggle with, with what I believe was a

1    press of time on top of getting our arms around a substantial

2    investment and agreement going forward and against the

3    backdrop of -- you know, you heard the testimony of other

4    outlets.  And, you know, this small part of the operation is

5    against the backdrop of other things.  And so, you know, my

6    belief would be that with additional time and a deep breath,

7    we'd get back on track, but, you know, I think maybe those

8    words ring a little hollow to the Court because we continued

9    to try and push things off.  I mean -- and I understand my

10   colleagues, you know.  They -- you know, in terms of not

11   wanting to have this be a 30-day event, a 30-day negotiation.

12   Rather, let's keep it on a tight string.  But I think, you

13   know, even though we made great strides, I think a tight

14   string has, at least from our side, worked against us a little

15   bit because we are, you know, dealing with a publicly traded

16   company that's got to look at this.

17          THE COURT:  Well, I understand that.  You know, it

18   does occur to me that if some elements that were -- remained

19   contested were causing the defendants to be very uneasy about

20   a final total agreement, that it would have made sense to say

21   let's agree on the 60 or 80 or 95 percent that we have and

22   then ask for more time or tell the Court this last chunk just

23   isn't going to be resolved by agreement and the Court is going

24   to have to rule on it.  But I gather that that's, at least as

25   of right now, that's not the position that your client wants

```
 1    to take.
 2              MR. HURNEY:  I think -- let me say two things,
 3    Judge.  Your statement is correct.  I mean our marching orders
 4    were that we're just not going to get there.  Now, how to go
 5    back and dissect that, we'll be here all afternoon.
 6         The other thing I will tell you is that -- I mean I have
 7    Mr. Verheij with us, who is general counsel -- or, you know,
 8    he's counsel to Patriot and he had the communications.  If the
 9    Court -- Mr. Verheij has told me that if the Court wants to
10    hear from him as to, you know, the discussions they had -- I
11    know things secondhand.
12              THE COURT:  Well --
13              MR. HURNEY:  If the Court wants to hear from him --
14              THE COURT:  -- you know, I guess my sense is that
15    his internal discussions with management are probably not
16    something that I need to know about unless there's something
17    that he wants to offer about that.  I accept your
18    representations and explanation.
19         Mr. Verheij, is there something you would like to add to
20    this?
21              MR. VERHEIJ:  Yes, Your Honor, I would, if I may.  I
22    agree with everything that's been said to this point.  In
23    terms of having spent a lot of time talking to Mr. Lovett,
24    including over the weekend, I think the process was we would
25    work out things in principle.  And my understanding was and I
```

1    believe his understanding was is that we had an agreement in

2    principle and began to reduce it to writing.  That process

3    started and was in a very compressed time frame.  And last

4    night, I'm not sure exactly what happened, but when it came to

5    reducing it to writing, that time pressure, things snapped.

6        I can tell you that on the way over here, speaking with

7    the CEO, he still believes that an agreement can be reached,

8    that they -- in principle in terms of the major issues.

9    They're still prepared to go forward as Mr. Lovett and I have

10   discussed.  I mean his wording was he believes that if you

11   forced everybody -- here's the exact quote:  If you forced

12   everybody into a room and locked the door, that we would have

13   something by Friday.

14       I think it truly came down to trying to reduce this to

15   writing by this morning.  Something unraveled there, but they

16   are still prepared to continue to discuss.  They understand

17   that the Court is not going to indulge them and say we need

18   another month, but they say they're still prepared to continue

19   talking.  They believe there's agreement in principle, and

20   they believe that we can actually reach a settlement on

21   99.9 percent of this, other than Hobet 22.

22       And it's incredibly frustrating to all of us, including

23   sharing it with Joe last night.  That's -- and I mean this was

24   a conversation --

25            THE COURT:  It sounds like it's a combination,

```
 1    first, of just not being comfortable with the drafting of the

 2    agreement and then, secondly, no resolution apparently on

 3    Hobet 22.

 4              MR. VERHEIJ:  I don't think the Hobet 22 issue was.

 5    I think that was segregated.  And I believe that the notion of

 6    segregating that from any negotiated settlement, they were

 7    totally comfortable with that.

 8         I think you hit it exactly on the head, which is with

 9    respect to Apogee, it is reducing it to writing.  Now, I hope

10    that Joe doesn't say, "I didn't hear anything of this last

11    night," because we didn't hear any of this last night.  Last

12    night was just a complete unraveling.  My colleagues were on

13    the phone with Joe.  I said, "We need to terminate this call.

14    I need to talk to you, Joe," because we knew we had closings

15    scheduled today.

16              Obviously we've been on the phone the whole morning and

17    all the way over here, and I'm just telling you that the CEO

18    is still committed to reaching an agreement which would

19    substantially achieve the objectives I think of the plaintiffs

20    and of the Court in terms of reaching compliance over the time

21    period that we've discussed here.  And personally I think it

22    would be a shame if we -- if you didn't lock us in a room and

23    try to make us get it done.  And I'm not just saying that.  I

24    think --

25              THE COURT:  It's very tempting to lock you in a
```

1  room, regardless of the possible outcome.

2          MR. VERHEIJ:  Yes.  Well, not that kind of room,

3  Your Honor.

4          THE COURT:  And I mean this collectively, so --

5          MR. VERHEIJ:  Your Honor, he believes it can get

6  done, and even up to the chairman of the company believes it

7  can get done.

8          MR. LOVETT:  Your Honor, we worked very well with

9  all three of the lawyers here.  I thought that they were

10 honest, don't see any problem there.

11     What concerns me in all this -- and I think Mr. Hurney is

12 probably putting the best face on this thing saying it was a

13 tight schedule and the press of time.  Really, we had three

14 weeks since this hearing was over.  It was plenty of time.  We

15 were in agreement on everything last night.  I mean we were

16 just down to dotting i's and crossing t's.  And I don't think

17 that this came from any discomfort with the drafting of the

18 document.

19     I think it was, at least from my perspective, a change of

20 mind on the part of Apogee about complying with its permit.  I

21 have still no other explanation for why they didn't just say,

22 "Well, we've got a problem with this provision."  That's not

23 what happened.  It was, "We're finished.  We're not going to

24 do any more."

25          And I'm happy to continue talking.  I mean I would much

1    prefer to settle this than to have the Court rule.  It's just

2    a better scenario for all of us, I think.  If Apogee agrees to

3    it, it's more likely to comply without us having to constantly

4    come back to the Court and ask for enforcement.  That's really

5    my motivation and has been all along for trying to settle

6    this.  I don't want this to be a difficult process for the

7    next two and a half years.  I want it to move forward.  I want

8    Apogee to treat its water.  And I think that's what our

9    clients want.

10        So, you know, I don't mind talking for a few more days,

11   but my sense is, at least it was after last night, that this

12   wasn't about any drafting process.  This was about Apogee

13   deciding that it didn't want to comply with its permit and was

14   going to force somebody to order it to.

15              MR. VERHEIJ:  Let me just say that, you know, in

16   Mr. Hurney's outline, which obviously has a great deal of

17   input from St. Louis, I mean there's still a commitment to

18   spend the estimated amount of money for the treatment system

19   that's been the subject of the testimony here in court, to

20   continue to do a number of things we've already initiated.  We

21   have -- out of four proposed tasks submitted by FBR, I think

22   two have already been approved, expenditures of a significant

23   amount of money.

24        So the company -- you know, if there was an argument, if

25   we had a closing argument, Mr. Hurney would be telling you

1    that the company is still committed to installing that

2    treatment system.  And I do think it simply comes down to a

3    matter of reducing this to writing.  I joked with Joe.  I

4    said, "I wish we had continued through the night," because,

5    you know, some things tend to fall out in the wee hours of the

6    morning and people pick their priorities.

7             MR. LOVETT:  But, honestly, I don't think it was a

8    problem with us.  I don't --

9             MR. VERHEIJ:  No, no, it truly isn't.

10            MR. LOVETT:  You got a call from somebody --

11            MR. VERHEIJ:  Yes, I did.

12            MR. LOVETT:  -- telling you to pull the plug.

13            MR. VERHEIJ:  It was, "Well, we don't think we can

14   get there, so we need to prepare for the closing argument,"

15   and that was a deadline.  You know, that was just a deadline

16   we were working against.  I still think it's worth a shot.

17            THE COURT:  All right.  Well, I don't think I need

18   to hear any more at this point.  While it would be extremely

19   unfortunate for all of the effort that's been put into this

20   the last three weeks to just be wasted, it's really beyond my

21   control.  I'm not going to direct the parties to continue

22   negotiating and I'm not going to delay this thing further

23   while that takes place.

24        I'm prepared today to go ahead and let each side have

25   some brief closing argument, and then I'll address what I

1    think will be the next step.  So let's proceed.

2        We spent a lot of time on this case at the hearing.

3    Obviously you've had a lot of discussion since then.  I'm

4    interested -- you can be seated, gentlemen.

