IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON


OHIO VALLEY ENVIRONMENTAL
COALITION, INC., and WEST
VIRGINIA HIGHLANDS
CONSERVANCY, INC.,

             Plaintiffs,

v.                              CIVIL ACTION NOS. 3:07-00413,
                                                  3:08-00088,
APOGEE COAL COMPANY, LLC, and                     3:09-01167
HOBET MINING, LLC,

                                     Huntington, West Virginia
             Defendants.             August 9, 2010



        TRANSCRIPT OF BENCH TRIAL - DAY 1
   BEFORE THE HONORABLE ROBERT C. CHAMBERS
         UNITED STATES DISTRICT JUDGE



APPEARANCES:

For the Plaintiffs:        JOSEPH MARK LOVETT, ESQ.
                           DEREK O. TEANEY, ESQ.
                           APPALACHIAN CENTER FOR THE
                           ECONOMY AND THE ENVIRONMENT
                           P. O. Box 507
                           Lewisburg, WV  24901

                           JAMES M. HECKER, ESQ.
                           TRIAL LAWYERS FOR PUBLIC JUSTICE
                           Suite 200
                           1825 K Street, NW
                           Washington, DC  20006-1202

```
For the Defendants:        THOMAS J. HURNEY, ESQ.
                           BLAIR M. GARDNER, ESQ.
                           ROBERT G. MCLUSKY, ESQ.
                           JACKSON KELLY
                           P. O. Box 553
                           Charleston, WV  25322-0553

Also Present for Patriot:  RICHARD VERHEIJ, ESQ.

Court Reporter:            TERESA M. RUFFNER, RPR
                           P. O. Box 1570
                           Huntington, WV  25716
                           (304) 528-7583
```

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

```
1                          I N D E X

2                                                          Page

3    Opening Statement by Mr. Lovett                        4

4    Opening Statement by Mr. Hurney                        9

5

6    Plaintiff's Witnesses    Direct   Cross   Redirect   Recross

7    SCOTT RASMUSSEN            23      40       47         --

8    JOHN MCHALE               50     128

9

10   Plaintiff's Exhibits                              Admitted

11   No. 15   description of flows                        50

12   No. 58   emails beginning 01/06/09                  128

13   No. 59   letter from Potesta to Crawford 01/07/09   128

14   No. 16   letter from Potesta to Crawford 01/20/09   128

15   No. 60   letter from Potesta to Crawford 07/29/09   128

16   No. 17   emails from McHale to Bell 07/23/09        128

17   No. 21   email from McHale to Gardner 08/07/09      128

18   No. 46   fluidization bed reactor pilot study       128

19   No. 41   WVDEP discharge monitoring report          128

20   Joint Exhibits

21   No. 17   technical memorandum 08/12/08              128

22   No. 4    technical memorandum 01/26/09 watershed flow  128

23   No. 5    technical memorandum 01/26/09 selenium      128

24   No. 21   technical memorandum 09/02/09 ABMet system  128

25   No. 18   Power Point 10/01/08 Ruffner Mine          128
```

1    Monday, August 9, 2010, at 1:23 p.m. in open court

2              THE COURT:  All right.  Are we ready to proceed?

3              MR. LOVETT:  Yes, Your Honor.

4              THE COURT:  All right.  Mr. Lovett?

5              MR. LOVETT:  The parties agreed to short openings.

6    Is that okay with the Court?

7              THE COURT:  That'd be great.

8              MR. LOVETT:  Okay.  Plaintiffs are asking that

9    Patriot be held in contempt for its failure to comply with the

10   consent decree and for the Court to issue an injunction

11   compelling compliance at Hobet 22.

12        It's clear that it will cost Patriot several tens of

13   millions of dollars to comply with its limits.  Patriot has at

14   least 72 outfalls in West Virginia where it is violating its

15   selenium limits.  Other coal companies also have scores of

16   limits out of compliance.  Rather than to comply with the

17   limits, however, as this case has shown, Patriot has

18   relentlessly and systematically tried to delay its day of

19   reckoning.

20        Patriot and mountaintop mining operations generally are

21   avoiding the cost of business and pushing them off onto the

22   state and taxpayers to remediate them in the future.  Patriot

23   and other coal companies are continuing to apply for and

24   receive permits in selenium-producing seams because they have

25   not yet been asked to pay the cost of their business.

1        We will ask the Court to stop Patriot from externalizing

2    its costs and force it to comply with the Clean Water Act.

3    Patriot is not currently complying with the selenium limits at

4    Hobet 22 or at Apogee.  Patriot has never written or

5    commissioned a plan to achieve full compliance at any of the

6    four outfalls at issue in this case.  It has never asked any

7    engineering company to help it comply by any fixed date.  In

8    fact, Patriot did not tell CH2M Hill, which is its consulting

9    engineering firm, that it had to comply with its limits by any

10   fixed deadline.

11       Patriot has not asked its engineers or CH2M Hill or any

12   other firm to prepare a plan to comply by July 2012, the date

13   until which it now asks to have its -- the consent decree

14   modified to.  It is, however, clear that at least three

15   technologies will bring Patriot into compliance; reverse

16   osmosis, including VSEP, which the Court heard about in the

17   previous hearing, ABMet, which is a General Electric

18   biological treatment technology, and an FBR, a fluidized bed

19   reactor, which is another biological treatment system.

20       Zero valent iron, however, which the Court also heard

21   extensively about in its previous hearing, has not been

22   successful in treating water at 5 parts per billion or less

23   consistently at any outfall.

24       Patriot has known since at least the July 2008 hearing

25   before this Court and since the January 2009 CH2M Hill

1     report that it will have to equalize flows at Apogee in order

2     to treat, yet Patriot has not designed or had an equalization

3     treatment system designed by anyone else.

4          For example, at Outfall 001, which is the largest outfall

5     of Apogee, CH2M Hill told Apogee in January 2009 that it must

6     construct an impoundment the size of a small to medium waste

7     treatment impoundment.  In other words, it would have to have

8     a 60-foot dam in order to treat there.  Patriot did not even

9     bring a geotechnical engineer on-site until May 18th of this

10    year, after the deadline in the decree.  The geological

11    study -- geotechnical study still has not been commissioned.

12    So in terms of equalization, Apogee and Patriot generally are

13    in exactly the same place today that they were two years ago.

14         Patriot has not built and has not decided what technology

15    it will use to treat.  It has no date by which it will make

16    that decision.  It's interesting to note I think that the

17    July 2012 deadline, you'll hear testimony that Patriot cannot

18    comply with that date for compliance.

19         In addition, Patriot still has not come clean with regard

20    to its liability.  It is still significantly underreporting

21    its liabilities for the treatment-related costs at

22    $101.8 million for capital and operating costs in its most

23    recent quarterly statement.  This is an underestimate of at

24    least one order of magnitude, and Patriot knows it.  This

25    underreporting is part and parcel of Patriot's strategy to

1    kick the can down the road and saddle somebody else with its

2    liabilities.

3         It shows that -- the quarterly report shows that by

4    July -- strike that.  Patriot knew by July of 2009 that it did

5    not comply -- intend to comply with its limits; and its

6    quarterly reports, along with some studies from Potesta, will

7    make that clear, all of this while Patriot brags in its

8    March 31, 2010 quarterly report a cost savings of three fifty

9    per ton in Central Appalachia from efficiencies on nearly

10   6 million tons, or more than $20 million.

11        Plaintiffs will call six witnesses in the case.  We hope

12   to move through them quickly.  I'll just give the Court sort

13   of a roadmap of where we intend to go.

14        The first witness will be from CONSOL, which will show

15   that at least one coal company when given an order by a

16   regulatory agency actually takes it seriously and tries to

17   comply with it.  In fact, CONSOL is spending close to

18   $200 million on a reverse osmosis treatment system in Northern

19   West Virginia and has done -- has also constructed a reverse

20   osmosis treatment system in Buchanan, Virginia at a cost of

21   nearly $100 million.  And the water characterizations from the

22   Northern West Virginia site shows that that water is harder to

23   treat with reverse osmosis than is the water from the Apogee

24   site.  That will be our first witness.

25        The second witness will be John McHale, who has testified

1   here before for the company.  Then Mr. Rooney from GE will

2   appear on video to talk about the ABMet technology which GE

3   piloted at one of the Hobet outfalls and which we believe, as

4   did GE, the pilot was successful and showed that it would

5   treat selenium at these sites to below 5 parts per billion.

6       Next will be John Koon, an engineer that we've retained

7   to review the records and explain to the Court what we think

8   the engineering options, costs, and schedules should be.

9       The final two witnesses deal with economic issues.  Harry

10  Potter is an accountant who will talk about the availability

11  of money that Patriot has to pay for this system.  And last,

12  Dr. Mike Kavanaugh, an economist, will talk -- will explain to

13  the Court what we think appropriate fines for avoided costs

14  are.

15      So let me tell you what we will ask for.  We'll ask for

16  compliance with the permit, both permits, within 27 months.

17  We'll ask the Court to order the use of either an RO system,

18  including VSEP, ABMet, or an FBR.  We'll ask for a detailed

19  schedule with interim enforceable milestones to be enforced by

20  the Court with the help of an independent engineer as an

21  expert or a special master, if necessary.

22      We'll ask for a letter of credit to make sure that Apogee

23  will be forced to comply in the future and will not be able to

24  avoid costs, a letter of credit of approximately $95 million

25  to be made to the Court.  And that's broken down.  We think

1    that the Apogee costs for treating the first flush of a

2    25-year storm will be approximately $60 million at three

3    outfalls for total installed costs, we think at Hobet 22

4    approximately $15 million for total installed costs based on

5    an FBR system.  Other systems would be more expensive.  And

6    $20 million for equalization costs, bringing a total letter of

7    credit to $95 million.

8         Again, we'll ask that the Court order Apogee to treat the

9    first flush of a 25-year storm or 5150 gallons per minute at

10   Apogee.  And that will require equalization.  Because Apogee

11   has been dragging its feet, we still don't know whether an

12   impoundment can actually be built at Outfall Number 1.  If it

13   can be, there's testimony in depositions that that will cost

14   somewhere between two and five million dollars.  If, however,

15   it can't be built, more expensive storage requirements will be

16   necessary, like storage tanks.  So that's why we ask for

17   $20 million there, for a total of $95 million.  And that's

18   what we'll be asking for.

19             THE COURT:  All right.

20             MR. LOVETT:  Thank you.  I'm sorry, Your Honor.  I

21   left off a witness.  Mark Schroeder, who's the CFO of Patriot

22   Coal, we'll also call him.

23             THE COURT:  All right.  Mr. Hurney?

24             MR. HURNEY:  Good afternoon, Your Honor.  I'm not

25   going to belabor the Court with anything too fancy here, but

1    I'd like to --

2              CLERK JUSTICE:  There's a laptop button to push.

3              MR. HURNEY:  It should be --

4              THE COURT:  Here we go.

5              MR. HURNEY:  May it please the Court.  Your Honor,

6    I'm here on behalf of Apogee and Hobet.  There are two issues

7    pending in this court.  Excuse me, Your Honor.

8         There are two issues.  The first is my client's motion

9    for an extension of the April 5, 2010 deadline established

10   under the agreed consent order entered by this Court back in

11   March of 2008 and the plaintiff's motion for -- to hold us in

12   contempt for failing to comply with that order.

13        Your Honor, my colleague, Mr. Lovett, started with where

14   we were two years ago, in 2008, and where we are today, and I

15   think the general tenor of the comment would suggest to this

16   Court that Patriot and Apogee and Hobet have done nothing.  I

17   would suggest to the Court that you will hear evidence over

18   the next several days that that's not correct, that they have

19   taken great strides to attempt to comply with your order, that

20   they have retained consultants, that they have evaluated

21   technologies, and that they have done the best they can to

22   come to a technology that will work.  And this is against

23   significant challenges.

24        I can't help but reflect upon the contrast in what we

25   know today and what we've learned over these two years with

1    what happened and what we heard in 2008.  And the Court will

2    recall that in your order of July 7, 2008, you quoted -- you

3    referred to the expert witness who testified regarding VSEP,

4    which is a variant of reverse osmosis, and your order says

5    plaintiff's expert testified that a VSEP treatment system

6    could be implemented within four to six months, you know,

7    after agreeing on a contract.

8        I think the evidence today will demonstrate that the

9    process by which you get from the start of engineering and

10   proceeding through construction and completing a project is

11   far more than four to six months, and we know that because of

12   all of the things that Patriot has done over these last two

13   years.

14       I thought that I'd take just a moment, Your Honor,

15   because I think it's important.  I wanted to orient the Court.

16   And this is just I think a great program.  It's Google Earth.

17   And you can see I've marked with a yellow pin the Mud Lick

18   outlet, I've marked with red Slab Fork, and I've marked with

19   red the Titanic outlet.

20       You'll hear the evidence this week, Your Honor, that Slab

21   Fork has the largest flows.  I think the CH2M Hill report of

22   January 2009 estimated 750 gallons per minute base, about

23   1600 gallons as a -- what they refer as a design flow.  You'll

24   hear testimony that flows may be higher, may be lower in dry

25   times.  The issue of flow is a huge challenge.  Mud Lick has

1    got lesser flows, I think 400-some gallons per minute.   And

2    then you get down to Titanic, and those are in the

3    hundred-gallon-per-minute range.   So if you go over to

4    Hobet 22, which was added onto this case, I think you'll find

5    that, if I recall correctly, it was around 400 gallons per

6    minute.   I might be wrong on that.   But we're dealing with

7    three outlets which when you compare the thought that we could

8    wheel in a piece of equipment and fix this with what we know

9    now, the challenges of determining flow, how much flow do you

10   have to treat to ensure compliance with the Clean Water Act;

11   and just by way of example, Your Honor, we talk about 800 to

12   1600 gallons per minute at Slab Fork, and that's a lot of

13   water.   I think the numbers for a 25-year storm may be

14   somewhere in excess of 400,000 gallons per minute.

15        And you'll hear testimony about equalization, and we

16   throw it around.   Equalization is, is how much of a structure

17   are you going to have to build to hold enough water so that

18   you can treat it through a system.   We believe you'll hear

19   testimony that calculating the amount of water that needs to

20   be treated might be much less than the 25-year flow.   We think

21   that our engineers will estimate that treating between a one-

22   and five-year storm flow will be adequate to ensure

23   compliance.   And you'll hear that testimony and invite the

24   Court, as is your right under the rules, to ask any questions

25   you want of our consultants.

```
 1          And so we have a significant challenge, but one of the

 2   issues may be can we accomplish this by expanding ponds,

 3   existing ponds, and do things that would not require what we

 4   believe the testimony to show to be a lengthy period to gain

 5   permits.  If you want to build a big dam, that takes a long

 6   time to get a permit.  And we have not -- you know, my

 7   colleague, Mr. Lovett, is correct; we have started to look

 8   into that issue.  We have not commissioned anyone to do it

 9   because we still -- we are just now at the point where we

10   think we have the system that will work.  And I think that

11   what you'll hear this week is that we think after working with

12   CH2M Hill and other consultants, that a fluidized bed reactor

13   is probably the best technology to try to install to ensure

14   compliance.

15          I think the Court has to recognize a couple of things,

16   and indeed my colleague mentions Patriot is at the front end

17   of the coal industry on this.  As the Court is aware, there

18   are a number of other companies with NPDES permits that have

19   selenium limits.  The West Virginia legislature got -- you

20   know, they came due in April.  The West Virginia legislature

21   authorized the DEP to extend those to July 1 of 2012,

22   recognizing the difficulties in this immediate enforcement.

23   And, frankly, that's -- the July 1, 2012 date is what we asked

24   for in our motion because it made it consistent with others,

25   but I believe the testimony that you'll hear this week will be
```

 1   that to install a fluidized bed reactor at the three Apogee
 2   sites will take about two years and six months.  And I think
 3   that you'll hear experts -- I think Dr. Koon will -- thinks it
 4   can be done faster.  I think that CH2M Hill believes it could
 5   be done -- probably takes more time.  I think that's going to
 6   be the middle range that you get in terms of how long it will
 7   reasonably take to build the system and what we're looking at
 8   now.

 9        And, frankly, Judge, we met with the other side, as the
10   Court directed, but one of the things that led up, we recently
11   got the final report on the FBR, the fluidized bed reactor,
12   and CH2M Hill has just orally informed us of its belief that
13   these three outlets which you can see could be treated with a
14   single -- if you make some assumptions about the flow that
15   they recommend, they believe that there is a way to treat them
16   with a single facility at Slab Fork.  And you'll hear
17   testimony about that.

18        So what I wanted to tell the Court is that I think that
19   we can certainly sit here and put John McHale on the stand and
20   point out stuff he didn't do, and you can point out what we
21   didn't know about this technology, but I would hope the Court
22   would see that the progression and knowledge over the last
23   couple of years funded by -- and, again, we're under orders
24   here, orders in the state court, and so I don't want the Court
25   to think that we weren't doing this pursuant to court order,

 1  but they were consent orders.  And I think you'll hear that

 2  the company spent a substantial amount of money in attempting

 3  to solve this problem.  And I think that's what I said to you

 4  two years ago, is how do we solve the problem, and I think

 5  you'll hear that they spent probably around $9 million to

 6  solve this.

 7       And one of the things I did last night -- and I always

 8  wonder about the wisdom of doing this, but I was thinking

 9  about what I wanted to tell the Court about what we did, and I

10  came up with a -- I'm going to use a -- not high tech, but low

11  tech.  (Indicating)

12            CLERK JUSTICE:  On the touch screen right there,

13  press Document.

14            MR. HURNEY:  All right.  Excellent.  Now, my

15  opponents, who I like very much, are chuckling, Your Honor,

16  and I don't blame them a bit.  So to make this a little easier

17  on everybody, may I approach?

18            THE COURT:  You may.

19            MR. HURNEY:  I thought about sending this out to a

20  graphic artist, but I can make my point by talking about it.

21       If you look at this timeline, what I was trying to

22  illustrate to the Court in a crude manner -- I will tell you,

23  Judge, that at one point I thought I was going to art school.

24  And as you can see, that's probably not going to happen.  But

25  if you look at this timeline and just trace the things that

1    we've done and you go back to the 7/2 hearing in 2008, you'll

2    hear testimony that within weeks, as directed by the Court, we

3    retained additional consultants.  At the time, we had already

4    been working with Raymond Lovett and ShipShaper on the ZVI

5    technology.  Within several weeks, we contacted CH2M Hill, we

6    contacted MATRIC, an engineering firm in South Charleston,

7    contacted GE with respect to its ABMet system and its RO

8    system.  We got on the ball to investigate what was available,

9    and this is in the Fall of 2008.

10       You'll see that by January 26th of 2009, within six

11   months, we had a review of technology by CH2M Hill.  And then

12   as you follow in 2009 and 2010, you'll see that we began to

13   engage in pilots.  There is an RO pilot that was performed in

14   November.  There is a GE ABMet pilot that was performed from

15   February to April.  There is a pilot of VSEP.  And you'll

16   recall from the agreed consent order, Your Honor, there's

17   three or four pages devoted to the piloting of VSEP, which

18   was -- as part of our consent decree, the plaintiffs insisted

19   upon a pilot of the VSEP system.  And that was performed under

20   the supervision of CH2M Hill.  And you will hear about that.

21       After the VSEP system, you'll also see that we started an

22   FBR pilot.  You see that the FBR pilot intersects the deadline

23   of April 5, 2010 that you set for us to be in compliance.  In

24   February when we realized that we were not going to be in

25   compliance, we filed a motion, and we've continued to work,

1   Your Honor.

2        During this time you'll also hear testimony, regardless

3   of what my opponents think about ZVI, there will be no

4   disagreement that iron removes selenium from water.  Now,

5   there's going to be questions about how much water it can

6   treat, whether it works at higher flows versus lower flows,

7   but there will be no disagreement among the experts that that

8   is one technology that will treat water.  And you'll see that

9   even at the same time that we were considering these other

10  technologies, using GE, using CH2M Hill, using MATRIC, that we

11  continued to at least try to institute partial treatment.  And

12  there's two reasons for that.

13       I mean one is I think that the idea of a passive system

14  that would work is really important in the coal industry, and

15  I don't think it can be sloughed aside.  You know, you saw

16  from -- and I wanted to show you the Google Earth image

17  because these outlets -- and there's lots of them -- are all

18  over the place.  They present, as you heard back in 2008,

19  challenges as to power, accessibility, and other things.  And,

20  frankly, if you could evolve a system that would be passive,

21  it would be a good thing for the treatment of water.