5        I'm interested in each side addressing two items.  First,

6    we literally have pending a motion by the plaintiffs for the

7    defendant to be found in contempt, and we have a motion by the

8    defendant for a modification of the prior consent decree.  So

9    I'd like each side to briefly address what they believe the

10   Court's ruling ought to be with respect to those and then

11   obviously some statement as to what you believe the

12   appropriate remedy should be.

13       I guess the third thing that we need to add to this is

14   that Hobet 22 is before the Court in a bit of a different

15   context.  So let's add that as the third item, and that is the

16   nature and scope of the relief to be granted now that the

17   Court has already found in favor of the plaintiffs on their

18   entitlement to injunctive relief.

19       So I'm going to try to limit each side to about a half an

20   hour.

21           MR. LOVETT:  Thank you, Your Honor.  I'd like to

22   reserve some of my time, if I can.

23           THE COURT:  That's fine.

24           MR. LOVETT:  I apologize.  I honestly didn't plan on

25   making a closing argument today.  I thought as of 10:00 last

1   night or thereabouts that we were going to settle this.  So I

2   may be a little more disjointed even than usual here.

3       So we do come today to ask the Court to hold Apogee in

4   contempt and to rule on the Hobet 22 matter and to start the

5   clock as of tomorrow for construction on the Apogee and two

6   weeks later on Hobet 22.  We think that -- you know, I won't

7   spend much time on the evidence.  The Court heard it fairly

8   recently, but we think that Patriot has shown, you know,

9   contempt for its obligation to comply with the contempt with

10  the court order and with the Clean Water Act.  And I think

11  what happened -- I think the reason the negotiations failed

12  is, again, because of the recalcitrance of this defendant and

13  its just general refusal to meet its permit limits.

14      So here's generally what we would like to see happen:

15  We'd like -- though we think Patriot can do it more quickly,

16  we understand the Court's position, and this was our

17  negotiating position.  We would like for the Court to order

18  both Apogee and Hobet to comply with the 2.5-year schedule

19  that was, I believe, Plaintiff's Exhibit 63, the document

20  prepared by CH2M Hill for compliance.

21      We would like the Court to order Patriot to begin that

22  schedule tomorrow for Apogee and in two weeks for Hobet 22,

23  two weeks from today -- or two weeks from tomorrow.

24      We would like the Court to require Patriot to submit

25  $80 million -- and I'll explain how we get to that -- into an

1    escrow account.  We were content with letters of credit until

2    now.  I think that Dr. Kavanaugh testified, and we agreed,

3    that an escrow account is a better vehicle, a safer vehicle,

4    and we would like that to be deposited in escrow with the

5    Clerk of the Court to complete the projects.  Until last

6    night, until the failure of these negotiations, I think we

7    would have accepted and would have asked for a letter of

8    credit rather than the escrow account, but I think that

9    Patriot is never going to comply with this voluntarily and

10   needs all of the incentive it can have.  And that money

11   sitting in escrow is a way to do it, plus I believe that it

12   will protect the money better should Patriot experience

13   financial difficulty during the next two and a half years

14   while it completes the project.

15        We'll ask the Court -- or I am asking the Court to

16   analyze -- to require Patriot to analyze and report the flow

17   information for Hobet 22 and for Apogee and to order a

18   geotechnical report.  And I give dates for all of this at the

19   end of the presentation here.

20        The Court is well aware of the history of the actions

21   that got us here, and I don't need to take us through them

22   all, but I would just point out a few of the highlights.  In

23   its July 7, 2008 order, the Court ordered that Apogee must

24   submit a status report to the Court and plaintiffs.  This

25   report shall include an explanation of treatment alternatives

1    Apogee is considering to bring itself into compliance with its

2    selenium limits.  Skip on a little bit.  The report shall

3    include a proposed timetable for completion of planning and

4    implementation of a treatment system.  The timetable should

5    include interim deadlines with enforceable benchmarks.  Of

6    course, today we don't have any compliance.

7         On August 13, the Court ordered Apogee to install the

8    zero valent iron system at Titanic by August 31, 2008.

9    Titanic is still out of compliance.  The Court said it would

10   not allow Apogee to explore treatment options and potential

11   consultants indefinitely, noted that, as plaintiffs complain

12   and the Court has previously recognized, Apogee already

13   squandered much of the time to experiment with different

14   technologies.  That was August 13, 2008.  Nothing has changed.

15        In December 2008, the Court observed that having given

16   Apogee the time and flexibility to obtain consulting

17   issuance -- assistance, review and investigate alternative

18   treatment options and choose its own course for compliance,

19   the Court will hold Apogee responsible for any failure to

20   achieve full success with the installation and compliance

21   deadlines.

22        Of course, we still don't have Apogee in compliance at

23   any outfall.  So this action has been going on since we filed

24   the complaint in June 2007 and still no compliance.

25        Now, we heard in the hearing that in January 2009 a

1  series of events occurred.  First of all, the ABMet pilot

2  started.  CH2M Hill submitted three reports, one recommending

3  a flow analysis be done, one recommending an FBR pilot.  And

4  neither of those things were done.  There's been no flow

5  analysis at Apogee and -- excuse me -- the FBR pilot did

6  eventually take place but long after that.

7       It also recommended that a study be begun to study the

8  dilution of selenium in rainfall events.  That got under --

9  that was in January 2009.  That didn't get underway until the

10  Spring of 2010 and won't be completed now until the Spring of

11  2011.

12       There was also a contested draft report in January of

13  2009 that said that Patriot had liability of 14,040 gallons

14  per minute to treat.  In March 2009, Mr. Rooney, who testified

15  by video deposition, guaranteed ABMet, gave a performance

16  guarantee for a full-scale system to Apogee.  That was

17  March 2009, the same month that the consent decree was issued

18  requiring compliance by April of 2010.

19       June 9, 2010, there's an email from Chris Knibb, who was

20  the controller, to Mark Schroeder, saying, "We have rough cut

21  and a new number -- of a new number that's about half the old

22  one.  We have not sold," in quotes, "EY on it yet," Ernst &

23  Young.  "Still working on this story."

24       July of 2009, a month later, Potesta comes out with its

25  final report, instead of 14,000 gallons per minute, now saying

1    that Patriot is responsible for 1872 gallons per minute,

2    24 gallons per minute at each of 78 outfalls.

3        If you look at that in terms of Apogee alone, that's

4    $1.3 million for all three outfalls.  Patriot never intended

5    to comply with its permit.  When that came out, it had the

6    ABMet pilot, it knew roughly what these things were going to

7    cost, yet it had Potesta prepare a report that reduced the

8    flow level from its earlier numbers and only treat at

9    24 gallons per minute at each outfall, significantly under-

10   estimating the cost.

11       Finally, in January 2010, the FBR pilot begins.  And in

12   July we get the FBR report.  And as of the day of the trial,

13   the first day of the trial, finally it appears that Patriot

14   asks CH2M Hill for a price and for a contract, not until the

15   trial begun.  That evidence shows to our minds unequivocally

16   that Patriot never intended to comply with its permit at the

17   Apogee mine; still doesn't.

18       Now, John McHale testified that he told the vendors and

19   CH2M Hill of these compliance deadlines, but at the trial both

20   witnesses from CH2M Hill testified that they were never told

21   of the deadlines and did not know of a deadline for

22   compliance.  Phil Rooney of GE testified that Patriot never

23   told him of any specific compliance deadline.  Mr. McHale

24   testified that he had a Power Point presentation that showed

25   the deadline, but on examination in the court, it became clear

1    that there was no deadline even on that Power Point

2    presentation.

3         In fact, Patriot took so lightly its obligation to

4    comply with the Clean Water Act and this Court's orders that

5    it did not even tell any of the people it was working with

6    outside of its operation that it had a specific compliance

7    deadline.

8         Tom Sandy and Tim Harrison, both with CH2M Hill who

9    testified here, said that if asked when Patriot entered into

10   the consent decree in March whether Patriot could comply by

11   April of 2010, they would have told Patriot it could not have

12   done so.  So Patriot had hired CH2M Hill's consultant, entered

13   into a consent decree, and didn't tell CH2M Hill that it had

14   done that.

15        Harrison also testified that if Patriot had asked him in

16   March 2009 whether they could comply, it would have told

17   him -- would have put them on a path for compliance by

18   March 2012, a year and a half from now, instead of two and a

19   half years from now.  So Patriot did not act diligently or

20   honestly at all here.

21        Now, we know based on the testimony that there are three

22   technologies that will work to treat this water, at least

23   three, and one that won't.  First of all, ZVI will not work.

24   There's not a shred of evidence in the record, there's not a

25   report, a piece of data, anything that demonstrates or even

1   suggests that ZVI can treat iron -- excuse me -- can treat

2   selenium to 5 parts per billion or less on a consistent basis,

3   not a shred of evidence.  And, in fact, all the evidence is to

4   the contrary.  CH2M Hill points out in its reports that ZVI is

5   a new, young technology.

6       We believe that there is no way that it will work,

7   there's no evidence showing it will work, and no pilot has

8   been successful, and there's no published data.  It's all --

9   any support that the technology has is based on unsupported

10  supposition.