22       The other thing is, is that we are subject, as the Court

23  is aware through your exercise of jurisdiction over Hobet 22

24  outlet, you're aware that we're under an agreement with the

25  DEP.  And part of that agreement is to deploy treatment at

```
 1    outfalls while we work on the problem.  And we have been
 2    deploying a combination of the GMT ZVI, which are the larger
 3    tanks, and the Liberty ZVI, which is the foam in the smaller
 4    blue tanks.  We've been deploying those at Hobet in an effort
 5    to have at least partial treatment.  And those are at all
 6    outfalls.  And you'll hear Mr. McHale or you'll hear testimony
 7    about a schedule of doing that pursuant to the agreement with
 8    the DEP and without the objection of the DEP.  And all of
 9    that, as we have been reporting to this Court, we have been
10    reporting to the DEP of our progress and reporting to the
11    Circuit Court of Boone County.
12         So where does this leave us?  Number one, I think that we
13    have agreement among the parties that we are going to need
14    additional time to complete this project, and we're going to
15    ask the Court to listen to the expert witnesses and to give us
16    the amount of time that they estimate.  And, again, I think it
17    will be about two and a half years.
18         Should there be supervision by the Court?  Absolutely.
19    And I suspect they're going to put on evidence of penalties.
20    I suspect that the Court will enforce its supervision through
21    penalties.
22         I think the critical issue is to listen to the expert
23    witnesses and at the end of the day is how much flow has to be
24    treated, because, as my colleague says, if you have to treat
25    every drop of water, that is an astronomical cost, and I don't
```

1    think anyone recommends as a matter of engineering that that's

2    the way to go.  And so we believe that the Court -- we're

3    going to need guidance from the Court.

4        Now, where else does the evidence go?  I think we will

5    establish that during the course of your order -- and your

6    order specifically said that this order remains in place and

7    required if anybody wanted to change its terms, that we had to

8    notify the other side before coming to the Court, and we did

9    that.

10        What I think that the efforts of Patriot show is an

11    effort to solve the problem.  Were we perfect?  No, but I

12    would suggest that you won't find any other company who has

13    done as much as Patriot.  And I think there's a lot that the

14    research and development and work that Patriot is doing that

15    overall is going to advance the ball for the industry.

16        So I think that we merit the Court's consideration for

17    additional time.  And I tried to think of the best way to

18    argue our motion for additional time, but that's it.  We have

19    done a kind of effort, albeit not perfect, Your Honor, and,

20    frankly, I would rather be standing here telling you we've

21    already solved the problem, but we haven't.  But I think

22    you'll hear that we have put in the kind of effort that merits

23    consideration of giving us additional time.

24        At the same time, I think our effort should lead the

25    Court to conclude that we shouldn't be punished by contempt.

1    And I thought I understood from the pretrial that the

2    plaintiffs were not -- and I don't believe they're seeking

3    any, you know, award of costs or anything for past -- for

4    failure to perform but merely looking forward in an effort to

5    craft an order that they believe and we believe will, you

6    know, result in ultimate compliance.

7        So I think, as I said in the pretrial, I think there's

8    differences between the parties about our effort, which I

9    think we did -- other than comply with the final order, I

10   think we did a lot of what the Court expected of us, and we

11   reported to the Court, you know.  None of this stuff -- in a

12   sense we're having a hearing, but none of what you hear from

13   us will be news because I believe you've heard it in our

14   status reports, and we gave you all of our consultants'

15   reports.

16       Probably the report you'll see that's new is the final

17   report on FBR that we received from CH2M Hill in the last

18   several weeks.  And I'll represent to the Court that we have

19   directed -- this morning directed CH2M Hill to price that and

20   get back to us as soon as possible.  So we continue to work on

21   the problem.

22       So at the end of the hearing, Your Honor, you know, I

23   will ask the Court to make a finding that -- to grant our

24   motion for additional time, to conclude that maybe we're not

25   perfect, but we did a lot of what the Court ordered us to do,

1   and grant us that additional time based on what the experts

2   say, not deadlines set by the legislature, but based on what

3   the evidence shows is a reasonable time to complete the

4   project, and I'd ask that you find that our effort merits your

5   consideration in not holding that we are in contempt of your

6   order.

7          THE COURT:  All right.

8          MR. HURNEY:  Thank you.

9          THE COURT:  Thank you.  All right.  The plaintiffs

10  may call their first witness.

11         MR. TEANEY:  Thank you, Your Honor.  Plaintiffs call

12  Scott Rasmussen.

13         MR. MCLUSKY:  Your Honor, if I might, Bob McLusky

14  for the Patriot defendants.  I attended the deposition of the

15  CONSOL representative, and we're a little mystified as to the

16  relevance of the testimony I expect to hear.  I believe it's

17  going to be testimony that CONSOL is committed to building an

18  expensive treatment plant for chloride, not selenium, for

19  underground mine discharges, not from surface water.

20      So I don't really understand how a different company with

21  a different economic profile working on a different problem

22  has any relevance to the case.

23         THE COURT:  Mr. Teaney?

24         MR. TEANEY:  Yes.  What we expect Mr. Rasmussen to

25  testify about is CONSOL's efforts to comply with a compliance

1    order that set a deadline for compliance with a water quality

2    based effluent limit.  Yes, that limit is based on chlorides

3    rather than selenium, but nonetheless they are under an order

4    from the DEP to comply.

5         Now, part of what Mr. Hurney talked about up here in his

6    opening was he wants to establish that Patriot did enough not

7    to be held in contempt.  And that's part of the grounds for

8    modifying a consent order, is there must be a finding that the

9    defendant or the person who's trying to modify the consent

10   order has to have complied with the order in good faith and

11   make good faith efforts to comply.

12        Well, what we expect the CONSOL witness to establish is

13   the standard by which that good faith can be measured.  Here's

14   a coal company expected to comply with water quality based

15   effluent limits.  They're going to use reverse osmosis to do

16   so and they're going to do so in a timely manner.

17        The other reason that this is relevant is that it does go

18   to the technology that's available for treatment.  For

19   example, we will introduce evidence both through Mr. Rasmussen

20   as well as our own expert that the wastewater that CONSOL is

21   going to treat at its facility in Northern West Virginia is

22   actually more complex to pretreat using reverse osmosis than

23   the water that comes off the Apogee site.

24        So for those two reasons, we believe that his testimony

25   is relevant.

```
 1              THE COURT:  Well, the second of those reasons I
 2    agree with.  It does seem to me that if you expect his
 3    testimony to be that the treatment method that CONSOL is
 4    using, albeit to treat for a different effluent, is applicable
 5    here, then I'll allow the testimony for that purpose.
 6         Just proving that a coal company or any other entity can
 7    comply with some effluent limitation imposed either by a court
 8    or by DEP, it seems to me that really doesn't establish
 9    anything that's helpful to resolving this case.
10              MR. TEANEY:  Well, I respectfully disagree, but if
11    that's the Court's ruling, if I could have just a moment to
12    confer with co-counsel.
13              THE COURT:  Certainly.
14         (Mr. Teaney and Mr. Lovett conferred privately off the
15    record.)
16              MR. TEANEY:  All right.  Thank you for your time.
17              THE COURT:  All right.  Sir, if you would please
18    stand, my clerk is going to administer the oath and then ask
19    you to spell your name so we get it right.
20              CLERK JUSTICE:  Please raise your right hand.
21           SCOTT RASMUSSEN, PLAINTIFF'S WITNESS, SWORN
22              CLERK JUSTICE:  Spell your last name.
23              THE WITNESS:  R-a-s-m-u-s-s-e-n.
24                         DIRECT EXAMINATION
25    BY MR. TEANEY:
```

Rasmussen - Direct

1    Q.    Thank you, Mr. Rasmussen.  By whom are you employed?

2    A.    CONSOL Energy.

3    Q.    Thank you.  And what do you do for CONSOL Energy?

4    A.    I'm a supervisor of water resources and environmental

5    compliance.

6    Q.    Are you here pursuant to a subpoena in this matter?

7    A.    Yes, I am.

8    Q.    Okay.  Thank you.  Are you familiar with CONSOL's

9    operations that discharge in the Dunkard Creek in Northern

10   West Virginia?

11   A.    Yes, I am.

12   Q.    Okay.  And are there NPDES permits associated with those

13   discharges?

14   A.    Yes.

15   Q.    And do those NPDES permits have chloride limits that will

16   go --

17   A.    That will go into effect, yes.

18   Q.    Okay.  If you know, are those water quality based

19   effluent limits?

20   A.    Yes.

21   Q.    Okay.  Has DEP ordered CONSOL to comply with those

22   limits?

23   A.    Yes.

24   Q.    And what method of treatment has CONSOL selected to

25   achieve compliance?

Rasmussen - Direct

1    A.    Reverse osmosis with evaporative technology.

2    Q.    Okay.  And how long did it take CONSOL to conclude that a

3    reverse osmosis was the technology to use?

4    A.    We first started looking at the chloride issues back in

5    2002, conclusions for reverse osmosis being the only -- or

6    that being part of the only technology available that could

7    reliably do this.  I would say it's probably taken us eighteen

8    months, two years, something like that.

9    Q.    Does CONSOL have experience with reverse osmosis at other

10   facilities, if you know?

11   A.    Yes.  We're building one at the Buchanan site in

12   Virginia.

13   Q.    And what is CONSOL using reverse osmosis to treat in

14   Buchanan, Virginia?

15   A.    Mine water.

16   Q.    Mine water?  Do you know what the flow is at the Buchanan

17   facility?

18   A.    I understand the Buchanan facility is designed for

19   approximately 1600 gpm.

20   Q.    Do you know how long that took to install?

21   A.    It's still under construction.  I think the latest I

22   heard was it is due to be commissioned in the next month or

23   so.  So that would put it at 23, 24 months.

24   Q.    Okay.  Do you know how much that cost to construct?

25   A.    My understanding is it's in the neighborhood of

Rasmussen - Direct

1    $90 million.

2    Q.   Okay.  And so based on that experience and the chloride

3    issues in Northern West Virginia, you all are going to

4    construct a reverse osmosis treatment there; is that correct?

5    A.   Yes.

6    Q.   What is the gallon per minute that it's designed to treat

7    in Northern West Virginia?

8    A.   In the Northern West Virginia plant, it's designed for

9    3500 gpm.

10   Q.   How many mines is that going to -- or how many mines are

11   going to provide a water source to --

12   A.   Three mines.

13   Q.   Three mines?  Is this what you would call a centralized

14   facility?

15   A.   Yes.

16   Q.   Okay.  And is it our understanding that there will be

17   pretreatment needed of the mine water before it goes into the

18   reverse osmosis system?

19   A.   Yes.

20   Q.   Okay.  And if you know, why is it going to need

21   pretreatment?

22   A.   Well, there's two steps of pretreatment.  There will be

23   some treatment at the original AMD sites to cut down on

24   scaling in the pipeline that will deliver the mine water to

25   the centralized facility.  And then there will be additional

Rasmussen - Direct

1    pretreatment at the centralized facility to maintain scaling

2    at a reasonable level as far as RO membrane maintenance.

3              THE COURT:  What does "scaling" mean?

4              THE WITNESS:  Scaling is the -- it's the

5    precipitation of calcium, the magnesium sulfates and

6    carbonates that would come out of the water, plate onto the

7    membrane and make the membrane unusable.

8    BY MR. TEANEY:

9    Q.   Okay.  And would there also be a third type of

10   pretreatment or filtration used to remove solids?

11   A.   Yeah.  It's part of a combination.  What you are hoping

12   to do is, in this pretreatment step, is to change the

13   chemistry such that these calcium sulfates and carbonates will

14   come out of solution, but then you have to filter that

15   particulate out of the water prior to going to the RO membrane

16   itself.

17   Q.   Do you know what type of filtration will be used?

18   A.   It may be advanced cold lime-softening, which will be a

19   clarifier.  It may be some laminar filtration device.  It may

20   be a nanofiltration device.

21   Q.   Back to the first step in the pretreatment, which I think

22   you said was going to be at the AMD facilities, what

23   constituents are going to be removed in that step?

24   A.   That will be aeration and some pH adjustment.  And that's

25   attempting to control the iron hydroxide and to take that out

Rasmussen - Direct

1   of the solution before it gets to the big pipeline.

2   Q.   Okay.  If you know, is there any need to treat or remove

3   the barium from the water before it reaches the RO system?

4   A.   It is -- because of our mine water has so much sulfate

5   and because of the solubility of barium or the, you know, the

6   lack of solubility of barium sulfate, it is not considered an

7   important factor here.

8   Q.   I would like to have you authenticate a document and use

9   an exhibit here.

10        This has previously been provided to the Court I believe

11   as Plaintiff's Unique Exhibit 15.  I need to get a copy for

12   the witness.

13             THE COURT:  All right.

14             MR. TEANEY:  I guess as a housekeeping matter, have

15   these been marked for admission?  I'm looking to opposing

16   counsel here because they marked them -- I don't know --

17             THE COURT:  They have not been marked --

18             MR. TEANEY:  Okay.

19             THE COURT:  -- as far as I've seen.

20             MR. TEANEY:  Okay.  Then I would mark this, I guess,

21   as -- I don't know.

22             MR. HURNEY:  We tried to number and put stickers on

23   everything.  We handled -- they let us know which documents,

24   and we got them all down to the court.  As you saw, we tabbed

25   and numbered them all.  We could probably re-number them as we

Rasmussen - Direct

1    submit them into evidence.

2              THE COURT:  Well --

3              MR. TEANEY:  Or we could go with the number.

4              THE COURT:  -- is this one of the exhibits unique to

5    plaintiffs?

6              MR. TEANEY:  Yes.  It should be tab 15.

7              THE COURT:  All right.

8              MR. TEANEY:  Shall we retain that numbering?

9              THE COURT:  Yes.

10             MR. TEANEY:  Okay.

11             MR. HURNEY:  That's sort of what we were thinking.

12             THE COURT:  That's fine.  Obviously there might be

13   some overlap here because I think there's at least Joint

14   Exhibit 15 as well.

15             MR. HURNEY:  Correct.

16             THE COURT:  So why don't we just make this

17   Plaintiff's Exhibit 15.  We'll call those that are within the

18   joint exhibits, Joint Exhibit, and then the others, if there's

19   an overlap in numbers, will be Defendant's Exhibit Number,

20   okay --

21             MR. TEANEY:  Okay.

22             THE COURT:  -- just to keep them straight.  This is

23   Plaintiff's 15.

24             MR. TEANEY:  This is Plaintiff's 15, that's correct.

25   May I approach?

Rasmussen - Direct

1          THE COURT:  You may.

2          MR. TEANEY:  Do you need to mark it in addition

3    to --

4          CLERK JUSTICE:  No.

5          MR. TEANEY:  May I approach the witness?

6    BY MR. TEANEY:

7    Q.   Mr. Rasmussen, do you recognize this document?

8    A.   Yes, I do.

9    Q.   What is this document?

10   A.   This is a description of the different flows that could

11   be expected from the underground sources that will go to the

12   centralized treatment system.

13   Q.   Okay.  I'm looking now at the document that's labeled

14   Table 2.  I know you said three mines will provide water.  Are

15   there six separate flows, if you would?

16   A.   Yes.

17   Q.   Okay.  And then there's a final column there that says

18   Total Flow Weighted Average.  What is your understanding of

19   the numbers in that column?

20   A.   What we were -- what we're doing here is since each of

21   the six different sites has a little bit different water

22   chemistry and we were trying to provide our potential vendors

23   with what they would see at the end of the pipeline by the

24   time all of these different sites were mixed together, we were

25   trying to forecast what that number would be.

Rasmussen - Direct

1   Q.   And just to -- I believe you mentioned that iron was

2   something you needed to precipitate out; is that correct?

3   A.   Yes.

4   Q.   And what is the total flow weighted average that you're

5   predicting for iron there?

6   A.   This 114.

7   Q.   Is it your understanding that these are supposed to --

8   should be -- these units should be milligrams per liter?

9   A.   Yeah, milligrams per liter.

10  Q.   Is that also known as parts per million?

11  A.   Uh-huh.

12  Q.   Okay.  And for manganese, what is the total flow weighted

13  average you predict?

14  A.   1.72.

15  Q.   Okay.  And then for -- there's an indication here, Al-d.

16  Do you understand that to be dissolved aluminum, or what would

17  that be?

18  A.   Yes, that's dissolved aluminum.

19  Q.   And what is the total weighted -- total flow weighted

20  average for aluminum that's predicted?

21  A.   That's 4.

22  Q.   Okay.

23  A.   One point of clarification, if I may.

24  Q.   Please.

25  A.   These are raw mine water quality.  So this is prior to

1    any of the site-specific pretreatment that would occur before

2    the water got into the pipeline.

3    Q.    I understand.  And when was this data compiled?

4    A.    This data is actually a sum of water samples that would

5    have been collected, oh, roughly quarterly since about 2008.

6    Q.    Okay.  And was this data provided to vendors from whom

7    you were seeking quotes or bids?

8    A.    Yes.  These tables were part of the request for proposal.

9    Q.    Why would -- why is it important to provide the vendors

10   with this information?

11   A.    Well, this gives them a sense of what they would have to

12   treat -- pretreat in order to effective -- to give us an

13   effective system.  It also gives them an idea of what their

14   sludge and evaporate production would be so you can size the

15   landfill that you would need to, you know, safely store the

16   solids that will be produced from the system.

17   Q.    You mentioned landfill.  So some of the pretreatment

18   waste will be going to a landfill; is that correct?

19   A.    Both the -- anticipate that the pretreatment waste, which

20   would be a lime-softening waste, would be filter-pressed and

21   then that would go to landfill, yes.

22   Q.    Okay.  What percentage or what dollar amount in the

23   cost -- strike that.  What is the total cost of the project,

24   if you know?

25   A.    Our budgetary cost is, in round numbers, $200 million.

Rasmussen - Direct

1   Q.   Two hundred?  And if you broke that down into capital

2   costs, what would that be?

3   A.   Well, that's all capital cost.

4   Q.   The two hundred is all capital?

5   A.   But that is for the complete system.  That includes the

6   gathering pipelines, the landfill, the preparation of the

7   construction site, the building of the plant.  There's a

8   treated waterline that goes from the plant to a reservoir.

9        Did I miss anything?  Those are the big pieces.

10  Q.   Do you know how much of that 200 million will be spent on

11  the pretreatment itself?

12  A.   No, I don't, because that's wrapped into the overall

13  plant cost.

14  Q.   Understood.  So after pretreatment, it then goes into the

15  membrane system itself; is that correct?

16  A.   After pretreatment, there will be some other

17  constituents, additives, added to the water because it will

18  still form scale, so you'll -- most of the vendors are looking

19  at some kind of anti-scale chemical to be added, and then

20  there will be an additional filtering step even after that,

21  and then it will proceed to the RO membranes.

22  Q.   Do you know what type of membranes your RO system will

23  use?

24  A.   Not specifically, no.

25  Q.   Do you know if they will be spiral-wound?

Rasmussen - Direct

1    A.    More than likely, yes.

2    Q.    Okay.  So after it goes into the membrane system, what

3    comes out of the membrane system?

4    A.    The membrane system, for this water we're projecting

5    about a 50/50 split.  So 50 percent of the incoming flow will

6    go off as water with very low TDS, very little dissolved

7    solids in it.  The other 50 percent will then have to go on to

8    an additional evaporative step to further reduce its volume.

9    Q.    Okay.  The first 50 percent you described as having very

10   low TDS content, is that what you understand to be called

11   permeate --

12   A.    Yes.

13   Q.    -- from an RO system?  Okay.  And is the second half that

14   you described sometimes called concentrate?

15   A.    Uh-huh.

16   Q.    Okay.  Let's start with the concentrate.  Where will the

17   concentrate go from the membrane system?

18   A.    It will go to an evaporator --

19   Q.    Okay.

20   A.    -- to remove additional quantity of water.  And then the

21   concentrate, if you will, further concentrate from the

22   evaporator will go to a crystallizer which removes an

23   additional amount of water from it, and then that salt

24   material would be taken off to the landfill.

25   Q.    And there will have to be an energy source, I guess, to

Rasmussen - Direct

1   evaporate the water?

2   A.   Yes.

3   Q.   And what energy source do you anticipate using?

4   A.   It will most likely be electrical at this point.

5   Q.   Electric?  Okay.  And is the cost of the concentrate

6   treatment and disposal wrapped up in that 200 million figure

7   as well?

8   A.   No.

9   Q.   No?

10  A.   We're estimating right now that the operation of the

11  system will be thirteen to fifteen million dollars a year.

12  Q.   Okay.  So that's kind of what's called O&M costs?

13  A.   Yes.

14  Q.   Okay.

15         THE COURT:  Is that the operational cost through the

16  full evaporative stage for the half of that that goes

17  through --

18         THE WITNESS:  Yes.

19         THE COURT:  -- that process?  And does that include,

20  then, the disposal of the leftover concentrate that would --

21         THE WITNESS:  Yes, and we would use a captive, on-

22  site facility for disposal.

23         THE COURT:  Landfill?

24         THE WITNESS:  Yeah.

25  BY MR. TEANEY:

Rasmussen - Direct

1   Q.   Is the capital cost of the concentrator and the

2   evaporator included in the $200 million figure --

3   A.   Yes.

4   Q.   Do you know what percentage that is?

5   A.   No, I don't.

6   Q.   So that's the disposal of the concentrate.  Can you just

7   discharge the permeate right into the stream?

8   A.   No.  The permeate is actually -- it has too low of a

9   dissolved solids content, so you need to add some salt back to

10  the water to make it dischargeable.  We anticipate that that

11  can be accomplished by letting it flow down a limestone riprap

12  channel, allow it to aerate, allow it to pick up some minerals

13  from the limestone before it gets discharged into a surface

14  water line.