11      Now, we do know from all of the testimony from CH2M Hill,

12  from Patriot, from Dr. Koon, that reverse osmosis will work,

13  including ZVI -- including, excuse me, VSEP, that an FBR will

14  work and an ABMet will work.  And I think that's been clear

15  for at least two years now.

16      We also understand that VSEP and traditional reverse

17  osmosis are probably not appropriate technologies in this

18  context because they cost more to treat the selenium than

19  ABMet or an FBR would.  It appears from CH2M Hill's reports

20  that the FBR is the most cost effective form of treatment.

21      Plaintiffs, of course, are agnostic about which of the

22  three treatment technologies the operator chooses.  It appears

23  that Patriot is set on FBR, and we have no objection to that.

24  The same is true of whether that the defendant uses a

25  centralized system or treats outfalls individually.  Those are

1   engineering questions.  We believe that CH2M Hill is competent

2   to help Patriot make those decisions, and those are decisions

3   that the operator should make.  We do not, however, want ZVI

4   to be permitted as a treatment technology because that's the

5   reason -- part of the reason we are where we are today is

6   because of defendant's continued reliance on ZVI as a ruse

7   rather than as a technology that will actually treat the

8   water.

9        So specifically here's what we're asking for:  We're

10   asking for a finding of contempt, and we're asking for the

11   Apogee to comply -- Apogee permit to comply with its permit at

12   all three outfalls by March 1, 2013, which is two and a half

13   years from tomorrow, and for Hobet 22 to comply by March 15,

14   2013, which is two and a half years and two weeks from

15   tomorrow.

16       The costs are broken down this way:  Dr. Koon testified

17   that to treat 5150 gallons at Apogee would cost roughly

18   $60 million.  Fifty-one fifty gallons is the first flush of a

19   25-year storm, and that's the design flow that seems

20   appropriate here.  It may not treat all of the water.  We

21   don't know because that dilution report was never completed,

22   so we don't understand yet how much dilution -- how much

23   selenium will be lost in dilution, but it seems reasonable to

24   go with 5150 and assume that above that point, dilution will

25   take care of the problem.  So that would cost $60 million.

1           We don't have an estimate from CH2M Hill for treating

2      5150.  I think CH2M Hill now estimates or estimated then

3      roughly between forty and forty-two million dollars to treat

4      about 2100 or 2200 gallons per minute.  So extrapolate up from

5      that to 5150, Dr. Koon testified that would cost 60 million.

6      It's the only evidence in the record.

7           At Hobet 22, using an FBR, Dr. Koon estimated that the

8      cost would be $15 million to treat 875 gallons per minute.

9      Now, as uncertain as the flow is at Apogee, it's even more

10     uncertain at Hobet 22 because that 875 gallons per minute is

11     based on a quick review I think of DMRs and hasn't even been

12     subjected to the same scrutiny that the Apogee number has.

13     Nevertheless, it's the only number that we have.

14          And then for equalization projects, we expect

15     conservatively that -- conservatively, I think will cost no

16     less than $5 million.  Now, plaintiffs have made the

17     concession in settlement, and we're willing to make it here as

18     well, we don't want the MSHA requirements to be triggered

19     because we think that that may take so long for review that

20     the project would be delayed.  So therefore the dam, the

21     60-foot or 90-foot dam that would be required to treat all of

22     the water perhaps, we don't ask the Court to order that and

23     don't think it's appropriate given where we are in this

24     process.

25          We would, however -- we do, however, think it's

1    appropriate that ponds at Outfall Number 1 at the Apogee site

2    be extended upstream from the lowest pond, that the ones there

3    be increased in size to up to -- we understand that the number

4    is 20-acre feet.  If you've got over 20-acre feet, then MSHA

5    requirements are triggered, and we don't want that.  So a

6    series of ponds as practicable.  We understand if you don't

7    know what's practicable yet, that's another aspect that we

8    would like a special master appointed.  And I think both

9    parties would probably agree to this, to have a special master

10   appointed to help the Court and the parties, frankly,

11   understand how much water can be equalized at Outfall 1 and at

12   Outfalls 2 and 3 to treat as much water as is practicable

13   there given the concession that no dam that would require MSHA

14   approval be built.

15       So the total of that is $80 million.  And I don't think

16   there's any evidence contrary to that in the record for those

17   flows.

18       Again, September 1 start date for the Apogee schedule,

19   September 14 start date for the Hobet 22 schedule.  Now, one

20   difference, we understand that -- I expect that at Apogee that

21   the company is far enough along that if it actually treats

22   this water, it's going to do it with an FBR.  It's spent time

23   and resources already on that, and I think it's probably

24   committed some money now towards an FBR system.  However,

25   that's not clear to me at the Hobet 22 site.

1      We would ask the Court to order it not to use ZVI at

2   Hobet 22 because we think that it will -- and I think the

3   evidence is clear it would just lead to more delay and won't

4   be a serious attempt to treat.  If, however, the Court does

5   not want to do that, we would ask a series of purgeable fines

6   be put in place and that the money placed in escrow to

7   guarantee it not be returned if at the end of the period they

8   have tried it and it has not worked.

9      On the other hand, for Apogee, or any system -- any

10   outfall that uses FBR, ABMet, or reverse osmosis, we

11   understand -- everyone expects that they will work, but if

12   they don't, we expect that the Court should not keep any

13   resources that it has from the company for that failure.  We

14   believe that if they don't work, there are remedies going

15   forward for plaintiffs to sue for violation of the permits

16   going forward, but to the point of on -- on those days when it

17   doesn't, when it's completed and not working, we don't expect

18   the Court to keep any of Apogee's money or Hobet's money.

19      On September 14 we would ask the Court to order Patriot

20   to begin a flow analysis at Hobet 22 and at Apogee to

21   understand the flow; and on the same date, September 14, ask

22   the Court to order Patriot to begin the geotechnical

23   reports -- begin geotechnical reports at both mines to make

24   certain that the equalization processes comply with state and

25   federal guidelines.  Those should have been done a long time

1    ago.

2         We would also ask the Court to require that the

3    geotechnical report be completed within two months of its

4    start date and that the flow analysis be conducted for at

5    least a year and that the results be reported in a reporting

6    schedule I'm going to talk about now.

7         So for reporting, we would ask the Court to require

8    Patriot to report once a month for the first year on

9    everything, including the storm water dilution study at Hobet,

10   the geotechnical report, the flow analysis at both mines, and

11   the progress of the construction of the treatment system.  So

12   we would ask reports once per month to the Court, to the

13   master, and to plaintiffs on those processes during the first

14   year.  After that, we would ask for quarterly reports.

15        We think it's important that it's monthly in the first

16   year because the company needs to be kept on track, and three

17   months past -- we've seen what those months passing in the

18   past have done.  That's why we're here today.  So we think we

19   need monthly reports and that the Court needs them.

20        We would ask that the Court order us to submit names of

21   special masters for the Court's consideration by September 14

22   and that the Court choose a special master at its own schedule

23   but as expeditiously as possible so that we can get this

24   process moving.

25        To achieve that, we'd ask Patriot to submit $80 million

1    into an escrow account with the Clerk by September 7, that

2    the Court release that as it's used.  I honestly believe

3    that's the only way or the best way to make this happen.  I

4    don't think that as security a revocable letter of credit is

5    as good.  Nevertheless, if the Court is unwilling to require

6    an escrow account, we'd ask it to require $80 million in

7    secured irrevocable letters of credit be placed with the

8    Court.

9         Now, I know that, you know, the Court has told us in

10   chambers its -- I think we were asking for 95 million at the

11   time and we came down to 80.  That may not be what the Court

12   had in mind, but I think that given what's happened in our

13   negotiations makes it even clearer that at least $80 million

14   is necessary to assure that this project is completed.

15        We'd also ask for purgeable fines for the costs of delay.

16   We have in evidence those schedules, but let me tell you what

17   they are.  In the first quarter, it would be for --

18        (Mr. Lovett and Mr. Teaney conferred privately off the

19   record.)

20        MR. LOVETT:  So we didn't do the math.  I'm sorry.

21   But we have $60 per million per day in the first quarter.  And

22   this is in the record, too.

23        THE COURT:  Say that again.

24        MR. LOVETT:  Sixty dollars per million of cost per

25   day in the first quarter.  And "quarter," I don't mean a

1    quarter of a year but a quarter of the project.

2              THE COURT:  Right.

3              MR. LOVETT:  A hundred and seventy-nine dollars per

4    million per day in the second quarter.  Three hundred and

5    thirty-eight million -- $338 per million per day in the third

6    quarter, and $397 per million per day in the fourth quarter.

7    Now, that's based on $80 million and it's based on a break-

8    down -- you may recall the testimony.  We broke that down into

9    15 percent of the money would be spent in the first quarter,

10   30 percent in the second quarter, 40 percent in the fourth

11   (sic) quarter, and 15 percent in the last quarter.  And that's

12   based on Dr. Koon's testimony.

13        We also have the numbers -- and I can give you four --

14   25, 25, 25, 25, which is a quarter each, you know, instead of

15   the 15, 30, 40, 15.  That would be in the first quarter, $99

16   per million per day.  In the second quarter, $199 per million

17   per day.  Two ninety-eight in the third quarter, and three

18   ninety-seven in the fourth.  And I see I'm running out of

19   time.  I want to save some time.