15  Q.   Is this the least -- would you describe this as the least

16  complex of the steps --

17  A.   Yes.

18  Q.   -- in the treatment system?

19  A.   Yes.

20  Q.   Okay.  Something that can easily be taken care of?

21  A.   Yes.

22  Q.   Okay.  Are you currently under a consent decree to

23  install this system?

24  A.   We have an order that says that we must meet the chloride

25  effluent limits by May of 2013.

Rasmussen - Direct

1   Q.   Okay.

2   A.   So working backwards from that date, that is -- we -- you

3   know, we're having this plan to put the system in.

4   Q.   And are you currently moving through a schedule to do

5   that?

6   A.   Yes, we are.

7   Q.   Are you on track with that schedule?

8   A.   We are currently on track with the schedule, yes.

9   Q.   What stage are you at in the schedule today?

10  A.   We just received the bids back from the vendors to

11  perform a preliminary engineering step which will at the end

12  of -- towards the end of the year give us 30 to 50 percent

13  drawings and a guaranteed maximum price for the facility.

14  Q.   Are you undertaking any steps concurrently with that?

15  A.   We're also simultaneously going through several

16  permitting steps, and we're also going through the process to

17  engineer, design, and buy the property for the gathering

18  pipeline.

19  Q.   Do you need to modify your NPDES permit to construct this

20  and operate this system?

21  A.   Oh, yes.  Yes.

22  Q.   Have you begun that application process?

23  A.   That has begun.

24  Q.   Do you know what level of design DEP will require in

25  order to modify the permit?

Rasmussen - Direct

1    A.   This facility is going on an existing mining property

2    that has an NPDES permit, but it's obviously significantly

3    different since it is a, you know, basically a closed mine

4    property.  So it's a significant change.

5    Q.   Do you anticipate that you would need to provide

6    preliminary line drawings or the results of the preliminary

7    engineering that you just discussed?  What level of planning

8    do you intend to provide with your NPDES application?

9    A.   I'm envisioning -- and I'm not the permitting person.

10   I'm envisioning the line drawing and specifics about what the

11   discharged water quality will be in volume.

12   Q.   Okay.  Has EPA been involved in this process at all?

13   A.   EPA has been involved in the meetings for this, yes.

14   Q.   Okay.  Let me have just a moment.

15        We've got the DEP and EPA involved here.  Who is driving

16   the process from your perspective -- EPA or DEP? -- as far as

17   motivating CONSOL to install this?

18   A.   Most -- you know, all of our correspondence and all of

19   our meetings are principally through the West Virginia DEP.

20   I'm not privy to their conversation.  So who is driving it, I

21   don't know.  Certainly EPA is reviewing everything we're

22   providing.

23        MR. TEANEY:  Okay.  No further questions, Your

24   Honor.

25        THE COURT:  You said that your compliance deadline

Rasmussen - Direct

1   is May of 2013?

2          THE WITNESS:  Yes.

3          THE COURT:  When was that imposed?

4          THE WITNESS:  The first order that referenced that

5   date -- the first unilateral order came out last year.  I

6   believe that date was also in the last compliance order that

7   we had.  So that would've been in 2008, give or take.

8          THE COURT:  So was it in 2008 that DEP first issued

9   an order or compliance order that gave you till May 2013 to be

10  in compliance with the chloride?

11         THE WITNESS:  I believe so.

12         MR. TEANEY:  May I follow up on that?

13         THE COURT:  Sure.

14  BY MR. TEANEY:

15  Q.   Subsequent to the 2008 compliance order, at the end of

16  2009 or in early 2010 did DEP revise that or give a

17  supplemental order which required the submission of this RO

18  plan to DEP?

19  A.   Correct.

20  Q.   Okay.  Which -- do you recall whether it was Fall 2009 or

21  early 2010?

22  A.   Oh, I'm sorry.  I believe it was Fall of 2009 the first

23  order came out.

24  Q.   And did CONSOL submit a plan to DEP for this in April of

25  2010?

Rasmussen - Direct/Cross

1    A.    Yes.

2    Q.    And prior to the submission of that -- strike that.

3          At what point in time did CONSOL begin work on the draft

4    engineering details that were submitted in April 2010?

5                MR. MCLUSKY:  Your Honor, I let it go on for a

6    while, but this is all about chloride, this whole treatment

7    gizmo we're talking about now.  It has nothing to do with

8    selenium.

9                THE COURT:  All right.  I agree, Mr. Teaney.

10               MR. TEANEY:  All right.

11               THE COURT:  All right.

12               MR. TEANEY:  I have no further questions.

13               THE COURT:  All right.  Cross, Mr. McLusky?

14                         CROSS EXAMINATION

15   BY MR. MCLUSKY:

16   Q.    Mr. Rasmussen, good afternoon.  You testified about

17   Plaintiff's Exhibit Number 15 a moment ago; is that correct?

18   A.    Yes.

19   Q.    And you said this is raw water data, is that correct, or

20   untreated --

21   A.    The chemistry on Table 2 is raw water quality.

22   Q.    Okay.  And by that raw water quality, you mean water that

23   is coming directly out of the mine before any type of

24   treatment?

25   A.    Yes.

Rasmussen - Cross

1    Q.    But you have existing acid mine drainage treatment plants

2    in place that is treating some of that water on Table 2, do

3    you not?

4    A.    Yes.

5    Q.    And those treatment plants will continue to be used as

6    part of the system that you're going to put in place to take

7    care of chlorides; isn't that right?

8    A.    Yes.

9    Q.    So whoever is going to design and construct a treatment

10   facility for you won't have to deal with the raw water.  They

11   will deal with the water that comes out of the acid mine

12   drainage -- acid mine drainage treatment plants after

13   treatment; isn't that right?

14   A.    Correct.

15   Q.    So the water quality in Table 2 couldn't be picked up by

16   an expert here on the other side and say this is the water

17   they're going to have to deal with at the reverse osmosis

18   plant.

19   A.    Correct.

20   Q.    Thank you.  This chlorides treatment plant in Northern

21   West Virginia, I think you said you've been dealing with this

22   issue since 2002?

23   A.    That was my recollection.  That's when the first order

24   came out regarding, you know, investigation and potential

25   remediation of chlorides.

Rasmussen - Cross

1    Q.    And you all actually submitted some type of technological

2    report, technology report, to DEP as early as 2003 on

3    treatment type alternatives, didn't you?

4    A.    Correct.

5    Q.    So you've been working on this for already eight years.

6    A.    Correct.

7    Q.    Just to be clear, neither one of these plants -- that is,

8    you have one in Virginia.  Was it --

9    A.    Buchanan.

10   Q.    Buchanan, Virginia, or Buckhannon?  Is it Buchanan?

11   A.    Buchanan.

12   Q.    Buchanan.  Okay.  Nor the one in Northern West Virginia

13   are designed to treat for selenium; is that fair?

14   A.    That is correct.

15   Q.    Both are designed to treat for chlorides.

16   A.    Yes.

17   Q.    Neither one is yet operational.  Is that a fair

18   statement?

19   A.    Yes.

20   Q.    The one in Virginia is nearing the end of construction

21   but has not yet been turned on.

22   A.    Correct.

23   Q.    As has it taken longer than the company envisioned to

24   construct that?

25   A.    I think the anticipated schedule for Buchanan was 18

Rasmussen - Cross

1    months.

2    Q.    From --

3    A.    From start to commissioning.

4    Q.    Okay.  And I know you weren't the person deposed, but my

5    recollection of Mr. Owsiany was that it's already been under

6    construction for 23 or 24 months.

7    A.    Yes, coming up on -- it's 23 months now.  Probably 24

8    months to -- to start commissioning.

9    Q.    All right.  So five or six months past the date you

10   anticipated it would be operational.

11   A.    Correct.

12   Q.    Despite your best efforts to meet the 18 months.

13   A.    Yes.

14   Q.    And then the Northern West Virginia plant, you haven't

15   even started to construct that yet.

16   A.    Correct.

17   Q.    Both these facilities are going to address underground

18   mine discharge water?

19   A.    Correct.

20   Q.    The flows from those underground mines at the two

21   locations, that is, the Virginia and Northern West Virginia,

22   are those controllable by you underground?  That is, you don't

23   need the equalization capacity on the surface?

24   A.    Yes, those are -- I'm thinking because they're a

25   different situation.  Some of the mines are protecting flooded

Rasmussen - Cross

1    mines and protection of active works, and some of them are

2    active works.  The majority of them are controllable at least

3    to some degree, yeah.

4    Q.    And as I understand it, they're both designed to avoid

5    treating surface water, surface runoff water.

6    A.    Correct.

7    Q.    Would you say that the flows, the variability of flows at

8    a surface mine would be far different than the variability of

9    flows from your underground mines that you're going to treat?

10   A.    Yes.

11   Q.    They would be far greater, I assume, at the surface mine?

12   A.    The variation would be, yes.

13   Q.    If you know, does that play any role in the ability of

14   the technology to operate?

15   A.    My understanding from talking with the technology vendors

16   is you can -- a given RO plant, you can give -- well, back up.

17   An RO evaporation plant in total, you might be able to turn

18   that plant down, if you will, 30 percent, give or take.  You

19   could operate a plant at 70 percent of its design flow.

20   Contrarily you cannot turn them up.  The design flow is the

21   flow.

22           THE COURT:  What do you mean, that they can't

23   accommodate greater than expected flow?

24           THE WITNESS:  Correct.

25   BY MR. MCLUSKY:

Rasmussen - Cross

1   Q.   So if you had a 10-year, 24-hour storm event, you would

2   have to design it for something close to that if that's what

3   you're going to have to treat.

4   A.   If that's what you have to capture.  You have to design

5   for your -- to your largest expected flow.

6   Q.   And your largest expected flow at Buchanan, Virginia, I

7   understand is 1600 gallons per minute?

8   A.   Correct.

9   Q.   And your largest expected flow in Northern West Virginia

10  is on the order of 3500 gallons per minute?

11  A.   Correct.

12  Q.   Has CONSOL ever designed or constructed a reverse osmosis

13  plant for treatment of water at a surface mine?

14  A.   No.

15  Q.   Has it ever even considered it?

16  A.   Not to my knowledge.

17  Q.   Is the water quality at the two facilities, does it stay

18  relatively constant over time, if you know?

19  A.   Buchanan stays relatively constant.  The reason we went

20  through this exercise with these several sources is to give

21  the vendors an idea of the variation between low flow and high

22  flow because there is some variation in flow.  And looking at

23  that, off the top of my head I'd say that the changes in the

24  major constituents from low flow to high flow, plus/minus

25  10 percent, 15 percent at the most; my guess.

Rasmussen - Cross

1  Q.   And the variation in flows, what percent would that be

2  from low to high?  Single digit?

3  A.   Yes, probably 10 percent, 12 percent maybe.

4         THE COURT:  Well, by that you mean that the highest

5  flow would be no more than maybe 10 percent above the low

6  flow?

7         THE WITNESS:  Actually if you picked your middle

8  median flow and you went 10 percent on either side.

9         THE COURT:  All right.

10 BY MR. MCLUSKY:

11 Q.   Mr. Rasmussen, so I understand, both Buchanan and the

12 Northern West Virginia facility are active mines?

13 A.   Yes.

14 Q.   And these treatment plants will facilitate ongoing mining

15 in these active mines?

16 A.   Yes.

17 Q.   And may facilitate expansions of those mines into

18 previously unmined areas?

19 A.   Yes.

20 Q.   Any idea of the -- you got -- how many coal mines in

21 Northern West Virginia are feeding the proposed treatment

22 plant there?

23 A.   Three.

24 Q.   Three?  And they're all underground mines, right?

25 A.   Yes.

Rasmussen - Cross

1    Q.   Are they longwall mines?

2    A.   They're all longwall.

3    Q.   Rough idea of the production, the current production up

4    there annually?

5    A.   The three of them probably average three to five million

6    tons per year.

7    Q.   All right.  So could see 15 million tons a year coming

8    off these three mines?

9    A.   Yes.

10   Q.   And Buchanan, Virginia, a little smaller overall?

11   A.   No, it's actually larger.  I don't know exactly, but I'm

12   recalling roughly 6 million tons.

13   Q.   Okay.  Is it fair to say, then, that the cost of the

14   plants at these two locations that you've testified about will

15   be paid for by active or ongoing mining operations that will

16   actually use these treatment plants?

17   A.   That's my understanding.

18            MR. MCLUSKY:  Thank you.  I think that's all I have,

19   Your Honor.

20            THE COURT:  All right.  Any redirect?

21            MR. TEANEY:  Briefly, Your Honor.

22                       REDIRECT EXAMINATION

23   BY MR. TEANEY:

24   Q.   Mr. Rasmussen, will you -- you and Mr. McLusky engaged on

25   the AMD pretreatment that's out there.  Will there be

Rasmussen - Redirect

1    additional pretreatment needed before -- to be constructed

2    before the water is sent to the membranes?

3    A.   The existing pretreatment systems will suffice, with the

4    exception of two locations.  One of the locations, there are

5    three underground sources coming to that current AMD treatment

6    plant.  Only one of those underground sources has high

7    chlorides in it.  So we will build an additional plant to

8    split that waste -- that underground stream off and treat it

9    separately.

10        And at our Sugar Run facility, the underground mine water

11   has a significant amount of fines in it that need to be

12   removed prior to putting it in the gathering pipeline.  So

13   that will be an additional construct.

14   Q.   And there still needs to be the clarification and

15   filtration constructed?

16   A.   There will be a new clarifier at the one site where we

17   split off.  You know, essentially the fines removal at Sugar

18   Run will be a clarification step.

19   Q.   Okay.  You discussed the schedule at the Buchanan

20   facility.  Is there any court order or any particular hurry-up

21   motivating the construction of the Buchanan facility?

22   A.   The Buchanan water is needed for the prep plant.  The

23   Buchanan prep plant will run short of water in the summertime.

24   There is a managed discharge that is operating in the Buchanan

25   facility.  In order to operate a managed discharge, you need

Rasmussen - Redirect

1    the storage capacity.  And my understanding of the legal cases

2    that were involved, that ability to store water was in doubt

3    and still is in doubt.  So the RO system is necessary to

4    supplement the managed discharge.

5    Q.   Are you moving faster on the Northern West Virginia plant

6    or is it on an accelerated schedule compared to the Buchanan

7    facility?

8    A.   It will be an accelerated schedule, yes.

9    Q.   Okay.  And finally on the varying flow issue, will CONSOL

10   be equalizing the flow through a retention structure prior to

11   sending it to the RO facility?

12   A.   There will be an equalization basin or series of tanks at

13   the -- our facility, yes.

14   Q.   Have those been constructed yet?

15   A.   No.

16             MR. TEANEY:  Okay.  Thank you.  Nothing further,

17   Your Honor.

18             THE COURT:  All right.  Anything else?

19        Thank you, sir.  You may step down.

20             MR. TEANEY:  Your Honor, plaintiffs would ask, since

21   Mr. Rasmussen is subject to a subpoena, that he be excused

22   from being a -- excused from service as a witness so that he

23   can return to Pittsburgh.

24             THE COURT:  All right.  Any objection to that?

25             MR. MCLUSKY:  No, Your Honor.

```
 1              THE COURT:  He's excused.  Thank you, sir.
 2              MR. TEANEY:  And also I've been told that I
 3   neglected to move for the admission of Plaintiff's 15.
 4              THE COURT:  All right.  Is there objection?
 5              MR. MCLUSKY:  No objection, although I'm not sure
 6   what the relevance is now after the cross-examination.
 7              THE COURT:  Well, I'm not sure if that's an
 8   objection, but I'll deny it.  It's admitted.
 9              MR. TEANEY:  Thank you, Your Honor.
10              THE COURT:  All right.  Call your next witness.
11              MR. LOVETT:  John McHale.
12              THE COURT:  Mr. McHale, if you'll step up here, my
13   clerk is going to administer the oath to you.
14            JOHN MCHALE, PLAINTIFF'S WITNESS, SWORN
15                     DIRECT EXAMINATION
16   BY MR. LOVETT:
17   Q.   Good afternoon, Mr. McHale.
18   A.   Good afternoon.
19   Q.   Would you state your name, please.
20   A.   John McHale.
21   Q.   And what is your -- by whom are you employed?
22   A.   Patriot Coal Corporation.
23   Q.   What's your current title?
24   A.   Vice-president, environmental engineering and compliance.
25   Q.   And how long have you worked for Patriot?
```

McHale - Direct

1    A.    Since July of 2009.

2    Q.    For whom did you work before?

3    A.    Magnum Coal Company.

4    Q.    And Magnum was acquired by Patriot in 2009?

5    A.    That's correct.

6    Q.    How long have you been vice-president?

7    A.    Excuse me.  It was acquired in 2008.

8    Q.    2008.  I'm sorry.

9    A.    Yes, sir.

10   Q.    How long have you held your current job?

11   A.    Since July of 2009.

12   Q.    And are you the person within Patriot that is most

13   responsible for selenium compliance issues?

14   A.    The responsibility for selenium compliance is actually at

15   the operations.  I am the person responsible for making sure

16   the operations have all the support they need and everything

17   to achieve that compliance.

18   Q.    And who heads up that effort?

19   A.    Excuse me?

20   Q.    Who heads up the effort to achieve compliance?

21   A.    It's headed up from the corporate level.

22   Q.    Okay.  And who would that be?

23   A.    And that would be me.

24   Q.    Okay.  Are you involved on a regular basis in selenium

25   compliance issues?

McHale - Direct

1    A.    Yes, I am.

2    Q.    And before you took your current job, were you even more

3    involved with selenium compliance issues?

4    A.    Yeah, more directly involved.

5    Q.    With Patriot?

6    A.    Yes.

7    Q.    And before that with Magnum?

8    A.    Yes.

9    Q.    What percentage of your time would you say you spent on

10   selenium compliance issues in your previous job?

11   A.    In the neighborhood of 60 percent or more.

12   Q.    And in your current job?

13   A.    Probably 25 to 30 percent of direct involvement.

14   Q.    Now, you testified I think in the previous hearing that

15   we had on this issue in July of 2008, did you not?

16   A.    Yes, I did.

17   Q.    Okay.  And were you here for that whole hearing?

18   A.    Yes, I was.

19   Q.    And as a result of that hearing and the order that came

20   from it, did you hire CH2M Hill as a consultant?

21   A.    Yes, I did.

22   Q.    Were you the person responsible for hiring CH2M Hill

23   within Patriot?

24   A.    Yes.

25   Q.    How did you choose CH2M Hill?

McHale - Direct

1    A.    I had researched available environmental engineering

2    firms.  CH2M Hill was very prominent in the business and had a

3    very good reputation, and I basically went to their website

4    and made contact with them.

5    Q.    Okay.  Who did you make contact with at CH2M Hill?

6    A.    I made a phone call to one of their regional office

7    numbers and explained my situation and left a message.

8    Q.    And when was that?

9    A.    That was, as near as I can place it, July 9th.

10   Q.    And who did you finally get in touch with at CH2M Hill?

11   A.    I was contacted by Tom Sandy.

12   Q.    Okay.  And that was in July or August?

13   A.    That was the following -- on July 14th I think he called

14   me.

15   Q.    Mr. Sandy is, in fact, the person you continue to work

16   with today, right?

17   A.    We do.

18   Q.    And when -- at the time that you talked to Mr. Sandy, was

19   there a court order requiring compliance with the permit limit

20   already in place?

21   A.    At the time I talked to Mr. Sandy, there was a court

22   order requiring a status report back to the Court by

23   July 24th.

24   Q.    And that was all there was?

25   A.    At that point.

McHale - Direct

1   Q.   And is that what you hired CH2M Hill to do, to help you

2   with the status report?

3   A.   No.

4   Q.   Okay.  What did you hire CH2M Hill to do?

5   A.   Explained to CH2M Hill the history of the situation going

6   back to the May order to comply and explained to him that we

7   would need someone to evaluate available selenium treatment

8   options and to help us select.

9   Q.   Did you believe at the time you were going to have to

10  meet a certain compliance date with your permit?

11  A.   Yes.

12  Q.   And what was that date?

13  A.   We did not know at that point.

14          MR. LOVETT:  Okay.  Your Honor, this gets more

15  complicated, I'm afraid, the exhibit listing.  We had listed

16  on our original list this next exhibit as Joint 28.  However,

17  Mr. Hurney provided us just this morning I guess with the same

18  exhibit labeled Exhibit 17.

19      May we try to work this out so that we don't get

20  confused?

21          THE COURT:  Yes, please do.  Let's not get off on

22  the wrong foot.

23          MR. HURNEY:  Your Honor, I apologize.  Every time I

24  try to pre-mark documents, it never works.

25          MR. LOVETT:  We appreciate Mr. Hurney's efforts

McHale - Direct

1    here.  He did this for us.

2        (Counsel conferred privately off the record.)

3        MR. HURNEY:  Your Honor, the numbers that are used

4    are consistent with what is submitted to the Court.  I'm

5    cleaning up exhibits here and there.  We'll fix it.