20        So let me just say one more thing, which is that also we

21   had in negotiations agreed not to do this, but I think that

22   the Court should be aware and we may soon file a complaint for

23   penalties in this case since April of 2010 for the permittee's

24   failure to comply with its permit in the interim.

25              THE COURT:  All right.

1              MR. LOVETT:  Thank you.

2              THE COURT:  Mr. Hurney.

3              MR. HURNEY:  Thank you, Your Honor.  If it pleases

4    the Court, I believe that my argument will address both the

5    motion for contempt and our motion for additional time because

6    I believe the factual predicate that I'll be discussing

7    supports our position on both.

8         In order -- one of the defenses to contempt -- and I

9    don't intend to go into a long discussion of law; we put this

10   in our initial brief -- is whether you've provided substantial

11   compliance or whether there was impossibility of performance.

12   And I want to talk about those themes as we review what

13   Patriot did.

14        I think in terms of the extension of time, you know, this

15   is an area where, you know, different rules may apply.  It

16   seems to me that two things are significant.  The first would

17   be kind of the principle of a change of circumstances.  And

18   what I'll be talking about is the change of circumstances that

19   has arose as a result of the efforts Patriot made pursuant to

20   this consent decree and pursuant to the consent decree in the

21   Circuit Court of Boone County to evaluate and find out about

22   various technologies in the aftermath of the hearing we had in

23   July of 2008.  And I think also that the Court has inherent

24   power to change a consent order that involves a continuing

25   supervision of the Court.  So I just want to talk a little bit

1    about the facts, because I think that the evidence in the

2    three days before the Court was pretty striking for a number

3    of reasons.

4        You know, first, I think in my opening statement I told

5    the Court that back in July 2008, I think that the testimony

6    suggested that there were what I would describe plug and play

7    solutions to the treatment of selenium.  And the Court heard

8    very little evidence.  You heard about ZVI, which we

9    discussed, and you heard about VSEP.  And the testimony about

10   VSEP, which we quoted in our brief, was that it was a

11   six-month project.  And I think the Court reflected that in a

12   later order.

13       I think that the efforts made by Patriot and the things

14   that have been done in the last two years demonstrate that the

15   problem was much more complex than that and that technology to

16   treat selenium was far less developed than we expected.  It is

17   notable I think that at the three days of testimony, every bit

18   of testimony related to treatment systems either came from

19   CH2M Hill or was entirely derived from CH2M Hill.

20       You heard Tim Harrison, you heard Tom Sandy, and you

21   heard Dr. Koon.  And on cross-examination, Dr. Koon conceded

22   that the whole of his examination had been reviewing what CH2M

23   Hill had done.  And I think that's important because I think

24   we've brought to the Court an expert that we hired under the

25   Court's order, and these experts have evaluated and worked

1    with Patriot to identify treatment.  And just going through

2    it, you know, Patriot, we've installed and tested and used the

3    ZVI.  And I know that's the great Satan of treatment systems,

4    but Tom Sandy testified that ZVI was still a technology that

5    needed to be considered.  That's contained in the report --

6    the January 2009 report.  It's contained in the larger report

7    to the minerals council.  It needs work and there's a question

8    about it at high flows, but to say ZVI doesn't work is

9    incorrect.  And I think that we start with the premise of that

10   doesn't work, but look at what else we -- we tested ABMet.  We

11   tested, piloted RO.  We piloted VSEP.  We piloted FBR.  And

12   all of the pilot information has been submitted to the Court.

13   You have the reports.  We can go back and forth.

14       The interesting thing to hear is to hear from my

15   colleagues that VSEP works.  Well, VSEP will remove selenium,

16   but it did not work in the pilot, and there was a back and

17   forth that was submitted in evidence to the Court where CH2M

18   Hill concluded that it wasn't an effective technology.  These

19   things take time.  And I think looking back at Patriot's

20   effort, whether, you know, John McHale on the stand differs

21   with what he told somebody doesn't change the fact that over a

22   period of two years, they piloted and did studies on all of

23   these technologies that bring us to the point today that we

24   can talk about them.  And that's my point as it relates to all

25   of the information about technology that was brought to this

1   Court came from work done by Patriot, work brought to you

2   through the testimony of the CH2M Hill witnesses.

3       To me, that's not contempt.  That is not ignoring Court's

4   orders.  You know, we can go back -- and I think I talked

5   about it with my low-tech board.  I'll try to be fancier next

6   time, Judge, but if you looked at it and you argued could we

7   parallel things, could we do this, could we have shaved six

8   months off if we'd done a better job, I think you can argue

9   those things.  And I told you in opening we're not perfect,

10  but I don't think the fact that we weren't perfect translates

11  into flouting the Court's order and not doing what the Court

12  wanted.

13      The bottom line is that had we instructed CH2M Hill to

14  immediately embark on building a system, they probably would

15  have put in an RO system that cost two to three times as much

16  and they never would have gotten around to figuring out that

17  maybe FBR -- FBR is the better solution.  And whether we want

18  to talk about cost or not, when you look at companies and the

19  size of these mines, cost is a significant factor if we are

20  going to solve this problem.

21      And I think the other thing that's important as we have

22  discussed these technologies is, you know, I think they used

23  the term "fledgling," and I don't want to get caught up in the

24  language, but all of the technologies are being moved over

25  from treating something else.  FBR was used to treat something

1      else.   And the water treatment experts are looking at things

2      and saying, "Hey, what existing systems can we use to solve

3      this problem?"   But to date, to date, nobody has installed a

4      full-scale FBR.   There's no testimony that there's a

5      full-scale FBR to treat selenium or to treat it in a coal mine

6      environment, but I do think that the effort's imperfect -- the

7      imperfect effort of Patriot and Apogee and Hobet to get us to

8      this point deserves their consideration and really to me

9      establishes that even though they didn't get to that deadline,

10     they didn't get a system in place, they did the things to be

11     able to identify the system.   And had they tried to install

12     one within the deadlines, I think the testimony is unrefuted

13     that they wouldn't have made it.

14          And that's where -- you know, to make a side point, maybe

15     we're looking too much at artificial deadlines of, you know,

16     when permits expire and other things.   And I think those are

17     important and those are the law, but when you're looking at

18     trying to solve the problem and you're looking at trying to

19     get a system in place that works, it seems to me that the

20     critical people to listen to are the expert witnesses.

21          And so, you know, from a factual standpoint, you know,

22     I'd ask the Court to consider the efforts that Patriot made.

23     And, look, I know they were made under consent orders, but

24     they were consent orders.   They were orders the company

25     entered into.   They were orders that the company financed in

1   Boone County and under the second consent decree before this

2   Court and spent substantial money.  I think John McHale

3   testified they've spent over $9 million on the evaluation in

4   testimony, or something in that neighborhood.

5       And I think that is, you know, contrary to the idea that

6   you're flouting the Court, I think that shows a substantial

7   investment.  If you listen to John McHale, they have, you

8   know, people at Patriot -- John spends, I think, 50 percent of

9   his time.  They have other people spending a lot of time

10  trying to solve this problem.  I overlay that with the fact

11  they didn't just go with CH2M Hill.  They -- as you know, they

12  had Dr. Lovett.  And I know the other side doesn't like

13  Dr. Lovett, but they continue to work with him to say, "Can

14  you get ZVI to work?"

15      They brought in MATRIC, which became Liberty, who assured

16  them on a couple of occasions that they could install systems

17  that would work.  And so, you know, in addition to doing these

18  other things, whether you like ZVI or not, they were

19  proceeding with hiring experts who told them they thought they

20  could get them to compliance.  Did we get there?  We know we

21  didn't because we wouldn't be standing here today, Your Honor.

22  But they didn't put all their eggs in one basket, and they

23  made these efforts.  And I think that's significant, and I

24  think that's worthy of the Court's consideration before you

25  find them in contempt for flouting your ruling.  And I think

1    it's also worthy of the Court's consideration because I think

2    we are here today with the knowledge we have of the treatment

3    systems because of the efforts of the last two years.  And I

4    think that's significant as it relates to our burden to

5    convince you to give us additional time.

6        You know, I've got pages of notes, Judge, about could we

7    have done this a little faster, that we had a point made about

8    parallel proceedings.  And, you know, it just seems like,

9    "Hey, why don't you do all this stuff all at once and get it

10   all done in six months?"  Well, you know, Tim Harrison said

11   that's a good idea, but practically you can't say that would

12   have worked, you can't say that you would have been able to,

13   first of all, I guess -- you know, I learned from this process

14   that there aren't -- GE doesn't have 25 ABMet pilots sitting

15   around to haul off all over the country.  So it's availability

16   of equipment, availability of technology.  And so, you know, I

17   don't think there's been any proof that -- despite the

18   suggestion we could have done all this stuff at once and been

19   done, there's really no proof that it could have been done.

20       And I think that, you know, I tried to show the Court

21   with my primitive timeline that I think we moved the pace.  We

22   got projects done.  We didn't wait until they were completed.