6        THE COURT:  All right.  So this is Joint Exhibit --

7        MR. LOVETT:  This is Joint Exhibit 17, and we may

8    have this confusion, Your Honor, throughout this examination,

9    and I apologize and we will get it worked out by tomorrow.

10   BY MR. LOVETT:

11   Q.   Mr. McHale, have you seen this document before?  It is

12   Joint 17.

13   A.   Yes.

14   Q.   And what is it?

15   A.   It is the Phase I report that CH2M Hill was hired to do.

16   Q.   So this is what you hired CH2M Hill to do in July.

17   A.   Yes.

18   Q.   And it was produced on August 12th, correct?

19   A.   Yes.  Actually this is a revision to the first report,

20   which was on August 6th.

21   Q.   Okay.  So this is the final report and/or revision?

22   A.   Well, there were two reports.  They revised the first

23   report.  It was not a draft.  It was also a final report.

24   Q.   And this was approximately two years ago?

25   A.   Yes.

McHale - Direct

1   Q.   I turn your attention to page 6.  Now, as I understand

2   it, these were recommendations from CH2M Hill in this report,

3   correct?

4   A.   On page 6?

5   Q.   Well, generally -- let me just start again, if I may.

6   What was the purpose of the report?

7   A.   This was basically a screening analysis to review

8   available technologies and to winnow it down to a, you know,

9   finite number, three to five, say, of technologies that they

10  would recommend for further evaluation.

11  Q.   Okay.  So this was just a -- these were preliminary tasks

12  in preparation for construction of a facility; is that right?

13  A.   These were preliminary tasks for selection of a

14  technology.

15  Q.   Because you hadn't at that time contemplated actually

16  constructing a facility, right?  You hadn't as of two years

17  ago even contemplated actually constructing a system.

18  A.   No, we knew that we would have to build systems.  We were

19  currently involved in installing base systems on certain

20  technology.

21  Q.   Okay.  On page 6, I notice Task 8.  Do you see that?

22  A.   Yes.

23  Q.   It's Preliminary Engineering of Selected Alternatives.

24  A.   Yes.

25  Q.   Have those tasks been completed to date?

McHale - Direct

1   A.   Yes.   That was a Phase II report.

2   Q.   Task 8 has been done by Patriot?

3   A.   No, I'm sorry.   What was done, that was Tasks 1 through

4   6 --

5   Q.   Right.

6   A.   -- because the report, Tasks 1 through 6 did not lead to

7   sufficient information to select an alternative.

8   Q.   So when did you make that determination?

9   A.   What determination?

10  Q.   That Tasks 1 through 6 yielded no appropriate technology.

11  A.   Well, there were recommendations out of that report, out

12  of Task 6 in January of 2009 that made certain recommendations

13  to proceed further before we selected --

14  Q.   The January 2009 reports, were there three of them from

15  CH2M Hill?

16  A.   January 2009 was the last in the series.   There were --

17  upon completion of this report, they went on to perform a

18  series of tasks, 1 through 6, which took place in basically

19  the September through -- they were published incrementally

20  from September through January.

21  Q.   So the January 2009 report that listed alternative

22  technologies --

23  A.   Right.

24  Q.   -- is your testimony that because that report didn't

25  choose a particular technology, you didn't proceed to Task 7?

McHale - Direct

1    A.    Not at that time.

2    Q.    Well, have you yet?

3    A.    We have just completed, you know, the final

4    recommendation from that January report, and we're at a

5    position now where we're soliciting additional cost estimates

6    and a proposal from our consultant to proceed with the

7    selected alternative.

8    Q.    You still haven't completed Task 8, the preliminary

9    engineering of selected alternative --

10   A.    No.

11   Q.    -- right?

12   A.    No.

13   Q.    And you're testifying that that is because the

14   January 2009 report didn't choose a particular alternative?

15   A.    It didn't show a clear-cut alternative that we should

16   select.

17   Q.    Did you ask CH2M Hill which among the technologies

18   discussed in the 2009 report would be the best one if you had

19   to choose one?

20   A.    The report recommended further -- the report recommended

21   a further analysis and evaluation of two alternatives.

22   Q.    Did you tell CH2M Hill that -- strike that.

23         Your Honor, we have some exhibits that were just provided

24   this morning by -- or I guess yesterday evening by defendants,

25   and we're going to use those next.  They're not marked yet.

                          McHale - Direct

1              THE COURT:  All right.  Let's go ahead and mark

2    those.  Are you going to add those to the list of plaintiff's

3    exhibits?

4              MR. LOVETT:  Well, it might mess up the ordering if

5    they're already ordered.  Why don't we --

6              MR. TEANEY:  We could use letters.

7              MR. LOVETT:  Yeah, we could use plaintiff's letters

8    for --

9              THE COURT:  Well, are they already marked as

10   different exhibits in this?

11             MR. LOVETT:  No, Your Honor.  We didn't see these

12   until last night, so they weren't submitted to the Court.

13             THE COURT:  All right.  Well, I think probably the

14   easiest thing is to pick up the last -- the next number from

15   plaintiff's proposed exhibits --

16             MR. LOVETT:  Okay.

17             THE COURT:  -- and use that.

18             MR. LOVETT:  Let me see if I can find out what the

19   last number is.

20             THE COURT:  Go ahead.

21             MR. LOVETT:  The last number is 57.  So there are

22   two here.  That will be 58 and 59.  May I approach?

23             THE COURT:  You may.

24             MR. LOVETT:  58 is a -- starts with a January 6

25   email, and 59 is a January 7th letter.

McHale - Direct

1   BY MR. LOVETT:

2   Q.   Mr. McHale, I'll give you 58, which I believe is

3   January 6th, and 59, which is January 7th.

4        Your Honor, do you need a copy?

5           THE COURT:  No, that's all right.

6   BY MR. LOVETT:

7   Q.   Now, let's turn to the January 6th document.  As I

8   understand it, there are some track changes to a draft report

9   from Potesta & Associates in this document.  Is that your

10  understanding as well?

11  A.   Yes.

12  Q.   And did you create those track changes?

13  A.   Yes.

14  Q.   What is this document you were editing?  What is the

15  document?

16  A.   This was a document that was submitted to my supervisor,

17  and he forwarded it on to me for my comments.

18  Q.   And your supervisor at the time was James Crawford?

19  A.   Yes.

20  Q.   Mr. Crawford still employed by Patriot?

21  A.   No, he's retired.

22  Q.   And you have his job now?

23  A.   Yes.

24  Q.   So at the time, he was your supervisor and he asked you

25  to comment on the report; is that right?

McHale - Direct

1    A.    Yes.

2    Q.    And this is a report from Potesta & Associates?

3    A.    Yes, it is.

4    Q.    And what is Potesta?

5    A.    Potesta is an engineering consulting firm that's located

6    in Charleston.

7    Q.    So you were -- and there are several iterations of the

8    Potesta report over the next several months; is that right?

9    A.    Yes, there were.

10   Q.    And were you involved in that process generally, as you

11   were here?

12   A.    Only to the extent that I was asked to respond by my

13   supervisor to things.  I was not directly in contact or

14   communication with Potesta concerning this.

15   Q.    And why was Potesta hired?

16   A.    My understanding was to review the Patriot's selenium

17   liability cost estimates.

18   Q.    For whom?  Did an auditor -- was there an auditor that

19   wanted to understand Patriot's --

20   A.    As it says in the first paragraph, it was to be used for

21   purchase accounting.

22   Q.    Well, do you know if a particular auditor had asked for

23   this kind of information?

24   A.    I assume they were doing -- I assumed at some point they

25   would have to have, you know, have it supplied to the

McHale - Direct

1   auditors, yes, sir.

2   Q.   But you don't know that -- well, let me strike that.  Was

3   Ernst & Young auditing Patriot's books at the time?

4   A.   I don't know.

5   Q.   You don't know?

6   A.   I don't know if they were at that time.

7   Q.   No one said to you, "We've got to get this report done to

8   show to Ernst & Young Patriot's liabilities for selenium"?

9   A.   No, they did not tell me it had to be done for our

10  auditors.

11  Q.   Okay.  Let's turn to the January 7th document, which I

12  believe is the final report from the one that you edited on

13  the 6th; is that right?

14  A.   I think this was the next in the series.  There were

15  subsequent versions of this.

16  Q.   Well, there was nothing between the 6th and the 7th, was

17  there?

18  A.   Yes, but I wouldn't call it a final.

19  Q.   Okay.  It's signed by the -- it's submitted and signed by

20  Potesta & Associates staff, isn't it?

21  A.   Yes, it is.

22  Q.   Why would you not say it was the final one?  It doesn't

23  say Draft.  It appears to be a final report, doesn't it?

24  A.   Yes, I assume.  My assumption is that Potesta meant it to

25  be a final version.

McHale - Direct

1    Q.    And on page 6, the discussion and recommendations

2    section, do you see that?

3    A.    Uh-huh.

4    Q.    The second paragraph says, "Potesta agrees with the

5    selection of ABMet biological and ZVI chemical treatment

6    systems.  Potesta believes that Patriot is using the currently

7    best available treatment technology."

8          Do you see that?

9    A.    Yes, I do.

10   Q.    Okay.  So at the time Potesta included among the best

11   available technology ABMet; is that right?

12   A.    Yes.  That's what it says here.

13              MR. LOVETT:  May I approach?

14              THE COURT:  You may.

15   BY MR. LOVETT:

16   Q.    I'll show you what's marked as Plaintiff's 16.  And is

17   that a January 20th letter from Potesta to Mr. Crawford?

18   A.    Yes.

19   Q.    And, again, this does say Draft, doesn't it?

20   A.    Yes, it does.

21   Q.    So this is a follow-up to the previous report of

22   January 6th or 7th?

23   A.    I assume, yes.

24   Q.    Okay.  Now, I'll turn your attention to page 2, Average

25   Flow Rate Per Outlet section.

McHale - Direct

1   A.   Yes.

2   Q.   And it's estimating -- well, tell me, how did -- for the

3   purposes of this report, how did Patriot and Potesta determine

4   the flow at all of Patriot's outfalls that it would have to

5   treat?

6   A.   Well, it states in the report that Potesta conducted

7   field reconnaissance at Hobet Mining and determined that

8   the -- you know, determined the maximum average flow rates

9   from the DMR reports, and that's what they utilized.

10  Q.   So you didn't have any flow meters out there, right?

11  A.   I don't know if they used flow meters or not.

12  Q.   You don't know?  Do you have flow meters --

13  A.   I didn't do this.  (Indicating)  It's very possible that

14  Potesta field staff had flow meters with them.

15  Q.   How many outlets are there?

16  A.   At Hobet?

17  Q.   No, at the Patriot operations that are being -- well, I

18  guess they were Magnum at the time.  At the Magnum operations

19  that were being analyzed.

20  A.   What it says here, this was based on the outlets at

21  Hobet.

22  Q.   Okay.  Does Hobet have 72 outlets requiring treatment?

23          THE REPORTER:  I'm sorry.  Seventy-two?

24  BY MR. LOVETT:

25  Q.   Does Hobet have 72 outlets requiring --

McHale - Direct

1    A.    No, they have in the neighborhood of 50, plus or minus.

2    Q.    Well, doesn't the last sentence say in that section with

3    72 outlets requiring treatment at a flow rate of 195 gallons

4    per minute, the total water flow rate treatment required for

5    Magnum operations is 14,040 gallons per minute?

6    A.    Yeah.  I'm just reading what they said is their

7    methodology.  They determined the average flows at Hobet and

8    applied it to the 72 outlets it looks like.

9    Q.    Okay.  Now I understand.  In order to determine -- in

10   order to determine the entire flow at the -- all Patriot

11   operations, they used Hobet as, in essence, a model and

12   extrapolated from that to the other outfalls; is that right?

13   A.    That's all I can --

14          MR. HURNEY:  Your Honor, I object.  Two reasons.

15   One is he's handing this report to this witness and asking him

16   to speculate what Potesta meant or what Potesta was doing.

17   He's just asking the witness to read a document, whether he

18   saw it or not.

19       The second is I fail to see the relevancy.  We are here

20   on two issues; were we in contempt for failure to comply with

21   the order which required us to be in compliance with our NPDES

22   permits by April 5, 2010 on the three Apogee outlets.  And the

23   second issue relates to your consideration of appropriate

24   injunctive relief at Hobet 22, the single outlet.  And the

25   third issue is our case for additional time.

McHale - Direct

1           I don't see how this is even remotely relevant, you know,

2      what was calculated by Potesta in terms of a report to the

3      auditors.

4                 THE COURT:  Well, Mr. Lovett?

5                 MR. LOVETT:  It's completely relevant, Your Honor,

6      because this shows that Potesta underestimated its

7      liability -- I mean, excuse me, Patriot -- Magnum at the time

8      and Patriot still -- was underestimating its liabilities as

9      far back as January of 2009, continues to do so to this date

10     and I believe shows that Patriot never intended to comply with

11     its permit limits at Apogee or Hobet.

12                THE COURT:  All right.  I'll allow you to pursue

13     that argument.  It's not clear to me how well you expect this

14     witness to know about the methodology used by Potesta to make

15     these calculations.

16                MR. LOVETT:  I was trying to avoid having him read

17     it.  So I can just read from the document --

18                THE COURT:  All right.

19                MR. LOVETT:  -- myself and do that if you'd like,

20     Your Honor.

21     BY MR. LOVETT:

22     Q.   Okay.  What Potesta did -- and you read these reports as

23     they came out, didn't you?

24     A.   I don't know that I saw all of them.  I did see several

25     of them.

McHale - Direct

1   Q.   Well, were you in charge, I think you just testified, had

2   spent 60 or 70 percent of your time and headed the day-to-day

3   compliance efforts of Magnum, right?

4   A.   This particular exercise was handled by my supervisor,

5   and he asked for my input at certain times.

6   Q.   So the Potesta report determines that at 72 outfalls at

7   Patriot, or at Magnum, there were 14,040 gallons per minute

8   that needed to be treated; is that right?

9   A.   Yeah, that's what it says.

10  Q.   Then we'll turn to the last page, which is page 4, where

11  it estimates a cost for that treatment.  Do you see that?

12  A.   Yes.

13  Q.   And the cost is $219,304,800 as present worth cost?

14  A.   Yes, that's what it states here.

15  Q.   Okay.  Do you agree that the 14,040 gallons per minute

16  was the -- is the appropriate flow number to use for the 72

17  outfalls?

18  A.   I agree that that represents the flows that were reported

19  on the DMRs that they used for this.

20  Q.   Well, you said in your deposition you thought it was a

21  reasonable number.  Do you still say that?

22  A.   It probably is a reasonable number for the base

23  somewhere, the base flow, or slightly higher.

24  Q.   Explain to the Court and to me what the base flow is.

25  A.   The base flow would be the dry weather flow.

McHale - Direct

1   Q.   So it's flow that comes mostly from groundwater without

2   rainwater contribution.

3   A.   Yeah, that would be the definition.

4         MR. LOVETT:  May I approach?

5         THE COURT:  Yes, you may.

6   BY MR. LOVETT:

7   Q.   This exhibit is not marked.  It didn't make it into the

8   book.  I don't know why.  We can ask defendants.  It may be --

9         (Counsel conferred privately off the record.)

10        THE COURT:  I'm going to ask, Counsel, if you talk

11  at the table or while you're moving around, my court reporter

12  can't pick it up.

13        MR. LOVETT:  I'm sorry.  So we would mark it as

14  Plaintiff's 60.

15  BY MR. LOVETT:

16  Q.   Now, is this another Potesta iteration of the report?

17  A.   Yes, it appears to be.

18  Q.   Okay.  And how did it determine -- how did this

19  July 29th report determine how much flow Patriot had as a

20  liability for selenium?

21        MR. HURNEY:  Your Honor, I make the same objection I

22  made before.

23        THE COURT:  Overruled.

24        THE WITNESS:  I believe this was a verification of

25  the treatment cost that Patriot planned to expend.

McHale - Direct

1   BY MR. LOVETT:

2   Q.   Right.  How did it determine the flow for the estimate in

3   this final report?  I turn your attention to Table 3, which is

4   at the back, and I think it says that at all 72 outlets it was

5   going to use two trains of three tanks each which would treat

6   24 gallons per minute at every outfall; is that right?

7   A.   Yes, that is what's on this table, yes.

8   Q.   So instead of marking Patriot's liability at

9   14,040 gallons per minute, it now marks it at 24 gallons at

10  each outfall for 72 outfalls, right?

11  A.   That looks to be the case.

12  Q.   That's quite a drop in the estimation of flow liability,

13  isn't it?

14  A.   This was an analysis of a schedule of expenditures by

15  Patriot.  I think the starting point was a spreadsheet that

16  showed a schedule over time, and they had analyzed that.  I

17  don't think the assumptions were necessarily the driving

18  forces of the analysis.

19  Q.   Well, this isn't a schedule just for -- this is supposed

20  to be a schedule for Potesta's liability for treatment of

21  selenium at its 72 outfalls, isn't it?

22            THE COURT:  You said Potesta's.  You mean --

23  BY MR. LOVETT:

24  Q.   Potesta's.  This is supposed to be Potesta's summary of

25  Patriot's or maybe Magnum's liability -- I don't know if it

McHale - Direct

1  was Magnum or Patriot at this time -- but either Magnum's or

2  Patriot's liability at all 72 outfalls.

3  A.    As I read it, it is -- I didn't instruct them, so I don't

4  know what they were to be doing, but it is basically a --

5  looks to me to be a net present value analysis of a schedule

6  that Patriot has applied to --

7              MR. LOVETT:  May I approach?

8              THE COURT:  You may.

9              MR. LOVETT:  Plaintiff's Exhibit 17.

10             THE COURT:  May I see the one you were looking at?

11             MR. LOVETT:  Did you not get one, Your Honor?  I

12  have an extra one.

13             THE COURT:  This is Plaintiff's Exhibit 60?

14             MR. LOVETT:  60.

15             THE COURT:  And it was not part of the package, so

16  it needs to be marked.

17             MR. LOVETT:  I'm sorry.  I thought I gave one to --

18  that's the July 29th letter, right?

19             THE COURT:  All right.  It's marked as Plaintiff's

20  60.

21             MR. LOVETT:  Here's another copy, Your Honor.  I'll

22  give it to the witness since you have one.

23  BY MR. LOVETT:

24  Q.    I've just given you Exhibit -- Plaintiff's Exhibit 17.

25  Have you seen that?

McHale - Direct

1    A.    Yes, I have.

2    Q.    What is it?

3    A.    It's an email from me to Lawrence Bell.

4    Q.    And who's that?

5    A.    He is -- works in our accounting --

6    Q.    Okay.  Is this --

7    A.    -- department.

8    Q.    Let's start at the back.  Is this because Ernst & Young

9    has questions about Patriot's estimation of its liability?

10   A.    Yes, I believe so.

11   Q.    Okay.  And turn your attention to the third page here.

12   It's not numbered.  The top says Methodology Related Questions

13   & Supports -- & Support.  Do you see that page?

14   A.    Yes.

15   Q.    The third paragraph.  Now, this is, as I understand it,

16   questions asked by Ernst & Young, the auditor, and the

17   question is -- tell me if I'm wrong.

18         The question is, "Can you provide your basis of

19   professional judgment for assuming that the portfolio of

20   outfalls requiring ongoing treatment will likely require, on

21   average, 6 tanks?"

22         Is that a question from the auditor?

23              MR. HURNEY:  Objection, Your Honor.  I don't know

24   how this witness can --

25              MR. LOVETT:  Well, John McHale gives the answer to

McHale - Direct

1    it in the next sentence.

2              THE COURT:  Overruled.  Is this Plaintiff's

3    Exhibit 17?

4              MR. LOVETT:  Yes.  I'm sorry.  This one is 17.

5              CLERK JUSTICE:  Which is different than Joint.

6              THE COURT:  Right.  This is P17, not J17.

7              MR. LOVETT:  Plaintiff's.

8              CLERK JUSTICE:  I need a copy of that.

9              MR. LOVETT:  It should have been submitted with

10   the --

11             THE COURT:  All right.  So we have a copy of that.

12             MR. LOVETT:  Anything up to 58 should already be

13   with the Court.

14             THE COURT:  Okay.  So we're going to use ours.

15             MR. LOVETT:  Is this okay?

16             THE COURT:  This one is marked, Terry.

17             MR. LOVETT:  How bad would it be if we hadn't tried

18   to simplify it before trial?

19   BY MR. LOVETT:

20   Q.   Anyway, is that a question asked by the auditor?

21   A.   Yes.

22   Q.   Is that -- then it says "John McHale."  Is that your

23   response that you proposed?

24   A.   Yes, I think it is.  Yeah.

25   Q.   Okay.  And as I -- what do you say?  So that the auditor

McHale - Direct

1    asks you if you can provide the basis of your professional

2    judgment for assuming that the portfolio of outlets requiring

3    ongoing treatment will most likely require, on average, six

4    tanks, how do you respond to that?

5    A.    Do you want me to read it off?

6    Q.    Well, you don't have to read it.  Just --

7    A.    I responded that the systems are modular in design,

8    consisting of individual treatment trains that will reduce the

9    selenium concentration for a fixed flow to compliant levels.