23   We started others.

24       The flow project, we probably should have started that

25   sooner, probably should have started it sooner, Judge, and it

1   seemed clear as day once we got to this courtroom, but, you

2   know, I think they were making judgments about proceeding with

3   evaluating treatment systems, and maybe that one slipped

4   through the cracks, but, again, it's the overall effort that I

5   would ask the Court to focus on as it relates to treatment

6   systems.

7        I think the Court wants to know particularly what it is

8   we think you ought to do.  And if it's all right with the

9   Court, I hope I've made my point as it relates to the efforts

10  of Patriot through its subsidiaries, Apogee and Hobet, to

11  investigate and comply with consent decrees and, frankly,

12  to -- the last point I'll make is the work they have done is

13  the basis for the papers written by CH2M Hill which are now

14  being used by others in the industry.  Talk about the metals

15  council they went to, if you read that thick document when

16  they talk about FBR and the other things, a lot of that comes

17  from what they know about what was done at Patriot Coal.

18       So not only have we, you know, been a part of developing

19  this knowledge, I think it's meaningful as it relates to other

20  companies and things outside this case.  I think -- I don't

21  know the right way to ask.  I think we ought to get credit for

22  that.  I think that ought to be considered before you decide

23  that this company was in contempt.

24       We think that the Court should issue an order directing

25  us to install a water treatment system, and I want to talk

1   about Apogee.  I'd like to, if it's all right with the Court,

2   can I put Hobet to the side?

3           THE COURT:  Sure.

4           MR. HURNEY:  The argument is a little bit different.

5   We think you should order us to install a treatment system,

6   and our experts testified that they could do it in two and a

7   half years.  They also testified that in their opinion -- and

8   I know Dr. Koon disagreed, but CH2M Hill said in their opinion

9   two and a half years works if everything goes right, if it

10  doesn't take too long to blast out the mountain to put in the

11  building that you have to put for an FBR system, if you don't

12  get rain or other problems when you're trying to build the

13  access road.  So there's a lot of things that go into the

14  project.  And so what I'd ask the Court is -- certainly the

15  evidence you heard was that both sides' engineers got in a

16  room and came up with two and a half years as a reasonable

17  schedule, an achievable schedule, but I think that that

18  schedule should be balanced with, in your order, if the

19  parties don't -- if we don't think we can get there, that we

20  have an opportunity to come to the Court and demonstrate that.

21  And I think that's fair.  And it's the equivalent I think of a

22  force majeure clause in any kind of contract.

23      You know, if we had a -- to make a ridiculous example, if

24  we had an earthquake and we couldn't do anything, I think we'd

25  need to come into court and demonstrate to you.  And I think

1   that there ought to be a process contained in the order to

2   provide for this.

3        I also -- you know, I think that the order should not

4   direct Patriot as to what technology it should choose.   I

5   think a couple of things are important.   One is, I think we

6   need -- the company needs to rely on the experts, on the

7   engineers as to what the best system is.   And I think the

8   testimony you've heard is that we've been convinced that FBR,

9   a fluidized bed reactor, is the way to go both in terms of its

10  ability to treat within the limits of the permit and in terms

11  of overall cost.   I find the cost of these things to be almost

12  breathtaking.   And so I think that's important if we look down

13  the road and we want to get water treated.

14       You know, it seems to me that a recognition by the Court

15  in its order that any treatment system that's being adapted

16  from elsewhere, you could get it scaled up to full scale and

17  it doesn't work, and I think that the Court should somehow

18  recognize that and compel the parties to come back to either

19  the Court or the special master.

20       And I'll jump ahead.   We agree with -- I agree with my

21  colleagues.   I think that a special master is an appropriate

22  assistance to the Court, not that the Court needs any

23  assistance, but for the kind of hands-on supervision I think

24  is appropriate and I think the Court would want, I think the

25  expertise of someone with water treatment credentials would be

1    invaluable both to the parties and to the Court.  And we

2    would -- I would join with Mr. Lovett that the Court's order

3    should give us a period of time to submit names and

4    information, if we can't agree on someone, that the Court

5    would appoint.  And I will represent to the Court that we have

6    three potential names supplied from us by CH2M Hill that we're

7    prepared to look at.

8         I think that, you know, in terms of the volume of water,

9    you know, looking at my notes, they want to specify

10   5150 gallons, which comes from Dr. Koon's adding up of

11   estimates from CH2M Hill's reports.  It seems to me that the

12   Court's concern should be to direct Patriot Coal to construct

13   an appropriate system that puts it in compliance with its

14   permits.  Whether that's 3000 gallons or whether that's 5000

15   gallons or whether it's the combination of two outfalls or

16   three outfalls or three separate things are things to me that

17   I think the Court should leave to Patriot and leave to its

18   experts.

19        And, you know, I think it's difficult for the Court to

20   dictate, for example, "We think you have to treat this much

21   water."  I think that's up to Patriot to design the system.

22   They're going to have to submit it to the DEP for approval of

23   its NPDES permits.  And I think it ought to be left to the

24   company and the DEP as to whether or not the system that they

25   propose is sufficient for the treatment of water.  And I

1   accent for the Court the testimony of Tom Sandy looking at

2   historical data.  And, of course, we can find a flood here or

3   there that skews the curve, but looking at historical data and

4   making the best estimate of what system and at what flow will

5   treat -- I think he said 99 percent of the water at a level

6   that was lower than 5150.  I think that if the Court gets into

7   dictating how much water we should treat, then we just get

8   into those fights in front of the Court.

9       To me, the end goal is you've got two and a half years to

10  build a system to be in compliance.  I don't suggest for a

11  moment that we want to leave and come back in two and a half

12  years and tell you we're done.  What I do agree with the other

13  side, I think there ought to be a series of milestones based

14  on critical parts of the construction project.  I think these

15  milestones must derive from the actual schedule that CH2M Hill

16  is going to operate under.

17      In other words, I think that rather than say start

18  tomorrow, I think that the Court should create a deadline for

19  the submission of the initial engineering drawings.  And I

20  think there was some testimony with respect to Plaintiff's

21  Exhibit 63 where they talked about the various phases of when

22  things would be submitted.  And I think that the Court -- you

23  know, this is not going to be -- you know, if the Court has to

24  enter an order, this is not going to be a single order I think

25  that covers everything.  I think the Court's order will

1    dictate the overall responsibility you place on the parties,

2    but I think there certainly can and should be subsequent

3    orders that refine things like what is the actual construction

4    schedule and how are we going to put in reporting milestones

5    and purgeable penalties to make sure that you have an

6    incentive -- that my client has an incentive to proceed with

7    the project.

8        I think purgeable penalties is a fair process.  I think

9    it gives the opportunity to complete a segment of the project

10   and know that you're not going to be penalized and then start

11   on the next segment.  I think they're more manageable for the

12   Court because they are segments of projects that, you know,

13   you've either completed it or you didn't.  You make that

14   decision and it's a definable number.

15       We didn't -- I mean I think we could probably quibble

16   with the formula by Dr. Kavanaugh, but it's probably no better

17   or worse than any other.  The only thing I would suggest is

18   rather than, you know, as my colleague pointed out, rather

19   than, you know, try to denote that they're spending 15, 30,

20   and 40, and 15 percent on quarters, I think those can be

21   derived from the actual construction schedule and the billing

22   schedule of the parties, and I think that's something that the

23   Court could direct that these things in stages be submitted to

24   the special master for recommendation.

25       Like Joe, I wasn't expecting a whole closing.  I think a

1    special master -- and I've seen orders where, you know, the

2    special master, you submit things to them, they make a

3    recommendation to the Court, and usually there's some

4    opportunity for the parties to lodge their objections before

5    the Court decides whether to adopt or not adopt the special

6    master's order, and I think that would be appropriate.

7         You know, I think that in terms of going back to the two

8    and a half years where I asked the Court for a kind of a *force

9    majeure*, the reason I'm asking for that is, one, you know, I

10   think this will be the first full-scale FBR erected to treat

11   selenium and the first full-scale project erected to treat

12   selenium in the coal industry.

13        I think the testimony has been that CH2M Hill is pretty

14   confident that it's going to work, but it's still the first

15   one.  And I think that bodes or that supports the idea that

16   the Court ought to have a mechanism by which the parties can

17   come back.  There's unpredictability as it relates to

18   procuring equipment.  You know, we heard -- you would think

19   that you have a water treatment system, you have water in the

20   treatment system, but there was a lot of testimony we're going

21   to widen the road so that trucks can get in; we're going to

22   need to create a larger flat area.  And so I think there's a

23   lot of unpredictability, and I think that that really supports

24   the Court having some mechanism to consider the need for

25   additional time.

1           Financial assurance.  I think that maybe the point that

2      we disagree the most is the idea that you would take

3      $80 million and put it in an escrow account or $95 million and

4      put it in a letter of credit.  You heard the testimony of our

5      CFO.  I mean the company had -- is in -- you know, has

6      liquidity, the company has cash, and there's no suggestion

7      that Patriot cannot begin to finance this project.  And, in

8      fact, I think, you know, contrary to my colleague's argument,

9      I think they've demonstrated that they have financed it.  You

10     heard John McHale.  He's never had anything turned down.  They

11     spent $9 million.  And so I think that a more reasonable --

12     you know, a smaller letter of credit that would continue the

13     project if there appear to be some issue that they weren't

14     going to do it is much more appropriate than taking

15     $80 million away from this company and putting it in an escrow

16     account.