10   The average selenium concentrations of the untreated water are

11   approximately 20 to 30 parts per billion.  In order to bring

12   this concentration to a compliant level, a three-tank

13   treatment train, i.e., three tanks arranged in series, is

14   required to treat a flow of approximately 12 gallons per

15   minute.  Each tank or stage in the train will reduce the

16   concentration approximately 40 percent.  The six-tank system

17   allows for installation of two treatment trains which allow

18   for variation of flow rates and other factors between two

19   streams of water being treated in order to gain additional

20   data for evaluation.  It also helps to evaluate the modular

21   design approach.

22   Q.    Okay.  So these are trains -- are these ZVI treatment

23   trains?

24   A.    Yes.

25   Q.    Okay.  So you've got -- you're estimating the cost for

McHale - Direct

1   putting six tanks at all the seventy-two outfalls, right?

2   A.    Correct.

3   Q.    And that would treat how many gallons at each outfall?

4   A.    Roughly 24 --

5   Q.    Twenty-four?

6   A.    -- gallons per minute.

7   Q.    Twenty-four gallons per minute.  And the auditor is

8   asking, on the other hand, isn't it -- how much will it cost

9   to treat the water, the flow, from all of Patriot's outfalls.

10  A.    He did not ask that.

11  Q.    Do you think the auditor just wants to know how much it

12  costs to treat 24 gallons per minute from each outfall?

13  A.    I think he asked for my basis for using this design.

14  Q.    What is the purpose of the auditor's question?

15  A.    The rationale for using the six tanks in the instrument.

16  Q.    Is that what it said, what's the rationale for using the

17  six tanks?

18  A.    Well, the basis of professional judgment.  Okay.  I

19  assume that's my rationale.

20  Q.    So Ernst & Young, then, didn't want to know -- wasn't

21  trying to determine what Patriot's total liability was for

22  selenium discharges; is that right?

23  A.    I can't -- Ernst & Young -- I answered the question that

24  Ernst & Young had here.

25  Q.    Okay.  Why did -- what was your understanding at the time

McHale - Direct

1   of what Ernst & Young wanted to know?

2   A.   We had supplied a spreadsheet of our -- a schedule of our

3   projected selenium treatment expenditures --

4   Q.   Okay.

5   A.   -- and they were reviewing it.

6   Q.   The Potesta report of July 29th came six days after this

7   email, right?

8   A.   Yes, it appears so.

9   Q.   Okay.  And that report says, at paragraph 3, in the

10  beginning, the July 29th letter, "Patriot requested that

11  Potesta prepare an estimate of the costs to remediate selenium

12  exceedances in order to meet the requirements of court orders,

13  consent decrees and Magnum's permits."

14  A.   That's what it says.

15  Q.   And the Potesta report then -- and the first Potesta

16  report -- strike that.

17       The draft Potesta report of January 20th, 2009 -- was the

18  January 20th, 2009 draft report a draft of the July 20th,

19  2009 report?

20  A.   It appears to be two different -- it appears to be two

21  different documents.

22  Q.   It is two different documents, but was one made in

23  preparation for making the other one?

24  A.   It appears they were evaluating two different things.

25  Q.   Why would the auditor want to know how much it costs to

McHale - Direct

1    treat 24 gallons at each outfall?

2    A.    I don't believe that's what he asked me.

3    Q.    It isn't?

4    A.    No, he asked me why, on average, we were -- why we were

5    installing, on average, six tanks.

6    Q.    So this report was not prepared -- the July 20, 2009

7    report, unlike the January 20th, 2009 draft, was not prepared

8    to tell Ernst & Young what the liabilities of Patriot for its

9    selenium liabilities were.

10   A.    I was asked to prepare a schedule of our projected

11   selenium schedules.  That schedule was then submitted to

12   Potesta for this report (indicating) on July 29th as a third-

13   party verification.  That's all I know.

14   Q.    Your schedule in the July 29th report was to treat only

15   24 gallons, then, at each Apogee outfall and at Hobet 22?

16   A.    No, there were already 15 tanks installed at the

17   Apogee -- one Apogee outlet.

18   Q.    And how many gallons a minute would that treat?

19   A.    Five times twelve is roughly -- whatever that works out

20   to.

21   Q.    Sixty?

22   A.    Yeah.

23   Q.    Sixty gallons per minute?  And what is the average flow

24   at that outfall?

25   A.    That's roughly in that -- that would be roughly close to

McHale - Direct

1   the base flow.

2   Q.    Which outfall is it you're talking about now?

3   A.    At Titanic.  The average -- the base flow would be in the

4   40- to 50-gallon-per-minute range, and the average flow would

5   be around 100 to 105.

6   Q.    What about at Outfall 2?  Titanic is Outfall 3, right?

7   A.    Yes.

8   Q.    And what about at Outfall 2?  What's the average flow

9   there?

10  A.    Outfall 2, the average annual flow at Outfall 2 is around

11  400 gallons per minute.

12  Q.    And what's that called?

13  A.    Mud Lick.

14  Q.    And what about -- is Slab Fork Number 1?

15  A.    Average annual flow was calculated in the neighborhood of

16  around 1600 gallons per minute.

17  Q.    Okay.  And what did you -- and you estimated in this

18  July 29th -- or Potesta estimated in this July 29th report

19  that you'd be treating 24 gallons per minute at Slab Fork and

20  Mud Lick?

21  A.    The systems that were, you know -- that they evaluated,

22  yeah, that looks to be like what they assumed.

23  Q.    And you helped them make that assumption, didn't you?

24  A.    Helped Potesta?

25  Q.    Yes.

McHale - Direct

1    A.   We gave them our projected expenditures and what we
2    planned to install.  At that point in time we did not know how
3    much water would have to be treated.
4    Q.   Now, I notice that the ABMet is not included in the
5    Potesta report but only the --
6              THE REPORTER:  I'm sorry.  I can't hear you.
7    BY MR. LOVETT:
8    Q.   That ABMet only was included in the price estimate and
9    not ZVI; is that right?
10   A.   It doesn't look like ABMet is in this July 29th report.
11             MR. LOVETT:  May I approach?
12             THE COURT:  You may.
13   BY MR. LOVETT:
14   Q.   Plaintiff's Exhibit 21.  Have you seen that before?
15   A.   Yes.
16   Q.   And did you write this to Blair Gardner?
17   A.   Yes.
18   Q.   Okay.  And had -- at this time had an ABMet pilot been
19   completed?
20   A.   Yes, it had.
21   Q.   And that was completed by GE, right?
22   A.   Yes.
23   Q.   And they quote costs there I think of -- the total
24   installed cost would be 8,742,000 in the first paragraph?
25   A.   Yes.

McHale - Direct

1   Q.   And you say, "This is clearly not economically feasible,"

2   right?

3   A.   Yes, that's what it says.

4   Q.   Is that why ABMet was not considered by Potesta?

5   A.   I don't believe so.

6   Q.   Did you tell Potesta that ABMet was not economically

7   feasible?

8   A.   No.

9   Q.   And you don't know why Potesta left ABMet out of its

10  analysis of liabilities for Patriot.

11  A.   I did not talk to them about any preparation of any of

12  those reports.  That July 29th report, they basically state

13  that ZVI treatment system is the currently best available

14  technology.  So they somehow reached that conclusion on their

15  own.

16  Q.   How did they reach that conclusion on their own?  Did

17  they talk to you?

18  A.   It's in the report.  They did not talk to me.

19  Q.   Who else could they have talked to?

20  A.   They did not talk -- I did not talk to them concerning

21  this.

22  Q.   Why do you say it's not economically feasible?

23  A.   That was -- that was my opinion at the time based on

24  where I thought the technology was going.

25  Q.   Somebody give you a limit of how much you could spend to

McHale - Direct

1    comply with the Court's order?

2    A.   No.

3    Q.   You made the decision alone that that was too much money

4    to spend to comply with the court order; is that right?

5    A.   I felt at that time that it was not economically

6    feasible.  That's different than whether it's too much money

7    to comply with the court order.

8    Q.   How is it different?

9    A.   We had an alternative technology that I had just as much

10   confidence in that we considered less costly.

11   Q.   That's not what you said.  You said this isn't

12   economically feasible.  You didn't say there's another

13   technology that will work.

14   A.   No, I didn't, but clearly I can tell you why I made that

15   decision, and that's why.  I had an alternative technology

16   that was less expensive and, in my opinion, just as feasible.

17   Q.   And that would be ZVI?

18   A.   Yes.

19   Q.   Now, had ZVI at that time ever been installed at an

20   outfall and treated the flow from that outfall to meet water

21   quality standards all the time?

22   A.   No.

23   Q.   Exhibit 4.  Mr. McHale, have you seen this CH2M Hill

24   report before?

25   A.   Yes, I have.

McHale - Direct

1    Q.    And this is the Preliminary Watershed Flow Estimation

2    with Diversion and Equalization Analysis, right?

3    A.    That's correct.

4    Q.    Made on January of 2009 by CH2M Hill?

5    A.    Yes.

6    Q.    And let's turn to page 3.  There are two tables there, I

7    think, and let's look at the second of those tables, if we

8    can, the one -- Table E-4.

9          Now, this is the estimation that CH2M Hill did of the

10   flows from the Apogee site; is that right?

11   A.    Yes.

12   Q.    Okay.  And did it have flow meters installed or did it

13   rely on the monitoring reports from Patriot?

14   A.    This was based on monitoring reports, plus CH2M Hill

15   personnel had flow meters with them when they did the field

16   work.

17   Q.    But they didn't have continuous flow meters out there,

18   did they?

19   A.    Well, they -- I'm not sure what they installed for the

20   duration of when they were there, but there weren't permanent

21   flow meters installed.

22   Q.    And as I understand it, the average flow from Outfall 1

23   is 1600 gallons per minute; Outfall 2, 400; and Outfall 1

24   (sic), 100, right?

25   A.    That was the design -- that was actually a calculated

McHale - Direct

1    number for design average annual flow.

2    Q.    And that's different from base flow.

3    A.    Well, it's different from the average flow that they

4    observed from the DMRs and their own flow measurements.

5    Q.    Okay.  How so?

6    A.    Well, when they did these flow measurements, it was

7    during a dry period.

8    Q.    Uh-huh.

9    A.    And the DMRs -- they determined that the previous year's

10   DMRs, it was a rather dry period so that the flows that were

11   measured were probably lower than the average flows.  So they

12   did a calculation, a hydrological calculation and backed into

13   these numbers.

14   Q.    And this is what they estimated the flow to be from those

15   outfalls based on the DMRs and their back calculation.

16   A.    That's right.

17   Q.    And they estimated the average flow to be 2100 gallons

18   per minute from the three outfalls, right?

19   A.    Correct.

20   Q.    And the average flow is different from the base flow in

21   that the average flow includes surface water as well.

22   A.    It would probably include some runoff, yes.

23   Q.    Some rainwater?

24   A.    Yes.

25   Q.    Okay.  And then the design maximum flow, what is that?

McHale - Direct

1   A.   That was the -- the design maximum flow was -- my

2   understanding of that, that is the flow that would result from

3   equalization structures that were constructed for, in this

4   case, the first flush from a 25-year storm event.

5   Q.   Okay.  And what does it mean, the first flush from a

6   25-year storm event?

7   A.   The first flush as defined in the report would be the

8   first inch of rainfall from the 25-year event.

9   Q.   Okay.  So even that doesn't treat all the water that

10  would fall in a 25-year rain event, right?

11  A.   No, it -- in this case it's very close to a 10-year

12  event.

13  Q.   Okay.  So the first flush of a 25-year event in this case

14  is close to treating all of a 10-year event.

15  A.   Yes, it is.

16  Q.   And the rest of the flow would have to be bypassed -- the

17  rest of the -- the treatment system would have to be bypassed

18  if there were a rain in excess of a 10-year rain.

19  A.   Yes, the excess flow would be bypassed.

20  Q.   And that flow would go into a water of the United States

21  without treatment.

22  A.   Yes.

23  Q.   Now, you're at the environmental -- are you in charge of

24  environmental compliance for Patriot?

25  A.   Yes.

McHale - Direct

1    Q.    And isn't it normally the case that you have to treat all

2    of your flow before you discharge it into a water regardless

3    of the size of the rain event?

4    A.    For permits with water quality based effluent limitation,

5    we're supposed to be in compliance at all times.  For

6    technology based limitations, you're allowed to bypass storm

7    events.

8    Q.    Right.  But these are, as you say, water quality based

9    effluent limits, right?

10   A.    Yes.

11   Q.    So you have to be in compliance at all times.

12   A.    That's correct.

13   Q.    And that would require you to treat at least the 5150

14   that is the total of 4800 and 350, right?

15   A.    Depends -- like I said, that's dependent on the design

16   storm event.

17   Q.    I'm talking about what the Clean Water Act requires.

18   A.    Well, that would not be all the water.

19   Q.    You still have to treat more water to comply with the

20   Clean Water Act than the 5150.

21   A.    I can't speak to that.  I know that that flow rate

22   represents the first flush, and it wouldn't treat all the

23   water that would theoretically fall.

24   Q.    In fact, on the previous page, Potesta -- I mean, excuse

25   me -- CH2M Hill estimated the flows from a 25-year storm and a

1    100-year storm in addition to the first flush of a 25-year

2    storm.

3    A.    Yes, they did.

4    Q.    But in any event, the first flush of a 25-year storm

5    requires the treatment of 5150 gallons.

6    A.    Yes, the equalized --

7    Q.    Equalized treatment.

8    A.    Yeah.

9    Q.    Now, let's go back to these Potesta reports for a minute,

10   if we can, based on that.  Now, this report, the CH2M Hill

11   report is from January of 2009, right?  Do you remember the

12   exact date that you got it?

13   A.    Which report?  The January?

14   Q.    It said January 26th.

15   A.    Oh, the CH2M Hill report.  I'm sorry.  I misunderstood

16   you.

17   Q.    So that's January 26, 2009?

18   A.    Yes.

19   Q.    And have you seen drafts of this, the CH2M Hill report?

20   A.    I believe they did show a draft of this before they

21   finalized it.

22   Q.    And you knew sometime in advance of this what they were

23   going to estimate the flows to be, right?

24   A.    Yes.

25   Q.    And the draft January 20th Potesta report lists the

McHale - Direct

1    total flow as 14,040 gallons per minute at all outfalls for

2    the base flow, right?

3    A.    Yes.

4    Q.    So the January 20, 2009 draft does not capture all of the

5    flow from all of the outfalls at Patriot; is that right?

6    A.    I don't think that's necessarily right.  We hadn't

7    evaluated the other outfalls other than that -- what you saw

8    right there, the review of the DMRs.

9         I'm not sure I understand your question fully.

10   Q.    Well, it says -- look at this Average Flow Rate Per

11   Outlet, the same section we looked at before on page 2, where

12   it says, "With 72 outlets requiring treatment at a flow rate

13   of 195 gallons per minute, the total water flow requiring

14   treatment for Magnum operations is 14,040 gallons per minute."

15   A.    That's what it says, yes.

16   Q.    And at this one -- at these three outfalls in the CH2M

17   Hill report, it estimates that you have to treat 5150 gallons

18   per minute just at those outfalls, right?

19   A.    Yes, that was the basis of design.

20   Q.    And then when you get to the July 29th, 2009 Potesta

21   report, you are only disclosing how much it will cost to treat

22   approximately 1800 gallons per minute; is that right?

23   A.    I think that's what the calculation would work out to,

24   yeah.

25   Q.    You were using these Potesta documents to give Ernst &

McHale - Direct

1    Young an assessment of Patriot's total liability so that its

2    board and governing body would know what its liabilities were.

3              MR. HURNEY:  Objection.  He already asked, and the

4    witness said he doesn't know.

5              THE COURT:  Overruled.  You can answer.

6              THE WITNESS:  I wasn't dealing with Ernst & Young

7    directly.  I was answering some questions.  I wasn't

8    representing anything to Ernst & Young.

9    BY MR. LOVETT:

10   Q.   Okay.  Let's turn next to the evaluation of treatment

11   alternatives from CH2M Hill, which is Exhibit -- Joint

12   Exhibit 5.  Is this -- sorry.  Is this also a report from

13   January 26, 2009 from CH2M Hill to Patriot?

14   A.   Yes, it is.

15   Q.   And you asked CH2M Hill to evaluate different treatment

16   technologies?

17   A.   Yes.

18   Q.   And you asked for a Class 5 cost.  I'll turn your

19   attention to page 3.

20   A.   We did not request any particular class of cost.  That's

21   the cost that CH2M Hill is comfortable in providing.

22   Q.   If you had spent more -- what is a Class 5 cost?

23   A.   My understanding, that is, you know, based -- you know,

24   based on -- it's based on the amount of analysis and design

25   that has been completed for a given project.

McHale - Direct

1   Q.   So a Class 5 cost in this case at Table 1, E1, is plus

2   100, minus 50; is that correct?

3   A.   That's correct.

4   Q.   That means it could be 100 percent more or 50 percent

5   less than the estimate.

6   A.   That's what I understand.

7   Q.   And the Class 5 cost is much less accurate than a Class 1

8   cost; is that right?

9   A.   Yeah, that's my understanding.

10  Q.   And is a Class 5 cost the least accurate cost they could

11  have estimated, or is there a Class 6?

12  A.   Prior to actually starting the design, that's why it

13  was -- they explained it to me, that to get a tighter cost,

14  you would actually have to start designing the system.

15  Q.   And you never asked Potesta to start designing any of

16  these systems, right?

17  A.   At this point, you know, we wouldn't ask them to start

18  designing a system until we had selected a single system.

19  Q.   Well, as of Friday of last week, you hadn't asked them to

20  start designing a system, had you?

21  A.   As of Friday, I hadn't.

22  Q.   Is that right?

23  A.   Yes.

24  Q.   Is that still true, or have you now asked them since

25  Friday to start designing --

McHale - Direct

1    A.    They have been tasked with giving us a proposal.

2    Q.    Since Friday?

3    A.    Yes.

4    Q.    But you could have tasked them with giving you a proposal

5    on January 26th of 2009 after they submitted this report,

6    couldn't you?  You could have tasked them --

7    A.    That is if we had -- were able -- had been able to select

8    the appropriate technology to go ahead with, yes.

9    Q.    What technologies did -- well, let me just take you

10   through it.  It will be more quick, I guess, to do it that

11   way.  So basically they costed out two types of ZVI.

12   A.    That's right.

13   Q.    ZVI SS is -- what's that?  ShipShaper?

14   A.    That's correct.

15   Q.    And that's the technology that we heard about July in

16   2008, the Dr. Ray Lovett technology; is that right?

17   A.    Yes, it is.

18   Q.    Since then another ZVI technology has emerged.  That's

19   ZVI MATRIC, right?

20   A.    That's right.

21   Q.    And so they costed those out, and they costed out RO.

22   What does BC-BX mean after RO there?  Do you know?

23   A.    I don't --

24   Q.    This is on Table 1, E1, Alternative 2.  I just don't

25   know.

McHale - Direct

1   A.   What page is that on?

2   Q.   3.

3   A.   I don't know what that is.

4   Q.   Okay.  But it's reverse osmosis.

5   A.   It's my understanding it's conventional RO.

6   Q.   Okay.  Not VSEP.

7   A.   Right.

8   Q.   Okay.  And Alternative 3A is ABMet.

9   A.   That's correct.

10  Q.   And 3B is an FBR, a fluidized bed reactor.

11  A.   That's correct.

12  Q.   And 4 is Subsurface Flow Wetland.

13  A.   That's right.

14  Q.   I take it that you've abandoned Alternative 4 at this

15  point as a possibility.

16  A.   We ruled it out at that time and based on CH2M Hill's

17  recommendation also that there wasn't sufficient acreage

18  available to do -- to perform that technology.

19  Q.   Okay.  And when you look at these, you have installed

20  costs and operating costs and totals for a 10-year present

21  worth cost, right?

22  A.   Yes.

23  Q.   And if you -- ZVI turns out -- the ShipShaper, though,

24  Lovett technology is very expensive, 56 million, right?

25  A.   Yes.

McHale - Direct

1    Q.   The ZVI MATRIC, the newer ZVI is 16 million.  RO is

2    fifty-eight and so forth.  It turns out that FBR is the least

3    expensive of the technologies, right?

4    A.   Yes, in this ranking.

5    Q.   And ABMet is more expensive, twice as expensive as the

6    FBR but much less expensive than RO or ZVI SS.

7    A.   Yes.

8    Q.   Okay.  In the ballpark with MATRIC ZVI, right?

9    A.   That's correct.

10   Q.   Okay.  Now, at this time had the pilot from ABMet been

11   completed?

12   A.   No.  It was just about to get started.

13   Q.   Okay.  Now, at this time you still hadn't told CH2M Hill

14   that you had a compliance deadline, had you?

15   A.   Oh, yes, we had.

16   Q.   You had?  Had you told Tom Sandy that?

17   A.   I told Tim Harrison I know for sure.  In fact, it was in

18   the Power Point presentation on our kickoff meeting

19   October 1st.

20   Q.   The date?

21   A.   Huh?

22   Q.   The date?

23   A.   The fact that we had a consent order obligation, yes.

24   Q.   Was the date of the order on that Power Point?

25   A.   I don't recall what the date was, but I had -- I kept

McHale - Direct

1    each of our vendors informed of our compliance dates.