17          I mean putting it in a letter of credit makes it, you

18     know, as a practical matter, unavailable.  It means you can't

19     use that for other credit, you can't use that for other

20     things, and I don't think that an order of the Court should

21     hamper the company in terms of doing its business because I

22     think we need a healthy company.  I think they need the

23     opportunity to continue to grow and do other things so that

24     they can pay for this system.  I mean, you know, West Virginia

25     is littered with sites that companies went broke and didn't

1    reclaim.  And I think that in considering the idea of letter

2    of credit, you know, I would suggest that maybe the Court say,

3    "Well, I want a $5 million letter of credit up front," and

4    then, you know, if OVEC feels like there's some question about

5    the funding of this project, you know, you have an immediate

6    opportunity to go either to the special master or the Court

7    and ask for additional security.  But I think that it needs to

8    be flexible and I think it needs to recognize that this is an

9    ongoing business.

10       I mean we are looking at -- I disagree with the total

11   cost of 80 million.  I think Dr. Koon added up a bunch of

12   things.  He made -- I thought it was unusual that he made an

13   assumption as to the amount of water that would be treated and

14   then added up things to come to a number.  When I

15   cross-examined him, I said, "How much water do they have to

16   treat?"  And he says, "I have no idea."  I mean that was his

17   testimony, "I have no idea," as contrasted with the testimony

18   of CH2M Hill.  And so, you know, when we talk about

19   $80 million, I think the testimony of CH2M Hill was more in

20   the thirty-five to forty-million-dollar range for the FBR

21   project, whether, you know, depending on whether it was

22   installed separately or whether it was installed at a single

23   site with piping of water back and forth.

24       And so, you know, I think, first of all, the Court should

25   be conservative in terms of demanding either escrow or a

1    letter of credit.  Second, I think it ought to be based on the

2    actual cost of the project and not a -- I think Dr. Koon said

3    he, for one, he rubbed his belly and looked at the stars.  I

4    just don't think that's a basis for the assertion of a letter

5    of credit.

6        All right.  I think that -- Your Honor, I think I've hit

7    the main points I wanted to hit as it relates to Apogee.  Let

8    me talk for a little bit about Hobet 22.  And Hobet 22, as the

9    Court, I think, pointed out, is a little different.  We are at

10   a different stage in the proceedings because you're

11   determining, you know, the scope of injunctive relief.

12       The other thing about Hobet 22 is that it was carved out

13   of -- you know, it had been added.  That permit had been added

14   to the consent order in Boone County, and this Court

15   determined to take jurisdiction.  And one of the things that

16   you said in your order was, "I'm going to take" -- and I'm

17   paraphrasing because I think it was better said by you, Your

18   Honor.  "I'm going to take jurisdiction over this, but I won't

19   make an order that's inconsistent with, you know, the orders

20   of Boone County so that -- the Circuit Court of Boone County,

21   rather, so that Hobet is not subject to differing obligations

22   in differing courts."  And that was an argument.  You know, we

23   argued vociferously that you shouldn't take jurisdiction, and

24   the Court decided.

25       I suggest to the Court that that -- that the fact that we

1     are in two places on Hobet 22 and the fact that that is carved

2     out from another consent decree militates toward giving us

3     more than two weeks to start a project.  I mean, first of all,

4     there was no testimony about, you know, what would be involved

5     in, you know -- contrary to you heard all about Titanic and

6     Mud Lick and Slab Fork, there really wasn't a lot of testimony

7     in front of the Court, I think, to justify directing that in

8     two weeks we begin to erect a treatment system.

9          What I would suggest to the Court is a period of -- that

10    the Court direct us in a period of 60 to 90 days to come up

11    with a plan to the Court to treat Hobet 22 either by itself or

12    in combination with other permits that aren't before this

13    Court.  And that's the -- you know, to me, that's the

14    difference between, you know, working on Hobet 22 here versus

15    working on Hobet 22 in Boone County.  And I'd ask the Court to

16    consider giving us a little bit more flexibility, particularly

17    in two weeks in terms of trying to deal with that permit in

18    light of the fact that, you know, it is part ongoing

19    litigation in Boone County and ongoing addressing of the

20    problem in that court.  And so it seems to me that it makes

21    sense that the Court might give us a little bit more time to

22    come to the Court with a plan with respect to Hobet.

23         I mean we didn't have evidence from CH2M Hill that

24    concentrated their efforts in Apogee.  Dr. Koon talked briefly

25    about Hobet 22 deriving from other things.  And so I think

1    it's really difficult to say you've got two and a half years

2    to erect a system based at that on the current evidence.  I

3    think that the Court could extend -- you know, if the Court,

4    as I believe it should, appoints a special master, I think the

5    special master could be involved in making sure we are moving

6    at a pace and coming up with a plan.  So if you gave us 60 or

7    90 days, say, "Look, I want you to tell a special master in 30

8    days, you know, where you're at and whether this Court has

9    confidence that it will have a plan in that amount of time."

10        And I think that that's certainly appropriate, and I

11   think it also is a recognition that this is a complex issue,

12   and these treatment systems are -- you know, we knock on wood

13   with the best advice that they're going to work, but I think

14   that certainly additional time at Hobet would also militate,

15   Your Honor, toward, you know, perhaps getting a good feel of

16   the scale of the FBR unit, you know, at Apogee.  You know, if

17   it gets building and it's working, I think you have more

18   confidence that it would work in this environment.

19        Your Honor, the last thing I would ask the Court is, you

20   know, if we'd have the opportunity to -- two things.  One, an

21   opportunity to, you know, submit a post-trial brief to the

22   Court that I think would be maybe a little more exacting on

23   dates and some other things than perhaps I've been in my

24   argument.  And the second is a suggestion that the Court might

25   pick a date in a couple of weeks, to hold its ruling in

```
 1    abeyance and suggest to the parties that it might be a good
 2    idea to see if we can't work this out.  And I realize that the
 3    second request is asking a lot of this Court, which has shown
 4    a great deal of patience with the process, but I feel obliged
 5    for my client in the hope that we could get this worked out,
 6    that perhaps a little bit more time might be the solution to
 7    that, Judge.  I wish I could tell you I was 150 percent
 8    optimistic about that, but I'm an officer of the court, but I
 9    am hopeful and I think that it does, in fact, make sense.
10         With that, Your Honor, unless you have any questions of
11    me, I conclude my closing.
12              THE COURT:  Thank you.
13              MR. HURNEY:  Thank you.
14              THE COURT:  All right.  Briefly, Mr. Lovett.
15              MR. LOVETT:  In response, I'll work backwards.  In
16    holding in abeyance the ruling, we don't have any problem with
17    that.  I think the Court indicated in a conference earlier
18    that it would probably rule by Friday.  If the Court would
19    hold ruling in abeyance until the following Monday or so, I
20    mean that seems reasonable to us.  We're willing to continue
21    talking.  I do think, though, at some point it's just
22    necessary to rule on this.  And I understand that if the Court
23    holds its ruling in abeyance, the dates that we suggested
24    starting tomorrow may not start until the day after the
25    ruling, but we're willing to continue talking.
```

1          In terms of a post-trial brief, we're fine with that,

2     too.  We would, however, like the Court to get the ball

3     rolling before the post-trial briefing schedule is done.  And

4     I think that there are a lot of details that need to be

5     cleaned up in a post-trial brief, but, for instance, if you

6     look at the schedule, the pilot study and the preliminary

7     engineering need to be started right away.  And it's clear

8     that those have to be done at Apogee.  So we'd ask the Court

9     to rule on that, if it's going to have post-trial briefing,

10    before the post-trial briefing is concluded and order Apogee

11    and Hobet to begin the preliminary engineering and the pilot

12    study before the conclusion of the post-trial briefing, if

13    any, and to conclude the project by two and a half years.  I

14    don't think that any briefing will help or aid the Court in

15    that determination, and it would just slow things down.

16          And I think in terms of -- let me go back to the 5150

17    number.  We're not asking the Court to -- I agree with

18    Mr. Hurney, and I may have been inarticulate in my original --

19    in my opening statement -- or closing statement here.  We

20    don't think that the Court should order Apogee or Hobet to

21    treat any specific flow because nobody knows what the flow is

22    yet.  However, we think that in order to provide financial

23    assurance, it's necessary for them to put up enough money to

24    treat 5150 and 875.  It may turn out once we know more about

25    the flow, once the special master gets involved, once the

1  Court looks deeper into this issue, that it's less than 5150

2  and the cost will be less, in which case some money would be

3  refunded.  It may turn out to the contrary, that the number is

4  higher and that won't be sufficient.  But based on what we

5  have before us now, the 5150 -- and, by the way, I think

6  Mr. Hurney was incorrect.  I don't think that's Dr. Koon's

7  number.  That is a CH2M Hill number from its January 2009

8  report.  The 5150 is the first flush of a 25-year rain, and

9  that's the appropriate number to set the financial assurance

10  at at this point.  That could change as the flow numbers are

11  modified, but right now the Court has to have enough money to

12  assure this project gets built, and that's $60 million for the

13  5150.