2    Q.    You did?

3    A.    Yes.

4    Q.    Okay.

5    A.    And one thing I'd like to point out in this one report

6    from August, the first CH2M Hill report on the preliminary

7    screening, said revision one, the prior -- the prior report

8    actually referenced the consent decree in that document.

9    Q.    But it didn't reference a date, did it?

10   A.    It referenced the consent decree.

11   Q.    Okay.  After this report came out and the flow report

12   came out -- they came out on the same day, right?  Did you do

13   anything -- did Patriot do anything to explore how to equalize

14   5150 gallons per minute or more at the Apogee site?

15   A.    As far as --

16   Q.    Constructing a basin or a dam of some sort to do that.

17   A.    Well, you can't go ahead with that type of work until you

18   have your detail design work done.

19   Q.    Did you do your detail design work?

20   A.    We hadn't selected a technology yet.

21   Q.    You knew you had to equalize the flow, didn't you?

22   A.    Yes.

23   Q.    Okay.  So does it matter whether you use ABMet or reverse

24   osmosis or FBR how you equalize the flow?

25   A.    It matters what flow rates you treat.

McHale - Direct

1  Q.   Well, you know you've got to treat at least 5150, don't

2  you?

3  A.   That was the design basis for the CH2M Hill report.  We

4  were still trying to evaluate what was the appropriate flow

5  levels.

6  Q.   Because you thought you might have to treat more than

7  that?

8  A.   Well, we did not know how much would have to be

9  treated to maintain compliance.  The standard assumption with

10  storm water is that during storm water events, you get

11  dilution.  So, you know, in theory you don't have to treat

12  storm water --

13  Q.   I thought you just told me that DEP required the

14  treatment of all water when there was a water quality based

15  effluent like there is at Apogee.

16  A.   No, your effluent just needs to be in compliance at all

17  times.  It doesn't require the treatment of all water.

18  Q.   Do you have any data to support the contention that when

19  flow is high, that the water that would be bypassed would be

20  meeting the water quality standard?

21  A.   No, and that's what we -- we have a -- in fact, we have a

22  year-long study going on right now to try to quantify that,

23  but that has been the conventional wisdom on this treatment

24  for years.

25  Q.   This hearing we had in July of 2008, wasn't equalization

McHale - Direct

1    a significant part of the testimony at the hearing?

2    A.    In July 2008?

3    Q.    Yes, before this Court.

4    A.    I know it was -- I know it was -- it was discussed.  I

5    don't know how significant it was.

6    Q.    And the CH2M Hill report of January of 2009 tells you,

7    doesn't it, that you're going to have to construct a 60-foot

8    impoundment to equalize the flow at Outfall 1?

9    A.    At that basis of design, yes.

10   Q.    And to this day have you undertaken any design of an

11   equalization structure at Apogee?

12   A.    No.  Like I said, until you decide on the flow rate, you

13   can't go to the regulatory agency and say, "I have a range of

14   pond designs I need to get approved."

15   Q.    How did you expect to comply with the court order, with

16   the consent decree here by April if you never even made --

17   took the first step to decide how to equalize the flow?

18   A.    We had hired MATRIC to design base systems to be

19   installed in compliance with the consent order deadlines based

20   on the average flows in the CH2M Hill report.

21   Q.    You hired MATRIC to put in ZVI?

22   A.    Yes, we did.

23   Q.    To treat 1600 gallons per minute at Outfall 1?

24   A.    And 400 at Mud Lick.

25   Q.    Of course, that's not what the Clean Water Act requires,

McHale - Direct

1  right?

2  A.   No, but that's -- that's what we -- we had an order to

3  install treatment; and when you design for average flows,

4  you're going to be treating 90, 95 percent of the water

5  anyway.  That's as close as we could get based on what we

6  knew.

7  Q.   So you entered into a contract with MATRIC to do this?

8  A.   No, we didn't have a formal contract, but we had -- we

9  had -- in July of 2009, we had entered -- we had tasked MATRIC

10 to review selenium technologies.  They quickly came up within,

11 you know, a month or so, with this ZVI foam and proposed it as

12 the -- as a solution that would work.  And so in November we

13 basically -- we tasked them to design and to construct by

14 June 30th a system.

15 Q.   I don't know how we got off onto ZVI.  I was asking you

16 about equalization.

17 A.   No, you asked me how I was going to comply with the

18 June 30th deadline.  That's how I was going to comply.

19 Q.   What I meant was, if you hadn't equalized the flows

20 yet --

21 A.   If you're designing for 1600 and 400 and 100, you don't

22 need to equalize.

23 Q.   Is it your testimony that to treat 1600 gallons per

24 minute at Outfall 1, no equalization is required?

25 A.   Not the equalization that's here.  I don't know.  The

McHale - Direct

1    analysis is being performed right now.

2    Q.    Who's performing it?

3    A.    CH2M Hill.

4    Q.    When were they hired to perform that?

5    A.    Well, we did preliminary work last week, and I formally

6    tasked them to do it today.

7    Q.    Today?

8    A.    To clean up what they came up with last week.  It was

9    done on a very preliminary basis, and we want to finalize it.

10   Q.    Okay.  Nevertheless, CH2M Hill back in January

11   recommended a 40-foot impoundment, right?

12   A.    I believe it was a 60-foot --

13   Q.    Sixty-foot impoundment.  You're right.  What did you do

14   to accomplish that?

15   A.    As I said, we weren't in a position or at a stage to

16   start designing equalization structures.

17   Q.    Did you even do a geotechnical analysis necessary to

18   determine whether or not it could be built in that location?

19   A.    No.  That wasn't appropriate to do so at the time.

20   Q.    Because you hadn't decided how much water you were going

21   to treat.

22   A.    That's correct.

23   Q.    There's no question but that you have to treat at least

24   the average flow, is there, 1600 gallons per minute at

25   Outfall 1?

McHale - Direct

1    A.    As I said, yes, there's still significant questions as to

2    what the appropriate flow is.

3    Q.    Well, it couldn't be less than that, could it?

4    A.    Sure.

5    Q.    Really?

6    A.    Yes.

7    Q.    How?  How could it be that you would have to treat less

8    than the average flow?

9    A.    As I explained, any runoff due to rainfall could

10   potentially be bypassed.  We're evaluating that now.

11        Also, there are -- you know, there is the possibility, as

12   you just heard from the previous witness, of splitting a

13   stream, the inflow stream, you know, in certain circumstances

14   where you bypass some that doesn't have to be treated but

15   could be blended in later.  And we're evaluating all those

16   options.

17   Q.    Who's evaluating them?  Have you hired CH2M Hill to do

18   that?

19   A.    We've hired CH2M Hill to do the storm water evaluation,

20   yes.

21   Q.    But that's only to determine whether there is going to be

22   selenium in storm water events, right?

23   A.    That's the primary purpose.

24   Q.    Not to -- you just testified about splitting the flows.

25   You haven't even tasked anyone with that, right?

McHale - Direct

1    A.    That would be part of the detail design, yes, once we

2    selected a technology.    That would be one of the tasks.

3    Q.    It hasn't been started yet, though, has it?

4    A.    We've requested -- based on the FBR report, which we just

5    got July 22nd, we have authorized CH2M Hill to give us a

6    proposal for constructing a fluidized bed reactor at Apogee to

7    treat three sites.

8    Q.    Okay.    In Joint Exhibit 5, the alternatives evaluation,

9    let's go to page 36 at the recommendations.    So these are

10   recommendations that CH2M Hill made to Patriot on January 26th

11   of 2009, right?

12   A.    Yes.

13   Q.    The second bullet point says, "Initiate discussions with

14   the WVDEP to negotiate the quantity of water that will need to

15   be captured and treated," right?

16   A.    Yes.

17   Q.    Have you actually had any negotiations with DEP about

18   that?

19   A.    I've had informal discussions with them.

20   Q.    And when was that?

21   A.    Over a period of time.

22   Q.    I think that you testified -- well, did you have two or

23   three discussions informally with Tom Clark?

24   A.    I had two or -- I had several discussions informally with

25   Tom Clark and others at DEP.

McHale - Direct

1   Q.   Others?  Who else?

2   A.   It would've been Ken Politan and people like Lewis

3   Halstead.

4   Q.   Did you talk to Lewis Halstead about this?

5   A.   In the setting, you know, yes, in a general setting.

6   Q.   What do you mean, in a general setting?

7   A.   When we -- we would meet with DEP from time to time, and

8   that was always a topic that would come up.

9   Q.   Lewis Halstead.  Anybody else?  Tom Clark?

10  A.   I don't know, you know.  I can't say specifically.  I

11  think Jeff Parsons was probably involved.

12  Q.   Did you ever make a formal request for them to tell you

13  how much water you're going to have to treat?

14  A.   Request in writing?

15  Q.   Yeah.

16  A.   No.

17  Q.   Did you ever get a response from them?

18  A.   No, we never did get any feedback.

19  Q.   Did you ever make a formal response orally -- I mean,

20  excuse me -- a formal request orally for them to do it, not

21  just a chitchat thing, but a formal request?  "I want you to

22  tell us how much water we have to treat so that we can start

23  building an equalization system."

24  A.   I think I just testified that I asked them in the context

25  of several of our meetings what is the quantity of water we

McHale - Direct

1  have to treat.

2  Q.    I think you testified it was in a general conversation,

3  though.

4  A.    Yes.

5  Q.    You never -- okay.  And that's all you've done?

6  A.    Yes.

7  Q.    Okay.  The other one says, "Install appropriate flow

8  monitoring and sampling equipment near-term to better define

9  the basis of design for the outfalls of concern."

10  A.    Yes.

11  Q.    You didn't do that, did you?

12  A.    No, we've not installed those at Apogee.  We have

13  installed them at several outlets at Hobet in conjunction with

14  our storm water flow that we're doing at this point.

15  Q.    Only for that test you're doing to see if --

16  A.    Excuse me?

17  Q.    Only for the test to determine the concentrations of

18  selenium in rainwater --

19  A.    Right, yeah, and to better determine the flows to be

20  treated as part of the --

21  Q.    And then the next one is, "Based on the drivers of

22  effectiveness, cost, footprint, and availability, CH2M Hill

23  would recommend that Patriot pursue a pilot test of

24  Alternative 3B to treat selenium in mine water."

25        You did that, right?

McHale - Direct

1   A.   Yes, that's just been completed.

2   Q.   Okay.  When did you start that pilot test, the FBR pilot

3   test?

4   A.   We started the project up in about February time frame

5   this year.

6   Q.   February 2010?

7   A.   Yes.

8   Q.   And this recommendation was made to you in January of

9   2009?

10  A.   That's correct.

11  Q.   Why did it take you over a year to do it?

12  A.   Well, we were -- at that point in time, we were -- had

13  just completed the RO pilot.  We were embarking on the ABMet

14  pilot, and then that went right into a pilot of the VSEP

15  operations, of the VSEP technology.  So, you know, we pursued

16  those first since they were already --

17  Q.   The truth is, even at this time CH2M Hill thought that

18  FBR was going to be the best technology, didn't it, in January

19  of 2009?

20  A.   That's not what this says.

21  Q.   But it is a fact, though, isn't it?

22  A.   That's not what this says.

23  Q.   I know, but I'm asking you, do you know that to be a fact

24  otherwise?

25  A.   I can't speak for what CH2M Hill believed other than what

McHale - Direct

1    they've put in this report.

2    Q.    Did they have meetings with you?

3    A.    Yes.

4    Q.    And did you not come away from some of those meetings

5    with the impression that CH2M Hill would recommend an FBR?

6    A.    They recommended further evaluation.

7    Q.    Did you not have the impression that that was a favorite

8    technology at the time?

9    A.    No, because they also said to keep evaluating ZVI.

10             MR. LOVETT:   Approach, Your Honor?

11             THE COURT:   You may.

12   BY MR. LOVETT:

13   Q.    Exhibit 21.  Joint Exhibit 21.  Have you seen that

14   before?

15   A.    Yes.

16   Q.    And this is from September of 2009, right?

17   A.    Yes, it is.

18   Q.    And what is it?

19   A.    It is a cost estimate for ABMet.

20   Q.    Okay.  And was there an ABMet pilot before this?

21   A.    Yes, there was.

22   Q.    And did that pilot successfully treat water to below

23   5 parts per billion for selenium?

24   A.    Yes, it did.

25   Q.    And that's a GE technology?

McHale - Direct

1    A.   Yes.

2    Q.   And that's the technology that you said was -- I can't

3    remember -- cost prohibitive in the earlier email?

4    A.   Yes.

5    Q.   Okay.  Let's turn to the cost on the very back page of

6    the exhibit, in the appendix, the second to the last page,

7    which says page 13 or 14 on the top.  Do you see that?

8    A.   13 or 14?  Yes.

9    Q.   Okay.  So it estimates the cost of a 175-gallon-per-

10   minute system at -- the estimated cost is $2,350,000 for the

11   technology?

12   A.   Yeah, the total equipment costs.  Yes.

13   Q.   Well, the total cost is 9,195,000, right?

14   A.   That's correct.

15   Q.   What does the 2,350,000 represent?

16   A.   That's simply the ABMet equipment.

17   Q.   So the whole thing for the ABMet process for 175 gallons

18   is $9,195,000 --

19   A.   That's right.

20   Q.   -- for 250 gallons per minute.  And then on the next page

21   you have an estimate for 500 gallons per minute, right?

22   A.   That's correct.

23   Q.   And it estimates that cost at $18,213,000.

24   A.   That's right.

25   Q.   For only 500 gallons per minute.

McHale - Direct

1    A.    Correct.

2    Q.    So if you had to treat 5000 gallons per minute, would it

3    be fair to guess that the cost would be, you know, 10 times

4    the 18 million, or do you think you would have economy to

5    scale that would reduce that?

6              MR. HURNEY:  Objection, Your Honor.

7              THE COURT:  Overruled.

8              THE WITNESS:  I don't know.  I don't think it's a

9    linear relationship.

10   BY MR. LOVETT:

11   Q.    Did you ever ask anybody?  Did you ever ask GE?

12   A.    Ask them --

13   Q.    GE.

14   A.    For what?

15   Q.    For a cost of treating more than 500 gallons per minute.

16   A.    No, we didn't.

17   Q.    Why not?

18   A.    Because at that point in time we were considering this

19   for the Outlet 2 at Hobet, and that was the design flows we

20   were looking at.

21   Q.    Why weren't you considering it for everywhere?

22   A.    We were considering ABMet for everywhere, but this was

23   specific to an outlet that we were considering putting ABMet

24   in.

25   Q.    Well, that's just for the pilot that was performed,

McHale - Direct

1    right?

2    A.    Excuse me?

3    Q.    That outlet is just where the pilot was being performed

4    at Hobet.

5    A.    GE quoted us equipment for Outlet 2 at Hobet.

6    Q.    Okay.  Did you ever ask it how much it would cost to

7    treat more than 500 gallons per minute with ABMet?

8    A.    No, I didn't task them with that, but CH2M Hill did do

9    the analysis at 800 gallons per minute.

10   Q.    Right.  We'll get to that, I think.  Is that in the FBR

11   study?

12   A.    Excuse me?

13   Q.    Or is that somewhere else?  In the FBR pilot study?

14   A.    That was done in the January 26th report.

15   Q.    Okay.  Well, it couldn't have done it -- I mean that

16   would have been done before the pilot.

17   A.    Yes.  They did it based on information -- they contacted

18   GE and got some information from them in preparation for this.

19   Q.    Right.  But this study is after the pilot, the -- strike

20   that.  The cost estimates for two full-scale ABMet systems

21   provided by CH2M Hill, that was done after the pilot, right?

22   A.    Yes, this was.

23   Q.    So CH2M Hill were serious about evaluating this

24   technology.  They're giving you a cost after the pilot in

25   addition to the cost they gave you before the pilot, right?

McHale - Direct

1    A.   I asked for those specific -- I asked CH2M Hill -- GE and

2    CH2M Hill both to give me quotes for those particular flow

3    rates.

4    Q.   Right.  And you never asked for a quote for a flow rate

5    above 500 gallons.

6    A.   No, I didn't.

7    Q.   Was your contact at GE Mr. Rooney?

8    A.   Yes.  Initially it was a gentleman by the name of Fred

9    Liberatore and then later Phil Rooney.

10   Q.   Phil Rooney?  And did Phil Rooney follow up with you on

11   the ABMet pilot?  Did he call you and ask you what you were

12   doing?

13   A.   I believe he did contact me.

14   Q.   And did you get back to him?

15   A.   Well, actually I got back to him to ask him for a quote,

16   yes.

17   Q.   Did he give you a quote?

18   A.   Yes.

19   Q.   And what was the quote?

20   A.   I don't recall off the top of my head.  I think, you

21   know, they were basically -- the equipment costs were quoted

22   in the CH2M Hill report.

23   Q.   Was that before or after the pilot?

24   A.   That was after the pilot.

25           THE COURT:  We need to take a break soon.

McHale - Direct

1              MR. LOVETT:  This is --

2              THE COURT:  All right.  We're going to take a

3    five-minute recess.

4         (Recess from 3:56 p.m. to 4:10 p.m.)

5              THE COURT:  All right.

6              MR. LOVETT:  Exhibit 5.  Sorry about that.

7              MR. MCLUSKY:  Your Honor, before we go, might I

8    inquire scheduling-wise?  We have a deposition that has been

9    designated to be shown.  We got the plaintiff's designation of

10   their part apparently emailed to us today.  I'm trying to

11   figure out whether to stay for the rest of this or go back and

12   work on my designation of that so that --

13             THE COURT:  Well, how much longer is your direct

14   going to be?

15             MR. LOVETT:  Half hour, 20 minutes.  Half hour.

16             THE COURT:  Are you going to do the cross?

17             MR. MCLUSKY:  No, Mr. Hurney is.

18             THE COURT:  I think we're going to be tied up with

19   this for the rest of this day.

20             MR. MCLUSKY:  All right.  Thank you.

21             MR. HURNEY:  Your Honor, if it's quarter of five or

22   something, do you want to -- I think I'm going to be an hour

23   or so if you want to -- I would propose I can clean up my

24   notes --

25             THE COURT:  Well, let's see what time we get there.

McHale - Direct

1    That's fine.

2              MR. LOVETT:  May I approach, Your Honor?

3              THE COURT:  Yes, you may.

4    BY MR. LOVETT:

5    Q.   I'm going to show you two -- I'll just bring two at once

6    to expedite things.  First is Exhibit --

7              MR. TEANEY:  Whatever it says.  Joint.

8              MR. LOVETT:  Joint Exhibit 18.  Here's Joint

9    Exhibit 56.  That way I won't have to go back up here.  I

10   apologize.  Plaintiff's 46.

11             THE COURT:  Joint Exhibit 18 and then --

12             MR. LOVETT:  Joint Exhibit 18 is a Power Point

13   presentation from Patriot Coal, and the other one is the FBR,

14   fluidized bed reactor, pilot study.

15             THE COURT:  And what was the other number?

16             MR. TEANEY:  Plaintiff's 46.

17             MR. LOVETT:  46.

18             THE COURT:  Plaintiff's?

19             MR. LOVETT:  Plaintiff's 46 and Joint 18.

20   BY MR. LOVETT:

21   Q.   Joint 18 will just be brief.  Is this the Power Point

22   presentation that you referenced earlier in terms of

23   explaining to CH2M Hill and others that there was a consent

24   decree deadline?

25   A.   This was the -- yes, this is what I referenced earlier.

McHale - Direct

1    Q.    Can you find it here where it says the deadline?

2    A.    If you go to the sixth page in, it says Potential Key

3    Objective Areas.

4    Q.    One, two.   Okay.

5    A.    Environmental.   It said Compliance with Consent Order.

6    Q.    Right.   No date, though.   No date.

7    A.    I mean, you know, they were aware of a compliance

8    obligation with a consent order.   It's not reflected in here.

9    Q.    What date is this Power Point given?

10   A.    October 1st.

11   Q.    Of what year?

12   A.    Of 2008.

13   Q.    Does that refer to the DEP consent order?

14   A.    Excuse me?

15   Q.    Does that refer to the DEP consent order in the Boone

16   County case?

17   A.    No.   This is related to Apogee.   This is Ruffner Mine

18   selenium.

19   Q.    But the Apogee consent decree hadn't been entered by that

20   time, had it?

21   A.    The March 19th order of 2009 are you referring to?

22   Q.    Yes.

23   A.    No, it hadn't been.

24   Q.    So it couldn't be referring to that, could it?

25   A.    It couldn't have been referring to that order.   It was

McHale - Direct

1   referring to our compliance obligation at Ruffner because we

2   had -- I mean this was not above Hobet.

3   Q.   That doesn't show in any way that you told CH2M Hill that

4   you had to comply with the consent decree before this Court

5   that required compliance by April of 2010, right?

6   A.   It shows that they were aware of a court deadline, of a

7   court compliance obligation, yes.

8   Q.   Okay.

9   A.   Otherwise, why would it be in there?

10  Q.   The FBR pilot study, July 2010 report, it's Plaintiff's

11  46.