14      Hobet 22.  You know, it is true that it's been before

15  this Court for a shorter period of time.  However, we filed

16  our notice of intent on that in February of 2009.  This

17  company has known that it has to treat that water for a long

18  time.  It entered into the consent decree with DEP in December

19  of 2009.  Nothing has happened, you know, in the past -- since

20  February of 2009 or December of 2009 to make treatment a

21  reality there.

22      He says there's no evidence it can be done in 2.5 years.

23  Well, of course, it can.  Don't forget that Patriot didn't get

24  its response from CH2M Hill about the FBR until the Monday of

25  the beginning of this trial.  CH2M Hill could easily do the

1    same for Hobet.  That's why I thought two weeks was a

2    reasonable amount of time for Hobet, because CH2M Hill could

3    do the same thing for it that it did for Apogee.

4         Now, liquidity.  The company has $230 million, or about

5    $230 million in cash, I think, and 400 million -- a little

6    more than 400 million in liquidity.  Now, that can go away

7    fast.  It's important -- as Mr. Hurney said, West Virginia is

8    littered with pollution control projects that never were

9    completed because the company went bankrupt.

10        This company has kicked the can down the road so far,

11   it's in turmoil as a company.  If you look at its stock price,

12   it's dropped significantly.  Its COO was recently fired.  This

13   company needs to put that money up to make sure this project

14   gets done.  It has to be the full amount.  Anything else will

15   not assure that this will be built, especially given Patriot's

16   reluctance to build this project or any other project.  So

17   liquidity is not an issue.  They have plenty of money.

18   There's no evidence to the contrary.

19        Now, another issue is default.  Another reason that the

20   Court needs to have a letter of credit or an escrow account is

21   in case this company defaults and decides just to stop

22   building it.  Then that money would be forfeited and the

23   project could be built.  Without that, there's no assurance

24   that this project will go forward.

25        In terms of defenses to contempt that Mr. Hurney raised,

1     first is impossibility.  Clearly there's no impossibility

2     here.  Mr. Hurney said that if they had asked CH2M Hill a year

3     and a half ago what to do, they would have put in an RO

4     system.  They could have put in an RO system.  It may not have

5     been, as it turns out, the most cost-effective system to put

6     it, but they could have treated the water.  So impossibility

7     was no issue.  There's been no change in circumstances.  But

8     the failure to build even any full-scale treatment or any

9     treatment at all shows a lack of good faith or willingness to

10    do anything here.

11          Now, he also said that -- I don't know why.  He said

12    that, you know, the plaintiffs hate Dr. Lovett.  Well, that's

13    clearly not true.  But even more important, Dr. Lovett and

14    Mr. Sawyer -- Dr. Lovett from ShipShaper and Mr. Sawyer from

15    Liberty MATRIC were deposed in this case.  They never

16    testified.  Therefore there's no evidence here or anywhere

17    from any of the depositions or any of their testimony, since

18    they didn't testify, that ZVI is a reasonable concern.  If

19    they thought that that was a serious -- if Patriot thought

20    that ZVI was a serious treatment option, I think we would have

21    seen Dr. Lovett here or we would have seen Mr. Sawyer.

22          The consent decree that they entered into and that we

23    entered into in March of 2009 was, unfortunately, it turned

24    out to be just another attempt by Patriot to delay its

25    compliance date.  It never intended to comply.  The pilot

1    projects don't make up -- don't show any attempt to comply.

2    They were pilot projects.  Still it has not treated any of its

3    water to compliance.

4        Let me make a couple of very quick last points.  In terms

5    of the letters of credit or the escrow account, if we would

6    ask that -- if the Court takes those, that it reduces them as

7    the projects move forward, so that they're continually

8    reduced, unless ZVI is chosen, in which case they would not be

9    reduced until the project is completed and released only upon

10   a successful project.  So we want them to be reduced and the

11   penalties to be purged as they move forward.

12       Two things I failed to ask for, one near and dear to my

13   heart, costs and fees.  And the other is a smaller issue that

14   we've talked about with defendants and I think is before this

15   Court as well, which is that the water from Mud Lick and

16   Titanic comes -- if there is a centralized system, that comes

17   to a centralized system to be treated, is then sent back to

18   the stream from which they came so that they don't dry the

19   streams out.  And that's part of the CH2M Hill $42 million

20   proposal anyway.  Thank you.

21            THE COURT:  All right.  Thank you.

22            MR. HURNEY:  I don't know if I've got rebuttal on

23   our --

24            THE COURT:  Well, I'll let you briefly.  Go ahead.

25            MR. HURNEY:  Okay.  Two things.  One, Mr. Vining

1     resigned.  He wasn't fired.  Just no basis for that.

2          I think that with regard to the issue of piping water

3     back and forth to Mud Lick and Titanic, I think that's

4     something to be left to the regulator, consistent with our

5     other position.  I'm a little uncomfortable because we've been

6     seemingly merging things we discussed in settlement with

7     things we discussed with the Court, and I think that's all

8     right because there's been a remarkable level of candor on

9     both sides, but I do think that the extent we're agreeing to

10    pump water back, that wouldn't be required under the Clean

11    Water Act.  I don't know that the Court should order us to do

12    it.  And so we would -- you know, they're going to argue that

13    it is required, but I don't know that, and I don't know that

14    there's been a lot of evidence on that.

15         And I think those are the only two points I wanted to

16    make, Your Honor, and I appreciate your allowing me to make

17    them.

18              THE COURT:  Certainly.  Well, I think we all share a

19    considerable disappointment that this matter couldn't be

20    worked out by agreement.  I certainly respect and value the

21    effort that each side has made, not just the lawyers but the

22    parties themselves in trying to resolve these things.  We've

23    spent the last two or three weeks seeing considerable progress

24    made, and as I said earlier it's unfortunate to think that

25    that might have all actually ended up being wasted effort.  I

1    hope that that's not the case.  And I think there's still
2    certainly an opportunity here for the parties to try to work
3    together to pin down a number of matters.
4        Having said that, though, I have believed all along,
5    frankly, as we've progressed with each week, that if this
6    matter couldn't be finally resolved by agreement, that the
7    Court has an obligation to rule.  So I'm going to rule on
8    these matters now.  I regret if ruling on these matters
9    precludes further negotiation and discussion by the parties.
10   I hope that that's not the case, but under the circumstances,
11   I feel it's the Court's obligation to proceed to ruling; and
12   then if the parties continue to negotiate and resolve matters,
13   certainly I would invite you to return to this Court, and
14   you're going to return on a number of matters.  But as far as
15   I'm concerned, anything that the parties can work out quickly
16   by agreement, I would be interested even if it effectively
17   would seek a modification of the ruling that I'm now going to
18   make.
19       The first matter that I believe is appropriate for this
20   Court to address is the plaintiff's motion to find the
21   defendant in contempt.  I think both sides agree that the
22   facts underlying that issue also have to be taken into
23   consideration in the Court determining whether to grant the
24   defendant's request for a modification of the requirements
25   under the consent decree.

1    Having sat through this three days of testimony by the

2    witnesses, reviewing literally hundreds of documents, also

3    reflecting upon the past orders that I have entered in this

4    case, the reports that have been provided by the defendant

5    throughout, I feel compelled to find that the defendant is in

6    contempt.

7        In this situation the defendant came forward and entered

8    into a voluntary consent decree with the plaintiff to

9    establish these deadlines.  I have throughout the course of

10   the effective period of that consent decree tried to give the

11   defendant as much leeway as possible in order to let the

12   defendant determine the best means of technology, the

13   appropriate scheduling, the appropriate evaluation of those

14   technologies, and a fair chance to rely upon its chosen

15   consultants to determine how it could comply.  And while I'm

16   certainly not inclined to adopt everything that Mr. Lovett has

17   said and I agree that here the defendant has taken some

18   significant steps, I nonetheless conclude that the defendant

19   has not exercised reasonable diligence in trying to comply

20   with this Court's consent decree.

21       If it becomes necessary, and it probably will, I'll try

22   to set out much of this in more detail in an opinion, but the

23   thrust of my findings I think center upon several conclusions.

24       First, there was ample testimony here about the work of

25   CH2M Hill, a recognized expert.  I commended the defendants

1    for employing CH2M Hill.  I think they got the names from some

2    of the experts who testified in the earlier hearings in this

3    matter.  Certainly this is a company that's recognized as

4    perhaps being the most well-equipped company in the world in

5    helping design wastewater treatment and similar services.  And

6    here I had hoped and expected that early on that by the

7    defendant employing CH2M Hill, we'd see a dedicated and

8    determined effort by the defendant to comply.

9        What disturbs me is that, first, there was no clear

10   communication between the defendant and CH2M Hill as to the

11   deadlines that the defendant had agreed to in the consent

12   decree.