12  A.   Yes.

13  Q.   Is a fairly recent report from CH2M Hill?

14  A.   Yes, it is.

15  Q.   Estimating costs for the FBR?

16  A.   That's correct.

17  Q.   And those costs are summarized, I guess, on a table on

18  the second page, and they only went to a flow of 800 gallons

19  per minute there, right?

20  A.   Yes.

21  Q.   Why didn't you ask them to do a higher flow?

22  A.   For purposes of this report, we wanted to conform with

23  the earlier report.

24  Q.   But you know you have to treat 5100 -- at least

25  5150 gallons at Apogee, don't you?

McHale - Direct

1    A.   As I said earlier, I do not know ultimately what we will

2    have to treat.

3    Q.   You know you -- you believe you're going to have to treat

4    more than 800 gallons per minute?

5    A.   I don't know.

6    Q.   And then it compares the costs of technologies on

7    page iii, and an FBR turns out to be significantly cheaper

8    than ABMet, ZVI, or RO; is that right?

9    A.   Yes, it is the cheapest alternative in this table.

10   Q.   Now, if FBR were put in, would CH2M Hill be the

11   engineering and contracting firm to do that?

12   A.   I would anticipate that they would.

13   Q.   So would CH2M Hill make a larger profit if it put in an

14   FBR as opposed to ABMet do you think?

15   A.   I have absolutely no idea.

16   Q.   They do a lot more work for Patriot, right?

17   A.   They do not -- they do not market the FBR technology,

18   so --

19   Q.   The FBR technology is not proprietary, right?

20   A.   There's a third party, EnviroGen, who markets it just

21   like GE markets ABMet.

22   Q.   I think they're just marketing equipment for it, right?

23   They're not marketing the process, are they?

24   A.   They do the same thing for FBR that GE does for ABMet.

25   It's identical.  They'll supply the equipment.

McHale - Direct

1    Q.   But GE also has a proprietary interest in the process of

2    ABMet that nobody has in FBR, right?

3    A.   I don't know what EnviroGen's proprietary interest is.  I

4    assume no one else could manufacture that technology.

5    Q.   Okay.  Just turn your attention to the page at the end,

6    the recommendations, 6-3, which is about halfway through this

7    stack of documents, page 6-3.  Do you see that?

8    A.   Yes.

9    Q.   It says, "Based on the results of the FBR pilot study, an

10   appropriate design of full-scale FBR system with associated

11   effluent suspended solids removal system would be able to

12   consistently achieve a dissolved selenium reduction to less

13   than the required WVDEP limit of 4.7 micrograms per liter."

14   A.   Yes.

15   Q.   So they say it works, right?

16   A.   They think they could design a system that would meet

17   that limit, yes.

18   Q.   So we know now after all --

19   A.   Subject to the qualifications on the following page.

20   Q.   Those don't qualify whether it would work or not, do

21   they?  They just qualify different ways of setting it up.

22   A.   They identified items that need to be answered prior to

23   that.

24   Q.   Right, but they don't think that that will stop the

25   system from working to treat the 5 parts per billion.

McHale - Direct

1    A.   I don't know what -- I can't tell you what they think,

2    but if any of these additional evaluations were to come up

3    negative, yes, it would affect the decision.

4    Q.   Tom Sandy is going to testify about this tomorrow or the

5    next day.

6    A.   That's fine.  I just -- these bullet points do concern

7    me.  There's certain things that need to be addressed.

8    Q.   There are always things that could be addressed, right?

9    I mean it never ends.

10   A.   These are items that have been flagged by the consult --

11   by CH2M Hill as affecting the feasibility of the design.

12   Q.   Do you think that CH2M Hill believes that there are any

13   problems that would stop the FBR process from treating your

14   effluent to 5 parts per billion selenium?

15   A.   They've indicated to me exactly what's in the

16   recommendations here, that they think we can get there.

17   There's still some obstacles to be overcome.

18   Q.   And do you think that -- so now we have a situation where

19   reverse osmosis will treat to 5 parts per billion or less,

20   although expensively; is that right?

21   A.   The pilots we did failed.

22   Q.   You don't think that reverse osmosis will treat your

23   effluent to 5 parts per billion or less?

24   A.   Not on our -- not on our conditions, no.

25   Q.   Do you think it will?

McHale - Direct

1    A.   Do I think it will?

2    Q.   Uh-huh.

3    A.   I don't think it will.

4    Q.   Okay.  Do you think ABMet would work to treat selenium to

5    5 parts per billion or less at your outfalls?

6    A.   All I know is that ABMet has been installed in many

7    places and it is not treating to that limit anywhere that I'm

8    aware of at a surface mine or --

9    Q.   Do you think it will work at your outfalls?

10   A.   Do I think ABMet will work to achieve compliance?

11   Q.   Yes.

12   A.   At this point I have no reason to believe it will work

13   any better than other technologies we're employing.

14   Q.   I'm not asking you that.  I'm asking if you believe that

15   it will work.

16   A.   Ultimately I don't know until, you know -- I have no

17   basis for determining if it will work in our conditions.

18   Q.   Okay.  Do you think the FBR will work in your conditions?

19   A.   I think, you know, based on CH2M Hill's recommendations,

20   I think it has potential to work, yes.

21   Q.   Do you think it will work?

22   A.   I don't know if it will work until we build one.

23   Q.   Do you think that FBR has an advantage over ABMet --

24   A.   Yes, I do.

25   Q.   -- in its ability to work?

McHale - Direct

1   A.   Yes, I do.

2   Q.   Why do you think that?

3   A.   First of all, it requires ultimately a smaller footprint,

4   which is very attractive in our conditions because we're very

5   constrained by space; and secondly, it -- you know, obviously

6   the cost factors in.  It is a less expensive system than

7   ABMet.

8   Q.   Let me take cost out of the equation.  If cost were not

9   an issue, do you think that one technology would be superior

10   to the other for the sole purpose of treating your effluent to

11   5 parts per billion?

12   A.   I believe the FBR technology has some inherent

13   advantages, but -- the way it's been explained to me.

14   Q.   Any except for the footprint?

15   A.   Well, it's more -- it's a more -- my understanding, the

16   way it's been explained to me, because the system itself

17   increases the amount of surface area of the bacteria that are

18   available for selenium reduction, it's a more efficient

19   system.  So the more efficient system gets the nod in that

20   case.

21   Q.   Okay.  Now, since this FBR report has come out, it sounds

22   like you've had some discussions with CH2M Hill about the cost

23   of the FBR; is that right?

24   A.   Yes, we've discussed it quite a bit last week.

25   Q.   Okay.  And with the timing of installation as well?

McHale - Direct

 1   A.   Yes, we did.

 2   Q.   And also with the equalization?

 3   A.   We talked about equalization also.

 4   Q.   What about flows?

 5   A.   We talked about flows.

 6   Q.   Timing, flows, equalization, cost.  Anything else?

 7   A.   Putting a centralized system in rather than three

 8   independent units.

 9   Q.   Okay.  Let's talk about what's happened in these

10   conversations.  Timing.  How long does CH2M Hill think it

11   would take it to install a treatment system, whether

12   centralized or individualized?

13   A.   The minimum they think they could do it in, the most

14   compressed time frame, would be two years and six months.

15   Q.   Two years, six months?

16   A.   Yes.

17   Q.   Is that for a centralized system or for individual

18   systems at each outfall?

19   A.   We were talking more or less about the centralized

20   system.  I've asked them to go ahead and cost it out both

21   ways.

22   Q.   And which came out to be more expensive?

23   A.   It came out to be more expensive.  They're also working

24   the schedule.

25   Q.   The individualized system --

McHale - Direct

1    A.    Yes.

2    Q.    -- came out to be more expensive?

3    A.    Yeah, the three separate outlets rather than one central

4    system.

5    Q.    And what is the cost of the individualized system?

6    A.    In total?

7    Q.    Yes.

8    A.    Roughly 40 million by their estimate.

9    Q.    Forty million for the individual systems?

10   A.    For the centralized system.

11   Q.    Oh, okay, for the centralized.  Forty million for

12   centralized system.  And how many -- and what flow would that

13   treat?

14   A.    That would treat a 2100-gallon-per-minute flow.

15   Q.    2100-gallon-per-minute flow.  And that's the average

16   flow.

17   A.    Yes.

18   Q.    Well less than the 5150 first flush 25-year flow, right?

19   A.    Yes.

20   Q.    Did you ask them for a cost for the 5150?

21   A.    Yes.  That is the 40 million.

22   Q.    No, I thought you said that was the cost for 2100 gallons

23   per minute.

24   A.    Oh, I'm sorry.  I misspoke.

25   Q.    That's okay.

McHale - Direct

1   A.   No, I have not asked them for a cost for 5150.

2   Q.   You still have not asked for that cost?

3   A.   Not yet.

4   Q.   Okay.  Do you plan to do that?

5   A.   I don't currently plan to do it.  I want to see what they

6   come up with here first.

7   Q.   Okay.  And what was the cost for the individualized

8   systems?

9   A.   Roughly 46 million, round numbers.

10  Q.   And that is for 2100 gallons per minute as well?

11  A.   That's correct.

12  Q.   Okay.  Now, is this the total installed costs, or is

13  there something that's left out of it?

14  A.   It was meant to be total installed cost, and it's a very

15  rough estimate.  It doesn't qualify as a Class 5 estimate at

16  this point.  That's why I've asked them to formalize that.

17  Q.   You mean it's less accurate or -- than a Class 5?

18  A.   Yes.  It was done in the course of a couple of days of

19  discussions there, and they used a lot of assumptions.

20  Q.   Well, I'm confused, because I thought the FBR study was a

21  Class 5, the pilot was a Class 5.

22  A.   It is, but for the differing flow -- for the different

23  flow rates and for centralized --

24  Q.   I see.

25  A.   -- versus independent, that requires quite a bit of

1    additional work.

2    Q.    I see.  So you're saying this is a Class 5 for

3    800 gallons per minute.

4    A.    Yes, it is.

5    Q.    But it's not a Class 5 for 2100 gallons per minute.

6    A.    2100.  And also it doesn't -- you know, like I said, the

7    centralized system includes a lot of things that are not

8    included in the independent, in the individual scenario.

9    Q.    Now, for equalization, that's not in these total

10    installed costs?  That's left out of it?

11    A.    It is.

12    Q.    It is left out?

13    A.    It is left out.

14    Q.    Is that the only item, significant item that's left out

15    of the total installed costs?

16    A.    I believe so.

17    Q.    Okay.  And what have you decided to do for equalization?

18    A.    I've tasked them with giving me the equalization volumes

19    that would be necessary for each scenario.

20    Q.    What do you mean, for each scenario?

21    A.    With the centralized scenario and the independent

22    scenario.

23    Q.    Is it only for 2100 gallons per minute?

24    A.    Yes.

25    Q.    You have not tasked them with giving you an equalization

McHale - Direct

1    proposal for anything higher than that.

2    A.    Not at this time.

3    Q.    When do you expect to get their response?

4    A.    I've asked them to let me know how soon they can provide

5    that to me.  I don't -- I've not gotten that back yet.

6    Q.    Do you think you'll have it by the end of the week?

7    A.    I think that would be the earliest.  I would expect that

8    the cost would be next week sometime.

9    Q.    You still haven't tasked CH2M Hill with actually

10   designing and installing a project, have you?

11   A.    I've asked them to give me a proposal.

12   Q.    You've asked for a proposal?

13   A.    Oh, yeah.  Yeah.

14   Q.    And when did you do that?

15   A.    I did that this morning.

16   Q.    And by when did they have to give you the proposal?

17   A.    Once again, I asked them to let me know how long it would

18   take to provide that to me and any additional information I

19   needed to provide to them for preparation.

20   Q.    And what did they tell you?

21   A.    They'll let me know something hopefully later this week.

22   Q.    Do you mean they're going to give you a proposal or

23   they're going to tell you when they're going to give --

24   A.    When they can give me the proposal.  There's quite a bit

25   of work that will go into that.

McHale - Direct

1    Q.    That will take a few weeks for CH2M Hill?

2    A.    I imagine it could.

3    Q.    So the $40 million does not include equalization, it is

4    for 2100 gallons per minute, and it's not even accurate to a

5    Class 5 level.  Is that a fair summary of your testimony?

6    A.    That's essentially true, yes.

7    Q.    Do you intend to install an FBR at the Apogee and Hobet

8    sites?

9    A.    Yes, we do.

10   Q.    You do?  Did you ask for a proposal for the Hobet 22 site

11   as well?

12   A.    Oh, I'm sorry.  Did you include the -- at this point

13   we're still evaluating 22.

14   Q.    So you've not yet asked for a proposal there from CH2M

15   Hill.

16   A.    No, we haven't.

17   Q.    Does that mean that you no longer intend to use ZVI at

18   Apogee?

19   A.    That's probably true.  It depends on -- you know, we

20   haven't made a final decision, but at this point it looks like

21   we'll go ahead with FBR at all three sites.

22   Q.    Why does CH2M Hill recommend an FBR over a ZVI?  Does it

23   believe it's a more mature technology?

24   A.    It's been used in other applications.  It's not mature

25   from the standpoint of selenium treatment.

McHale - Direct

1    Q.    Okay.  Have you actually applied for any permits to

2    construct equalization to put in an FBR or any other

3    technology with either the DEP, the Army Corps, or MSHA?

4    A.    We've discussed permitting for an FBR facility with DEP

5    as to what permitting requirements would be necessary for

6    Article III NPDES.

7    Q.    And when did you do that?

8    A.    Last week.

9    Q.    Last week?

10   A.    I think around Thursday.

11   Q.    But you haven't submitted an application.

12   A.    No, there's -- you can't submit an application until you

13   at least have some design done.

14   Q.    Sure.  But that was the first discussion you've had with

15   DEP about --

16   A.    About FBR.

17   Q.    Or about changing your NPDES permit for these sites.

18   A.    For the Apogee permit?

19   Q.    Yes.

20   A.    Yes.

21   Q.    And for the Hobet 22 permit.

22   A.    We did not discuss Hobet 22 in that meeting.

23   Q.    Have you tasked anyone yet with -- I think you answered

24   this already.  Let me ask you again.  Did you task anyone yet

25   with a geotechnical study of the site for water retention?

McHale - Direct

1    A.    No.  A site has not been selected yet, or the sites.

2    Q.    Are you confident that you have sufficient room on-site

3    without building any new impoundment to treat 2100 gallons per

4    minute?

5    A.    There may be some new capacity would have to be

6    constructed.

7    Q.    But that would be a small --

8              THE REPORTER:  I'm sorry.  "There may be some" --

9              THE WITNESS:  New capacity that would have to be

10   constructed.

11   BY MR. LOVETT:

12   Q.    But that would be a small pond and not a large

13   impoundment like the 60-foot dam that CH2M recommends.

14   A.    I don't -- no, it would certainly not be a 60-foot dam.

15   Q.    After Mr. Schroeder's deposition in this case, did he

16   call you?

17   A.    No.

18   Q.    Did anyone from the financial side of the company call

19   you?

20   A.    Mr. Schroeder and I spoke in person.

21   Q.    You spoke -- Mr. Schroeder is the CFO of Patriot?

22   A.    Yes.

23   Q.    And after his deposition, he came to see you?

24   A.    I spoke with him.  He didn't come to see me.  I spoke

25   with him when he was in Charleston.

McHale - Direct

1   Q.   Okay.  Is that the only time you've spoken since the

2   deposition about the contents of his deposition?

3   A.   No, we also had some -- well, yes, that was the only time

4   we spoke about that, yes.

5   Q.   Did he ask you about the cost of compliance with these

6   permits?

7   A.   Yes, we discussed generally selenium compliance and the

8   FBR technology in particular.

9   Q.   Did you explain to him that it's going to cost several

10  tens of millions of dollars to treat the selenium at the

11  Apogee site?

12  A.   Yes, we had that discussion.

13  Q.   He understood after that discussion that it was going to

14  cost several tens of millions of dollars to treat the selenium

15  at the Apogee site?

16  A.   Yes, he understood that it could cost up to those numbers

17  we discussed here.

18  Q.   Up to $40 million --

19  A.   Yes.

20  Q.   -- to treat the average flow.

21  A.   Yes, to treat those flows.

22  Q.   Did you explain to him that if you had to treat more than

23  the average flow, that those numbers could go up?

24  A.   We didn't -- we didn't go there in the discussion, no.

25  Q.   When was that discussion?  What was the day?

McHale - Direct

1    A.    We spoke this morning.

2    Q.    You've spoken to him since your deposition but before

3    this morning?

4    A.    We spoke last week.  Well, there was a conference call

5    last week that both he and I were involved in about these

6    costs.

7    Q.    And did he understand then that the costs could be

8    several tens of millions of dollars at Apogee?

9    A.    Yes.

10   Q.    And what day was that conference call?

11   A.    We had two calls I believe on Tuesday afternoon and

12   Wednesday morning.

13   Q.    Okay.  Was there any other time between the time of his

14   deposition and today that you spoke to him about the costs of

15   treating selenium?

16   A.    Not that I recall.

17   Q.    He didn't contact you after his deposition to talk to you

18   about these things?

19   A.    No, he didn't call me.

20   Q.    Is Mr. Schroeder concerned about the economic feasibility

21   of accomplishing this treatment?

22   A.    He didn't express that concern to me.

23   Q.    Has he ever?  Has he ever expressed that concern to you?

24   A.    No, not to my knowledge.  I can't recall that if he has.

25              MR. LOVETT:  May I approach?

McHale - Direct

1          THE COURT:  You may.

2          MR. LOVETT:  Plaintiff's 41.

3          MR. HURNEY:  41?

4          MR. LOVETT:  Four one.

5    BY MR. LOVETT:

6    Q.    Do you recognize this summary of the most recent quarter

7    of DMRs for Patriot?  Excuse me.  For Apogee?

8    A.    Yes.  I don't know that I've seen specifically this

9    summary, but I know what it is, yes.

10   Q.    And it shows you still to be violating your permit limits

11   at all three outfalls, right?

12   A.    Yeah, it does show non-compliances.

13   Q.    Apogee has moved to modify the consent decree here based

14   on changed circumstances.  What has changed?  What has changed

15   since you entered into the consent decree?

16   A.    We just only recently, you know, identified a technology

17   that we think can go forward for larger scale treatment.

18   Q.    The FBR?

19   A.    Yes.

20   Q.    And you don't think you can install that FBR by July of

21   2012, do you?

22   A.    No, I don't.

23   Q.    Has Patriot moved -- or Apogee moved to modify the

24   consent decree to give it until July of 2012 to comply?

25   A.    Yes, that's my understanding.  Yes.

McHale - Direct

1   Q.   Why didn't you ask for enough time?

2   A.   We didn't have this late a schedule tied down at the time

3   we made the motion.

4   Q.   When did you make the motion?

5   A.   I don't recall exactly.

6   Q.   Several months ago?

7   A.   Several months ago.

8   Q.   Have you talked to Mr. Thacker at all?  Do you know who

9   he is?

10   A.   Yes, I know Mr. Thacker.

11   Q.   Have you talked with him?

12   A.   Yes, I have.

13   Q.   As I understand it, Jackson & Kelly hired him to do a

14   report on potential pitfalls of the sites for installing

15   equalization at Apogee.

16   A.   Yes.

17   Q.   Patriot didn't retain him, right?

18   A.   No, we did not.

19   Q.   And you haven't asked him to do that at all.

20   A.   I initially contacted Mr. Thacker and had him contact our

21   attorneys, yes.

22   Q.   But Patriot hasn't asked Mr. Thacker to evaluate the

23   equalization potential at the outfalls, has it?

24   A.   No, we haven't.

25   Q.   The FBR and ABMet pilots could have been done

McHale - Direct/Cross

1  concurrently, couldn't they?

2  A.   Theoretically.  We had an awful lot going on at that time

3  too.  We were doing the ABMet pilot.

4          MR. LOVETT:  That's all I have.  Thank you.

5          THE COURT:  All right.  Let's go ahead and use what

6  time we have.

7          MR. LOVETT:  May I move the admission of the

8  exhibits?

9          MR. HURNEY:  No objection.

10          THE COURT:  All right.  Each of the exhibits

11  identified by counsel's examination of the witness are

12  admitted.

13                    CROSS EXAMINATION

14  BY MR. HURNEY:

15  Q.   Good afternoon, Mr. McHale.

16  A.   Good afternoon.

17  Q.   We know each other.  I'm Tom Hurney.  Have you got energy

18  to answer a few more questions?

19  A.   Sure.

20  Q.   You've been asked a lot of questions about stuff you

21  didn't do, okay?  I'd like to talk with you for a little bit

22  about some stuff you did do.

23      I really want to focus in a minute or two on the time

24  period of the order we're here about, but just go back a

25  little bit and tell me when you first became involved in the

McHale - Cross

1   issue of selenium.

2   A.   That would have been in the time frame of October of

3   2006.

4   Q.   And why did you -- why did selenium become of interest to

5   you?