13       Further, the first two reports -- and I don't know the

14   exhibit numbers offhand, but the reports, one in the summer,

15   and I think the other was December or January, CH2M Hill

16   suggested several clear and specific steps that should be

17   undertaken in order to evaluate treatment technologies and try

18   to make a decision.  For reasons unexplained by any of the

19   witnesses, there was considerable delay in following up by the

20   defendant on the recommendations.  Literally there was a

21   period of a number of months where there was virtually no

22   communication about those recommendations.  And then when

23   there was communication, again it strikes me that the

24   defendant failed to exercise reasonable diligence to pursue

25   those recommendations.

1    The Court also believes that the defendant made its own

2    decision to pursue other technologies outside of its work with

3    CH2M Hill.  In particular, the defendant seemed determined

4    from the beginning to try the ZVI approach.  While certainly

5    the plaintiffs contested it, I found that the defendant had a

6    reasonable basis for at least pursuing that, recognizing that

7    there was no clear and industry-established treatment plan

8    available for these circumstances.  But as I review the

9    defendant's work with ZVI, it leads me to the conclusion that

10   the defendant failed to exercise reasonable steps to evaluate

11   and analyze the viability of ZVI as a technology and, as a

12   result, allowed the ZVI technology to be utilized under

13   circumstances which were clearly inadequate to treat the flow

14   expected from the outlet involved.

15   Further, it appeared that the defendant failed to employ

16   reasonable steps to monitor and evaluate and rely upon other

17   consultants to evaluate the viability of ZVI.  And the end

18   result is that we have ZVI not -- certainly not eliminated.  I

19   won't say that.  But at least its viability is seriously in

20   doubt in terms of being able to treat the type of flow that's

21   involved here.

22   Another aspect of the defendant's failure to exercise

23   reasonable diligence is the position it's taken throughout

24   this two-year process on determining the amount of flow that

25   it needed to treat.  That was one of the early recommendations

1    by CH2M Hill.  There's been virtually no followup on that.  So

2    now we've spent really at least the last year and a half and

3    probably longer with the defendant failing to recognize that

4    the amount of flow likely to be produced by these outlets

5    required a different type of analysis, a more detailed

6    determination of flow and other variables in order to

7    implement any treatment program even on a pilot basis.

8        I find the inconsistencies the defendant has allowed on

9    the flow issue to be very disturbing.  On the one hand,

10   consistently there are reports reflecting the amount of the

11   flow coming from these outlets, and yet there were a number of

12   internal corporate documents and reports filed that greatly

13   underestimated that flow.

14       That suggests to me that there was a lack of

15   communication between Mr. McHale or others on the ground and

16   actually working at these sites and upper-level management in

17   this case.  I can't explain it any other way.  There seemed to

18   be a significant disconnect between the upper-level management

19   and Mr. McHale and others who were more directly involved in

20   trying to bring these outlets into compliance with the Court's

21   order.  I think that's the reason that -- and is evidenced by

22   the failure to communicate about the deadlines that the

23   defendant had voluntarily undertaken and failure to provide

24   accurate information about the variability of the flow, the

25   failure to pursue the recommendations made by CH2M Hill.  And

1   when I see a corporate defendant allow this type of
2   communication to continue for such a long period of time, I
3   find that that's further reason to believe that the defendant
4   has failed to exercise reasonable diligence.

5       So I find the defendant in contempt.  I deny the
6   defendant's motion for a modification.  The defendant has
7   argued that there's been a change in circumstances.  Certainly
8   there have been changes in circumstances.  It is now much
9   clearer than it was when this consent decree was first entered
10  that there might be other better treatment options than were
11  apparently recognized at the time.

12      I certainly can sympathize with the defendant that it's
13  now clear that this is going to be more expensive to treat,
14  that there were not readily available and proven technologies
15  to implement, and so certainly I wouldn't find the defendant
16  in contempt or deny this motion to modify just based upon an
17  inability to bring these outlets into literal compliance,
18  but -- because I recognize that under the state of the science
19  currently, even the most determined and dedicated effort might
20  not have resulted in full compliance.  But here the principal
21  reason that we only have discovered in the last couple of
22  months the most viable and appropriate treatment plan is
23  largely because the defendant failed to pursue this analysis
24  and these recommendations at a much quicker pace since the
25  consent decree was entered into.

1          So I believe that most of the changed circumstances, if

2     you will, that the defendant relies upon really were brought

3     about by the defendant simply not using reasonable diligence

4     to come into compliance.  Had the defendant done so, then

5     perhaps we would still be faced with uncertainty as to the

6     best and most viable treatment plan and still be looking at

7     years before we could expect literal compliance, but as I

8     reviewed the evidence adduced at this hearing, I can only

9     conclude that we could have been at this point and should have

10     been at this point much earlier.  And had the defendant

11     exercised reasonable diligence, I think we would have been

12     there much earlier.  And perhaps under those circumstances the

13     Court would have been willing to grant the defendant a

14     modification of these deadlines and withhold any finding of

15     contempt.

16          But for all of those reasons, I grant the motion by the

17     plaintiffs to find the defendant in contempt, and I deny the

18     defendant's motion for a modification.

19          Now, we've spent a considerable amount of time at the

20     hearing and since then and today discussing what the remedies

21     should be.  There are certain aspects of the remedy that I'm

22     prepared to order now, and so I will do so, again emphasizing

23     that I invite the parties to continue to negotiate and discuss

24     matters and to fill in the gaps or even seek some change.

25          But, first, with regard to the three outfalls at Apogee,

1    I order the defendant to be in compliance by no later than

2    March 1, 2013.  I further order that it implement the FBR

3    technology described by CH2M Hill.  As to Hobet, I order that

4    Hobet be in compliance no later than May 1, 2013.  I direct

5    that Hobet advise this Court by October 1 as to the plan of

6    treatment that it intends to utilize for Hobet.

7         There's been considerable discussion here about financial

8    guarantees.  I had hoped that that matter might be resolved by

9    the parties.  At this point, I'm going to order defendants

10   Apogee and Hobet to jointly provide to the Court irrevocable

11   letters of credit in the total amount of $45 million.  I order

12   that those letters of credit be provided no later than

13   September 14, 2010.

14        I will also tell the parties explicitly that once more of

15   the details that we'll address here briefly are decided, the

16   Court reserves the right to decrease or increase the letter of

17   credit commensurate with the cost to be undertaken by the

18   defendant, the Court's satisfaction with the steps taken by

19   the defendant to bring Hobet and Apogee into compliance, and

20   the financial ability of the defendant to do so.

21        I also order that the parties provide to the Court and

22   exchange with each other at least three individuals with

23   expertise in wastewater treatment as potential special masters

24   by September 14.  If the parties are able to agree on one,

25   the Court would likely adopt it.  Otherwise, the Court would

1    be inclined to consider the six individuals, three by each

2    party that are proposed.

3        Last, I will require the parties to provide, as now a

4    post-trial matter, proposals on the balance of the relief to

5    be considered by the Court.  I would expect the parties to

6    identify the issues that they believe the Court ought to

7    resolve as part of that.  Among those, that would include a

8    reporting schedule for the defendant's compliance at both

9    Apogee and Hobet, a plan for purgeable fines as to the Apogee

10   project and separately as to the Hobet 22 project, a deadline

11   and plan for the defendant to conduct flow analysis and other

12   geotechnical reports necessary to allow a fair evaluation of

13   the prospect for successful treatment of each of the treatment

14   plans, the one for Hobet as well as the one for Apogee.

15       I am not going to preclude any particular treatment

16   option with regard to Hobet 22.  I'll leave that again to the

17   defendant.  And plaintiff may argue, as has been suggested

18   today, that the Court ought to take into consideration the

19   type of treatment chosen for Hobet 22 and determine whether

20   it's sufficiently viable or not that that may affect the

21   purgeable fine, plan, or the amount of money to be held in

22   escrow or the terms of that -- of irrevocable letters of

23   credit or the terms of holding that money.

24       I'm sure there are other details of a compliance plan

25   that the parties may have discussed, whether you've reached

 1   agreement or not.  The parties are certainly free to submit

 2   those.  I'm going to require that that be submitted no later

 3   than next Tuesday.  I guess that's September -- is that the

 4   7th?  September 7th.  So each party may submit their

 5   proposals concerning the balance of the relief in as much

 6   detail as you care to provide the Court, and it would be

 7   appreciated certainly as to anything else that I haven't

 8   resolved to this point.

 9       I'll take under advisement the plaintiff's motion for

10   fees and costs.  At some later stage when we are past the

11   beginning of implementing the compliance order here, I'll

12   allow the defendants to -- or the plaintiffs to file a

13   petition for fees and costs up to that point.

14       All right.  Is there anything else that the Court need

15   resolve at this point?

16           MR. HURNEY:  No, Your Honor.

17           MR. LOVETT:  No, Your Honor.

18           THE COURT:  All right.  If not, again I thank you

19   for your efforts.  We stand adjourned.

20       (Hearing concluded at 2:45 p.m.)

21       I, Teresa M. Ruffner, certify that the foregoing is a

22   correct transcript from the record of proceedings in the

23   above-entitled matter.

24       s/Teresa M. Ruffner              September 2, 2010

25   _____    _____