6   A.   We -- I became aware that we were -- you know, we had --

7   I was the engineering manager at Samples Mines for Catenary

8   Coal Company and we had a compliance schedule on one of our

9   permits that had another year before we were required to be in

10  compliance.

11  Q.   So what did you find out and what did you do?

12  A.   I contacted Dr. Paul Ziemkiewicz of West Virginia

13  University, who we've worked with, had worked with previously

14  on water treatment issues, and asked him if he could come and

15  take a look at our situation and make recommendations.

16  Q.   Who is Dr. Ziemkiewicz?

17  A.   Like I said, he's a professor at West Virginia

18  University.  He's also the director of the West Virginia Water

19  Research Institute.

20  Q.   What did you do next?

21  A.   Dr. Ziemkiewicz came to our site and he brought Dr. Ray

22  Lovett, a chemist, with him, and they took water samples from

23  the outlets of concern and took them back to their lab for

24  analysis.

25  Q.   Over time did they make a recommendation to you about the

McHale - Cross

1    potential way to treat selenium in water?

2    A.    They made a recommendation to employ the steel wool or

3    iron wool to reduce the selenium concentrations in the water.

4    Q.    Did you proceed to -- did they proceed to do some

5    evaluation of that at the --

6    A.    Yes, they did.

7    Q.    How long -- you said you were at the Samples Mine?

8    A.    Yes.

9    Q.    Okay.  And that was with Magnum?

10   A.    That was with Magnum, yes.

11   Q.    And what was your position?

12   A.    I was the engineering manager.

13   Q.    At some point did you get a promotion or a job transfer?

14   A.    Yes.  In January of 2007 I was promoted to director of

15   environmental affairs, actually manager of environmental

16   affairs.

17   Q.    We've spent a lot of time talking about the ZVI

18   technology.  Summarize -- you know, I don't want to spend a

19   lot of time on this, but tell us how it came to be that you

20   were installing some ZVI tanks at outlets at Apogee in an

21   effort to treat the effluent.

22   A.    Well, based on lab work mainly done by Dr. Ray Lovett in

23   conjunction with Dr. Ziemkiewicz, they presented us with a

24   proposal for a pilot system at one of the Samples Mine

25   locations, which we installed in January of 2007.  We

McHale - Cross

1   continued monitoring that throughout the year, and in -- we

2   got to the point where we asked Ray Lovett, Dr. Lovett, to

3   come up with a basis for design for ZVI so that we could start

4   designing installations for our other outlets.  And that

5   was -- Dr. Lovett did that for us, and he also -- we asked him

6   to -- well, let me step back once.

7        He also proposed that he would set up a pilot system at

8   Outlet 2 over at Hobet to gain additional information.  We

9   funded that.  And based on his additional information there,

10  he proposed a pilot-scale installation larger -- the larger

11  scale than the Samples pilot test for Hobet.  And that was in

12  early 2008 that we installed that.

13  Q.   When did you come to install ZVI at the Titanic outlet?

14  A.   We had asked Dr. Lovett to design a ZVI system for

15  Outlet 3 at the Apogee permit in question.  That's what we

16  refer to as the Titanic outlet.  And that was in -- you know,

17  that was shortly after we -- the May order in the hearing

18  for -- from this Court that we had 30 days to comply and 90 --

19  or 30 days to submit a plan and 90 days to comply.

20       And we had been working with Dr. Lovett during that

21  period to come up with a design for that, and we asked him to

22  accelerate that.  And we -- subsequent to that, in the

23  August-September time frame, we installed ZVI at Outlet 3.

24  Q.   And this is what year?

25  A.   Two thousand and --

McHale - Cross

1   Q.   Eight?

2   A.   -- eight.

3   Q.   We had a hearing before Judge Chambers in that year,

4   correct?

5   A.   That's right.

6   Q.   I want to keep talking about ZVI up to now.  At Titanic,

7   what company is the vendor for your ZVI?

8   A.   Originally it was ShipShaper.  It is now that they

9   have -- it's Global Material Technology, GMT, out of Chicago.

10  Q.   Do you purchase the units from GMT?

11  A.   Yes, we do.

12  Q.   Do they do their own research and development?

13  A.   Yes, they do.

14  Q.   Who at -- you were testifying earlier -- and I'm going to

15  segue for a minute.  You testified earlier that in your prior

16  position, you spent more time on selenium.  What changed?  I

17  mean why is it now that maybe you don't spend as much of a

18  percentage of your time on selenium?

19  A.   Well, my former position, my primary responsibility was

20  for selenium compliance.  In my current position, I'm

21  responsible for all environmental compliance at Patriot.

22  Q.   Who's tasked with doing the day-to-day work of what I

23  would call the legwork as it relates to selenium?

24  A.   James Constant.

25  Q.   Does he do that at Apogee and Hobet?

McHale - Cross

1    A.    He does it everywhere.

2    Q.    Now, you were asked questions about deployment of ZVI.

3    There's two separate types of ZVI, correct?

4    A.    Yes, currently.

5    Q.    You've got Liberty or MATRIC ZVI.

6    A.    Yes.

7    Q.    And now you have GMT.

8    A.    That's correct.

9    Q.    Now, are you installing GMT and Liberty ZVI units at

10   Hobet?

11   A.    Yes.

12   Q.    In how many outfalls do you think you have these units?

13   A.    Currently there's -- we have units installed at

14   approximately 34 outlets.  Twenty-two of those are GMT style

15   and the remaining twelve are Liberty style.

16   Q.    All right.  You've read and talked about the report

17   that -- and you understand there are some limitations to ZVI,

18   correct?

19   A.    Yes.

20   Q.    Okay.  Why -- tell the Court why you are -- why you

21   proceed to install these ZVI systems, whether they be Liberty

22   or whether they be MATRIC, over at Hobet.  Why are you doing

23   that?

24   A.    Well, one of the goals of our consent order with DEP for

25   Hobet is to have some form of selenium treatment in at all

McHale - Cross

1    outlets, you know, basically as soon as we can.  And the most

2    readily available technology to comply and get in on a

3    schedule that is adequate is the ZVI technology.

4    Q.    And you concede that ZVI doesn't -- either one -- doesn't

5    treat to Clean Water Act limits all the time.

6    A.    It hasn't so far.

7    Q.    Okay.  Is part of the goal of the installation of these

8    units under the state consent order to reduce the load?

9    A.    Yes.

10   Q.    Okay.  What else are you doing under the state order to

11   investigate technologies for the treatment of selenium?

12   A.    We are doing various supplemental environmental projects,

13   one of which was the RO pilot that I mentioned earlier, the

14   ABMet pilot that I mentioned earlier.  The fluidized bed

15   reactor pilot is being performed as a supplemental

16   environmental project for the consent order.

17         We are also doing aquatic studies in the Mud River Basin,

18   and we are doing a watershed study of the Mud River Basin to

19   better understand the selenium loading in that watershed.

20   Q.    All of these projects are ongoing as we speak?

21   A.    Yes.  And there's one more.  The watershed -- the storm

22   water evaluation, which I talked about earlier, that's also

23   being done as a supplemental environmental project.

24   Q.    Okay.  Now, looking at -- do you have Joint Exhibit

25   Number 5 in front of you, John?

McHale - Cross

1    A.    I'm going to have to dig.

2    Q.    That is the -- may I, Your Honor?

3          THE COURT:   You may.

4    BY MR. HURNEY:

5    Q.    Make sure we have the same page.  Conceptual Treatment

6    Alternatives.

7          All right.  Now, this is CH2M Hill's review of potential

8    technologies.  Is that a fair statement?

9    A.    Yes.

10   Q.    Did you ask them for this?

11   A.    Yes.

12   Q.    I think you testified earlier that you contacted and

13   hired CH2M Hill.  Was that within days or a week of the

14   hearing we held in front of Judge Chambers in 2008?

15   A.    Yes.  The following week was when I made my initial call,

16   and I'd heard back from them before the end of the week.

17   Q.    Okay.  I know there's work orders back and forth, but

18   what did you ask them that brought them to send you this

19   document?  What did you ask them for?

20   A.    We asked them to identify, of all the technologies they

21   were aware of, the technologies that could potentially be used

22   to treat to the required effluent limitation at Apogee and to

23   help, you know, assist us in selecting the appropriate

24   technology.

25   Q.    Okay.  Now, there's an executive summary of this report

McHale - Cross

1    in the first several pages, correct?

2    A.    Yes.

3    Q.    And does that, if you look at that quickly, does that

4    appear to give a brief overview of the strengths and

5    weaknesses of each of these technologies?

6    A.    Yes, I believe so.

7    Q.    All right.  Let me ask you a question.  At the time you

8    received this report on January 26, 2009, how many of these

9    technologies had been installed full-scale to treat water at

10   surface mines in West Virginia?

11   A.    None that I'm aware of.

12   Q.    Are you aware through CH2M Hill or anything else as to

13   whether anyone had employed or was employing in January of

14   2009 any of these technologies in surface mine environments?

15   A.    No, I was not.  I'm not aware of any.

16   Q.    Okay.  You are the environmental manager?

17   A.    Yes.

18   Q.    Okay.  Are you a member of the NAMC?

19   A.    Yes, I am.

20   Q.    What is that?

21   A.    North American Metals Council.  They have a selenium

22   working group which meets twice a year.

23   Q.    Are you a member of that?

24   A.    Yes, I am.

25   Q.    Do you attend the meetings?

McHale - Cross

1   A.   Yes, I do.

2   Q.   You talk about selenium?

3   A.   Exclusively about selenium.

4   Q.   Must be fairly exciting meetings, I assume.  Do you --

5   does the Coal Association ever -- do they have a task force on

6   selenium?

7   A.   Not -- no, they don't have a task force for selenium.

8   Q.   Do you think that if there was a scale that if any of

9   these technologies were being employed somewhere else in

10  West Virginia to treat selenium on a full-scale basis, you'd

11  know about it?

12  A.   Yes.

13  Q.   Okay.  Now, I have a question for you.  Looking at this

14  report, is there anything in this report that says ZVI doesn't

15  remove selenium?

16  A.   No.

17  Q.   Okay.  Based on your knowledge, does ZVI remove selenium?

18  A.   Yes.

19  Q.   Okay.  Are there challenges with pretreatment of the

20  water in ZVI systems so that they are more efficient?

21  A.   ZVI doesn't seem to require the pretreatment some other

22  technologies do.

23  Q.   I thought they were experimenting with the pH, with $CO_2$

24  or acid added to it to --

25  A.   More recently they have been experimenting with pH on

McHale - Cross

1    pretreatment in order to reduce the scaling that could affect

2    the flow through the media.

3    Q.   Now, jumping back to ZVI -- and I apologize for seguing

4    here -- are the ZVI tanks at Titanic the same configuration

5    that they were when you installed them back in 2008?

6    A.   The basic configuration is more or less the same, but

7    there have been changes to mainly the media.

8    Q.   Well, I guess I was thinking -- I wanted to ask you, you

9    said the configuration.  The tanks are still in the same place

10   they were?

11   A.   Yeah, pretty much.

12   Q.   What have they done with the innards, with the media,

13   that's different?

14   A.   The most recent innovation that we've employed is

15   basically rather than having the iron wool media basically in

16   what the vendor calls a hockey puck, which is just steel wool

17   that's basically just, you know, put together, you know, in no

18   particular order, they've basically come up with a new

19   configuration that resembles a bale of hay.  They call them

20   reels.  And this makes for a more homogenous type of media,

21   and it has so far -- well, theoretically what it does, it

22   allows for better permeability through the media and more

23   surface contact, less short-circuiting of the water through it

24   and better efficiency of the selenium reduction.

25             MR. LOVETT:  Objection, Your Honor, to any further

McHale - Cross

1   testimony along these lines.  You know, we don't have a direct

2   witness here about the reels.  As far as I know, they're not

3   using them.  They don't know if they're going to work.  It

4   seems well beyond the scope of his knowledge or expertise.

5              THE COURT:  Well, I take it the purpose of it is to

6   demonstrate the efforts he's made to investigate other

7   technologies.  So I'll deny the objection.

8   BY MR. HURNEY:

9   Q.   Let me direct your attention -- I want to discuss with

10  you MATRIC.  What was the original -- first of all, when did

11  you initially retain MATRIC?

12  A.   We met with MATRIC the Wednesday of the week following

13  our last court hearing.

14  Q.   Back in 2008?

15  A.   Yes.

16  Q.   Okay.  Did you ask MATRIC for a proposal to treat

17  selenium?

18  A.   We asked MATRIC to give us a proposal for -- to, yeah, to

19  evaluate technologies for treating selenium.

20  Q.   Did they bring you an idea?  Did they bring you a

21  proposal?

22  A.   Yes, they did.

23  Q.   Could you describe -- I don't want you to testify as an

24  expert or anything, but just describe generally what process

25  they brought to you to treat selenium.

McHale - Cross

1    A.    Well, you know, part of what that proposal is to evaluate

2    ZVI also as a potential technology, but what they had come up

3    with -- what they came up with was basically a different media

4    configuration of a ZVI.

5    Q.    How was it different?

6    A.    Rather than being iron wool or steel wool, it is a --

7    basically it is iron-impregnated foam, and it is similar to

8    filtration technology that has been developed for other

9    metals, some heavy metal zinc and things like that, but not

10   with the ZVI media, with other things, with other elements

11   impregnated in the foam, and it's diffused through it.  And

12   the benefits that they proposed to us for this was that this

13   type of media allowed -- was much more permeable, that the

14   retention time required to reduce selenium is much less than

15   other ZVI media than that.

16         Also, you know, it was more -- it was better suited for a

17   passive type of a system because it did not require -- it was

18   not a large pressure drop across the media, so it didn't

19   require pumping.

20   Q.    How were they going to deploy it?  In the original

21   design, how was that to be deployed?

22   A.    The original design was basically to build it, you know,

23   above the inlet to the ponds.  It was basically for -- the

24   configurations were basically constructed concrete-lined

25   troughs with ZVI media and that the flow through it would be

McHale - Cross

1    by gravity.

2    Q.   At the time that you retained MATRIC, did you have a

3    June 30, 2009 deadline?

4    A.   No, we did not.  It was in -- we retained them in like

5    late July.  We had not yet --

6    Q.   Did you -- was there a time -- when you retained them,

7    did you have a deadline for compliance at some point?

8    A.   We --

9    Q.   I'll tell you what I'm getting at.  I want to know did

10   you retain the Liberty/MATRIC to install a -- install systems

11   at Apogee that they told you would be -- would get you in

12   compliance by your deadline?

13   A.   Yes.  We actually in November of 2008 tasked them with

14   designing and constructing systems by that deadline.

15   Q.   Okay.  Did they bring -- was the initial proposal these

16   troughs?

17   A.   Yes, and it was -- there was no formal design submitted

18   up-front.  What we basically did with that was we -- Jim

19   Constant and I met with them on at least a weekly basis for

20   status updates with the -- toward, you know, getting this

21   system designed and then, you know, initiating the

22   construction process so we'd have it installed by the

23   June 30th deadline.

24   Q.   Okay.  Did they pilot that?

25   A.   We did pilot that.

McHale - Cross

1    Q.   Did it work?

2    A.   It didn't work a hundred percent of the time, but it did

3    work.

4    Q.   Did Liberty/MATRIC at some point change its design?

5    A.   Yes.

6    Q.   Okay.  Why was that?  Under what circumstances did they

7    bring a new design to you?

8    A.   Well, during the piloting process, initially results were

9    very promising, but as time went on, what happened was scaling

10   developed in the media and blocking off the flow.  And, you

11   know, this was designed as a horizontal flow through the media.

12   And what they determined was that they needed to change the

13   flow from horizontal to vertical flow.

14            MR. LOVETT:  Your Honor, I understand your previous

15   ruling, but, again, there's nobody here from MATRIC to testify

16   about this.  And I think that, you know, he doesn't understand

17   the MATRIC technology.  He has no expertise in this area.  And

18   if they want to testify about MATRIC, what its pluses and

19   minuses are, they should have somebody from MATRIC here to do

20   it.

21            MR. HURNEY:  A couple things, Your Honor.  I sat

22   here for two hours while he asked questions about every single

23   technology in this book, in this report of January 26.  He

24   asked question after question after question.  The reason

25   that -- the reason that this witness can answer these

McHale - Cross

1  questions is he was the person who tasked different

2  contractors with the job of getting him into compliance.

3        Now, we can pick at him all we want, but I think he's

4  allowed to tell this Court what he did, when he did it, and

5  why he did it.

6             THE COURT:  I agree.  I overrule the objection.

7  BY MR. HURNEY:

8  Q.  All right.  Last question.  So the MATRIC and Liberty

9  work was ongoing.

10  A.  Yes.

11  Q.  Okay.  And I think you said this is in kind of the early

12  2009 time frame?

13  A.  Yes.  That was initiated pretty much in December and

14  continued through into early June.

15  Q.  Okay.  That wasn't the only thing that you were doing

16  during that time frame, was it?

17  A.  No.

18  Q.  Okay.  What other vendors were you working with during

19  that time period contemporaneous with MATRIC and GMT?

20  A.  Well, we had GE for both the RO pilot and the ABMet

21  pilot.

22  Q.  Okay.  Tell me what GE was doing for you and when, to the

23  best of your memory.

24  A.  Okay.  GE piloted our RO system in January of 2009.

25  Q.  How long did that pilot last?

McHale - Cross

1    A.    Just a couple of weeks.

2    Q.    Why did it terminate?

3    A.    Basically it was a catastrophic failure due to fouling

4    issues, scaling issues -- not scaling.  Fouling issues because

5    of suspended solids.

6    Q.    What did GE do for you next?

7    A.    The ABMet pilot.

8    Q.    Am I correct that ABMet is a biologic system?

9    A.    Yes, it is.

10   Q.    When did they do the ABMet pilot?

11   A.    That process happened in the February through May time

12   frame, set up an operation and the commissioning.

13   Q.    During the course of the -- while GE was doing the ABMet

14   pilot, did you institute any other pilot projects?

15   A.    Yes.  Subsequent to the March 19th consent order, we

16   initiated two separate VSEP pilots, one at Hobet and one at

17   Apogee.

18   Q.    Did CH2M Hill ever recommend to you that you proceed with

19   the VSEP pilot?

20   A.    No.

21   Q.    Why did you do a VSEP pilot?

22   A.    Because that was what we negotiated in the consent

23   decree.

24   Q.    Because the plaintiffs insisted on VSEP being piloted as

25   part of the consent decree; isn't that true?

McHale - Cross

1    A.    Yes.  We needed more time and they wanted VSEP piloted.

2    Q.    Did you bring VSEP in to perform the pilot?  And tell me

3    what the time frame was.

4    A.    It was basically a four-month period, and, you know, we

5    started the process in April.  You know, I think the equipment

6    was delivered by the end of May.  Yeah.  And May through July.

7    Q.    Okay.  What was the result of the pilot?

8    A.    We -- we -- you know, the result of the pilot was that,

9    you know, in our opinion it did not consistently perform.

10   Q.    Now, tell me about the -- the FBR pilot started around

11   this time.  Tell me about that pilot.  Who performed it?

12   A.    The FBR pilot was performed by CH2M Hill this year.

13   Q.    And tell us, when did you order it, when did they start

14   it, and when did they finish it?

15   A.    The FBR pilot, we were to -- basically had got an

16   extension in time to our Hobet consent order in 2009, the

17   latter part of 2009.  That supplemental environmental project

18   for FBR was included in the consent order for Hobet, and we

19   had had CH2M Hill work out the details of that project for

20   inclusion in the order.

21   Q.    So is it fair to say that you were embarking on some of

22   these projects in an attempt to comply with the state consent

23   order?

24   A.    Oh, yes.

25   Q.    Okay.  Now, when did the FBR pilot -- Your Honor, is

McHale - Cross

1    there a stop time?

2             THE COURT:  Well, pretty soon.  Are you at a place

3    or close to a place where it would be convenient to stop?

4             MR. HURNEY:  Why don't I finish a few questions on

5    FBR and then I can break.

6             THE COURT:  That would be great.

7    BY MR. HURNEY:

8    Q.   When did the FBR pilot end?

9    A.   I think testing stopped in the end of May and we

10   dismantled it early June.

11   Q.   Okay.  When did you receive -- you received a draft and

12   then a final report on FBR?

13   A.   Yes, I did.

14   Q.   When did you get those?

15   A.   The draft I got on July 14th and then the final on

16   July 22nd.

17   Q.   All right.  And in between -- Your Honor, I think I'm at

18   a break point if that's satisfactory to the Court.

19             THE COURT:  That would be fine.  All right.

20             MR. LOVETT:  Your Honor, can I ask the witness not

21   to talk to his lawyer or anyone else about his testimony while

22   he's on the stand?

23             THE COURT:  All right.  Mr. McHale, since you'll be

24   on the stand again tomorrow, please don't discuss your

25   testimony with your attorneys or anyone else.

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  All right.  We'll stand adjourned until

3    9:00 a.m. tomorrow morning.

4        (Proceedings adjourned at 5:05 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21      I, Teresa M. Ruffner, certify that the foregoing is a

22   correct transcript from the record of proceedings in the

23   above-entitled matter.

24        s/Teresa M. Ruffner                November 27, 2010

25   _____    _____