IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., and WEST
VIRGINIA HIGHLANDS
CONSERVANCY, INC.,

       Plaintiffs,

v.                              CIVIL ACTION NOS. 3:07-00413,
                                                  3:08-00088,
APOGEE COAL COMPANY, LLC, and                     3:09-01167
HOBET MINING, LLC,

                                Huntington, West Virginia
       Defendants.              August 11, 2010


TRANSCRIPT OF BENCH TRIAL - DAY 3
BEFORE THE HONORABLE ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:          JOSEPH MARK LOVETT, ESQ.
                             DEREK O. TEANEY, ESQ.
                             APPALACHIAN CENTER FOR THE
                             ECONOMY AND THE ENVIRONMENT
                             P. O. Box 507
                             Lewisburg, WV  24901

                             JAMES M. HECKER, ESQ.
                             TRIAL LAWYERS FOR PUBLIC JUSTICE
                             Suite 200
                             1825 K Street, NW
                             Washington, DC  20006-1202

```
For the Defendants:          THOMAS J. HURNEY, ESQ.
                             BLAIR M. GARDNER, ESQ.
                             ROBERT G. MCLUSKY, ESQ.
                             JACKSON KELLY
                             P. O. Box 553
                             Charleston, WV  25322-0553

Also Present for Patriot:    RICHARD VERHEIJ, ESQ.

Court Reporter:              TERESA M. RUFFNER, RPR
                             P. O. Box 1570
                             Huntington, WV  25716
                             (304) 528-7583
```

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

```
1                       I N D E X

2   Plaintiff's Witnesses      Direct   Cross   Redirect   Recross

3   MARK SCHROEDER (resumed)    407      422     431/438    437

4   HARRY POTTER                439      450     453        --

5   MIKE KAVANAUGH              455      494     507        511

6   Defendant's Witnesses

7   TIMOTHY HARRISON            515      559     583        584

8   THOMAS SANDY                585      620     653        655

9   Plaintiff's Exhibits                               Admitted

10  No. 3     CV Harry Potter                              454

11  No. 67    McHale deposition vol. II                    454

12  No. 2     CV Dr. Michael Kavanaugh                     493

13  No. 68    model for calculating economic benefits      493

14  No. 69    spreadsheet                                  493

15  Defendant's Exhibits

16  No. 4     CV Timothy Harrison                          553

17  No. 11    CV Thomas Sandy                              662

18  Joint Exhibits

19  No. 3     technical memorandum screening-level         536

20  No. 2     technical memorandum basis of design         536

21  No. 6     memorandum CH2M Hill review pilot            662

22  No. 7     memorandum CH2M Hill review filtration       662

23  No. 8     memorandum CH2M Hill review comments         662

24  No. 14    Preprint 10-142                              662

25
```

```
 1    Wednesday, August 11, 2010, at 9:05 a.m. in open court
 2              THE COURT:  All right.  Are we ready to proceed?
 3              MR. LOVETT:  We are, Your Honor.
 4              THE COURT:  All right.  Mr. Schroeder, if you'd come
 5    up and take the stand again.
 6              THE WITNESS:  Bring this?  (Indicating)
 7              THE COURT:  Yes, you may.
 8    BY MR. LOVETT:
 9    Q.   Good morning, Mr. Schroeder.
10    A.   Good morning.
11    Q.   I'd like to turn your attention back to the 10-Q, the
12    most recent 10-Q, which is Joint Exhibit 36.  I think when
13    you -- when we concluded yesterday evening, I was trying to
14    understand your financial position.
15    A.   Uh-huh.
16    Q.   I think I almost finished with that part of the
17    examination, but I'd like just to complete it and make sure I
18    understand what the situation is.
19         So as I recall your testimony from yesterday, you have a
20    credit line, a credit facility of four hundred and -- was it
21    twenty-seven million dollars?
22    A.   427.5 million.
23    Q.   I went back and looked at your deposition.  I think,
24    though, that not all of that is available now; is that right?
25    A.   That is correct.
```

Schroeder - Direct

1    Q.    It's $93 million that's available, or what is the number

2    that's available?

3    A.    Yes, roughly 93 million.  There are letters of credit

4    of approximately 335 million that were outstanding as of

5    June 30th.

6    Q.    Okay.

7    A.    So that amount would be a reduction of the 427.5 million.

8    Q.    So you have 93 million available there to do what you

9    want with, right?

10   A.    Yes, there's 93 million available.

11   Q.    And you have $125 million securitized receivables?

12   A.    That is correct.  There is a facility called accounts

13   receivable securitization that totals 125 million.

14   Q.    And at least a hundred of that is available for any one

15   project, right?

16   A.    There's a sub-limit of 100 million for a line of -- for

17   letters of credit.

18   Q.    Then you have $239 million in cash.

19   A.    Yes, June 30th, 239.2 million.

20   Q.    Has that changed since then?

21   A.    Yes.

22   Q.    What is the current situation?

23   A.    I don't know the balance.  I mean we close our books on a

24   monthly basis, so the balance would have changed.  I don't

25   know what it is right now.

Schroeder - Direct

1    Q.    Have there been any substantial changes to that balance?

2    A.    I would say the balance is probably somewhere between

3    200 million and 239 million.

4    Q.    Okay.  Do you expect to spend more than 50 million of

5    that in the next six to nine months?

6    A.    I'll answer it this way.  I think the balance would be

7    expected to be at least 150 million by the end of the year.

8    Q.    Okay.  And for the securitized receivables, what would

9    you expect that that could go to by the end of the year?

10   A.    I'm not really sure.  I mean it really depends on what

11   happens with operations between now and the end of the year,

12   what happens with coal prices between now and the end of the

13   year.  As of this point, we -- or as of June 30th, I guess I

14   should say, there was no amount borrowed against the accounts

15   receivable securitization.

16   Q.    Okay.  And with the credit line, do you expect a material

17   change in that over the next several months?

18   A.    No, I don't.  I expect that to be 427.5 million.

19   Q.    What about the available money under that credit line?

20   A.    I wouldn't expect to have any borrowings.  The letter of

21   credit side, I do expect some additional letters of credit

22   between now and the end of the year.

23   Q.    In any event, when I total those three, I come up with

24   approximately $457 million.  Does that sound reasonable to you

25   as an amount of money that Patriot has to spend over the next

Schroeder - Direct

1   several months or years?

2   A.   We refer to it -- I refer to it as liquidity.   So

3   liquidity, if you include cash, plus the amount available in

4   the accounts receivable securitization, plus the amount

5   available in the credit line, would be a number in excess of

6   400 million.

7   Q.   Okay.   One other line on the -- we were at the page -- I

8   guess it's page 2.   It's the condensed consolidated balance

9   sheet.   Do you have that in front of you?

10  A.   Yes, I do.

11  Q.   And have the total stockholder equity at the bottom

12  there; is that right?

13  A.   Yes.

14  Q.   Is that essentially the net worth of the company?

15  A.   That is the net worth of the company.

16  Q.   And was that $942,107,000 as of your last reporting

17  period?

18  A.   Yes.

19  Q.   And has that changed materially since then?

20  A.   Materially, no.

21  Q.   Okay.   So if Patriot were ordered by the Court to post a

22  $100 million or $95 million letter of credit or to establish

23  an escrow account with $100 million in it to treat selenium,

24  it has the financial resources to do that; is that true?

25  A.   Yes.   Can I add a little bit more to that?

Schroeder - Direct

1    Q.    Sure.

2    A.    We also have covenants within our revolving credit

3    agreement and our AR securitization.  So if there were some

4    additional monies either in a -- or additional funds either

5    through a letter of credit or through money set aside, that

6    could or would impact the covenant calculations.  So on some

7    of those covenant calculations, there could be some factors

8    that would bump up against some existing covenants that are in

9    the credit facilities.

10   Q.    Okay.  That's pretty general.  I'm not sure I understand

11   it.  Could you be a little bit more specific about what could

12   happen if the Court ordered Patriot either to post a letter of

13   credit or to place $95 million in an escrow account?

14   A.    Yeah, $95 million would increase one of our -- let me

15   talk about one of our covenants.  It's called a leverage

16   covenant.

17   Q.    And what is this a covenant to?

18   A.    It's a covenant in the revolving credit agreement.

19   Q.    Okay.

20   A.    The leverage covenant tracks something defined as funded

21   net debt divided by, as defined, EBITDA.

22   Q.    Right.  What does EBITDA stand for?

23   A.    Earnings before interest, taxes, depreciation,

24   amortization.

25   Q.    Okay.

Schroeder - Direct

1    A.    That calculation includes funded debt, which is the

2    typical borrowings that you have, plus it includes certain

3    letters of credit.   And maybe if I -- I'll say the exclusion

4    of letters of credit are those related to certain areas like

5    Workers' Compensation, retiree health care, certain bonding of

6    reclamation.

7         If the Court were to, say, post an additional 95 million

8    I think was your example, I think that 95 million would add to

9    the definition of net funded debt, and that calculation then

10   would get closer to the covenant limit, which is 3.0.   If we

11   were to go above 3.0, that is defined as an event of default

12   within the credit agreement and there's some consequences that

13   could happen there, not the least of which is discussions with

14   the bank as to -- banks as to next steps.

15   Q.    Well, that's -- you're talking only about the credit

16   facility now, right?

17   A.    Yes, I am.

18   Q.    And as I understand your testimony, you don't know right

19   now if you were asked to post that letter of credit whether it

20   would ripple through and have other financial consequences to

21   the company, right?

22   A.    I think it would, but I don't know for sure.

23   Q.    But you also have $125 million in securitized

24   receivables, right?

25   A.    Yes, I do.

Schroeder - Direct

1    Q.   You could post a letter of credit from that, couldn't

2    you?

3    A.   But it would still count towards the net funded debt in

4    the definition under the credit facility.

5    Q.   Okay.  And the $239 million in cash --

6    A.   Yes.

7    Q.   -- you could take $95 million from that and place it in

8    an escrow account, couldn't you?

9    A.   Yes.

10   Q.   Okay.

11   A.   That would also count -- the definition of net funded

12   debt includes cash.

13   Q.   And explain to me one more time what the -- how the

14   change in the net funded debt would affect Patriot's

15   operations materially.

16   A.   Well, the change in the net funded debt would impact the

17   numerator of the calculation; and to the extent there is an

18   additional amount included in net funded debt, the

19   calculation, the numerator and therefore the end result would

20   be a higher number.  To the extent it's a higher number, it

21   gets closer to the covenant restriction of three.

22   Q.   You don't come here prepared to tell us any effect,

23   specifically, that an imposition of a requirement of an escrow

24   account or letter of debt would impact your operations.

25   A.   Well, I guess what I've said is that I do think it would

Schroeder - Direct

1    count against the covenant.

2    Q.    I understand.

3    A.    And therefore it would impact the end result of that

4    covenant.

5    Q.    How would it impact the end result of the covenant?

6    A.    The covenant at the end of June was 1.8 to 1.

7    Q.    Okay.

8    A.    And increasing the numerator by 95 million would change

9    that to roughly 2.4, 2.5 to 1 --

10   Q.    Okay.

11   A.    -- as of June 30th.

12   Q.    And what would that mean in the real world, the change of

13   the covenant from 1.8 to 2.4?

14   A.    In the real world, I guess, or in the banking world, or

15   in our operations, it would say the closer we are to 3.0, the

16   more difficult it is to operate.

17   Q.    To borrow more money?

18   A.    To borrow more money, to spend money, yes.

19   Q.    Okay.  But as I understand your testimony, $100 million

20   or $95 million would take you to 2.4 to 1, still significantly

21   below 3 to 1.

22   A.    Yes.  And I guess I would add to that the denominator is

23   EBITDA.

24   Q.    Right.

25   A.    And EBITDA is a rolling 12-month calculation.  So as of

Schroeder - Direct

1    June 30th, the numbers that I gave you would be 2.4, roughly,

2    2.5.  As you go forward into September 30th, then you have

3    another quarter of EBITDA that is added on and a quarter that

4    drops off.

5        So going forward, it has an impact in that 2.4 is less

6    than 3, but as you go forward, variables, not the least of

7    which is the coal, what's going on with coal prices, coal

8    operations, etcetera, could impact the denominator.

9    Q.   The number could actually go down, couldn't it, depending

10   on what happens?

11   A.   It could go either way naturally.

12   Q.   Now, you heard testimony yesterday from -- I think it was

13   yesterday -- yesterday or the day before -- from Mr. McHale

14   that he had spoken with you about the potential treatment with

15   the FBR at the Apogee site I think sometime either earlier

16   this week or -- no, strike that.  In the middle of last week.

17   A.   I've spoken with Mr. McHale a couple of times last week

18   and earlier this week, on Monday.

19   Q.   And in the middle of last week, I think he told you that

20   CH2M Hill was proposing that it would cost approximately

21   $40 million without equalization of flows to treat the water

22   at the three Apogee outfalls; is that right?

23   A.   He did have an estimate of around $40 million for

24   treating the three outfalls.

25   Q.   And at the time did you think that it was likely or

Schroeder - Direct

1    reasonably likely that that would be the result of the amount

2    of money you would have to pay to resolve the liability at the

3    Apogee outfall?

4    A.    No.

5    Q.    Why not?

6    A.    I thought it was a possibility, but I did not think it

7    was reasonably likely I think was the words you used.

8    Q.    They were.  Well, what did you think at the time was a

9    reasonably likely outcome?

10   A.    The liability that we have right now is based on doing

11   the ZVI method, that remediation over the time period that is

12   laid out, and at this point I think that is still the

13   reasonably likely methodology and time period.

14   Q.    Has any engineering firm or your own company produced a

15   report showing that ZVI is an appropriate treatment

16   technology?

17   A.    I'll point back to the Potesta report that indicated

18   ZVI -- I think the words in there were something -- they may

19   not have used most likely.

20   Q.    I think that it said it was best available technology.

21   Is that what you mean?

22   A.    Those are the words I was looking for.  They are specific

23   words, but yes.

24   Q.    So you're relying on the Potesta statement that it is

25   best available technology back in January of 2009?

Schroeder - Direct

1    A.   Their report was in July of 2009.  I think those are the

2    words that were in the July 2009 report, and that's what I'm

3    relying on at this point.

4    Q.   Okay.  Let's turn to the July 2009 report one more time,

5    and I think we're almost finished with your testimony.

6              THE COURT:  Which exhibit number is that?

7              MR. LOVETT:  It's Plaintiff's Exhibit 60, Your

8    Honor.

9    BY MR. LOVETT:

10   Q.   Now, after the cross-examination yesterday on this

11   document and after your -- I guess it was cross-examination --

12   your examination yesterday on this document and after your

13   deposition, were you curious enough to go back and look at the

14   document and try to understand how the flow numbers are

15   arrived at?

16   A.   I did not take this document with me last night.

17   Q.   Did you think about it?

18   A.   I thought about a lot of how the day went yesterday,

19   but --

20   Q.   Okay.

21   A.   -- I guess this was part of it.

22   Q.   Let me turn your attention to -- I just want to try to

23   make sure I understand this document.  Table 2 at the back, we

24   looked at this yesterday.  It estimates installation costs,

25   capital costs for adverse and favorable conditions, right?

Schroeder - Direct

1    A.   Yes.

2    Q.   And the adverse condition is $406,705; is that right?

3    A.   Yes.

4    Q.   Then let's look to page 2 of the document.  Do you see

5    where it says Treatment System and Operating Cost?  Do you see

6    that section?

7    A.   Yes, I do.

8    Q.   It says, "Tables 2 and 3 summarize the actual operating

9    costs required to implement several ZVI treatment systems

10   currently installed at Hobet, Catenary, and Apogee.  Potesta

11   believes that these costs represent a reasonable cost basis

12   for the installation of future systems."  Right?

13   A.   Yes.

14   Q.   It believes then -- and it tells you to look at the

15   table, in effect -- Tables 2 and 3 summarize it -- to

16   understand how the costs were calculated, right?

17   A.   It refers to Table -- this section refers to Tables 2 and

18   3, yes.

19   Q.   Table 2 we just looked at, and it says that you have four

20   hundred and six seven oh five for an adverse --

21   A.   As the adverse.

22   Q.   Now, let's turn to -- let's look at the spreadsheets.  I

23   want -- there's more than one.  Let's just turn to the third

24   spreadsheet.  I think that's Apogee.  It says --

25           THE COURT:  Is that page 060?

Schroeder - Direct

1      MR. LOVETT:  00059.

2  BY MR. LOVETT:

3  Q.   And it has outfalls.  These are the outfall numbers for

4  the Apogee permit.  Outfalls 1, 2, and 3.  Do you see those?

5  A.   Yes, I do.

6  Q.   Let's just look at Outfall 2.  And the reason I'm looking

7  at Outfall 2, I'll tell you, is because I think that Numbers 1

8  and 3 are mixed up.  1 should be 3, and 3 should be 1.  I

9  think Potesta made a mistake.  But to avoid that, let's just

10 use Number 2 as an example.  It lists Outfall 2 as adverse,

11 right?

12 A.   Yes, it does.

13 Q.   And if you follow the line across, the first boxes are

14 for months, for operating costs, right, and capital costs, and

15 it has zero through there?

16 A.   Yes.

17 Q.   That is not going to be installed, they're saying, for

18 the first quarter of 2010, right?

19 A.   Correct.  Those were -- the numbers show up in the first

20 quarter of 2010 section.

21 Q.   And the system installation cost there is $406,705,

22 right?

23 A.   Yes.

24 Q.   And, of course, that's the same number from Table 2 for

25 the adverse number.

Schroeder - Direct

1   A.   Yes.

2   Q.   So that indicates that the total system cost to Outfall 2

3   is going to be $406,000, right?

4   A.   Yes.

5   Q.   So that leads to the conclusion that based on what we

6   know from Table 3 that it's going to treat 24 gallons per

7   minute of flow, that that figure represents the treatment of

8   24 gallons.

9   A.   Again, I'm not sure I see the 24 gallons, but if you

10  could point it out to me --

11  Q.   It says flow rate for treatment train, right, 12?  It has

12  tanks per treatment train, three.  So you know there are three

13  treatment trains, right?

14  A.   Yes.

15  Q.   We know that the gallons per minute is four.  So you know

16  therefore that the flow rate, if you have three tanks, to get

17  to the 12, which is what the treatment train treats, that it

18  needs three tanks, because three times four is twelve, right?

19  A.   Three times four is twelve.

20  Q.   Therefore, each of these -- this number represents six --

21  or two trains of six tanks each will treat 24 gallons, two

22  tanks -- strike that.

23       Two tanks -- three -- two trains of three tanks each will

24  treat 24 gallons per minute.

25  A.   I see the three tanks and the four.  I'm sorry.  I don't

Schroeder - Direct

1   really understand how the actual calculation works.  I can do

2   three times four.  I think you probably pointed that out.

3   Q.   Well, you know that there's three tanks per train and

4   that they treat four gallons each and that the flow rate per

5   treatment train is twelve, right?

6   A.   I see all those numbers, yes.

7   Q.   Do you understand them?

8   A.   Honestly, no, I don't understand the flow rate.  I can do

9   the math, but I don't understand the flow rate and how that

10  works in the trains and the tanks per train.

11  Q.   Okay.  And you've -- I'm almost finished.  You've made no

12  attempt to understand that at the time that it was submitted

13  to you, right?

14  A.   Well, "no attempt" is probably an exaggeration.

15  Q.   Did you sit down and puzzle over it for a minute?

16  A.   I probably looked at this page.  I don't think there was

17  a reason for me to specifically understand the number of tanks

18  in each train and the flow rate that would support each tank.

19  I'm not an engineer.  I rely on my engineer for that help.

20  Q.   Evidently Ernst & Young was concerned about it, though,

21  right?

22  A.   As yesterday's comment, Ernst & Young had a question

23  around this area, and it looks like John McHale responded to

24  them.

25          MR. LOVETT:  Okay.  That's all I have.  Thank you.

Schroeder - Cross

1         THE COURT:  All right.  Mr. Gardner?

2              CROSS EXAMINATION

3  BY MR. GARDNER:

4  Q.   Good morning.

5  A.   Good morning.

6  Q.   I will try to be brief in my questions.  Let's go back

7  just a moment, please, to the document that Mr. Lovett just

8  asked you to discuss.  This is Plaintiff's Exhibit 60, the

9  July 29, 2009 Potesta report addressed to Mr. Crawford.

10     Do you have that in front of you, sir?

11  A.   Yes, I do.

12  Q.   All right.  On the first page of that document, third

13  paragraph, third sentence, the sentence begins, "This cost

14  estimate."  Would you read that sentence, please?

15  A.   "This cost estimate has been prepared considering the

16  dynamics of current legislation, capabilities of currently

17  available technology and the company's planned remediation

18  strategy."

19  Q.   Read the next sentence, please.

20  A.   "Installation of treatment systems, as detailed in this

21  valuation, at each of the 78 identified outlets should prevent

22  any enforcement actions under court orders, consent decrees

23  and permits.  Potesta believes that water treatment could be

24  required in perpetuity if there are no changes to the current

25  compliance standards."

Schroeder - Cross

1    Q.    Turning to the next page, Mr. Schroeder, the last section

2    headed Selenium Remediation Liability Cost Estimate, would you

3    read the first sentence, please?

4    A.    "The cost to remediate selenium was estimated at

5    $390,719,470 gross (adjusted for inflation) or $85,155,374

6    expressed as a present worth cost.  Based on the current state

7    and federal regulatory requirements imposed and implemented

8    under the West Virginia NPDES program and the current best

9    available remediation technology, Potesta believes that this

10   estimate is reasonable."

11   Q.    Can you explain the relationship between the gross number

12   that is identified in that sentence and what is described as a

13   present worth cost?

14   A.    The gross number would represent actual dollars spent at

15   the time you were spending the money.  The net or the present

16   worth cost would represent the dollars expressed in current

17   terms, so today, as of today, or as of the date of this

18   report.

19   Q.    Is that sometimes also referred to as a net present

20   value?

21   A.    Yes, it is.

22   Q.    Is that a term that as an accountant you're more familiar

23   with than present worth cost?

24   A.    I'm more familiar with net present value than present

25   worth cost.

Schroeder - Cross

1    Q.    Is the net present value a calculation or formula that is

2    understood by accountants?

3    A.    Yes.

4    Q.    Mr. Schroeder, turning now, please, to Joint Exhibit 32,

5    this was the 10-K that was filed by Patriot Coal for the

6    period ending December 31, 2009.  Do you have that document in

7    front of you, sir?

8    A.    Yes, I do.

9    Q.    I'm going to ask you to look -- I believe it is on page

10   F-37, Notes To Consolidated Financial Statements.

11         Can you see if you can find that page, sir?

12   A.    I have page F-37 in front of me.

13   Q.    All right.  Looking on the third paragraph of that page,

14   will you read the first sentence, please.

15   A.    "We estimated the costs to treat our selenium discharges

16   in excess of allowable limits at a net present value of

17   $85.2 million as of the Magnum acquisition date."

18   Q.    Does that 85.2 million tie back to the Potesta report

19   that's referred to as a present worth cost?

20   A.    Yes, it does.

21   Q.    Have you continued to rely upon that number in your

22   reporting?

23   A.    Yes.

24   Q.    Turning now to Plaintiff's Exhibit 66, this was the 10-Q

25   that Patriot filed I believe just last Friday.  If you can

Schroeder - Cross

1    turn to page 14 of that, do you see a heading entitled General

2    Selenium Matters?

3    A.    Yes, I do.

4    Q.    Would you read, please, the first sentence in the second

5    paragraph of that -- on that page.

6    A.    "We estimated the costs to treat our selenium discharges

7    in excess of allowable limits at a net present value of

8    $101.8 million and $96.0 million at June 30, 2010 and

9    December 31, 2009, respectively."

10   Q.    Mr. Schroeder, if you're expressing a current liability

11   as a net present value, does that mean going forward that that

12   number becomes much greater on a gross basis over time?

13   A.    Yes, going forward you would accrete to a higher number

14   to effectively discount one less period of time.  So if it's

15   an annual review, one year to the next year, you would have

16   one year less of present value.  So it would grow to a larger

17   number.

18   Q.    Are there other ongoing liabilities that the company

19   reports and that it must manage in addition to the selenium

20   issue that is the topic of this proceeding?

21   A.    Yes.

22   Q.    What are some of those, sir?

23   A.    Retiree health care, Workers' Compensation, black lung

24   liabilities, reclamation obligations.

25   Q.    Mr. Schroeder, Mr. Lovett has questioned you this morning

Schroeder - Cross

1    about the cost of the liquidity and those features in your

2    financial statement that express what the liquidity is.

3        What does the company do with liquidity?  What is its

4    use?  That's an open question, but for a non-accountant, can

5    you try to explain that to the Court and to me?

6    A.   Liquidity is effectively the amount of funds that you

7    have available -- that a company has available to use to pay

8    its bills.  Liquidity, as I described it to Mr. Lovett, was

9    encompassing cash on hand, plus lines of credit that are

10   available either through the revolving credit agreement or the

11   accounts receivable securitization agreement.  All of those

12   add up to something called liquidity, and liquidity is

13   therefore used by companies to pay their bills as they become

14   due, to use to expand operations, to use for capital

15   expenditures, but basically to pay bills going into the

16   future.

17   Q.   Mr. Schroeder, if you know, are the three outlets at

18   Apogee that are the subject of this proceeding part of an

19   ongoing mining operation on that property or not?

20   A.   The three outlets are not part of existing -- are not

21   part of ongoing mining.  They relate to mining that has been

22   done in the past.

23   Q.   In order, then, sir, to pay for the treatment of those

24   discharges, whatever that treatment might be, is it necessary

25   for Apogee and other subsidiaries of Patriot to be an ongoing

Schroeder - Cross

1    operation?

2    A.   We certainly need funds from existing operations to pay

3    for costs related to past operations.  So I would say this

4    would fit into past operating costs, and therefore we would

5    need current operations to help fund these charges.

6    Q.   Is that equally true of the other ongoing liabilities

7    that you've identified?

8    A.   It would be equally true of the other liabilities that I

9    talked about.

10   Q.   Mr. Schroeder, just very briefly, there were changes in

11   the coal industry and in financial markets generally between

12   2008 and 2009; is that correct?

13   A.   Yes.

14   Q.   Did that affect Patriot?

15   A.   Yes, very much so.

16   Q.   In what way, sir, just briefly?

17   A.   Briefly--

18   Q.   Do you know if coal prices --

19   A.   The coal industry was very dependent on coal prices.  So

20   coal prices in 2008 -- really the mid part of 2008 through

21   about the third quarter were very good for coal producers.

22   And by very good -- I may be getting too detailed here.  But

23   by very good, steam prices were well in excess of $100 a ton,

24   and coal, coal referred to as metallurgical coal, was selling

25   for, depending on the quality, in excess of $200 a ton.  Those

Schroeder - Cross

1    were very good prices for coal producers.

2         So during the period up through, let's say, the --

3    sometime during the third quarter of 2008, those prices were

4    evident.

5              THE REPORTER:   "Those prices were" --

6              THE WITNESS:   Those prices were evident.   Around

7    September or October of 2008, as our U. S. economy began to

8    falter, the prices for coal products decreased substantially.

9    By the first quarter of 2009, we had steel producers who use

10   our metallurgical coal telling us that they did not want to

11   receive the coal.   They were either trying to cancel their

12   contracts with us or defer deliveries of products from us.

13        Metallurgical prices in the spot market were dropping

14   drastically.   The steam market, which I mentioned was well in

15   excess of $100, moved down into the $50- to $60-range for the

16   same type of coal, same quality of coal.   So the coal prices

17   were declining drastically.   We had customers who were either

18   trying to get out of contracts or to defer deliveries

19   constantly calling on us.

20        Our share price, as another barometer, moved from a

21   little bit north of $80 a share in the third quarter of 2008

22   to less than $3 a share by the end of the first quarter of

23   2009.   So the market -- the coal market moved drastically as

24   the economy in the U. S. moved drastically and we entered a

25   recession.

Schroeder - Cross

1      We also had banks -- I mentioned to Mr. Lovett our

2   revolving credit agreement and the fact that we had a number

3   of banks who were part of that syndication who commit funds to

4   us.  The banking industry was in turmoil.  We were concerned

5   about several banks that were in that commitment and whether

6   they would continue to be in the commitment or not.

7   Eventually one of those banks, Lehman Brothers, dropped out of

8   our committed funds.  We were able to replace them with other

9   banks.  But I guess the point there is the financing market

10  was moving quite a bit, as the coal markets were moving quite

11  a bit, as our share price was moving quite a bit.

12  BY MR. GARDNER:

13  Q.   Mr. Schroeder, did the company -- how did the company, if

14  you can describe this in one or two examples, how did Patriot

15  respond to these changes that you've described?

16  A.   Made a number of changes.  I guess a couple that are

17  easily described is shutting down operations.  We closed the

18  Jupiter Mine and the Remington Mine, two underground

19  operations that we had, and ended up laying off a number of

20  individuals.  We ended up reducing our 401(k) plan.  We

21  reduced our capital expenditures, reduced our capital

22  expenditures by a sizable amount.

23      We were trying to do things through cutting back on the

24  operations side, on the production side, to save dollars both

25  through capital and through operating costs.

Schroeder - Cross

1    Q.   Mr. Schroeder, during this time do you know if Patriot

2    continued to install the treatment systems that have been

3    described in these documents that have been given here as

4    exhibits?

5    A.   Yes, we did.

6    Q.   Do you know if you have ever in this time or since 2009

7    turned down any request for any capital expenditures for

8    research, for the work that CH2M Hill has done, or for

9    anything else that has been requested from the operations?

10   A.   I'm not aware of any.

11   Q.   Do you know if you've approved everything with respect to

12   these items that have come to you for your approval?

13   A.   These generally come in through a budget, an annual

14   budget process, and I would've approved as part of the annual

15   budget process the expenditures for these items.

16   Q.   Mr. Schroeder, just one last thing that I meant to ask

17   you about when we were talking about your K and your most

18   recent Q.  In preparation of your Q, do you read the

19   financial -- the publicly available financial reports of other

20   publicly traded companies?

21   A.   I often do, just to look at specific disclosures that

22   they have.  Generally if we have similar items, I look at

23   theirs, at least in the section that they would typically have

24   the similar items, to see if, in fact, they describe things

25   the way we describe things.

Schroeder - Cross/Redirect

1    Q.    Do you know if any of your competitors in the Central

2    Appalachian Region that are publicly traded have identified

3    selenium in their public reports?

4    A.    I did look at the 2009 form 10-K of several competitors,

5    Arch Coal, Massey Energy, Alpha Natural Resources, and CONSOL.

6    In looking at all four of those, one of the items I was

7    looking at is to see how they described selenium matters, and

8    I did not find the word selenium.  I did a search of their

9    form 10-K filing.  I did not find the word selenium in any of

10   those four, except for CONSOL.  CONSOL used the word selenium

11   twice, but Alpha, Massey, Arch did not use the word selenium.

12   Q.    Mr. Schroeder, in your most recent Q filed on Friday, do

13   you know how many times you used the word selenium in that Q?

14   A.    We used the word selenium 25 times in the June 30, 2010

15   form 10-Q.  I did -- we did use the word selenium 71 times in

16   the 2009 form 10-K.

17            MR. GARDNER:  Your Honor, I have no further

18   questions.

19            THE COURT:  All right.  Any redirect?

20            MR. LOVETT:  Briefly, Your Honor.

21                    REDIRECT EXAMINATION

22   BY MR. LOVETT:

23   Q.    You say that you've looked at Arch and Massey's quarterly

24   and annual reports for selenium liability disclosures and

25   found none?

Schroeder - Redirect

1   A.   Yes.

2   Q.   Is it your understanding they have selenium liability?

3   A.   They operate in the same basin that we did, that we do,

4   so I would expect that they would have some selenium

5   liability.

6   Q.   Do you think their failure to include that liability in

7   their quarterly reports constitutes fraud?

8   A.   What I indicated is I have not --

9           MR. GARDNER:  I object to the --

10          THE COURT:  I'm going to sustain the objection.

11  You're asking him to speculate.  He doesn't know if they have

12  any --

13  BY MR. LOVETT:

14  Q.   If a company had a liability for its selenium treatment

15  and that liability were measured in the millions or even tens

16  of millions of dollars and it wasn't disclosed in a financial

17  statement, would that constitute fraud?

18  A.   Materiality --

19          MR. GARDNER:  I'm going to object again.  I thought

20  we just covered this.

21          MR. LOVETT:  I thought it was a general question.

22          THE COURT:  I'm going to sustain the objection.

23          MR. LOVETT:  Okay.

24  BY MR. LOVETT:

25  Q.   Now, I think you said you had not turned down any

Schroeder - Redirect

1   proposal from CH2M Hill?

2   A.   I said I did not turn down any request to spend money

3   that Mr. McHale would have forwarded any kind of budget

4   process.

5   Q.   And how much has Patriot spent on its selenium

6   remediation projects over the past two or three years?

7   A.   I don't know the exact amount, but I think you'll

8   probably ask a range, and I would say the range is probably

9   ten to twenty million dollars.

10  Q.   I think Mr. McHale had a different number, a much lower

11  number.  So I'll say you don't -- is it fair to say you don't

12  know?

13  A.   I gave you a range.  That's the best guess I can give

14  you.

15  Q.   Fair enough.  In the exhibit, Plaintiff's Exhibit 65,

16  which is the most -- not the most recent 10-Q, but it's the

17  10-Q filed on 8/7, 2009, just a several-page --

18  A.   Four or five pages, yes.

19  Q.   Yeah.

20  A.   I have that in front of me.

21  Q.   You have it?

22  A.   I do.

23  Q.   Really the only page that matters on there is page 8, and

24  I've taken you through this before.  You say, "Our estimated

25  future payments for selenium remediation average $12 million

Schroeder - Redirect

1   each year over the next five years."  Do you see that?

2   A.   Yes, I do.

3   Q.   What did you base that on?

4   A.   That was based on the estimate from the Potesta analysis

5   and then further through, I believe, what Mr. McHale put

6   together for us.

7   Q.   Have you spent that much each year?

8   A.   My recollection of the number is somewhere between ten

9   and twenty million dollars --

10  Q.   Okay.

11  A.   -- over the several-year period.

12  Q.   Are you spending $12 million a year on selenium

13  remediation?

14  A.   I don't recall the exact amount.

15  Q.   Is it your belief that you're spending that much?

16  A.   I think we are probably spending in that area, yes.

17  Q.   You say you laid off miners --

18  A.   Yes.

19  Q.   -- and reduced 401(k)s?

20  A.   Yes.

21  Q.   Was your salary reduced during that time?

22  A.   My 401(k) match was reduced; my salary was not.

23  Q.   What is your current salary?

24  A.   $463,500.

25  Q.   And how many -- what did you make in bonuses last year?

Schroeder - Redirect

1   A.   2009 bonus, I believe, was 256,000.

2   Q.   Stock options as well?

3   A.   Yes.

4   Q.   How much does a CEO make?

5   A.   I don't know the exact amount, but in the ballpark of

6   750,000 on an annual basis.

7   Q.   Bonus?

8   A.   I don't recall his bonus amount.  Several hundred

9   thousand.

10   Q.   Several hundred thousand?  Stock options?

11   A.   Yes.

12   Q.   COO?

13   A.   I don't recall his salary.  Somewhere in the 700,000

14   range.

15   Q.   Bonuses?

16   A.   Don't recall the amount.

17   Q.   I think you said the stock price in 2009 went to $3.

18   A.   Yes.

19   Q.   Is that right?

20   A.   Yes, it did, first quarter of 2009.

21   Q.   That was the time you entered into the consent decree in

22   this case; is that right?

23   A.   Yes.

24   Q.   So you entered into the decree at the time your stock was

25   at its bottom, right?

Schroeder - Redirect

1  A.    Yes.

2  Q.    And when you entered into the decree, you intended to

3  comply with it, right?

4  A.    Yes.

5  Q.    So you didn't see your stock prices an impediment to

6  that, did you?

7  A.    No.

8  Q.    What is your stock price now?

9  A.    Somewhere in the $12 range.

10 Q.    So it's quadrupled since you entered into --

11 approximately quadrupled since you entered into the consent

12 decree; is that right?

13 A.    Yes.

14 Q.    What is the coal price today for steam and metallurgical

15 coal?

16 A.    Steam coal is $65 a ton, roughly; metallurgical coal is

17 $160, $170 a ton.  It certainly depends on quality and --

18 Q.    Those prices have recovered since the bottom as well,

19 haven't they?

20 A.    Metallurgical, yes; steam, a little, not much.

21 Q.    How much -- how many tons of coal did Patriot mine in

22 2009?

23 A.    Roughly 33 million.

24 Q.    How many did it mine in 2008?

25 A.    Roughly 25 million, which includes the Patriot operations

Schroeder - Redirect/Recross

1    for a full 12 months and the acquired Magnum operations for

2    roughly five months.

3    Q.    What do you anticipate mining this year?

4              MR. GARDNER:  Your Honor, I think we're going well

5    beyond the scope of my cross-examination.

6              MR. LOVETT:  The only reason I'm asking these

7    questions is because I understood him to ask the witness about

8    the financial condition of the coal market, the stock

9    market --

10             THE COURT:  I agree.

11             MR. LOVETT:  I'm almost finished.  I just want to

12   point out that basically the questions weren't --

13             THE COURT:  Overruled.

14             THE WITNESS:  I think your question was what do we

15   expect to mine in 2010.

16   BY MR. LOVETT:

17   Q.    Yes.

18   A.    The number is probably in the low 30's; 30, 31 million.

19             MR. LOVETT:  Thank you.  That's all.

20             THE COURT:  All right.

21                         RECROSS EXAMINATION

22   BY MR. GARDNER:

23   Q.    Mr. Schroeder, isn't it true that the company needs to

24   maintain a significant liquidity in order to take it through

25   the peaks and trials --

Schroeder - Recross/Further Redirect

1    MR. LOVETT:  Objection.  That's beyond the scope of

2    my questions.

3    THE COURT:  Well, overruled.

4    BY MR. GARDNER:

5    Q.   -- that you've just described?

6    A.   Well, liquidity is very important for us; and naturally

7    in my role, I want to see as much liquidity as possible to

8    spend the money that we need to spend on operations, on

9    capital, on liabilities that we have, retiree health care

10   liabilities, Workers' Comp. liabilities, selenium liabilities.

11   Q.   And has the company's liquidity position improved today

12   from what it was a year ago?

13   A.   Yes, it has.

14   MR. GARDNER:  Thank you, Your Honor.

15   THE COURT:  All right.  Anything else?

16   MR. LOVETT:  Just one question.

17   FURTHER REDIRECT EXAMINATION

18   BY MR. LOVETT:

19   Q.   By liquidity, you need -- one of the things that coal

20   companies need liquidity for is to pay for their environmental

21   obligations, right?

22   A.   Yes, it is.

23   THE COURT:  All right.  Any other questions?  If

24   not, Mr. Schroeder, you may step down.

25   Call your next witness.

Potter - Direct

1          MR. LOVETT:  Mr. Harry Potter.

2          THE COURT:  All right.  Mr. Potter, if you'll step

3   over here, my clerk will administer the oath.

4             HARRY POTTER, PLAINTIFF'S WITNESS, SWORN

5          THE COURT:  Are you going to be using these

6   exhibits?

7          MR. LOVETT:  No, Your Honor.  I may use one or two

8   of them.  Are these the Court's exhibits?

9          THE COURT:  No, they're not the Court's.

10          MR. LOVETT:  May I take them away?

11          THE COURT:  Yes.

12                    DIRECT EXAMINATION

13   BY MR. LOVETT:

14   Q.   I'm going to hand you a copy of Plaintiff's Exhibit 3,

15   your CV or resume.

16   A.   Yes.  Thank you.

17          MR. LOVETT:  Does the Court have a copy?

18          THE COURT:  Yes.

19   BY MR. LOVETT:

20   Q.   Would you state your name for the record, please.

21   A.   Yes.  Harry James Potter.

22   Q.   Mr. Potter, where do you live?

23   A.   Tulsa, Oklahoma.

24   Q.   And what is your profession?

25   A.   I am a certified public accountant, forensic accountant,

Potter - Direct

1    and a certified fraud examiner.

2    Q.    What is a forensic accountant?

3    A.    A forensic accountant is an expert CPA that is involved

4    in reviewing financial transactions and the ramifications

5    thereof for a lot of different purposes.

6    Q.    And I believe you said that you are a CPA as well, right?

7    A.    Yes, I am.

8    Q.    You're also a certified fraud examiner?  What is that?

9    A.    Yes.  A certified fraud examiner is someone who has

10   background, experience, and training in the investigation of

11   fraud, including financial statement improprieties.

12   Q.    How many certified, if you know, forensic accountants are

13   there in the United States?

14   A.    You know, there's several bodies that certify that.  It's

15   in several thousands.

16   Q.    What about certified fraud examiners?

17   A.    I'm not sure in the U. S.  That's a worldwide

18   organization, and I believe there's ten thousand, at least

19   five to ten thousand.

20   Q.    And have you appeared as an expert witness before?

21   A.    Yes.

22   Q.    In federal court?

23   A.    Yes.

24   Q.    Have you appeared in West Virginia in federal court

25   before?

Potter - Direct

1    A.   Yes, probably about five or six times.  I was the

2    principal accounting and financial expert in the Keystone Bank

3    failure for the Federal Deposit Insurance Corporation.  So I

4    would have testified in front of Judge Faber.

5    Q.   You were the FDIC's expert?

6    A.   Yes.

7    Q.   How long did that trial go on?

8    A.   Well, my work went on for nine years, from 2000 -- the

9    bank failed in September 1999.  It went on for nine years,

10   with the last hearing in April 2009.

11   Q.   Any other experience in West Virginia as an expert

12   witness?

13   A.   Yes.  I've given depositions and assisted in cases in

14   other -- like accounting malpractice cases.

15   Q.   And were you qualified as an expert witness in forensic

16   accounting in those cases?

17   A.   Well, I just gave a deposition in one case, but I've been

18   qualified as an expert and testified as an expert in financial

19   cases, audit failure cases, failure to meet the standard of

20   care, improper financial reporting cases on many occasions.

21   Q.   Before Judge Faber?

22   A.   Yes.

23        MR. LOVETT:  Move to qualify Mr. Potter as an expert

24   witness in accounting and forensic accounting.

25        THE COURT:  All right.  I'm satisfied.  Go ahead.

Potter - Direct

1    You can cross-examine him as to his credentials.

2            MR. LOVETT:   Thank you.

3    BY MR. LOVETT:

4    Q.   Mr. Potter, this isn't going to take -- this isn't going

5    to be a long examination from me.  I just want to go through

6    several of the points that you've heard from Mr. Schroeder and

7    other witnesses.

8         Have you been here throughout the hearing?

9    A.   Yes.

10   Q.   And you heard --

11   A.   Well, I stepped out for a couple of minutes, but yes.

12   Q.   You heard Mr. McHale's testimony?

13   A.   Yes.

14   Q.   And you heard Mr. Schroeder's testimony?

15   A.   Yes.

16   Q.   Okay.  I think Mr. Schroeder testified that the liquidity

17   of Patriot is approximately $457 million, $437 million.

18   A.   I recall it being over four hundred.  I believe it's

19   comprised of cash and then $125,000 receivable securitization

20   program and a $93 million available letter of credit -- a line

21   of credit.

22   Q.   I think you said thousand, but I think you meant

23   125 million.

24   A.   Yes.  I'm sorry.

25   Q.   Which adds up to $432 million.

Potter - Direct

1    A.   That is my rough understanding, yes.

2    Q.   Okay.  And based on that, is it your understanding that

3    it would have sufficient funds to take from those sources to

4    cover a $95 million letter of credit to the Court or escrow

5    payment?

6    A.   Yes.

7    Q.   And did you hear Mr. Schroeder's testimony just now?

8    A.   I heard his testimony now, and I also attended his

9    deposition.

10   Q.   And did you raise any concerns based on his testimony

11   about the impact that a $95 million remediation liability

12   would inflict upon his company?

13   A.   Well, the way I would characterize it, I think anytime

14   most any company would have to write a $95 million check, it

15   would have a little pause and it would possibly have to

16   consider where they were getting the funds and the

17   ramifications from it.  But my understanding, based upon his

18   deposition and testimony yesterday and today, is Patriot would

19   be able to do that.  And that's also my opinion.

20   Q.   What specific concern did he raise today, if any?

21   A.   His concern today was the -- his concerns dealt with the

22   effect of the financial covenants of the company and as you

23   have more indebtedness, it raises the level of debt in your

24   ratio analysis.

25   Q.   And that's true, isn't it?

Potter - Direct

1    A.   Yes.

2    Q.   Is Patriot's -- are Patriot's books sufficient to allow

3    you to draw the conclusion that even though it would have that

4    impact, it wouldn't devastate the company?

5    A.   Yes.  In fact, you know, I base a lot of my opinion not

6    only on my review of the financial statements but also in my

7    listening to Mr. Schroeder here but also his deposition where

8    he indicated that up to 200 million wouldn't bankrupt the

9    company and actually beyond.  You asked him questions beyond

10   that, that, you know, the greater you go, the more effort it

11   takes by the company and the more concern they have to address

12   in various issues, but that's my opinion based upon all that

13   evidence.

14   Q.   Okay.  Let me change gears here.  Based on what you have

15   seen so far in the hearing and read, do you think that the

16   financial statements that we went through here have materially

17   misstated Patriot's selenium limits -- selenium liabilities?

18   A.   Since they started reporting them, yes.  It would have to

19   be -- I believe the first reporting would have been for the

20   June 30, 2009 quarter, which was a disclosure but not an

21   accrual.  And from then on out, I would still say that they've

22   been materially underreporting their selenium liabilities.

23   Q.   And you've read the Potesta reports that we've talked

24   about here, right?

25   A.   Yes.

Potter - Direct

1    Q.   And how do you understand the draft Potesta report to

2    estimate flows?

3    A.   The draft Potesta report estimates flows at 14,040

4    gallons per minute.

5    Q.   And then there was the final report of July of 2009?

6    A.   Yes.

7    Q.   How did that estimate the flows, if you know?

8    A.   That estimated flows --

9            THE COURT:  Hold on.

10           THE REPORTER:  Repeat your question.

11   BY MR. LOVETT:

12   Q.   I'm sorry.  How did the 2000 -- the July 2009 Potesta

13   report estimate the flows?

14   A.   Specifically for 72 outfalls, it would be 1724 gallons

15   per minute or 12.3 percent of the January '09 Potesta

16   accumulation of 14,040 gallons per minute.

17   Q.   That's because of the use of 24 gallons per outfall as

18   the number for estimating the flows, right?

19   A.   Yes.  And I know there's some controversy or some

20   confusion, rather, about how that's calculated, but I referred

21   to Mr. McHale's deposition to make certain that that was an

22   appropriate method.

23           MR. LOVETT:  May I approach, Your Honor?

24           THE COURT:  You may.

25   BY MR. LOVETT:

Potter - Direct

1    Q.   Plaintiff's Exhibit 67.  It's part of Mr. McHale's

2    deposition in this case.

3    A.   Yes.  I believe it's Volume II of it.

4    Q.   Is there something in this statement that leads you to

5    conclude that Patriot based its estimate of liability on

6    24 gallons per minute at each of the 72 or 78 outfalls?

7    A.   Yes.  There's testimony -- you know, it's kind of all the

8    way through here, but beginning in the middle of page 41, at

9    line 13, and ending about line 22 on page 42.

10   Q.   So at line 13, I asked Mr. McHale, "It's my understanding

11   that in the January -- excuse me -- July 2009 report, that you

12   estimated to your auditor that you were going to treat

13   approximately 24 gallons per minute at each outfall."  And he

14   responds, "That is what the report assumes."

15   A.   Correct.

16   Q.   And then I asked him, "How many outfalls are there?"  And

17   he said, "Approximately 78."  Right?

18   A.   Yes.

19   Q.   And then I said, "I've got a calculator here.  Twenty-

20   four times seventy-eight equals eighteen hundred and

21   seventy-two.  So the July 29th report is based on treating

22   1872 gallons total; is that right?"  Mr. Hurney objected to

23   form.  I said, "If you want to do the math, go ahead."  And I

24   asked him again, "Are you doing the math?"  He said, "Yes."

25   And then he concluded that the 1872 number was correct, right?

Potter - Direct

1    A.    That's correct.

2    Q.    And then I said, "Isn't it true, then, that the final

3    Potesta report of July 2009 is based on ZVI treatment of

4    1872 gallons per minute?"  He said, "Yes, that's what the

5    number works out to."  And then I asked him, "And yet the

6    January 20, 2009 draft report estimate flows at 14,040 gallons

7    per minute."  And he said, "Yes."  And I said, "And you agreed

8    that that was probably the base flow at the 70-some outlets,

9    correct?"  And he said, "Yes."  And then lastly I said, "I'll

10   ask you again.  Doesn't that mean that the Potesta July 29,

11   2009 final report is a significant underestimate of the flow

12   that would have to be treated at Patriot's outfalls?"  And he

13   said, "Yes."

14   A.    Yes.

15   Q.    Is that part of what you base your opinion upon?

16   A.    Yes, and it's clarifying my analysis of both the January

17   and July Potesta reports.  There's a question of whether it's

18   72 or 78 outfalls, but at 1872 gallons, it's less than

19   15 percent, I think, of the 14,040 gallons that is estimated

20   to be the base flow.

21   Q.    So from the time of the draft report to the final report,

22   the estimation of flow increased by what percentage?

23   A.    About 85 percent.

24   Q.    And the draft report of January is only calculating base

25   flow to begin with, right?

Potter - Direct

1   A.    That's correct.

2   Q.    Okay.  Now, as I understand, that was prepared for

3   Ernst & Young, Patriot's auditors, right?

4   A.    Yes.

5   Q.    Isn't it important for an auditor like Ernst & Young to

6   have accurate reports from experts to make sure that they

7   reflect the financial position of the company?

8   A.    Yes, it is, particularly in a situation like this.

9   Ernst & Young, like myself, we're not experts in environmental

10  liabilities or professional engineers, but CPAs auditing books

11  often have to take non-financial information and apply it to a

12  reasonable standard to make a determination if the financial

13  information is appropriately stated.  So this would be an

14  example of Ernst & Young's reliance upon an expert report.

15  Q.    And therefore the public's and this Court's understanding

16  of the report; is that right?

17        MR. GARDNER:  Your Honor, I'm going to object.  And

18  this is something that came up yesterday.  I don't understand

19  the relevance of this testimony for the purpose of this case

20  and the purpose of this hearing.

21        MR. LOVETT:  I'm finished.

22        THE COURT:  Well, do you want to respond?

23        MR. LOVETT:  Sure.  I'll respond the same way I did

24  yesterday.  I think that this is directly relevant because it

25  shows an attempt, a clear and a conscious attempt by Patriot

Potter - Direct

1    to underestimate its liabilities before this Court and before

2    the public generally starting back before the entry of the

3    consent decree, starting at least at the time of the first

4    hearing in this case in July of 2008 and progressing in a

5    systematic way forward to deceive shareholders and the Court

6    and us, the plaintiffs, about what the liabilities of the

7    company were and to make its case that it wasn't able to pay

8    for its treatment.

9              MR. GARDNER:  Your Honor, with all due respect, that

10   is not what this testimony has been about.  Now, Mr. Lovett

11   said yesterday when I raised this very point that he agreed

12   this is not a securities case, that this is a matter that

13   arises under the Clean Water Act.  The company has not pleaded

14   poverty.  It has not pleaded an inability or an unwillingness

15   to address this liability and to spend the money.

16       Mr. Schroeder just testified a few moments ago that the

17   company, despite a difficult time, had continued to do exactly

18   what it represented it was going to do before this Court two

19   years ago.  So I don't understand where this is going.

20             THE COURT:  Well, I deny the objection.  As I think

21   I indicated yesterday, obviously a central issue in this

22   hearing is to determine whether or not the defendant is in

23   contempt.  And part of that certainly includes consideration

24   of the effort undertaken by the company to conduct the proper

25   environmental remediation at these sites.  And this testimony

Potter - Direct

 1   I think is directly relevant to the effort of the company to

 2   understand its liability and responsibility and the steps that

 3   they took to remedy that.

 4        I'm certainly not at this point reaching the conclusion

 5   that Mr. Lovett is arguing here, that there was perhaps some

 6   level of fraudulent misrepresentation by the company in these

 7   reports.  But certainly the company's understanding of its

 8   liability, how they characterize that responsibility during

 9   this period when they're under this consent order is directly

10   relevant to the question -- to the central question before

11   this Court, and that is, is the defendant in contempt, has the

12   defendant made a reasonable effort to comply with the Court's

13   order.  So I overrule the objection.

14             MR. LOVETT:  Thank you, Your Honor.

15             THE COURT:  Are you finished with your questions?

16             MR. LOVETT:  That's all I have.

17             THE COURT:  All right.  Cross-examination?

18                       CROSS EXAMINATION

19   BY MR. GARDNER:

20   Q.   Mr. Potter, good morning.

21   A.   Good morning.  How are you doing?

22   Q.   Welcome back to West Virginia, sir.

23   A.   Thank you.

24   Q.   Mr. Lovett has had a brief direct examination of you and

25   I'll try to keep my cross-examination similarly brief.  First

Potter - Cross

1    of all, I did want to ask, your certifications as a forensic

2    accountant and a fraud examiner, who does those certifi-

3    cations?  What body?

4    A.   My certification as a forensic accountant is from the

5    American College of Forensic Examiners, and my certification

6    as a certified fraud examiner is from the American Institute

7    of Certified Fraud Examiners, I believe, American College of

8    Certified Fraud Examiners.

9    Q.   What is that group?

10   A.   That is a group that's been now around since the early

11   '90s -- I got my certification in '97 -- that is really a

12   leading force in terms of training and aggregating

13   professional resources in its headquarters in Austin, Texas,

14   and it's very well-recognized.

15   Q.   But it's not a state licensure or something done through

16   the financial accounting standards board or anything like

17   that.

18   A.   No.  It's a private organization actually that arose out

19   of the need to try to address the burgeoning amount of fraud

20   in the United States.

21   Q.   Thank you.  Mr. Potter, as I understand the questions

22   that Mr. Lovett has asked you, he had asked if the company

23   were required by the Court to both undertake treatment beyond

24   what it has reported and then to provide some additional

25   financial mechanism in effect to guarantee that performance,

Potter - Cross

1   whether that would affect the company's liquidity.

2       Do I understand that you believe it would affect the

3   liquidity?

4   A.   Oh, certainly.

5   Q.   It would?

6   A.   Yes.  And somewhere, you know -- if you narrowly defined

7   liquidity as being your available cash and your available

8   borrowings, it certainly will affect liquidity.

9   Q.   And I think you said that you heard Mr. Schroeder's

10  testimony.  You understand the purposes for which a company's

11  liquidity is important, especially in a business such as the

12  coal business?

13  A.   Yes.

14  Q.   Do you agree that in order for Patriot to undertake the

15  liabilities that are at the heart of this proceeding, that

16  Patriot must be an ongoing entity financially?

17  A.   You know, if Patriot were to go bankrupt, that would open

18  up -- it would make it more difficult.  As we all know,

19  bankruptcy is a very expensive process that can result in a

20  lot of uncertain outcomes.  It would certainly be preferable

21  if Patriot remained an ongoing entity and it would be better,

22  yes.

23  Q.   So you don't find bankruptcy a desired outcome in this

24  proceeding, do you, sir?

25  A.   No, but I recalled Mr. Schroeder's deposition where he

Potter - Cross/Redirect

1   indicated 200 million would not bankrupt the company.  So I'm

2   not testifying about a monetary amount, but I don't really see

3   bankruptcy flowing as an option of this proceeding, but I

4   could be wrong.

5   Q.   You haven't offered any opinion in this case about fraud,

6   have you, Mr. Potter, because I was at your deposition?  Did I

7   understand you in that to -- that you expressed any opinion

8   about fraud from your examination of these documents?

9   A.   No, I haven't expressed an opinion, and I think in my

10  deposition I specifically said I haven't looked at the audit

11  work papers to know what was given to Ernst & Young, and I

12  haven't expressed such opinion.

13          MR. GARDNER:  One moment, please.

14      Mr. Potter, thank you.  No further questions.

15          THE WITNESS:  Thank you.

16          THE COURT:  All right.  Any further questions?

17                      REDIRECT EXAMINATION

18  BY MR. LOVETT:

19  Q.   One of the purposes of posting a letter of credit or an

20  escrow -- creating an escrow account would be to assure that

21  this liability was discharged even if there was a bankruptcy,

22  right?

23  A.   Yes, that would effectively guarantee that.

24          MR. LOVETT:  Thank you.  Your Honor, I'd move to

25  admit the exhibits from Mr. Schroeder, which I neglected to do

```
 1    after his testimony, and Mr. Potter's as well.
 2              THE COURT:  All right.  Any objection?
 3              MR. GARDNER:  No objection.
 4              THE COURT:  All right.  All the exhibits will be
 5    admitted.
 6         All right.  Any other questions, Mr. Gardner?
 7              MR. GARDNER:  No, Your Honor.  Thank you.
 8              THE COURT:  All right.  Mr. Potter, you're excused.
 9              THE WITNESS:  Thank you very much.
10              THE COURT:  Are any of these papers yours?
11              THE WITNESS:  No.  I think they were --
12              THE COURT:  All right.  Counsel?
13              MR. LOVETT:  Can I retrieve them, Your Honor?
14              THE COURT:  Yeah.  How long is your next witness
15    going to take?
16              MR. LOVETT:  I would guess 40 minutes.
17              THE COURT:  All right.  Let's go ahead and take
18    about a ten-minute recess.
19              MR. MCLUSKY:  Your Honor, I wanted to figure out the
20    order of witnesses.
21              THE COURT:  Yeah, why don't you tell them.
22              MR. MCLUSKY:  We have some here at 1:00.  Would that
23    be sufficient --
24              MR. LOVETT:  We have one more witness.  My guess is
25    40 minutes on direct, thereabouts.
```

```
 1              THE COURT:  Who is that?

 2              MR. LOVETT:  An economist, Dr. Kavanaugh.

 3              THE COURT:  He's been deposed, I take it?

 4              MR. GARDNER:  He has been.

 5              THE COURT:  Any idea how long your cross is going to

 6    take?

 7              MR. GARDNER:  Potentially not a long time, Your

 8    Honor.

 9              THE COURT:  I'm sorry?

10              MR. GARDNER:  Potentially not a long time.  Thirty

11    minutes, perhaps.

12              THE COURT:  All right.  Well, that will probably get

13    us pretty close to a break anyway.  So I think if you've got

14    people coming at one, that's fine.

15              MR. GARDNER:  Thank you, Your Honor.

16              THE COURT:  All right.  We'll take a ten-minute

17    recess.

18         (Recess from 10:17 a.m. to 10:30 a.m.)

19              THE COURT:  All right.  Are you ready to call your

20    next witness?

21              MR. TEANEY:  Yes, Your Honor.  Plaintiffs call

22    Dr. Mike Kavanaugh.

23              THE COURT:  All right.  Doctor, if you'll step up

24    here, my clerk is going to administer the oath.

25              MIKE KAVANAUGH, PLAINTIFF'S WITNESS, SWORN
```

Kavanaugh - Direct

1                    DIRECT EXAMINATION

2    BY MR. TEANEY:

3    Q.    Good morning, Dr. Kavanaugh.

4    A.    Good morning.

5    Q.    Can you spell your last name for the record, please.

6    A.    Last name is Kavanaugh, K-a-v-a-n-a-u-g-h.

7    Q.    Thank you, Doctor.  Where do you live, Dr. Kavanaugh?

8    A.    Could you repeat that?  I can't --

9    Q.    I'm sorry.  I talk too fast sometimes.  Where do you

10   live?

11   A.    I live in Volcano, Hawaii.

12   Q.    What time is it in Hawaii right now?

13   A.    It's six hours before us, so it's late morning.

14   4:00 a.m., 4:30.

15   Q.    Thank you very much for coming out here and --

16   A.    It's a pleasure.

17   Q.    -- enduring the time change.  What is your occupation,

18   Dr. Kavanaugh?

19   A.    I'm a research economist.

20   Q.    I have a copy of your curriculum vitae.  It's been marked

21   and provided to the Court as Plaintiff's Exhibit 2.

22         May I approach, Your Honor?

23             THE COURT:  You may.

24   BY MR. TEANEY:

25   Q.    Dr. Kavanaugh, is this a recent copy of your resume or

Kavanaugh - Direct

1   CV?

2   A.    Yes, it is.

3   Q.    Excellent.  Where did you do your undergraduate work,

4   Dr. Kavanaugh?

5   A.    I did undergraduate work at Xavier University in

6   Cincinnati, and I did my graduate work at the University of

7   Cincinnati.

8   Q.    Did you obtain a doctorate degree?

9   A.    Yes, I did, 1975.

10  Q.    And what was the subject, or what was the area?

11  A.    Economics.

12  Q.    Economics.  Have you appeared as an expert witness in an

13  environmental case before?

14  A.    Yes, I have.  The last two pages of my -- three pages of

15  my resume set out when I've testified in federal court and my

16  deposition testimony since 1991.  There have been some cases

17  prior to 1991, but I have lost track of them and just report

18  since 1991.

19  Q.    Understood.  As I'm looking at this, a couple caught my

20  eye because they occurred here in the Fourth Circuit.  One is

21  them is *Friends of the Earth v. Laidlaw*.

22  A.    Yes.

23  Q.    Did you testify in that matter?

24  A.    Yes, I did.  I testified --

25  Q.    Was that -- I'm sorry.  Go ahead.

Kavanaugh - Direct

1   A.   I was deposed and I testified in court.  There were two

2   hearings in the *Laidlaw* matter, and I testified in both of

3   those hearings.

4   Q.   And what court was that?

5   A.   That was in Columbia, South Carolina federal court.  It

6   was a Clean Water Act case brought by citizens who were

7   seeking enforcement of a Clean Water Act permit held by

8   Laidlaw, and --

9   Q.   What opinion did you offer or were you asked to give in

10   that case?

11   A.   I was asked to opine upon the economic benefit that the

12   defendant Laidlaw enjoyed by its failure to comply with the

13   Clean Water Act.

14   Q.   Do you recall what pollutant was at issue in that case?

15   Do you recall what pollutant was at issue in that case?

16   A.   Well, there were several.  It was an incinerator, and

17   they collected waste from a number of sources and would bring

18   it to the incinerator and burn it.  Water was part of the

19   process, and so there were a number of pollutants.  The major

20   concern was mercury, which was a significant risk to human

21   health.  And that was, I think, what you would call the major

22   pollutant, but there were others as well.

23   Q.   Did that case ultimately reach the Supreme Court of the

24   United States?

25   A.   It did.  It did.  It was -- the plaintiffs -- there was a

Kavanaugh - Direct

1    finding for the plaintiffs at the district -- at the district

2    level.  The appeals court reversed, and then the Supreme Court

3    reversed on that.  Most of the appealing had to do with issues

4    involving the standing of citizens to bring actions in federal

5    court under the Clean Water Act statutes.

6    Q.   Another case on your resume that caught my eye was

7    *Friends of the Earth v. Gaston Recycling*.  Did that case also

8    take place in the District Court of South Carolina?

9    A.   Yes, it did.  It was similar in time to when *Laidlaw* was

10   also going forward, but that was more coincidence of

11   scheduling.  They were not unrelated cases.  And there was

12   some preliminary work on that, and I don't know if there was a

13   settlement or if *Gaston* just disappeared, and it just never

14   really came to a complete resolution.

15        I had a call years later, more than five years later,

16   asking if I still had some material from *Gaston*, that there

17   was some motion.  And I had not archived the material.  So I

18   don't know whatever happened.

19   Q.   What were you qualified as an expert to testify about in

20   *Gaston*?

21   A.   Again, it was on the economic benefit enjoyed by the

22   defendant for not coming into compliance in a timely manner.

23   Q.   Okay.  Another interesting case -- or I'm sure all of

24   these are interesting, but one that caught my eye again was

25   *U. S. v. Rapanos*.

Kavanaugh - Direct

1    A.   That was a Clean Water Act case brought by the United

2    States against a gentleman who was developing property in

3    Midland, Michigan and filling in wetlands without getting a

4    permit; and I, again, opined as to what the benefit was to

5    Mr. Rapanos for his failure to get a permit to fill the

6    wetlands, and --

7    Q.   Who retained your services in that case?

8    A.   Excuse me?

9    Q.   Who retained your services?

10   A.   The United States.  The case was brought by the United

11   States Department of Justice, and I was testifying on behalf

12   of -- they called me to the stand and asked me what my opinion

13   was about economic benefit.

14   Q.   Did that case ultimately reach the Supreme Court of the

15   United States?

16   A.   Yes, that reached as to whether or not the extent to

17   which wetlands were, if I understand it right, waters of the

18   United States; and if the wetlands were intermittent, was that

19   a -- how much of a factor was that on whether they were waters

20   of the United States.  Again, an odd standing issue.

21   Q.   Certainly.  So those are three cases that caught my eye.

22   Do you have an estimate of how many times you've been

23   qualified as an expert in economics to address economic

24   benefit?

25   A.   Every time I've been called I've been qualified as an

Kavanaugh - Direct

1    expert in economic and financing in that case.  I would say

2    more than 20 times.

3    Q.   Is your work always with plaintiffs or do others retain

4    your services?

5    A.   It's primarily with plaintiffs.  I have worked on behalf

6    of defendants, have been retained by defendants.  I have never

7    taken that all the way through to deposition testimony or

8    trial testimony.  Often my involvement with defendants is in

9    trying to get the parties to settle their differences among

10   themselves.  And I can -- if I can, I like to narrow the

11   differences between the parties so that an agreement can be

12   reached.

13            MR. TEANEY:  At this time, Your Honor, plaintiffs

14   would like to move to qualify Dr. Kavanaugh as an expert in

15   economics and on economic benefit resulting from

16   non-compliance with environmental laws.

17            THE COURT:  All right.  I'm satisfied.  You can go

18   ahead.

19            MR. TEANEY:  Thank you, Your Honor.

20   BY MR. TEANEY:

21   Q.   Dr. Kavanaugh, let's start kind of at a general level and

22   we'll try to funnel down a little bit here.

23       Can you explain for me the concept or the notion of

24   delayed costs when it comes to environmental compliance?

25   A.   Yes.  Generally, as a general matter, in order to comply

Kavanaugh - Direct

1    with this country's environmental statutes, spending has to

2    occur.  That spending is usually divided into two parts,

3    spending that is for capital equipment and spending that is

4    for operating and maintaining the capital equipment.

5         The concept of delayed costs are -- is that if you fail

6    to come into compliance in a timely manner, what you have done

7    is you have delayed some capital spending.  You should have

8    been in compliance in year one, you didn't come into

9    compliance until year five, that you've delayed the spending

10   of that capital.

11        That is often contrasted with avoided spending, in which

12   you should have been in compliance in year one, plus in year

13   two, three, four and five, and you would have had to pay

14   operating and maintenance expenditures during those years.

15   For the capital expenditures, you simply delay.  You should

16   have spent it in year one, but you spend it in year five.  You

17   actually do make that expenditure, or the equivalent of that,

18   just five years later.  But with the avoided expenditures for

19   O&M, once you have avoided them, once the passage of time

20   prevents you from ever making up that spending, so that's

21   money that goes to you and you keep; whereas, in the former

22   case, the delayed, what you get is the opportunity to use

23   those funds for a period of time until you actually make the

24   expenditure.

25   Q.    Thank you.  There's a couple of things I want to touch on

Kavanaugh - Direct

1    there.  First, with regard to operation -- operating and

2    maintenance costs you described as avoided, in a hypothetical

3    if a polluter had a deadline to comply by April 5, 2010, here

4    we find ourselves hypothetically in August 2010, would that

5    polluter have some avoided operating and maintenance costs?

6    A.    Yes.

7    Q.    Have you been asked to measure those costs in this case?

8    A.    Not exactly, no.

9    Q.    Okay.

10   A.    I have -- I have reviewed engineering documents trying to

11   determine what the operating and maintenance costs might have

12   been but never came to a conclusion or opinion as to what they

13   would have been had the proper equipment been in place at the

14   proper time.

15   Q.    And you weren't asked to prepare that opinion; is that

16   correct?

17   A.    That's right, I did not.

18   Q.    But with regard to calculating, you know, I guess -- I

19   believe you used the term opportunity cost or opportunity.

20   How would you calculate or determine -- what method would you

21   use to determine what the avoided costs were or what the

22   opportunity cost was?

23   A.    Yes.  I would take a fairly basic principle and apply it.

24   I would, first of all, seek out what the costs -- what costs

25   should have been spent in order to come into compliance and

Kavanaugh - Direct

1   when they should have been spent.  And then I would value

2   those costs in terms of their present value by taking into

3   account that the funds made available by a failure to comply

4   are available to a business organization to invest in its

5   company or to operate its company.  And those funds have an

6   opportunity cost.

7       So I would take the amount avoided, plus their

8   opportunity cost during that period of time to which they were

9   avoided, and that combination would provide an estimate of the

10  benefit enjoyed by the firm for avoiding operating and

11  maintenance costs from one period of time to the next.

12  Q.   And how would that method -- would it be similar to

13  calculate the delayed costs?

14  A.   Well, the difference in the delayed costs is that the

15  firm will eventually make the capital expenditure.  It should

16  have spent a million dollars in year one; it doesn't get

17  around to spending the million dollars until year two.  So

18  they've had the use of a million dollars for a year.  And I

19  would figure the benefit on the opportunity cost of a million

20  dollars to that firm; whereas, if it was an avoided

21  expenditure, it would be a million dollars, plus the

22  opportunity cost, but because this is just a delayed

23  expenditure, it's the opportunity cost on the million dollars.

24  Q.   I understand.  Let's make it a little more concrete.  How

25  would you determine the opportunity cost for a coal company?

Kavanaugh - Direct

1    A.   Well, it wouldn't matter what the industry was.  It would

2    matter what costs were avoided or delayed.  I would then want

3    to see if I could come up with an opportunity cost that was

4    applicable to the company.  And without having to go into a

5    lengthy investigation, I tend to use either other -- results

6    of other investigations or a more general default value

7    applying by standard models tools of economic and financial

8    analysis to find the equity cost of capital or the weighted

9    average cost of capital and use that figure as a way of

10   estimating the opportunity cost for that company.

11       So if it's a coal company, if I had something specific

12   for the coal industry or a coal company, I would take that

13   into account in arriving at an opinion as to what the proper

14   opportunity cost to apply to a coal company.

15   Q.   Do you have an opinion as to an appropriate opportunity

16   cost for Patriot Coal Company?

17   A.   I have formed an opinion on that.  I think that the -- I

18   formed the opinion by reading some documents that were

19   prepared by an independent firm, Duff & Phelps, as part of the

20   valuation of the Magnum assets when Patriot acquired them.  I

21   believe it was Mr. Schroeder was describing the need in

22   purchase accounting to make an estimate of the value of what

23   they purchased, and they had retained a firm to produce that

24   estimate.

25       I read that report.  And in that report, Duff & Phelps

Kavanaugh - Direct

1    also had need to come up with estimates of opportunity costs,

2    and they produced several estimates, and I thought that the

3    work was convincing and that for an equity cost of capital,

4    they were using about 14 percent, and for a weighted average

5    cost of capital, it was about 13 percent.  And I read around

6    and did some other calculations around that.

7        I was convinced that the Duff & Phelps had some

8    credibility to it and was applicable to Patriot since it was

9    produced with Patriot in mind and settled on the lower of the

10   two of 13 percent.

11   Q.   What is the result of using the lower of the two?

12   A.   Well, if you were doing an economic benefit calculation,

13   it would put down with pressure on the economic benefit.

14   Everything else equals as opportunity cost declines, the

15   benefit would decline.

16   Q.   Understood.  Have you reviewed some of Patriot's

17   financial documents?

18   A.   Yes, I have.

19   Q.   Have they used a discount rate to bring their selenium

20   liabilities to a present value?

21   A.   Yes, they have.

22   Q.   And what rate did they use?

23   A.   They disclosed in their filings with the Securities and

24   Exchange Commission their 10-K, their 10-Q, and in the

25   prospectus that accompanied their issuing of senior notes of

Kavanaugh - Direct

1    May of this year, they used a rate of 13 percent.

2    Q.    And that's the same as the weighted average cost of

3    capital --

4    A.    Yes --

5    Q.    -- that Duff & Phelps concluded?

6    A.    -- that's right.  The basis of the number 13 percent

7    is -- goes back to a -- the Duff & Phelps report; and in that

8    report, Duff & Phelps made an estimate of the weighted average

9    cost of capital and found that to be 13 percent.

10       In producing that estimate of the weighted average cost

11   of capital, they had to make an estimate of the cost of

12   equity.  And the cost of equity in that case would have been

13   14 percent.

14       I often move towards the notion of using an equity cost

15   more than a weighted average cost of capital.  And the reason

16   I do that, it was, I think, sort of stated by Mr. Schroeder

17   when he pointed out that there are no more cash flows coming

18   from Apogee.  So anything that you're going to have to do at

19   Apogee is going to be supplied mainly by equity.  It's going

20   to cost the company equity to fix Apogee.  And using a

21   weighted average cost of capital, which includes both equity

22   and debt, tends to understate -- would tend to understate the

23   benefit to the company from delaying fixing Apogee.

24   Q.    Understood.  Have you come up with a method to calculate

25   what the economic benefit to Patriot would be for further

Kavanaugh - Direct

1    delay in fixing the problem at Apogee?

2    A.    Yes, I have.  I've tried to modify the standard way that

3    we calculate economic benefit to adapt it to the situation

4    that we have here where we're just looking forward, not

5    looking backward.  In a regular economic benefit analysis, not

6    only would you stand at this point and look forward about when

7    Apogee or Hobet will come into compliance, but you would also

8    look back and say, well, they should have been in compliance

9    either as some statute of limitation date or when the permit

10   came out or when you got some sort of summary judgment

11   determination, but you would look back in time.

12        What I did for this case was to only look forward, and

13   the past became irrelevant.  So it is different.  My

14   calculations for this case are different than the standard

15   economic benefit analysis in that it doesn't look back.

16   Q.    And when you describe a standard economic benefit

17   analysis, is the typical use of that analysis to calculate

18   civil penalties in an environmental proceeding?

19   A.    Yes, that's the use.  The civil penalty has several

20   components.  Economic benefit is one of them.  And the purpose

21   of the economic benefit calculation is to put the defendant in

22   the same financial position had it complied, and then to that

23   economic benefit is added amounts for punishment or for

24   whatever else justice may require is the way to go.  That's a

25   lot of discretion.  But the economic benefit is more narrow.

Kavanaugh - Direct

1    It's a component of the civil penalty.

2    Q.   But in this case you're only looking, in the modeling

3    you've done --

4    A.   Because I'm just going forward from the date of -- from

5    an assumed date of when the order may come and that tells

6    Apogee what it must do.

7    Q.   Okay.  I have an exhibit that I would like to use to talk

8    about and walk through this model in your calculations.  This

9    has not been previously provided.

10        May I approach?

11            THE COURT:  You may.

12            MR. TEANEY:  Thank you.  Can we mark this?  I

13   believe it's Plaintiff's 68.  I have an extra copy for the

14   Court.

15            THE WITNESS:  Can you get me some water?

16            MR. TEANEY:  Yes.

17   BY MR. TEANEY:

18   Q.   Dr. Kavanaugh, do you recognize these pages?

19   A.   Yes.  I prepared these.

20   Q.   Thank you.  And what software program did you use to

21   prepare these?

22   A.   I used a spreadsheet program produced by Microsoft.  I

23   believe its version is Excel.  I don't know the number that

24   goes with it, but it should run on anybody's computer.

25   Q.   Understood.  And would you use the word model to describe

Kavanaugh - Direct

1    this application?

2    A.    Yes.  I've tried to make a very flexible model of what I

3    would call a fine that would provide an incentive for the

4    company to comply; and it's set up so that if the company

5    complies, the fine is zero.  And as the company either doesn't

6    comply either by stretching the time out over which it spends

7    money or doesn't spend enough money to fix the problem, then

8    part of -- then the fine goes up.  As the delay goes on, the

9    fine goes up.  As the amount of money not spent that it should

10   have spent increases, the fine goes up until it reaches its

11   maximum.

12   Q.    Thank you.  I think I want to talk about the second page

13   that I handed you first, and I probably put them in the wrong

14   order.  And we'll start with this and talk about some of

15   the -- I'll use the word inputs --

16   A.    Okay.

17   Q.    -- that go into the model.  Well, let's start with a

18   basic question.  Why are there four columns of numbers here?

19   What do these four columns represent?

20   A.    One of the large tasks that I had to look at was how to

21   characterize what it is they're going to do, and I came down

22   that they are going to spend money over a period of time, and

23   I wanted to break the period of time up into parts so that we

24   have four milestones.  So whatever the length of the project

25   turns out to be, or however much it's going to cost, I divided

Kavanaugh - Direct

1    into four equal time periods.  And at the end of those time

2    periods, in my mind, in my conception of the problem, you take

3    a look and see what has happened.  Is the project on schedule?

4    Have the agreements been made -- kept that have been made?

5         And at that time, you calculate a maximum fine and

6    determine how much of that fine should be purged for the

7    effort that the company made.

8    Q.   Okay.  So I just want to make sure I understand.  If the

9    time period were one year, then these columns would equal

10   what's commonly called a calendar quarter or --

11   A.   Yes, that's correct.

12   Q.   But if you go to a two-year schedule, you're now -- your

13   quarters are six months; is that right?

14   A.   That is right.

15   Q.   Okay.

16   A.   And it is flexible enough so that if you go to some odd

17   number like 28 months, then you just divide it up into four

18   7-month periods, which is neither a quarter nor a half.

19   Q.   Right.

20   A.   But it is that -- that's what I wanted to -- the point I

21   think is that there is flexibility in the model to accommodate

22   different opinions about how long it's going to take.

23   Q.   Understood.  And so that brings us -- I'll look down here

24   to -- on this page, it says 900 and then incremental days

25   delayed.

Kavanaugh - Direct

1  A.   Right.

2  Q.   And then in each quarter, it's 225, 225, 225, 225.  What

3  does this 900 represent?

4  A.   Nine hundred is the length of time for the project, nine

5  hundred days.

6  Q.   Okay.

7  A.   I used a 360-day financial year.  So 900 divided by 360

8  would give you the length of time in years.  That's going to

9  be roughly two and a half years it looks like.

10 Q.   And this 900 is one of the inputs --

11 A.   Yes, it is.

12 Q.   -- that you put in there?

13 A.   Yes, it is.

14 Q.   Okay.  Let's say it were two years.  We'd put in 720

15 days?

16 A.   That's correct.

17 Q.   And then when you input it there, does your model

18 automatically sub-divide the total number of days into four

19 equal parts?

20 A.   Yes, it does.

21 Q.   Okay.  And so in this case, the 225 over here represents

22 the number of days in the quarter based on a 900-day schedule.

23 A.   That's correct.

24 Q.   Okay.  All right.  Let's go back up to the top here, and

25 can you explain what the fractions here, .25, at the top of

Kavanaugh - Direct

1    each column represent?

2    A.   Once I decided that we're going to look at the project in

3    four steps, then I had to --

4              THE COURT:  Use the microphone.

5              THE WITNESS:  -- then I had to determine how much is

6    spent in each quarter.  Twenty-five across the top means that

7    spending is equal across each quarter, that if we had a

8    million-dollar project, you'd spend $250,000 in each quarter.

9         The model, though, is flexible enough that if you hit

10   another spending pattern that would be easier to do -- and I

11   believe that's what was showing on the second page that you

12   gave me --

13   BY MR. TEANEY:

14   Q.   Yeah, okay.  But if we could compare those really

15   quickly, I guess that since these are percentages, the sum of

16   the four quarters should be one.

17   A.   Yes, that's right.  The sum across of those four numbers

18   should equal one or one hundred percent.

19   Q.   And so in the case of the first page that we were

20   discussing, the .25 times four obviously is one.  What do we

21   have here on the second page?

22   A.   What you have on the second page is a plan of spending in

23   which in the first quarter you just do 15 percent of the work,

24   through the two middle quarters you do 70 percent of the

25   work -- first, 30 percent, then you build up to 40 percent --

Kavanaugh - Direct

1    and then you have some wind-down of 15 percent in the fourth

2    quarter.  So it's not equal, but it's more of a lump, more

3    rounded.

4    Q.    And so your model is flexible in that you can assign

5    different percentages to each quarter.

6    A.    That's right.  If you can come to an agreement among the

7    engineers and others about the pattern of spending, you can

8    take that into account.

9    Q.    In your -- let me take a step back and ask you a couple

10   of questions about how you've calculated it, how you come

11   about calculating economic benefits in other circumstances.

12        Do you often work with engineers and rely on their

13   statements about -- in your creation of these models?

14   A.    Yes.  Yes.  Natural resource and applying economics to

15   environmental matters requires you to read some engineering

16   documents and obtain -- be a little bit conversant, that

17   environmental statutes in the United States are -- a lot of

18   them are based on engineering and engineering feasibility, and

19   you need to be able to communicate with an engineer to do the

20   work.

21   Q.    So in forming your expert opinions --

22   A.    Yes.

23   Q.    -- you often rely on statements from engineers?

24   A.    Yes.

25   Q.    Okay.  Now, let me ask you, where did you -- why did you

Kavanaugh - Direct

1    input .15, .3, .4, and .15 --

2              THE REPORTER:  I'm sorry.

3              MR. TEANEY:  I apologize.

4              THE REPORTER:  Start over again, a little bit

5    slower.

6    BY MR. TEANEY:

7    Q.   I'd be happy to.  Why did you input here on the second

8    page .15 in the first quarter, .3 in the second quarter, .4 in

9    the third quarter, and .15 in the fourth?

10   A.   I had a conversation with Dr. Koon about what his

11   experience was, how spending in environmental projects go,

12   whether -- I was at the point in building this model that if I

13   divided it up into quarters, but then how did I divide the

14   spending up.  I divided the time up, but now I needed to

15   divide the money up.  And so I was asking Dr. Koon about that.

16   And at the end of the conversation with him, something that

17   looked more like a lump than like a line was appropriate.  And

18   that's where the 15, 30, 40, 15 came from.

19   Q.   Okay.  Thank you very much.  Working down to the next

20   input line -- I'm sorry.  That first one is called pattern and

21   milestones; is that right?

22   A.   Right.  That sets out the pattern of spending and the

23   milestone amounts of money that you would anticipate spending.

24   Q.   Okay.  And so the next line here, we have ordered amount.

25   And in the examples that we have before us and that the Court

Kavanaugh - Direct

1    has before it, there's a million dollars in there.

2    A.    Right.

3    Q.    Why did you put a million dollars in there?

4    A.    It's because I didn't know what other number to put in

5    there.  There was disagreements, varying opinions.  There were

6    varying opinions about what it was going to take to fix the

7    problem, and I didn't know, and I became convinced that I

8    would not know.  So in order to make it more useable, I tried

9    to take a number that was easily scaled, and one million

10   seemed to be an easily scaled number.

11   Q.    So you could take the product that a million tells you

12   and multiply that by the number of million dollars that is

13   ultimately ordered to calculate the fine?

14   A.    Yes.

15   Q.    Okay.  And when you said there were varying opinions on

16   the cost, whose -- what varying opinions are you talking

17   about?

18   A.    I read through different engineering reports produced by

19   CH2M Hill.  There was one from a firm out in the Bay Area.

20   There were different technologies, ABMet, DSL, ZVI.  I just --

21   not an engineer, didn't want to go that far, didn't think I

22   was going to get an answer to the number that would be agreed

23   upon, and so I used the million.

24   Q.    And so the varying opinions, then, were in the record in

25   this matter that you've been provided?

Kavanaugh - Direct

1    A.    Yes.

2    Q.    Okay.  Thank you.  Okay.  So we've got the ordered

3    amount.  And for ease of calculation, now that we understand

4    what the numbers on the top row meant, let's look at the one

5    that does it in quarters, just because it'd be easier to talk

6    about, because these columns are all the same.  Because you've

7    got a million dollars, in the first quarter they're expected

8    to spend $250,000?

9    A.    That's correct.

10   Q.    Okay.  And the same throughout, since this is a level

11   pattern of spending.

12   A.    Yes.

13   Q.    Okay.  Now, the next line down, under ordered amount, is

14   credit for effort.

15   A.    Correct.

16   Q.    What do you mean by credit for effort?

17   A.    That is the amount of money that you think the

18   defendant's actions are worth in executing the project.  If

19   the project's first quarter you expected to see plans and some

20   grading and $125,000 for plans and $125,000 for grading and at

21   the end of the first quarter, as your milestone came up, you

22   found out what they did and they only had the plans, so you

23   give him $125,000 for their plans but no effort for grading.

24   So you give him $125,000 credit, but that would be it.

25         If they had neither plans nor grading, it would be zero.

Kavanaugh - Direct

1    And if they had both, you'd put in 250,000.

2    Q.    So it measures the level of effort that --

3    A.    Yes.

4    Q.    -- the defendant expended during the time period?

5    A.    Yes.

6    Q.    Now, is this model -- this version of the model as it was

7    run, was there a zero credit for effort given?

8    A.    Yes.

9    Q.    Okay.  And that was to show how the fine increases across

10   the time period?

11   A.    Yes.

12   Q.    Okay.  If the fine were purged -- or let's say they did

13   the plans and the grading, using your example, what happens to

14   the fine?

15   A.    It's purged.

16   Q.    And so it goes to zero?

17   A.    It goes to zero.

18   Q.    Okay.  All right.  Let's go back to the scenario where,

19   you know, this particular polluter went to Florida or

20   something and didn't do anything in the first quarter.  We go

21   down to the number of days delayed.  We understand that that

22   is the 25 percent of the total days.  And then we've got this

23   rate.

24   A.    Right.

25   Q.    And what is this rate?

Kavanaugh - Direct

1    A.   Okay.  That is -- we start with the opportunity cost rate

2    of 13 percent.  That is the rate for a year.  Our quarter in

3    this instance is only 225 days.  So it's only a part of the

4    year.  So it's 225 divided by 360 times the opportunity cost

5    rate, and that tells you that the opportunity cost rate for

6    this quarter of the project is 8.1 percent.

7    Q.   Understood.  If the project, instead of 900 days, were,

8    say, 800 days, would the rate calculated per quarter change?

9    A.   Yes.  It would decrease.

10   Q.   Would it change significantly?

11   A.   Not a lot, no.  It would go from a 225 day rate to a 200

12   day rate in your example.

13   Q.   Okay.  All right.  So then the next line is the

14   incremental fine.  What is that and how does your model

15   determine that?

16   A.   Okay.  The model determines that -- that's determined by

17   taking the 8.1 percent and multiplying it by the amount of

18   money that was delayed, which in this example was $250,000.

19   And that's the maximum fine for that quarter of the project.

20   And that comes out to be 20,313 in the example.

21   Q.   And does the model tell you what that is on a daily rate

22   or the equivalent of a daily rate?

23   A.   Yes.  I also calculate that as a daily rate.  I found in

24   our discussions that people thought in terms of a daily rate.

25   I didn't see a daily rate being -- a fine being applied every

Kavanaugh - Direct

1    day, but I saw that there would be some period at the end of

2    that quarter, if the quarter had 225 days in it, then you

3    would pay a daily rate for those 225 days.  And people were

4    thinking in terms of that, so that's why I started to express

5    it as a daily rate.

6    Q.   And in this case, what is the daily rate, the effective

7    daily rate in the first quarter?

8    A.   At this stage I have just been making the calculation

9    without what I'm calling a margin of safety.  So without the

10   margin of safety, it's $90 a day.  That's for avoiding a

11   million-dollar -- that's a million-dollar project.  So if we

12   had a $100-million project, it would be 100 times 90, or a

13   $9000 day rate, but then the project would be so much bigger

14   than this 1 million.

15   Q.   Understood.  And just to be clear, this is only

16   calculating the economic benefit on delayed costs; is that

17   right?

18   A.   Yes, that's correct.  There's no avoided O&M involved in

19   this at all.

20   Q.   Understood.  Well, you mentioned a margin of safety.

21   What is the margin of safety here in your model?

22   A.   To this stage in my explanation of the model, this is

23   designed to make the company indifferent in financial terms,

24   indifferent between complying and paying the fine.  I wanted

25   to tip the balance and not make the company indifferent

Kavanaugh - Direct

1   between the fine or compliance, and so I added a 10 percent

2   charge to make it more financially attractive to comply rather

3   than pay the fine.

4   Q.   So the margin of safety is to motivate the company to

5   perform rather than treat it as a -- treat the fine as a cost

6   of doing business.

7   A.   Correct.

8   Q.   And you said you used 10 percent?

9   A.   Yes.

10  Q.   Okay.  And so looking here, you've got the equivalent

11  daily rate max of 90.  The bottom line says $99 per day.

12  That's the daily rate with the margin of safety, 10 percent.

13  A.   Correct.

14  Q.   Okay.  So that's how we walked through the first quarter.

15  And looking at the second quarter, these numbers are going up.

16  It looks like in this case they've gone up by 90 and change.

17  I'm looking at the daily rate.

18  A.   Yes.

19  Q.   Can you explain why they've gone up and what that means?

20  A.   Sure.  In this example that we have before us, there is

21  no credit for effort.  So at the end of the first quarter,

22  they paid a fine.  They have then moved on to the second

23  quarter where they are now having to spend not only the

24  250,000 that they failed to spend in the first quarter, but

25  they have to also be spending the money that they were

Kavanaugh - Direct

 1    supposed to be -- taking up the projects they were supposed to

 2    do in the second quarter.  So if you go from planned and

 3    grading to purchasing equipment, then that's what all has to

 4    happen in the second quarter.  They've got a lot of catch-up

 5    to do.

 6        And in this example, we have them not doing anything

 7    again.  So they owe for the first quarter.  The first quarter

 8    that they didn't do the first time was paid for, but they

 9    still have the first quarter to do, and now they have the

10    second quarter to do.  So the fine is roughly twice what it

11    was.  They're now 450 days behind.  They're now $500,000

12    behind.  So the fine is going to have to increase to reflect

13    that, and it does.

14  Q.   And so they have then -- you know, in the first quarter,

15    they would have enjoyed the economic benefit of 250,000.  Is

16    this another way of saying what you did?

17  A.   Yes, that would be another way of saying that.

18  Q.   And in the second quarter, they enjoy the economic

19    benefit of $500,000.

20  A.   That's right.

21  Q.   Okay.  Now, let's assume that they did everything they

22    were supposed to do in the first quarter.  If you were to

23    enter, you know, credit for effort, $250,000, if you entered

24    that in the first quarter, what effect would that have on the

25    fine in the second quarter?

Kavanaugh - Direct

1    A.   Well, that would make the fine on the second quarter
2    smaller.  If they did the first one, then quit, then their
3    fine would be looking more like the fine in the first quarter,
4    because they delayed the same amount of money for the same
5    amount of time.
6    Q.   Would it, in fact, be the same?
7    A.   It would be the same.
8    Q.   Okay.  All right.  I have tried to explain every -- or
9    work with you to have you explain every element here on the
10   model.  Let me ask you, have I overlooked anything?
11   A.   I don't think you have.  I think it's a tool.  I see it
12   as a tool for coming up with a way of making an incentive,
13   using fines as an incentive to achieve compliance.
14   Q.   In your opinion is this model so easy to use that even a
15   lawyer could do it?
16   A.   I have seen lawyers become very proficient with it.
17   Q.   Thank you.  I want to move on to another subject matter,
18   but I would -- let me go ahead and move on to another subject
19   matter.
20   A.   Okay.
21   Q.   And that has to do with financial assurance.  What do you
22   understand the concept of financial assurance to be?
23   A.   Financial assurances is a concept that it's part of the
24   environmental statutes certainly in Resource Conservation and
25   Recovery Act, certainly in Superfund.  It's when you require

Kavanaugh - Direct

1   financial assurances that an order or a task or an obligation

2   is fulfilled.

3       Some of the very early ones were building trust funds to

4   take care of liabilities at waste -- at solid waste sites so

5   that after the solid waste site is closed, there's still money

6   available to make sure that that waste doesn't leach into

7   groundwater.

8       The concept has grown now so that financial assurances

9   are found to accompany a number of different orders for relief

10  to make sure that it happens, the relief happens.  And there

11  are several ways to provide those, and they can be very

12  effective in seeing to that the work ordered is the work that

13  gets done.

14  Q.  Is a letter of credit one method of financial assurance

15  or one instrument?

16  A.  Yes.  Yes, it is.  It has several advantages.  It can

17  survive bankruptcy.  It is fairly easy to administer.  It can

18  be very low cost depending on the company's ability to provide

19  collateral.  It's a proven instrument.  So it has a number of

20  advantages.

21  Q.  Is an escrow account another method?

22  A.  An escrow account is another way.  Escrow may or may not

23  survive bankruptcy, it's more expensive but is -- all the

24  money is there immediately.

25  Q.  Would you ever pair the two in some way?

Kavanaugh - Direct

1    A.    You could pair the two.  You could require immediate

2    establishment of an escrow account, and you could then release

3    the funds from escrow when letters of credit equal to the

4    escrow are obtained.  So if there is some problem or delay in

5    obtaining letters of credit, an escrow account would do --

6    would fill that void, that delayed -- that administrative lag

7    in getting the letters of credit written.  During that period

8    of time when nothing was -- when the letters of credit had yet

9    to come in hand, you could have an escrow account.

10   Q.    And would that escrow account provide a motivation to the

11   party to obtain a letter of credit?

12   A.    I think that it would, because a letter of credit is less

13   expensive.  The opportunity costs of a letter of credit are

14   far -- of a given amount are far less than the equivalent cost

15   of an escrow account.

16       If I have a $10 million escrow account, I'm losing out on

17   $10 million.  If I have $10 million worth of letters of

18   credit, it's just the cost of the letter of credit, which is a

19   small fraction of its face value.  So it's financially

20   advantageous to have -- from the point of view of the

21   defendant to have letters of credit as a substitute for an

22   escrow account.

23   Q.    Are there benefits to a plaintiff as well of a letter of

24   credit?

25   A.    Oh, the plaintiff is the one who is being assured here.

Kavanaugh - Direct

1   No more are you -- that the money -- the cost of the order

2   is -- becomes the face value of the letter of credit.  The

3   cost of the order becomes the amount of an escrow.  So the

4   plaintiffs then know that the funds are there to assure

5   completion of the order.  It's just not a paper victory, but

6   things will happen.  If they don't, then the money is

7   available to make them happen.

8   Q.   And did you say that a letter of credit will survive

9   bankruptcy?

10  A.   Yes.  They are typically written with a clause in them

11  that says the letter will be honored in the event of a bank

12  bankruptcy and/or the event of an insolvency proceeding, and

13  they are not affected by the automatic stay.  So you get the

14  bank to agree to pay to the beneficiary of the letter of

15  credit, which in this case I would imagine would be the Court,

16  the sum, regardless of whether the company, Patriot, is in

17  financial distress.  So the bank is taking on that obligation

18  to go get the money from Patriot.

19      The bank provides the funds to carry out the order.  The

20  bank then has to go back to Patriot and secure its collateral

21  or secure its loan from Patriot.  So the plaintiffs are out of

22  this, out of that transaction.

23  Q.   And if I understand what you're saying, there are

24  advantages to a letter of credit to both defendants and

25  plaintiffs in that case.

Kavanaugh - Direct

1    A.   Oh, yes, yes.  The advantage to the defendant is, is that

2    it doesn't have to put up the whole amount in escrow.  It has

3    to only put up a small fee to have a letter of credit.  And

4    the plaintiffs, they have the advantage of having it escrowed

5    with the letter of credit because it's negotiable, because

6    it's a negotiable instrument, not that -- it's easily turned

7    into cash, easily turned.  And then that cash can be used to

8    do the plan and the grading and buying the equipment and

9    operate it.

10   Q.   Do letters of credit have a face value?

11   A.   Yes, it does.

12   Q.   And if someone were to go and try to cash or negotiate, I

13   guess would be the correct term, the instrument, do they have

14   to get the full face value?

15   A.   They don't have to.  They may take partial draws.  That

16   is often another part of the letter of credit, that partial

17   draws are allowed.

18   Q.   And so in this case if, say, half the facility were

19   constructed, the second half remained, the letter of credit,

20   even though on its face would be for the full amount, you

21   could draw only the remainder that's necessary to complete the

22   project?

23   A.   Absolutely, yes.

24   Q.   Okay.  Pardon me.  Do you have an opinion as to what the

25   appropriate method for a financial assurance in this case

Kavanaugh - Direct

1   might be?

2   A.   Well, I'm very much in favor of letters of credit.  I

3   think that starting out with an escrow account might be the

4   best way to go to hasten the securing of the letters of

5   credit.  That would be my -- my opinion is that you should

6   establish an escrow account immediately upon the order and

7   then release the money from escrow as letters of credit are

8   obtained.

9        If you add, talking numbers here, $100 million worth of

10  work that seems to be required by the order, so you'd have to

11  escrow $100 million.  Then as you got a first letter of credit

12  for 25 million, you could release $25 million.  And a second

13  letter of credit with another bank comes in for $50 million,

14  you can release another $50 million.  And when the third

15  letter of credit comes in for the remaining 25, then you

16  release that from escrow.

17       And so now in this example, you have three letters of

18  credit that in combination cover the cost of the order and

19  will remain in effect until the project is done.

20  Q.   Do you have an opinion about whether or not a financial

21  assurance of some kind is necessary in this case?

22  A.   From what I've read, yes.  I think there should be

23  financial assurances in this.  It's a contempt proceeding, and

24  that means to me that the first --

25            MR. GARDNER:  Your Honor, I'm going to object to

Kavanaugh - Direct

1    this because I think the witness, who has been qualified as an

2    expert in economic matters, is now testifying about legal

3    conclusions.

4              THE COURT:  Well, overruled.

5              MR. TEANEY:  Thank you, Your Honor.

6              THE WITNESS:  I think your first instrument of a

7    written consent decree didn't work.  And I don't think that

8    another -- I think you need something stronger, because the

9    first one didn't work.  And the next thing to me would be

10   financial assurances.  And when I get to financial assurances,

11   the most immediate is an escrow, and I think a more durable

12   and less expensive way to go are letters of credit.

13   BY MR. TEANEY:

14   Q.   Thank you.  I just have one final question.  Is there

15   anything else about letters of credit or financial assurances

16   that you think we need to understand?

17   A.   No, I don't think so.  I don't think so.

18   Q.   Okay.  Thank you.  I have one final topic to address, and

19   I have an exhibit I would like to use for that.

20        May I approach, Your Honor?

21             THE COURT:  You may.

22             MR. TEANEY:  A copy for the Court.  I would actually

23   like to use this exhibit in tandem with Plaintiff's Exhibit

24   60.  May I approach the witness to provide him a copy?

25             THE COURT:  Yes, you may.

Kavanaugh - Direct

1        MR. TEANEY:   Thank you.

2   BY MR. TEANEY:

3   Q.   Dr. Kavanaugh, do you recognize the spreadsheet that has

4   been marked as Plaintiff's Exhibit 69?

5   A.   Yes, I do.

6   Q.   Did you prepare this spreadsheet?

7   A.   I prepared part of the spreadsheet and checked the part

8   that I did not prepare against the Potesta July 2009 document.

9   Q.   What do these numbers in this spreadsheet indicate?

10  Where are they from?

11  A.   They are from the Potesta document dated July 2009, and

12  they are from Bates pages ending 057 to 065.   The Potesta

13  document that we received was difficult to read in the form in

14  which we received it, and so the spreadsheet was created from

15  the hard-to-read document.

16  Q.   And you have verified that these numbers are --

17  A.   They were transposed correctly.

18  Q.   Okay.   And what is your understanding of what these

19  numbers represent?

20  A.   They represent spending at Apogee Outfalls 1, 2, and 3

21  through time and projected spending at Apogee Outfalls 1, 2,

22  and 3, the environmental selenium compliance spending at

23  Apogee Outfalls 1, 2, and 3.

24  Q.   Looking at the Potesta document and this spreadsheet,

25  were you able to draw a conclusion as to what amount of money

Kavanaugh - Direct

1   Apogee or Patriot projected to spend on Outfalls 1, 2, and 3

2   for installed capital?

3   A.   Yes.  The outfall installations were listed in columns

4   for each outfall against each date, and at Apogee Potesta made

5   an estimate of what the total capital plus operating costs

6   would be and what total installed capital would be.  And

7   Potesta estimated that it would be about $1.3 million for all

8   three outfalls.

9   Q.   So they estimated that they were going to spend

10  $1.3 million for total installed capital --

11  A.   Yes.

12  Q.   -- for those three outfalls?

13  A.   Yes.

14  Q.   Do you know what time period those dollars --

15  A.   Yes.  Yes.  They were spent over a time period August the

16  8th to -- excuse me -- was spent over a time period of August

17  2008 until the year 2038.  Most of the capital, however, would

18  have been spent between September 2008 and the second quarter

19  of 2010.

20  Q.   And what years -- I don't know if I'm asking this

21  question correctly because I'm not good at economics or

22  finance, but what year's dollars are these numbers in?

23  A.   Well, they're in a variety of year dollars.

24  Q.   Okay.

25  A.   A better way to express the total installed capital would

Kavanaugh - Direct

1  be to convert these dollars all to a common denominator and

2  then express it as in terms of that common denominator.  They

3  didn't do that, and -- but because the time between

4  September 8 and 2010 is shored, the failure to do that for

5  installed capital doesn't make a big difference.  And to

6  demonstrate that, I went and made a calculation that put them

7  all in a common denominator so that comparisons would be more

8  apples to apples instead of apples to -- instead of fruit,

9  more apples to apples.

10  Q.   What was the common denominator that you worked these

11  numbers out to?

12  A.   I did it in terms of July 2009.

13  Q.   And why did you select that date?

14  A.   Well, that was really, if I remember right, the date of

15  the Potesta report.

16  Q.   And the 1. -- roughly 1.3 or just shy of 1.3 is in 2009

17  dollars?

18  A.   Yes.  So it's not a big difference between what they were

19  doing, and so that shouldn't be -- my interpretation of the

20  document would be that for installed capital and rounding up a

21  little, 1.3 million is a good present value common dollar

22  estimate of the installed capital that Potesta made for the

23  three outfalls at Apogee.

24  Q.   And have you converted that to 2010 dollars?

25  A.   I don't have that.  I think I have made that calculation,

Kavanaugh - Direct

1    but I don't --

2    Q.    Let me direct you to page 3 of the --

3    A.    I have just found it.  I have it's a little over

4    $1.3 million; 1.33.  It is on the last page of the exhibit.

5    Q.    And to confirm, that's the 2010 dollar value for the

6    total installed capital at Apogee?

7    A.    Yes.

8    Q.    Based on the Potesta document?

9    A.    Yes.

10            MR. TEANEY:  Thank you.  If I could have just a

11   moment to confer with co-counsel.

12      At this time plaintiffs would move for the admission of

13   the exhibits we've used, which I believe included the resume,

14   the copies of the model, and then the last spreadsheet we were

15   just discussing.

16            THE COURT:  All right.  Any objection?

17            MR. GARDNER:  No objection, Your Honor.

18            THE COURT:  They're admitted.

19            MR. TEANEY:  Thank you, Your Honor.  No further

20   questions.

21            THE COURT:  Before you conclude, I'm curious.

22            MR. TEANEY:  Okay.

23            THE COURT:  I don't quite understand what's in the

24   far right columns here.

25            THE WITNESS:  Those are my calculations.  I made

Kavanaugh - Direct

1    some calculations based on -- after we constructed this

2    spreadsheet, I just went up into the right-hand corner and

3    just made some calculations based on what I saw and to put

4    them in a common denominator.

5              THE COURT:  Well, what are these calculations?

6              THE WITNESS:  Oh, they are my calculations of the

7    present value in July '09 dollars of the total installed

8    capital at Apogee.

9              THE COURT:  All right.  Okay.

10   BY MR. TEANEY:

11   Q.   And just to make sure I understand, we've got here in the

12   right 209,533; 235,450; and then 813,410.  Is that 813,410 the

13   sum of --

14   A.   Yes, it is.

15   Q.   -- what Potesta had as Outfalls 2 and 3?

16   A.   Yes, Outfalls 2 and 3 in the first half of 2010.

17   Q.   Okay.  So that's where the eight thirteen came from.

18   A.   Yes.

19             MR. TEANEY:  Okay.  Thank you.  No further

20   questions.

21             THE COURT:  All right.  Mr. Gardner?

22                      CROSS EXAMINATION

23   BY MR. GARDNER:

24   Q.   Dr. Kavanaugh, good morning.

25   A.   Good morning.

Kavanaugh - Cross

1    Q.   My name is Blair Gardner.  We've spoken before on the

2    telephone at your deposition.

3    A.   Yes.  Thank you for staying late and accommodating the

4    time difference for me.

5    Q.   Well, actually, sir, I think it was more the latter.  I

6    think you were accommodating us because you were up quite

7    early for that, but welcome to West Virginia.

8         Your testimony by and large has been, I think, clear and

9    consistent between today and your deposition.  I would like to

10   ask a few clarifying questions starting with the -- you've

11   referenced a Duff & Phelps report that you said you have

12   reviewed and which has previously been offered into evidence

13   in this court.

14        I believe you testified that you took your weighted

15   average cost of capital from that Duff & Phelps report.

16   A.   Yes, sir.

17   Q.   Which you say you've estimated at 13 percent.

18   A.   Yes.

19   Q.   You found that Duff & Phelps calculation credible, and

20   you've used it for preparing your opinions in this case; is

21   that correct?

22   A.   Yes.

23   Q.   Moving on to the model that you have described today, I

24   think you're clear, and I understand it today as I understood

25   it at the time of your deposition, the various components of

Kavanaugh - Cross

1    the model assuming expenditures over quarters, however those

2    quarters end up being estimated or calculated, whether it's

3    two years or three years or something in between, different

4    percentages that are expended in each of those quarters, and

5    then using the capital that must be expended for the entire

6    project, estimating fluctuations in the expenditure of capital

7    over time.

8        Here's my question, though.  Let's start with the concept

9    of delay.  Now, in your model and your explanation this

10   morning, in your direct examination, you use the example of

11   the responsible officials of the company going to Florida or

12   Hawaii, if you prefer, sir, for the period of time and thus

13   doing nothing, expending no effort, and you calculate your

14   penalty.

15       I'm going to ask a hypothetical, and help me work through

16   this as to how it would work in your model.  Let's assume that

17   the company at whatever relevant point in the project is

18   prepared to move, it's got the capital allocated, it's got the

19   personnel prepared to do the work, wants to spend the capital,

20   is willing to spend the capital, but there is an approval that

21   must be given by a relevant government agency.  The documents

22   are before the agency, all of the information that the company

23   can supply is there, and the agency isn't making a decision.

24   There's a delay and the company cannot do what it needs to do

25   in the absence of a decision.  How does that get factored into

Kavanaugh - Cross

1    your model?

2    A.    That would be factored in by the credit for effort, that

3    the -- I think that the institution that's responsible for

4    levying the fine would have to make a determination about how

5    much credit for effort.  If you've done all you could and it's

6    beyond your control and I was advising that person, I might

7    very well say that they fulfilled everything that they had to

8    do and give -- if the only impediment is something that's

9    beyond their control, that seems to me to be satisfactory

10   effort.

11        To give you an example, I was working on a project in

12   New Orleans involving the sewer system, and we hammered out a

13   consent decree that set out schedules and what they had to do,

14   and Hurricane Katrina came through.  Well, that whole

15   schedule, that's all gone away.  These things happen.

16        So in your example, I would use the flexibility of the

17   model that says that if it was agreed upon that it was beyond

18   your control, that would give you credit for that, for that

19   effort.

20   Q.    Dr. Kavanaugh, in your testimony this morning, do you

21   believe that that credit for effort is implicit or might it

22   need some additional description or fleshing out if something

23   like this were adopted?

24   A.    Well, I think that a process around it that you could

25   make an argument about how much credit you should receive and

                          Kavanaugh - Cross

1    that the plaintiff might make an argument about how much

2    credit you should receive and someone would have to determine

3    it.  You may be able to come to that conclusion among

4    yourselves.  That would be, I would think, preferable, but

5    ultimately I think the -- it should be structured so that

6    someone can make a final determination.

7    Q.   So there's nothing in your model that prohibits, for

8    example, the parties agreeing or the Court requiring that

9    periodically the parties have an opportunity to come back to

10   the Court or to someone that the Court might appoint to

11   basically be an umpire --

12   A.   Yes.

13   Q.   -- to resolve --

14   A.   A special master, if you will, yes.

15   Q.   Another question about the model.  It assumes -- and I

16   think I understand for purposes of economic models that

17   certain assumptions have to be employed in order to construct

18   the model.  But it does assume that at the outset of the

19   model, that, in fact, the costs of the project are known; is

20   that correct?

21   A.   You have some idea, yes.  Dr. Koon was testifying

22   yesterday there are these uncertainties and there are some

23   risks involved.  We have estimates of what's required.  I

24   could see the model being recalibrated as that new information

25   comes in to being.

Kavanaugh - Cross

1    Q.   Well, that was my question.   That was what I was moving

2    toward.   You testified, I believe, that you have read various

3    reports prepared by CH2M Hill; is that correct?

4    A.   I have read some of those.

5    Q.   Did you notice in the reports that those estimates of the

6    cost that they provided were what they described as a Class 5

7    estimate?

8    A.   I noticed that.

9    Q.   And do you recall what the range was and what they called

10   a Class 5 estimate?

11   A.   I did.   I don't recall it at this moment, but it was what

12   I thought a fairly wide range.

13   Q.   So if something were ordered by the Court based on that

14   estimate, would your model -- could your model accommodate a

15   refinement of that so, for example, once an engineering plan

16   was done and a more precise cost estimated, that the penalty

17   calculation that you have provided here likewise could be

18   recalibrated?

19   A.   Yes.

20   Q.   Let me go to another feature of your model, and it was

21   one that you touched on just briefly today but we discussed a

22   bit more at length I think in your deposition, and that's what

23   you call the margin of safety.

24   A.   Yes.

25   Q.   Can you explain again what that is intended to do?

Kavanaugh - Cross

1    A.    That the model -- in the construction of a model up to

2    that point, I have been looking for a point of indifference

3    between paying the fine and executing the plan.  I don't want

4    indifference.  I want to tip the scale in favor of compliance

5    with the order and not using the fine as a cost of business.

6    So that margin, that extra 10 percent is an attempt by me to

7    tip the scale in favor of compliance and away from pay the

8    fine and move on.

9    Q.    And you chose 10 percent, didn't you, sir?

10   A.    Yes, I did.

11   Q.    And that was an arbitrary number that you applied.

12   A.    Yes, it was.  I would think that if it wasn't working,

13   you could increase it.

14   Q.    Likewise, if the company came forward with something very

15   quickly, it could be decreased as well, could it not?

16   A.    I -- well, you would be getting credit for effort, so it

17   wouldn't be if -- the margin for safety kicks in and is really

18   binding only when there has been a shortfall in the execution

19   of the order.  So I would be more reluctant to reduce it than

20   I would be to increase it.

21   Q.    Nevertheless, sir, it was an arbitrary number that you --

22   A.    Yes, it was.

23   Q.    Let's move now to this other aspect of what you -- well,

24   first of all, let me be clear, and I think you were, but I

25   just want to confirm it one more time.  This model is intended

Kavanaugh - Cross

1   to be -- to act in a purely prospective way; is that correct?

2   A.   That's correct.

3   Q.   You're not testifying today about any economic benefit

4   that anyone could assume has been received by Patriot Coal; is

5   that right?

6   A.   That's correct.

7   Q.   In fact, in your deposition do I recall you saying that

8   you were not going to offer any opinion about that, about any

9   economic benefit?

10  A.   Right, as economic benefit is understood as being a

11  component of a civil penalty policy.

12  Q.   Understood.  Let's move on to the questions about

13  financial assurance.  You've expressed a favor for what you

14  call a financial assurance mechanism that you've described as

15  possibly being an escrow account or a letter of credit.  You

16  prefer the letter of credit I think because you think it's

17  somewhat easy to administer, you believe it has a cost that is

18  less than just a full escrow account and because it survives

19  bankruptcy.  Is that a fair summary?

20  A.   Yes, it is.

21  Q.   Were you here in the courtroom this morning when

22  Mr. Schroeder testified?

23  A.   Yes.

24  Q.   You certainly understand the concept of liquidity, don't

25  you?

Kavanaugh - Cross

1   A.   Yes, I do.

2   Q.   Do you understand, I mean at this time, based on the

3   information that you've read about Patriot and its financial

4   disclosures and the testimony you've heard, what the cost of a

5   letter of credit would be to the company?

6   A.   I don't have any quote.  My understanding is that the

7   cost of a letter of credit is negotiated between the issuer,

8   the bank, and in this case Patriot, that they would come to an

9   agreement about what that is.  My understanding and experience

10  has been that it's 1 percent or less of the face value.

11  Q.   Do you have any understanding, though, of how the

12  imposition of a letter of credit, especially in the full

13  amount of the total installed capital cost for a project,

14  whatever that might be, would have on the company's liquidity?

15  A.   Well, Mr. Schroeder was describing some covenants.  I am

16  not familiar with those covenants, so I can't speak to that.

17  I would say that a letter of credit would leave the company

18  more liquid relative to the position that an escrow account

19  would leave the company.

20  Q.   I understand, but, for example, if the total installed

21  capital cost for the project were $1 million -- and to use

22  your hypothetical, the cost of that was merely 1 percent --

23  that would be --

24  A.   A hundred.

25  Q.   -- a hundred dollars.  If, in fact, there's an effect on

Kavanaugh - Cross

1    liquidity and the impossibility, then, of the company to use

2    that liquidity for other costs that occur in its business,

3    that's going to be more than $100, isn't it, Dr. Kavanaugh?

4    A.   Well, any -- maybe I should -- I think the arithmetic

5    would bear you out on that.   Any financial assurance will have

6    an effect on liquidity.   It's not possible to give a financial

7    assurance to a third party and not have your liquidity

8    affected.

9         It seems to me that the liquidity is not the best

10   measure, because you want to know -- you had an opportunity --

11   you want to know -- you're giving the order a higher priority

12   in this situation.   You want the fulfillment of the order to

13   have a higher priority than the maintenance of a particular

14   level of liquidity.   To make sure that the order occurs, you

15   need financial assurances.   Necessarily that means liquidity

16   will go down.

17        I will -- you know, I will agree with you on that.   I

18   think further, though, that of the assurance instruments, the

19   one that will affect liquidity the least will be the letter of

20   credit.

21   Q.   Do you think a letter of credit would affect liquidity

22   more or less than a surety bond?

23   A.   I don't think a surety bond is an effective financial

24   assurance.

25   Q.   Well, that isn't really what I asked.   Would a letter of

Kavanaugh - Cross

1    credit affect liquidity more or less than a surety bond?

2    A.    A surety bond would affect liquidity less than a letter

3    of credit --

4    Q.    All right.  Let --

5    A.    -- unless its premium were much higher than what I would

6    anticipate it to be.

7    Q.    So your estimation, then, is really based upon your

8    experience and judgment about a letter of credit, but you

9    really don't know in this particular instance how posting a

10   letter of credit in an amount equal to the total capital

11   installed cost might affect the company's liquidity.

12   A.    Well, I don't think anyone knows that in advance.  I saw

13   your chief financial officer basically testify the

14   calculations -- the chain calculations that he would have to

15   go through I think were at a stage of just doing ranking

16   rather than being able to be precise about the change in

17   liquidity.

18   Q.    Finally, have you ever heard of instruments called

19   liquidity letters, in other words, a report by a company to

20   another party about the changes in liquidity on some periodic

21   basis?

22   A.    I'm not familiar with that.

23   Q.    Basically what you're looking for in a financial

24   assurance mechanism, are you not, is simply some verification

25   that the company will proceed with the project that the

Kavanaugh - Cross

```
 1   parties or the Court might impose?  Is that correct?
 2   A.   No, what I'm looking for in financial assurance is the
 3   purchasing power to carry out the order if the company isn't
 4   carrying out the order.  So I don't -- I want a negotiable
 5   instrument.  I want to be able to go to a bank and get funds
 6   to purchase tanks and electricity and labor and materials to
 7   carry out the order.
 8   Q.   But in the example that you gave -- and perhaps I didn't
 9   understand it as I was listening to your testimony.  If the
10   company were to provide the financial assurance mechanism that
11   you seek, in addition to having to expend the funds over
12   whatever period is eventually ordered by the Court, is the
13   company -- if the company posts a letter of credit or other
14   mechanism at the inception of the project, as the capital is
15   being expended is there not more financial assurance as the
16   project proceeds than is needed to complete the project?
17   A.   Yes.  And you could then adjust the letters of credit.
18   If you had more than one letter of credit, then -- let's
19   say -- I believe the example I had was where you had three
20   letters of credit totaling a hundred million dollars, one for
21   fifty and two for twenty-five.  And as the project proceeded,
22   you might not need one of those letters and you could cancel
23   that letter of credit and just have seventy-five.  And as the
24   project proceeded, you could cancel a second letter of credit
25   and just have fifty.  And as the project proceeded, you could
```

Kavanaugh - Cross

1   replace the $50 million letter of credit with a $25 million

2   letter of credit.

3       You just need to have a letter of credit in place that

4   will pay for the resources that are needed to complete the

5   project.

6   Q.   And assuming the project is ongoing on whatever agreed

7   schedule, that should diminish over time.

8   A.   Yes.

9   Q.   Okay.  And, again, sir, in proposing what you have today,

10  it has been purely for that objective and not to impose any

11  sort of economic penalty on the company; is that correct?

12  A.   That's correct.

13  Q.   All right.  One -- I think one final question.  In the

14  previous cases that you discussed with Mr. Teaney in your

15  previous expert testimony, you described a case, *Friends of*

16  *the Earth v. Laidlaw*.

17  A.   Yes.

18  Q.   And it began in the District Court of South Carolina and

19  then proceeded through the Fourth Circuit.  Did you present an

20  economic benefit calculation in that case?

21  A.   Yes, I did.

22  Q.   Was that subsequently upheld?

23  A.   Yes.

24          MR. GARDNER:  Thank you.

25          THE COURT:  All right.  Any redirect?

Kavanaugh - Redirect

1        MR. TEANEY:  Briefly, Your Honor, and I think I can

2    finish it pretty quickly.

3        THE COURT:  Hold on just a minute.  My court

4    reporter needs to change paper.

5        MR. TEANEY:  Certainly.

6                    REDIRECT EXAMINATION

7    BY MR. TEANEY:

8    Q.   Dr. Kavanaugh, Mr. Gardner used a hypothetical with you

9    where a permitting authority delay interrupted the schedule.

10   Based on that hypothetical couldn't you also, as one way to

11   deal with that unforeseen delay from an external source,

12   extend the time period rather than purging the fine?

13   A.   That would -- that would be -- that would have

14   consequences throughout, but, yes, you would -- you would --

15   you could do that.  Instead of -- instead of having a

16   project -- all right.  Let me try it this way.

17        Instead of having a project that was to last 900 days, if

18   there was an unforeseen permitting problem that cost you 100

19   days, you could recalibrate the model for a 1000-day project

20   and spread it out that way, or maybe it cost you more.  I mean

21   you would have to come to some conclusion about the length of

22   the time that that permitting delay caused.  If you could do

23   that, then you could extend the project.

24        The other alternative was the answer I gave to

25   Mr. Gardner, which was then you could adjust the amount of

Kavanaugh - Redirect

1    credit you gave for their effort, but that is another variable

2    that you could touch, which would be the length of time for

3    the whole project.

4    Q.    Could you adjust that length of time such that its effect

5    was only on that particular quarter?

6    A.    No, I don't think that -- I don't know.  I don't think

7    so, because there's this linkage among quarters.

8    Q.    Uh-huh.

9    A.    So I think you would have to go in -- you're coming up

10   against a rigidity in the model.  I, in constructing and

11   designing, did not take into account variable length

12   milestones.  There's always a set time and an amount of money

13   that is spent between each of those quarters, and now you're

14   asking for a flexibility that I did not consider.  This is not

15   the time to do that.

16   Q.    Right.

17   A.    And it may be possible to make that modification, but I

18   can't -- I can't answer that question from here right now.

19   Q.    Fair enough.  At the outset what level of confidence do

20   you need in the cost to plug the cost in at the outset of the

21   order?

22   A.    I don't know that that is -- I mean I don't know what

23   that is.

24   Q.    Could you reevaluate the cost at each quarter --

25   A.    You could.

Kavanaugh - Redirect

1    Q.    -- as the cost is known at that time?

2    A.    Yes.

3    Q.    Okay.  With regard to the margin of safety, that

4    10 percent, I believe the word arbitrary was used to describe

5    it, but in reality that 10 percent does have a relationship

6    with the weighted average cost of capital, doesn't it?

7    A.    Yes, it does.  You could take that and increase the

8    weighted average cost of capital to reflect -- that would be

9    another way to build the margin of safety into the model.  I

10   did not go in that because I wanted to show that the

11   opportunity cost that I was using was -- I wanted to show its

12   pedigree.  I wanted to show where it came from and how it was

13   and all that.  I didn't want to then go in and start adjusting

14   it.  So I kept that adjustment separate so that it was

15   transparent.

16   Q.    So it's not entirely arbitrary, then.  It's for the sake

17   of transparency.  It could --

18   A.    Well, I -- yes, I brought it out to make it transparent.

19   Whether the amount is 10 percent, 20 percent, 30 percent, that

20   was not a number that I came to after a deliberate

21   consideration of facts or literature.  It was 10 percent.

22   Q.    In your opinion would any margin of safety less than

23   10 percent have this sufficient coercive effect?

24   A.    I don't think so, because I did run one experiment where

25   I said what if -- if I would have taken the alternative method

Kavanaugh - Redirect

1    and built in and made the margin of safety less transparent by

2    burying it in the opportunity cost, what would that

3    opportunity cost rate have been?  And for the model runs that

4    I did, it brought about an increase in the opportunity cost

5    from 13 to 14 percent.  So 10 percent made a small change in

6    the opportunity cost.

7    Q.   Do I recall that 14 percent also turns out to be the

8    equity cost of capital?

9    A.   You are correct.

10   Q.   With regard to financial assurance, Mr. Gardner asked you

11   about surety bonds, and I think you started to express an

12   opinion that a surety bond wouldn't work here.

13        In your opinion what are the problems that a surety bond

14   would pose in this situation?

15   A.   Well, a surety bond brings another party in to argue

16   about the type of controls and how the order should be

17   fulfilled, and it is not very protective of the plaintiff.

18   You've basically substituted an insurance adjustor's opinion

19   about what should occur for the Court's opinion about what

20   should occur.  And surety bonds often aren't written over long

21   periods of time, but you might not need a long period of time

22   here.  And a surety bond is only going to be as good as the

23   insurance company that writes it, and I did an investigation

24   about 18 months ago and was very surprised about the number of

25   insurance failures.

Kavanaugh - Redirect/Recross

1        I'm uncomfortable with surety bonds for those reasons;

2    one, that you need a strong insurance company to write it, and

3    two, you have an opportunity for an insurance company to

4    dispute your conclusion that the order isn't being fulfilled.

5    Q.   Could the use of a surety bond then result in a

6    collateral attack on the order that the Court had issued from

7    the prospective insurance company?

8    A.   Yes.

9    Q.   So we could end up relitigating this again?

10   A.   I -- yes.  I don't like to ponder that, but yes.

11           MR. TEANEY:  Neither do I.  Thank you.  No further

12   questions.

13           THE COURT:  All right.  Recross?

14                      RECROSS EXAMINATION

15   BY MR. GARDNER:

16   Q.   Dr. Kavanaugh, just very briefly.  Permitting delays.

17   You've worked with a lot of government agencies over your

18   career, haven't you?

19   A.   I have had them as clients, yes.

20   Q.   Have you experienced delays in agencies making decisions

21   in various projects that you've been involved in?

22   A.   I have seen that occur.

23   Q.   Thank you.  Surety bonds.  Do you agree that many

24   construction projects use performance bonds in the -- to

25   guarantee performance of various aspects of construction

Kavanaugh - Recross

1    projects?

2    A.    Yes.

3    Q.    Are you -- do you agree that the U. S. Treasury

4    Department maintains a list of qualified sureties that the

5    federal government and its various agencies can turn to for

6    issuance of surety bonds?

7    A.    Yes.

8    Q.    So it's not an unknown use to guarantee performance; is

9    that correct?

10   A.    That's correct.

11   Q.    All right.  I think just one final question.  If the

12   issue of a letter of -- or the issuance of a letter of credit

13   as you have hypothesized in your testimony were actually to

14   make more difficult the actual construction and commissioning

15   of a project for purposes of achieving compliance, would you

16   agree that that actually then is increasing the cost for the

17   success of that project beyond which you've testified to

18   today?

19             MR. TEANEY:  I'm going to object.  This is beyond

20   the scope of the redirect.

21             THE COURT:  Overruled.

22             THE WITNESS:  Financial assurances or any financial

23   assurance, from escrow, through letter of credit, to surety

24   bond, is going to increase the cost of the project.

25   BY MR. GARDNER:

Kavanaugh - Recross

1    Q.    But you don't --

2    A.    But in return, you get the assurance that the project

3    will be completed.   You get -- I'm sorry.

4    Q.    But you don't want a mechanism that actually imperils the

5    execution of the project, do you?

6    A.    Well, do I want a mechanism -- no, I want a mechanism

7    that assures the completion.   No, I don't want a mechanism

8    that imperils it.   I want --

9    Q.    That's all I have.   Thank you very much.

10   A.    -- a mechanism that assures the completion of the

11   project.

12            THE COURT:   All right.   Any further questions?

13            MR. TEANEY:   No, Your Honor.

14            THE COURT:   If not, Doctor, you're excused.   Thank

15   you very much.

16            THE WITNESS:   Thank you.

17            THE COURT:   All right.   Does the plaintiff rest at

18   this point?

19            MR. TEANEY:   I expect that we do.   I am looking

20   around for my co-counsel, and I don't know where he is.   So he

21   may tell me differently, but I believe we rest.

22            THE COURT:   Well, we're going to go ahead and take

23   our recess now.   We're going to recess until 1:30.   I suggest

24   that the defendants have their witnesses ready.   I presume

25   this ends the plaintiff's case and we'll be ready to start

1   with the others.

2               MR. MCLUSKY:  Yes, Your Honor.

3               THE COURT:  We'll stand in recess until 1:30.

4          (Lunch recess from at 12:10 p.m. to 1:35 p.m.)

5                           AFTERNOON SESSION

6               THE COURT:  All right.  Are we ready to proceed?

7               MR. HURNEY:  Your Honor, if I might, before I start,

8   as a scheduling matter, I've got two witnesses to put on this

9   afternoon.  I had not told my other witness to come and

10  instead had planned for first thing in the morning.  What I

11  fear is I may run short on the Court this afternoon.  I wanted

12  to get some guidance on that.

13              THE COURT:  Well, I guess my only question is if you

14  don't have other witnesses until tomorrow, when do you expect

15  to finish your case?

16              MR. HURNEY:  I will finish my case tomorrow.

17              THE COURT:  Then that's fine.

18          All right.  I assume, then, plaintiffs do rest.

19              MR. LOVETT:  Yes, Your Honor.

20              THE COURT:  All right.  Go ahead, Mr. Hurney.

21              MR. HURNEY:  I'd forgotten that part, Your Honor.

22              THE COURT:  Well, they weren't quite sure when we

23  went to lunch.

24              MR. LOVETT:  I'm sorry, Your Honor.  I snuck out

25  early.  I apologize.

Harrison - Direct

1          MR. HURNEY:  Your Honor, at this time we call

2    Timothy Harrison.

3          THE COURT:  All right.  Mr. Harrison, if you'll step

4    right up here, my clerk will swear you in.

5          TIMOTHY HARRISON, DEFENDANT'S WITNESS, SWORN

6          MR. HURNEY:  Your Honor, may I approach?

7          THE COURT:  Yes, you may.

8                   DIRECT EXAMINATION

9    BY MR. HURNEY:

10   Q.   Would you state your name for the record, please.

11   A.   Timothy Harrison.

12   Q.   Where do you work?

13   A.   I work for CH2M Hill in Cincinnati, Ohio.

14   Q.   Okay.  And what is your position with CH2M Hill?

15   A.   I'm a senior project manager.

16   Q.   What is a senior projector manager?

17   A.   I'm the firm's lead for running projects that we deliver

18   for clients.  I have responsibility for things like budgets,

19   schedules, deliverables, quality, those kinds of things.

20   Q.   In general, what type of projects do you run?

21   A.   Environmental projects.  My main area of focus is

22   industrial wastewater, but I manage other types of

23   environmental projects as well.

24   Q.   I'd like to hand you Defendant's Exhibit Number 4.  Could

25   you look at that document for me, please.

Harrison - Direct

1   A.   Yes.

2   Q.   What is that?

3   A.   That's my resume.

4   Q.   All right.  Is it current or reasonably current?

5   A.   Reasonably current.

6   Q.   Okay.  Do you have a longer version of this?

7   A.   I do.

8   Q.   So this is the *Readers Digest* version of the Tim Harrison

9   resume?

10  A.   Yes.

11  Q.   All right, sir.  Would you tell me, just looking at this,

12  where did you get your undergraduate degree and in what

13  subject?

14  A.   Undergraduate was a BS in biology from George Mason

15  University.

16  Q.   And when did you graduate from George Mason?

17  A.   1987.

18  Q.   What did you do next?

19  A.   I worked residential construction for a couple of years.

20  Q.   Were you running the job or working?

21  A.   I was a piecework drywall finisher.  I started actually

22  to work my way through undergraduate doing that and just

23  continued on for a couple of years after I graduated.

24  Q.   That's a good skill to have.  Did you proceed to graduate

25  school?

Harrison - Direct

1    A.    Yes, I did.

2    Q.    And where did you go and what degree did you obtain?

3    A.    I went to Virginia Tech and obtained a master of science

4    in environmental engineering.

5    Q.    Do you have any licenses or certifications?

6    A.    I have an Ohio professional engineer license.

7    Q.    And what does that mean?

8    A.    That means I'm certified to stamp drawings and so forth

9    in the State of Ohio.

10   Q.    Okay.  I take it that after you graduated from your

11   masters degree, you went to work.  Tell us where you went to

12   work.

13   A.    CH2M Hill.

14   Q.    Okay.  And where were you first employed by CH2M Hill?

15   A.    Milwaukee, Wisconsin.

16   Q.    Let me ask you this question.  What is CH2M Hill and

17   explain the name.

18   A.    Okay.  CH2M Hill is a large design, procurement,

19   engineering consulting firm.  We have about 25,000 employees

20   around the world.  And I'm sorry, what was the second part of

21   your question?

22   Q.    I'm just curious about the name, CH2M Hill.

23   A.    Oh, the name.  Yeah, the name was the -- the CH2M is the

24   initials of the four founders of the company.  It was a

25   professor and three students from Oregon State University that

Harrison - Direct

1    after World War II, they came back and opened up a little

2    engineering firm on top of a hardware store.  And then in the

3    '70s they merged with the Clair A. Hill Company, and I guess

4    he didn't want the H added to the CH3, so he had his name

5    stuck on the end.

6    Q.   You got your masters degree in environmental engineering.

7    What is environmental engineering?

8    A.   In my view, it's the use of math and science to solve

9    environmental problems.

10   Q.   All right.  So you go to CH2M Hill in Milwaukee.  What

11   kind of stuff did you do?

12   A.   I started out just as a project engineer.  I worked on a

13   range of projects.  In that area we had a lot of pulp and

14   paper client work.  So work involved in design and start-up

15   related to pulp and paper plants is one of the main areas that

16   I dealt with.

17   Q.   What types of systems were you designing?

18   A.   In that particular case, they were large wastewater

19   treatment systems.  We did one for Tenneco Packaging that was

20   a 25-million-gallon-a-day aerobic and anaerobic treatment

21   system.

22            THE REPORTER:  I'm sorry.  I didn't understand you.

23            THE WITNESS:  I'm sorry.  Aerobic and anaerobic

24   treatment system.

25   BY MR. HURNEY:

Harrison - Direct

1   Q.    How long were you in Milwaukee?

2   A.    Four years.

3   Q.    And where did you go to from Milwaukee?

4   A.    I transferred to our -- excuse me -- Cincinnati office.

5   Q.    How long have you been in Cincinnati?

6   A.    For 14 years.

7   Q.    Could you describe for the Court kind of over the past 14

8   years what your responsibilities with the company have been

9   and how they have either -- you know, promotions or changes?

10  A.    Yes.  With CH2M Hill we have kind of three primary career

11  paths, whether you go into kind of a project management career

12  path, a technologist career path, or more of a sales/business

13  development type career path.

14        I followed the course of a project manager career path,

15  so I stayed involved in the technical aspects of engineering

16  projects but kind of grew from task manager to project manager

17  to senior project manager.

18  Q.    And you're currently a senior project manager?

19  A.    Yes, I am.

20  Q.    Would you describe for the Court what a senior project

21  manager does at CH2M Hill.

22  A.    Yes.  I'm responsible for the successful delivery of our

23  scope of work that we receive from our clients, responsible

24  for schedules, budgets, client satisfaction, quality of our

25  deliverables, coordinating and getting the right resources on

Harrison - Direct

1    the team.  Those are some of the key things I can think of.

2    Q.   Are you involved in terms of the planning and scheduling

3    of projects?

4    A.   Yes.  So I'm also involved in the writing of proposals,

5    the scopes of work, that kind of thing.

6    Q.   Do you have experience as a project manager in dealing

7    with, you know, projects like this one where you're asked by a

8    company for assistance in solving a wastewater problem?

9    A.   Yes.

10   Q.   And for how many years have you been managing these types

11   of projects?

12   A.   Probably 12 years.

13   Q.   Okay.  Do you belong to any organizations in your field?

14   A.   Not currently.

15   Q.   Okay.  Do you attend continuing education or seminars or

16   meetings of like folks in your field?

17   A.   I do.  One of the requirements of the Ohio professional

18   engineering license requires that you maintain 15 hours a year

19   of credit in taking courses and being involved in seminars and

20   so forth.

21   Q.   What type of educational things do you attend?

22   A.   It's a wide variety.  One of the nice things about CH2M

23   Hill is that it's such a large company with so many areas of

24   expertise that a lot of our internal training qualifies for

25   that certification.

Harrison - Direct

1           MR. HURNEY:  Your Honor, at this time I'd ask the

2    Court's leave to treat Mr. Harrison as an expert witness as it

3    relates to the field of environmental engineering and the

4    management of environmental projects.

5           THE COURT:  You may proceed.

6    BY MR. HURNEY:

7    Q.   Mr. Harrison, are you familiar with Apogee Coal Company?

8    A.   Yes.

9    Q.   All right.  Have you been working on a project or a

10   series of projects to assist Apogee Coal Company with the

11   removal of selenium from outflows at the Apogee Mine --

12   A.   Yes.

13   Q.   -- or the Ruffner Mine, rather?  All right.  When was --

14   do you know when CH2M Hill was first contacted?

15   A.   Yes.  Mid July 2008 we received a call from John McHale

16   and asked for our kind of experience and expertise around

17   wastewater treatment and selenium specifically.

18   Q.   Okay.  Did somebody at CH2M Hill get in contact with

19   Mr. McHale?

20   A.   Yes.

21   Q.   And who was that?

22   A.   My recollection, it was Tom Sandy.

23   Q.   After Mr. Sandy talked with Mr. McHale, did you become

24   involved in the project?

25   A.   Yes.  As soon as we identified that they had a scope of

Harrison - Direct

1    work that they wanted us to deliver, I got engaged immediately

2    on the proposal development and the delivery of the scope of

3    work.

4    Q.    Okay.  Would you tell the Court what you mean when you

5    say scope of work.

6    A.    I'm sorry.  It's basically a definition of what we're

7    going to do for the client, and it outlines things such as

8    schedules, budgets, activities, things that we need from them,

9    information requests, so that both parties have a clear

10   understanding of kind of what the objective of the project is

11   and what needs to be done.

12   Q.    What was -- I'm going to place a series -- can I just put

13   this stack in front of him, Judge?

14         THE COURT:  Yes, you may.

15         MR. HURNEY:  I think it might be more efficient.  I

16   hope it's more efficient.

17   BY MR. HURNEY:

18   Q.    You exchanged some documents -- I believe you exchanged

19   some reports with or had some communication with John McHale.

20   What was the first project that you were asked to do?

21   A.    The first project we were asked to do was a small, ten-

22   to fifteen-thousand-dollar evaluation that included -- one was

23   kind of a high-level screening of technologies that have been

24   shown effective in treating selenium.

25   Q.    Okay.

Harrison - Direct

1    A.    Another task was -- kind of basically asked us how we

2    would approach a project, understand the issue and approach it

3    to resolve it.  It was kind of a skeleton outline of what we

4    would propose as the scope of -- the next scope of work.

5    Q.    Okay.  Let me ask you to look at Exhibit 3 in front of

6    you.  What is that document?

7    A.    This is one of our later deliverables.  After that

8    initial scope of work, we had a follow-on scope of work which

9    really had a list of four or five tasks, one of which this

10   deliverable addresses.  Specifically it was to do a screening-

11   level regulatory evaluation to understand selenium permit

12   limits, the basis of those and if there were regulatory

13   options to address that through a change of a discharge

14   criteria.

15   Q.    I need to go get one more document.  I'm trying to find

16   your document from November.  Do you have a recollection of

17   what kind of information you transmitted to John McHale in

18   November of that year?

19   A.    Let me see.

20   Q.    Now, you have a document in front of you.  Using your

21   scheduling tool did you prepare kind of a timeline of things

22   you did to assist you in remembering dates?

23   A.    Yes.  Since the project has been over two years, I wanted

24   to refresh my memory on when we did what.

25   Q.    Would a reference to that document assist you in

Harrison - Direct

1    recalling specific dates that you did things?

2    A.   Yes, that would help.

3    Q.   Now, so talk to me about November, about the initial

4    communication back to Patriot and the kind of things that you

5    were discussing with them.

6    A.   And just -- are you talking about a first deliverable in

7    the Summer of 2008?

8    Q.   Sure.

9    A.   Okay.

10   Q.   What I really want to try to do, and I apologize.   I

11   thought I had all my documents in line, and I do not.   What I

12   really want to do is walk through with you -- and I've kind of

13   drawn a timeline when I was taking Mr. McHale's testimony, and

14   I really want to get a sense from you of a timeline of what

15   CH2M Hill did for Patriot Coal and when they did it.

16   A.   Sure.

17   Q.   So if you could just start after you were hired, what was

18   the first thing that you did for Patriot Coal?

19   A.   Okay.   We first met with them in July.   Our first real

20   work activity started in August of 2008.   That first small

21   scope of work, we did a screening of selenium technologies,

22   which was just a table to understand what technologies are

23   appropriate.

24   Q.   Do you have that in front of you?   Is that one of those

25   documents --

Harrison - Direct

1   A.    Let me see.

2   Q.    -- an initial screening?  I'm having trouble putting my

3   hands on it.

4   A.    It would have been a small document --

5   Q.    Okay.

6   A.    -- a few pages.  I don't see it here.

7   Q.    Well, why don't you -- let's just discuss it.  I don't

8   know that it's all that important to have the document, but

9   what was the -- what was the -- tell me, what was in that

10  document?

11  A.    Three things; basically a site visit for me to go meet

12  with John McHale, and we did a one- or two-day site visit at

13  both Apogee and the Hobet mine sites.  The second item was

14  basically a table of technologies that are typically used to

15  treat selenium, the pros and cons, that was kind of a high-

16  level these are the things that seem reasonable to address

17  selenium, end of pipe treatment.  And then the final thing was

18  literally a skeleton outline of if we were to take the next

19  step, let's try to better understand this issue.  How would we

20  proceed down the path in a logical, systematic way?

21  Q.    Okay.  And ultimately what were the recommendations that

22  you made at that time for the things that you thought you

23  needed to do to proceed down the path?

24  A.    Okay.  There was -- the first item kind of refers to this

25  regulatory screening that was one of the outcomes, that we

Harrison - Direct

1    perform a high-level regulatory screening around selenium.

2    Q.   All right.  And that was October 21st of 2008?

3    A.   November 21st.

4    Q.   November?

5    A.   Yes.

6    Q.   All right.  And did you submit a technical memorandum on

7    that date?

8    A.   I -- let me look at my cheat-sheet here.

9    Q.   Let me ask you to look at Exhibit 3 --

10   A.   Okay.

11   Q.   -- in the stack in front of you.

12   A.   Yes.

13   Q.   Okay.  Is that a technical memorandum?

14   A.   Yes, it is.

15   Q.   Is that the memorandum to which you're referring?

16   A.   Yes.

17   Q.   All right.  So that was the first thing.  What else did

18   you supply to Patriot Coal as a recommendation for further

19   analysis?

20   A.   One of the next main items was there was very little data

21   or at least data that we felt was of good quality to

22   understand the selenium at these outfalls.  And what I mean by

23   that is there was no data that speciated the selenium, which

24   is one of the really important things to understand, the form

25   it's in from both a toxicity perspective and a treatment

Harrison - Direct

1    technology perspective.  So when we got on-site there for the

2    first time, the historical data was just total selenium.

3         The second aspect of that -- so, really, we really wanted

4    to characterize both the water quality and the flows.  So

5    there were kind of two parallel paths.  One was a watershed

6    evaluation study we did and, in parallel to that, field work

7    where we actually spent time on-site collecting samples over a

8    period of a week at each of these outfalls to look at not only

9    selenium but other chemical parameters that you need to

10   understand to design wastewater treatment systems.

11   Q.   Did this result in the reports that you all submitted on

12   January 26th of 2009?

13   A.   Yes, it did.

14   Q.   Okay.  And what reports did you submit that -- did you

15   ultimately submit to Patriot in January of 2009?

16   A.   Yeah, there was three reports that we submitted.  The

17   primary -- well, the first was the -- what we call the design

18   basis.  And to step back a little bit, once we had a -- we

19   really needed both flow and chemical character information in

20   order to do a conceptual evaluation.  So that was one of the

21   recommendations of our original scope of work.

22        So we did a storm water evaluation.  That deliverable was

23   one of those January reports --

24   Q.   Okay.

25   A.   -- or watershed evaluation --

Harrison - Direct

1    Q.    Let me interrupt you.  Would that be Exhibit 4, the

2    preliminary watershed flow estimation?

3    A.    Yes.

4    Q.    Okay.  Do you have Exhibit 4 in front of you?

5    A.    Yes.

6    Q.    Okay.  And that's the -- so that's the report.  And tell

7    the -- what I want to -- I'm going to focus on you on kind of

8    generally what was done and when it was done, and Mr. Sandy

9    will be testifying later.  I may go into more details on the

10   technology, but just in general, would you explain to the

11   Court what Exhibit Number 4 is?

12   A.    Yes.  It's a watershed analysis for the three outfalls

13   at Apogee that were in question.  What -- the historical flow

14   data at the site was collected based on monthly DMR reports.

15   So the client's contract laboratories go out and they

16   estimate flow.  These outfalls are typically just spillways,

17   so they don't have any flumes or sophisticated flow measure-

18   ment devices, so there's less accurate flow information,

19   basically.

20         And the second thing they didn't have was when you design

21   any kind of a treatment system, you need to understand the

22   variability of flow.  So while they had reasonable kind of

23   base flow data from when they went out and observed the

24   outfall, they typically weren't out there in storm events.  So

25   we really needed to see -- and because these are steep hills,

1    large watersheds, storm events -- particularly large storm

2    events generate an enormous quantity of water.  So we needed

3    to estimate that.

4        So one way that you can do it is you can literally go out

5    and set up, you know, these flow devices and monitor for a

6    very long period of time, because you really want to get

7    seasonable variation and you're kind of at the mercy of Mother

8    Nature to provide big storms that can take months sometimes.

9        So the alternative approach is we did this modeling where

10   we had the watershed volume and we used runoff coefficients to

11   estimate both the storm flow and storm flow peak flows and so

12   that we could take this information and better understand how

13   to design conceptual systems around that flow.

14   Q.   When we talk about flow, that's the amount of water that

15   comes out of the -- comes off of the mountain --

16   A.   Yes.

17   Q.   -- down through the --

18   A.   Yes, seeps out of the mountain and down the surface.

19   Q.   Looking at page 2 of the report, you all have a Table E1.

20   Could you -- first of all, Outfall Number 1 is the largest.

21   That's the Slab Fork outfall?

22   A.   That's correct.

23   Q.   Okay.  And Outfall Number 2 is Mud Lick?

24   A.   That's right.

25   Q.   And Outfall 3 is Titanic, correct?

Harrison - Direct

1    A.    Yes.

2    Q.    Next to that you have -- for example, Outfall 1, it says

3    750/1600.

4    A.    Right.

5    Q.    Am I correct that the 750 gallons per minute is the

6    annual average base flow?

7    A.    Yes, that is the average flow that was measured from

8    their DMR reports for that year.

9    Q.    Okay.  And then next to it, you say design average flow.

10   What is the design average flow?

11   A.    When our engineers evaluated the flow, the preceding year

12   was a drought year and there was some concern that we might be

13   underestimating the flows from that data, and so they used --

14   kind of added the annual storm runoff estimated for a typical

15   year into those calculations.

16   Q.    Okay.

17   A.    So kind of a safety factor basically that we put in

18   there, understanding there was some uncertainty in the flow

19   data.

20   Q.    Look at page 10 of the report, please.

21   A.    Okay.

22   Q.    Could you explain to the Court what this graph signifies

23   or what it is.

24   A.    I'm sorry.  I jumped from 9 to 11 here.

25          THE COURT:  I'll let him have the exhibit.

1          MR. HURNEY:  Thank you, Judge.

2          THE WITNESS:  Thank you.

3          MR. HURNEY:  And I believe I've discovered that I've

4     taken copies of documents and given them to the witness, so I

5     apologize.

6     BY MR. HURNEY:

7     Q.    Okay.  I was -- before I got off-track, please look at

8     the table.  And I've stuck it up on the machine.  What does

9     that table signify and where does it come from?

10    A.    What this is is data specific to a meteorological

11    database for Charleston, West Virginia.  It's called an

12    exceedance curve for daily rainfall.  And essentially what it

13    is, it's from 1970 to 1996.  It's, you know, 26 years' worth

14    of data where they've taken -- at every day that there is a

15    rain event, they've measured how many inches of rain resulted

16    in that 24-hour period.

17         And so if you look at this curve, just for an example, if

18    you kind of go up at the --

19    Q.    Could you step over and just kind of point at that.

20    A.    Sure.

21    Q.    That would help, so we understand a curve.

22    A.    So your percentage exceedance, zero to a hundred, and

23    then this is the amount of rainfall in that 24-hour period.

24    For example, a half inch, 1.5 inches of rain in that 24 hours.

25    So basically if you were just to go up maybe this 8 percent

Harrison - Direct

1    level, it would say that only 8 percent of rain events exceed

2    1 inches, 1 inches of rain in a 24-hour period.   So obviously

3    the larger the storm event, the less frequently they would

4    happen.

5    Q.   Okay.   And identify that as Exhibit Number 4?

6    A.   Yes.

7    Q.   All right.   Let me ask you to look at Exhibit Number 5.

8    A.   Okay.

9    Q.   All right.   What is this document?

10   A.   This document is where we took the basis that we

11   developed in the storm water watershed modeling analysis and

12   combined it with the characterization work that we did, and

13   there's one other document that came out about this same time

14   that's called the design basis document.

15   Q.   We'll locate that document.

16   A.   Yeah.   And so really what we wanted to do is the focus of

17   this report was to compare technologies that treat selenium

18   from a cost perspective, the pros and cons, those kind of

19   things, to help the client make the decisions on what seems to

20   be an appropriate approach here.   So to do that, you need a

21   design basis.   You need to understand the range of chemical

22   characteristics, flow ranges, those kind of things.

23       And so we -- of the three outfalls we analyzed, and

24   because we really wanted to proceed quickly on schedule, we

25   agreed to evaluate in this report only the Outfall 002.   And

Harrison - Direct

1   the reason we did that, it was the middle flow outfall and it

2   was also the outfall that has the highest average selenium

3   concentrations, with the understanding if you go above and

4   below that, in general the technology evaluation should hold

5   relatively true.

6        So that's really what this document does, is it talks

7   about how we evaluated cost and technologies and how we would

8   put that into a system at end of pipe.

9   Q.   And are these preliminary evaluation costs?

10  A.   I'm sorry?

11  Q.   Are these preliminary evaluations of cost?

12  A.   At cost?

13  Q.   You have --

14  A.   Yes.

15  Q.   If you'll look at -- yeah, I'm sorry.  Look at page --

16  A.   Okay.  Of cost?  Yes.

17  Q.   You've looked -- and across the top, I wrote the various

18  technologies that you evaluated.

19  A.   Yes.

20  Q.   Okay.  And which technologies did you look at?

21  A.   We looked at Alternative 1A and 1B are two zero valent

22  iron technologies.  We evaluated those two specifically.  "SS"

23  stands for ShipShaper, a company that Patriot Coal had been

24  working for before we started working with them.  And then

25  MATRIC was a competitor, had another variation of the ZVI

Harrison - Direct

1    technology that was working on-site.

2        The second alternative is reverse osmosis, third is

3    ABMet, which is a proprietary GE biological system.  FBR is a

4    fluidized bed reactor.  It's another form of a biological

5    system.  And then the final alternative was a sub-surface

6    wetland flow passage.

7    Q.    You have kind of cost estimates on here.  And is the

8    backup data for your cost estimates contained in the cost

9    appendix --

10   A.    Yes.

11   Q.    -- at the end?

12   A.    Yes, it is.

13   Q.    There's been some discussion of Class 5 cost estimates.

14   Could you explain what a Class 5 cost estimate is.

15   A.    Yes.  When you develop a cost estimate, you can only be

16   as accurate as the design information that you have.  So at

17   this stage, we were very conceptual.  We have maybe 1 or 2

18   percent of a design of a real system put together.  So you

19   don't have hard data on the specific size of the equipment

20   that you need to have, what are the infrastructure issues that

21   you may have to construct, what equalization capacity you have

22   to address.  So it's used at a high level, a magnitude more

23   for comparing technologies.  And as you can see in this case,

24   these estimates, Class 5, they're plus 100, minus 50 percent.

25       So if you looked at Alternative 1A that says $22 million

Harrison - Direct

1    capital cost, the accuracy of that estimate would be expected
2    to be up to twice that or, on the low side, half of that.
3    Q.    Pretty wide swing?
4    A.    Yeah.   Yeah.
5    Q.    I take it a Cost 3, 2, 1 estimate would be more accurate?
6    A.    Yes.
7    Q.    And do you get to those cost estimates as you get farther
8    in and actually decide what technology you're going to use and
9    how you're going to install it?
10   A.    Yes.   Once you select the specific site, the specific
11   flows you want to treat, the specific site conditions that you
12   may have to, you know, excavate significantly, those kind of
13   things, so as you move down the process of more and more
14   detailed design, getting firm bids from contractors, those
15   kind of things, that the range and variability narrows.
16   Q.    Okay.   I think I've located the other document.   Let me
17   hand you Exhibit Number 2 and ask you to look at that.
18         That's Joint Number 2, Your Honor.
19   A.    Yes.   This is the basis design document I talked about
20   where we took our flow and chemical characterization
21   information that we collected prior to this and then developed
22   a design basis for Outfall 002 flow specifically as the basis
23   of this conceptual engineering alternative Exhibit 5.
24   Q.    Okay.   Now, going back -- first of all, Your Honor, at
25   this time I don't believe we've moved the admission of Exhibit

Harrison - Direct

1   Number 2, and I would move the admission of that.  And that's

2   in our stack of joint exhibits.

3         THE COURT:  All right.  Any objection?

4         MR. LOVETT:  I have no objection to the admission of

5   any of the joint exhibits.

6         THE COURT:  All right.  We'll consider all the joint

7   exhibits which are offered to be admitted by stipulation.  I

8   don't seem to have the page 2.

9         MR. HURNEY:  I'll see if I can dig one up for you,

10  Judge.  I'm actually going to move back to Number 5.

11  BY MR. HURNEY:

12  Q.   Looking at Number 5, this is the document where, am I

13  correct, that CH2M Hill dug in deeper to potential

14  technologies that could be employed for the removal of

15  selenium at -- and I know you used Outfall Number 2, but for

16  removal of selenium in outfalls at the Apogee Mine?

17  A.   Yes.  Again, that first small study we did was devoid of

18  any water quality data or flow data.  So this was a refined

19  version.

20  Q.   All right.  Now, in this report, can you look -- we

21  talked about the cost estimates in the other report.  Are the

22  technologies that you listed as -- listed Class 5 cost

23  estimates for the same technologies that are discussed in more

24  detail in this report?  (Indicating)

25  A.   I'm sorry.  Say that again.

Harrison - Direct

1    Q.    Okay.  I guess I just wanted you to review for the Court

2    that this report discusses in more detail various technologies

3    to be evaluated; is that correct?

4    A.    Yes, that's correct.

5    Q.    Okay.  And in terms of proceeding with technology, what

6    technologies did CH2M Hill recommend that Patriot continue to

7    explore?

8    A.    Two that I know of, to look back to our recommendations,

9    was the FBR, fluidized bed reactor technology, and also the

10   MATRIC ZVI media system.

11   Q.    Now, as I understand it from your report, there were

12   other contractors that Patriot was dealing with with respect

13   to the ZVI technology, correct?

14   A.    That's correct.

15   Q.    Okay.  You all were familiar with it, but you were not

16   running that technology.

17   A.    That's correct.

18   Q.    All right.  So did you at some point start a -- well, let

19   me ask you this.  Let's do it this way.  What was the next

20   thing -- after this report, what was the next thing that CH2M

21   Hill did for Patriot Coal Company?

22   A.    We supported a technical evaluation of VSEP technology, a

23   kind of a membrane, reverse osmosis membrane technology by a

24   company, New Logic Research.  And I learned that they had been

25   involved in the process in litigation prior to our involvement

Harrison - Direct

1   and had claimed that this would be the best technology to

2   apply at these sites.  So we assisted Patriot in helping them

3   develop a pilot plan and provided oversight and final report

4   review of the VSEP system.  So that kind of -- about the time

5   we wrapped this up is when we started to change our focus to

6   provide support on VSEP.

7   Q.   Okay.  And just to be clear, VSEP, is it a variant of

8   reverse osmosis?

9   A.   Yes, it is.

10  Q.   Okay.  Had you recommended VSEP in your initial

11  evaluation of technology?

12  A.   No, we didn't.

13  Q.   All right.  I'd like to hand you Exhibits 6 -- Joint

14  Exhibit 6, 7, and 8 and ask you to look at these documents.

15  A.   Okay.

16  Q.   Are you familiar with those reports?

17  A.   Yes.

18  Q.   And what do they relate to?

19  A.   These are CH2M Hill's review comments on New Logic

20  Research reports.  They submitted two reports after they

21  completed their --

22            THE REPORTER:  "After they completed their"?

23            THE WITNESS:  Technology evaluation.  I think that's

24  it.

25            THE COURT:  Scoot just a little closer to the

Harrison - Direct

1    microphone.

2              THE WITNESS:  I'm sorry.  So they submitted two

3    reports, the actual summary of their pilot study and what they

4    claimed that it found, and they also submitted a budget report

5    on how much this technology would cost.  And then the third

6    one after we submitted our comments, they responded with an

7    additional set of comments, and this was our final response.

8    BY MR. HURNEY:

9    Q.    Okay.  On our timeline, could you tell me when the

10   planning from your report -- tell me about -- I assume there

11   was some planning that went into doing this pilot and then the

12   pilot itself and the subsequent comments.  During what time

13   period did that stuff occur?

14   A.    Well, the initial discussions on a project, my

15   recollection, was in about February --

16   Q.    Okay.

17   A.    -- of 2009.

18   Q.    All right.

19   A.    And then I'm sure there was probably two to three months

20   of planning, and I probably have it on my sheet here.

21   Q.    Okay.  If you could look at your cheat-sheet, I'd like to

22   give the Court an idea of the dates.  We had some testimony

23   yesterday, but could you tell us what the dates of the pilot

24   project were?

25   A.    It looks like as far as actually being in the field and

Harrison - Direct

1    operating, it started the very end of April 2009.

2    Q.    What was that date?

3    A.    April 27th.

4    Q.    All right.  And when did it end?

5    A.    It appears August the 28th.  Yes, August 28th, so it

6    was about a four-month pilot study.  That was the goal, that

7    it be a four-month study.

8    Q.    All right.  And you issued a report to Patriot with your

9    comments on the VSEP technology, correct?

10   A.    On their reports.

11   Q.    And those are the three reports in front of you?

12   A.    That's correct.

13   Q.    All right.  Now, were you aware that GE was performing

14   pilots of RO and ABMet?

15   A.    Yes, I was.

16   Q.    Okay.  Did you all have any involvement in doing those

17   projects?

18   A.    No.

19   Q.    Does CH2M Hill have anything to do with the GE RO pilot

20   system?

21   A.    No.

22   Q.    I thought you had designed one of the systems for GE.

23   A.    I understand -- I wasn't involved in that, but someone in

24   our company helped them kind of scope out the technical

25   components that a pilot system needed to be for an ABMet

Harrison - Direct

1  system.

2  Q.   All right.  Let me ask you a question.  We've been

3  talking about pilot systems for the last couple of days.  You

4  know, for example, you did an FBR pilot.  What exactly is a

5  pilot system?

6  A.   It's a system that, you know, you collect the data to try

7  to mimic what would happen in a full-scale system.  It's kind

8  of an early evaluation where you have -- typically like to

9  have a continuous flow of the actual wastewater you want to

10  treat where you're adding the chemicals and the equipment and

11  process that you would treat those in at a smaller scale, and

12  you can learn quite a bit on how to scale up to the larger

13  system and what other additional problems that you might find

14  before you go to the effort and expense of installing a full-

15  scale system.

16  Q.   Now, at some point did you all -- did Patriot ask you to

17  embark on a pilot project related to the fluidized bed

18  reactor?

19  A.   They did.

20  Q.   Okay.  And when was that?

21  A.   Those discussions started in August of 2009.

22  Q.   Let me ask you to look -- could you find the fluidized

23  bed reactor report --

24  A.   Yes.

25  Q.   -- dated -- I have dated July 2010.

Harrison - Direct

1    A.    Yes.

2    Q.    Okay.  What exhibit number is on that?

3    A.    46.

4    Q.    Is that just Exhibit 46?

5    A.    Yes.

6    Q.    Or is it Plaintiff's?

7    A.    Oh, I'm sorry.  Plaintiff's Exhibit 46.

8              MR. HURNEY:  Okay.  That's already been admitted,

9    Your Honor.

10             THE COURT:  All right.

11   BY MR. HURNEY:

12   Q.    Is that the report that relates to the fluidized bed

13   reactor study?

14   A.    Yes.

15   Q.    Okay.  Could you tell the Court, you know, starting with

16   the -- kind of from start to finish when you performed that --

17   you know, when you started planning, when you were in the

18   field and when you ended that pilot study?

19   A.    Yes.  We were in the planning stages with the client on

20   that and other projects, a storm water project as well, in

21   August.  They -- so through that planning and refinement

22   period and development of kind of the scope of work took us

23   into October, late October of 2009.

24   Q.    Okay.

25   A.    And then at that stage until we mobilized in the field,

Harrison - Direct

1   so from October until early February is when we were actually

2   in the field and installed and started up the pilot, and we

3   ran the pilot until June 1st.

4   Q.   All right.   And does the report -- the fluidized bed

5   reactor pilot report, is that what you submitted to Patriot to

6   report on this pilot?

7   A.   Yes.

8   Q.   Do you recall when you -- you submitted a draft report to

9   Patriot and then a final report?

10  A.   That's correct.

11  Q.   Do you remember the date of the final report?

12  A.   I don't remember the exact date.   I believe it was around

13  the 27th of July.

14  Q.   Okay.   Prior to that, you sent a draft.   Is it typical in

15  your company or in your business to give a draft report before

16  the final?

17  A.   Very common.

18  Q.   You have discussions with the client and then issue the

19  final report?

20  A.   Sure.   They have questions and want clarification on

21  things.

22  Q.   Okay.   Now, you mentioned a storm water evaluation.   Was

23  that evaluation recommended in your technical memorandum of

24  January 26?   Look at Exhibit 5, page 3, for flow monitoring

25  and sampling equipment.

Harrison - Direct

1    A.    Yes.

2    Q.    Okay.  Now, you indicated that that was January of 2009.

3    Was it August -- when did you start -- when did Patriot ask

4    you to start putting that together?

5    A.    At the same time as the FBR pilot.

6    Q.    Okay.

7    A.    So we had those discussions in August of 2009 and were

8    given the go-ahead in November or late October.

9    Q.    All right.  Get the go-ahead?  In other words, they said

10   proceed with the study?

11   A.    Right.

12   Q.    All right.  Walk the judge through -- by the way, that

13   study is ongoing as we speak?

14   A.    Yes, it is.

15   Q.    All right.  Could you walk the Court or could you tell us

16   the progress of that study?  You know, what happened from the

17   time they told you to do it up until you have people in the

18   field now?

19   A.    Sure.  Basically the concept of the storm water study is

20   we wanted to evaluate flow with precise flow instrumentation

21   for a period of about a year.  The reason for that is we

22   wanted to understand, you know, base flow, peak flows,

23   seasonal effects of flow.  And also in correlation with that,

24   we really wanted to understand how selenium concentrations

25   change during a storm event, because from a sizing and design

Harrison - Direct

1    and cost perspective, large storms really drive everything,

2    and so we really wanted to understand it as you would

3    intuitively expect that selenium concentrations would decrease

4    during a large storm event.  And we needed to understand that.

5         So the actual process then is after we were given the

6    authorization to proceed, we immediately set a site meeting,

7    got in the field at this activity -- the project they wanted

8    to have take place at the Hobet site.  So we spent a few days

9    on-site with Jim Constant and the mine manager staff looking

10   at potential outfalls that we could use for this study.

11        They had to be -- meet some pretty specific requirements.

12   One, it had to have selenium at a higher level so that we

13   could really understand and see within that range if we're

14   getting some dilution.  It had to be an easily accessible,

15   safe location for our sampling staff to fix -- or to be there.

16   So those are some of the things.

17        And then once we came back, we had to then, after we

18   selected two outfalls to do the study on, we then had to go

19   back and we had to develop weir sizing based on kind of doing

20   other modeling exercises --

21   Q.   Let me stop you.  What's a weir?

22   A.   I'm sorry.  A weir is a mechanical device that measures

23   flow.  In this case it was a -- we have a V-notch weir at one

24   location that has -- basically what it is, is you put a

25   vertical barrier in the stream and then the water will build

Harrison - Direct

1    up behind that, and then there's a notch -- a V-notch in this

2    case -- and it will spill over.  And based on the height of

3    flow above the bottom of the V-notch, you can do hydraulic

4    calculations to get the flow rate.  And so the other part of

5    that was then we had to install a transducer, the flow

6    measurement pressure device in a well in the stream, and a

7    data logger, so that basically we now, since June 1st at one

8    of the outfalls, we have continuous flow data where we'll take

9    flow, rain, and pressure every five minutes continuously, 24

10   hours a day.

11             THE COURT:  Can I interrupt just so I can keep the

12   timeline?  You said that you had conversations with Patriot in

13   August of '09 --

14             THE WITNESS:  Yes.

15             THE COURT:  -- that led to both going ahead with the

16   FBR study --

17             THE WITNESS:  Yes, sir.

18             THE COURT:  -- and also going ahead with this flow

19   study.

20             THE WITNESS:  Yes.

21             THE COURT:  And then starting in August, your

22   company started taking the steps that you've described now in

23   particular about going out and picking the outfalls you wanted

24   to examine, installing the devices and so forth.

25             THE WITNESS:  Yes, we had -- the early period

Harrison - Direct

1    between August and October, we had submitted a high-level

2    scope basically to get agreement from the client.  And I think

3    they also wanted input from West Virginia DEP, if they thought

4    they were appropriate projects.  So once that was defined in

5    October, then we actually mobilized to do the work.

6              THE COURT:  Well, as I understand it, you gave them

7    a report in late January of '09 where you specifically made

8    the recommendations you're --

9              THE WITNESS:  That's correct.

10             THE COURT:  Do you know why it was not until August

11   that you had conversations with them to implement those

12   recommendations?

13             THE WITNESS:  I don't know.  I know that our focus

14   at the end of that January period was to focus on the VSEP

15   technology.

16   BY MR. HURNEY:

17   Q.   By the way, there was some testimony that it's pretty

18   simple to do two or three pilots all at once.  Could you

19   explain the process of doing a pilot study, what it involves

20   and whether it is easy to do a bunch of pilots in parallel?

21   A.   It's definitely more difficult and challenging to do

22   pilots in parallel, particularly when you're -- I mean the

23   basic process for the FBR, for example, was an 8-gallon-a-

24   minute system.  So you have to work with the equipment vendor

25   that provides that technology first and identifying a

Harrison - Direct

1   subcontract with them.  You have a range of chemicals, granule

2   activated carbon media, other things that you have to procure.

3   You have to subcontract with laboratories to do, in this case,

4   selenium analysis, which we wanted to have done at a specialty

5   lab in Washington State, as well as the basic parameters.

6       You have to have field staff.  We ran these 24 hours a

7   day for a period of four months.  So we had field engineers on

8   there eight hours day, seven days a week.  And because you

9   want to have a good understanding, so we selected a large

10  range of data daily.  We had an on-site lab where we were

11  testing.  We couldn't test selenium because of the specialty

12  method, but most of the other parameters we had an on-site lab

13  where we did that testing.

14      So, you know, subcontracting, multiple -- if you

15  extrapolate that to more than one pilot, then you would have

16  to work with a different technology vendor typically, identify

17  more staff that were available to support being in the field

18  for four months in a remote mine site, those kind of things.

19  It's more juggling.

20  Q.   So it's not just pick up the phone and say, "Hey, can you

21  run over and do a pilot for us?"

22  A.   No.  It's involved to get prepared for that.

23  Q.   You all -- I take it that your storm water data, you're

24  not at a point where you've done any analysis of that at this

25  point.  Is that fair?

1    A.   We've done -- we've gotten one small storm actually last

2    Friday that we have gotten our first storm collected.

3    Q.   Okay.  So at present, what are the -- well, let me ask

4    this.  Go back to the Exhibit 5, please.  And the judge asked

5    you a question about some recommendations, and I do want to

6    talk to you about other recommendations in this report.  And

7    it appears to me that these same recommendations are contained

8    in the other reports issued that same day.  Is that your

9    recollection?

10   A.   Yes.

11   Q.   Okay.  So in other words, the first -- the first bullet

12   point on page 3 is to consider regulatory relief options with

13   the West Virginia DOH.

14       Is it fair to say that that was a recommendation that you

15   left to Patriot to pursue?

16   A.   That's correct.

17   Q.   Okay.  And the other was -- the second one was to discuss

18   or initiate discussions with the West Virginia Department of

19   Environmental Protection about the quantity of water to be

20   captured and treated.

21   A.   Yes.

22   Q.   Was that something you left to Patriot?

23   A.   Yes, it was.

24   Q.   All right.  We've talked about the appropriate flow

25   monitoring and sampling.  Am I correct that that's the study

1   that's ongoing at present?

2   A.   That's correct.

3   Q.   All right.  Did you -- the next one is confirmation

4   testing on the FBR system.  Has that been done?

5   A.   Yes, it has, this report we're talking about.

6   Q.   Okay.  And then looking at the next bullet point on

7   page 4, is that related to the FBR as well?

8   A.   Yes, it is.

9   Q.   All right.  And the next bullet point is -- relates to

10  MATRIC ZVI.  Was that something CH2M Hill was going to do, or

11  did you leave the relationship with MATRIC to Patriot?

12  A.   They had that relationship.  We weren't involved.

13  Q.   Okay.  And the last was in-situ biologic development.

14  What is that?

15  A.   The idea there is what happens that causes selenium in

16  the natural ground to move is when it's excavated and blasted

17  and moved, basically it's exposed to oxygen and water.  So

18  it's an oxidation process that starts and converts selenite or

19  reduced forms of selenium to selenate, which is very soluble

20  and starts to move in the water.

21       So what you do with in-situ treatment -- and a lot of

22  times you'll see this kind of technology in, say, hazardous

23  waste, like cleanup and so forth, where they'll actually go in

24  and inject chemicals in the ground either to oxidize it or

25  reduce contaminants of concern.

Harrison - Direct

1    So in this case, you would -- the idea is no matter
2    wherever it's been done, but you would go into, say, a valley
3    fill where you knew the source of selenium was, you would
4    inject some kind of a reducing agent or some material to bind
5    up the selenate to keep it from mobilizing in the groundwater.
6    Q.   Do you know whether Patriot is working on any pilot
7    projects on that, in that regard?
8    A.   I understand that they are working with Dr. Ziemkiewicz
9    from West Virginia University to look at ferrihydrite, I
10   believe.
11   Q.   And is that something that CH2M Hill is involved in?
12   A.   No, we're not.
13   Q.   All right.  Let me ask you to turn your attention to the
14   FBR report.  And I guess what I'd like to know is in your
15   report that was delivered at the end of July, what was your
16   recommendation to Patriot?  What was the next step
17   recommendation of CH2M Hill?
18   A.   The -- when we first set out to do this pilot study, it
19   was really a proof of concept.  We, CH2M Hill, believed that
20   it would be an effective technology because selenate is
21   similar to other contaminants that FBR is well-proven for, I
22   think nitrates and chlorates.  And so really the concept
23   was -- and to our knowledge, an FBR hadn't been used to treat
24   selenate in a mining or other setting, so -- and due to our
25   prior work where we did our conceptual evaluation and cost

1    estimates, it seemed to have a cost advantage to us in our

2    calculations considerably.

3         So the first step was really just to prove that out, that

4    we could achieve selenium to below the limits with this

5    technology.  So the recommendation out of that, though, was

6    now considering that you might have to go into a full design

7    of the system, there was some areas particularly related to

8    pretreatment and post treatment that weren't evaluated as part

9    of that scope.  It wasn't the original intent.

10   Q.   Okay.  Have you been directed just this Monday to take

11   further steps as it relates to FBR?

12   A.   Yes, we have.

13   Q.   Okay.  And what are you doing?

14   A.   Two parallel activities.  The first is to develop a cost

15   estimate schedule to install three FBR units at the three

16   Apogee outfalls and then a parallel cost estimate schedule if

17   you were to install one centralized system at the Slab Fork

18   outfall and then convey water from the other two outfalls to

19   that centralized system.

20        So the cost estimate development task is one of the tasks

21   we received Monday, and the other was to develop a formal

22   proposal to implement FBR technology at the outfalls.

23   Q.   When do you expect to respond to Patriot?

24   A.   Well, I just found out yesterday -- or Monday, so -- but

25   on the cost estimate, I'm --

Harrison - Direct

1    Q.   Can we get it by five today?  Do you have a ballpark on

2    when you'd get back?

3    A.   On the order of two to three weeks for the cost estimate.

4          MR. HURNEY:  Your Honor, I'm going to move to

5    another area.

6         May I move the admission of Defendant's Exhibit 4, which

7    is Mr. Harrison's CV?

8          THE COURT:  It's admitted.

9         (Mr. Hurney, the Court, and Clerk conferred privately off

10   the record.)

11   BY MR. HURNEY:

12   Q.   I'd like to hand you what has been marked as Plaintiff's

13   Exhibit 63.  Do you recognize Exhibit 63?

14   A.   Yes, I do.

15   Q.   What is Exhibit 63?

16   A.   It's a Microsoft project schedule, chart, that depicts

17   the general schedule for installation of a centralized FBR

18   system at the Apogee site.

19   Q.   Okay.  Did you prepare that schedule?

20   A.   I did, in conjunction with others.  It was kind of a team

21   development between Tom Sandy, Bill Shively, and I from CH2M

22   Hill and John Koon, the plaintiff's engineer.

23   Q.   And when did this occur?

24   A.   It was last week.

25   Q.   Okay.  Now, who is Tom Sandy?

Harrison - Direct

1   A.   Tom Sandy is the senior consultant on all of the selenium

2   work we've done for Patriot Coal.   He's our senior

3   technologist.

4   Q.   Who is Bill Shively?

5   A.   Bill Shively is one of our senior project delivery

6   directors that has extensive experience in designing and

7   construction of industrial wastewater systems.

8   Q.   How much time does that schedule allow in total for the

9   construction of an FBR facility, a single FBR facility to

10  treat the effluent from Titanic, Slab Fork, and Mud Lick?

11  A.   Approximately two and a half years.

12  Q.   Okay.   Putting -- and I guess I want to back up.   If you

13  were to schedule that project, about how long would -- you

14  know, from CH -- this is -- I'm not talking about this.   This

15  is kind of a collaboration?

16  A.   Correct.

17  Q.   Fair?   But absent a collaboration and two years, six

18  months, did you come to a conclusion about how long you

19  thought this project would take?

20  A.   We did.   We had Bill Shively evaluate it, and his

21  scheduling was three to three and a half years from start to

22  being in compliance.

23  Q.   Okay.   We had discussions over a big part of the day and

24  came to two years and six months.   Do you think that's a

25  reasonable amount of time?

Harrison - Direct

1    A.    I would say it's a schedule that if everything goes
2    flawlessly, it can be achieved, but there's not contingency
3    built in, which is typical of construction projects.
4    Q.    Could you give me an example of how you build a
5    contingency into a construction project?
6    A.    You just build in additional schedule for areas of
7    uncertainty.  In this case, you know, as of last week, we
8    really weren't even thinking about, you know, an approach
9    where we have a centralized system.  So we really had to think
10   through it.  But permitting is very uncertain.  You're
11   relying, depending on the kind of permit you have, on West
12   Virginia DEP, Army Corps of Engineers, U.S. EPA.
13        We also don't have any understanding of the geology
14   there.  There hasn't been a geotechnical evaluation to
15   understand if special foundation supports need to be put in.
16   There's risks around.  In this particular technology, you rely
17   on vendors to build and deliver large process equipment that
18   has long lead times of when they receive a PO on the order of
19   eight or more months from the time they're told to construct
20   these.  These are not items that are sitting on the shelf.  So
21   you have to have them built.
22        So if, you know, they were delayed in schedule or
23   something happened at their plant, it rolled off a truck --
24   you know, this assumes that everything can be done well.
25        One of the biggest concerns that was identified from our

Harrison - Direct

1    team relates to the fact that the valley is so narrow there

2    that there's not adequate space.  We're estimating that

3    something like that would probably be on the order of one to

4    two acres.  So we would have to go in and basically cut a

5    bench out of the mountainside there.  And just the current

6    one-lane road that goes up to the site, you may have to run

7    trucks 24 hours a day for a period of a month or two to get

8    the material out of there to excavate these needs.

9    Q.   And my recollection is -- and I think Dr. Koon testified

10   he thought it could be done in closer to two years, and you're

11   kind of over three.  But after back and forth with the

12   engineers, you guys came on two and a half years?

13   A.   Yes.

14   Q.   And have you all continued to drill down on detail and

15   planning to achieve the two-and-a-half-year schedule?

16   A.   We have continued to look at that.

17   Q.   And who's handling that?

18   A.   Bill Shively and one of our construction schedulers by

19   the name of Bill Hill.

20   Q.   Okay.  And are they actually going out and -- give me an

21   example of something that they're doing to drill down that

22   schedule.

23   A.   They're just laying down the more specific tasks in much

24   greater detail.  So as opposed to saying, you know, a site/

25   civil design, they break that down more specifically into, you

Harrison - Direct

1    know, earth work, foundations, those kind of things.  So when

2    you lay out -- and what BOP here stands for is balance of

3    process.  That's kind of all the stuff related to the

4    wastewater process, treatment equipment and so forth.  So you

5    actually get to the point where you're laying down specific

6    equipment items, electrical requirements and so forth, and so

7    when you drill down, you can get a better understanding of

8    where your risks are and what your procedure is.

9    Q.    And is this -- is this all towards cementing the proposal

10   like that Patriot can expect as to this project and its cost

11   and how long it will take?

12   A.    Yes.  You know, as an engineering firm, when you accept a

13   project, you want to -- you don't want to accept -- take on

14   unacceptable risk, and so you really need to identify what

15   those are, whether -- you know, if we don't believe that we

16   can do it any sooner, we'll potentially not bid on the

17   project.

18   Q.    Now, when you were retained by Patriot, you understood

19   that they were under consent orders to get things done?

20   A.    Yes, I did.

21   Q.    Okay.  Am I correct that you weren't aware of specific

22   dates on which they had to be in compliance?

23   A.    That's right.  We weren't involved in any of the

24   litigation support or anything like that.

25   Q.    Okay.  Now, looking back on this schedule, do you feel

1  like CH2M Hill proceeded with some urgency in recommendations

2  and proceeding with tasks?

3  A.   Yes, I do.  I think, for example -- and Patriot as well.

4  When we received -- or we submitted proposals, they would

5  typically be approved and funded within a matter of days.

6  Q.   Putting aside whether you could have done some things in

7  maybe a little bit shorter, do you feel like since July of

8  2008 till now that you've accomplished a great deal?

9  A.   Oh, yes.  We had -- we've closed a lot of the data gaps;

10 had very low understanding of the selenium in this

11 environment, the flows.  So we've learned a great deal,

12 technologies that show promise and those that don't.

13 Q.   I mean has all the work you've done put you in a position

14 to make a proposal to actually construct an FBR facility that,

15 you know, will bring Patriot into compliance?

16 A.   Yes.

17 Q.   You needed that work to get to that point.  Is that fair?

18 A.   Yes.

19      MR. HURNEY:  Your Honor, at this time I don't have

20 any further questions.

21      THE COURT:  All right.  Before we start cross, let's

22 take a few minutes here and sort out these exhibits and make

23 sure that we've got the right copies with the right people.

24      MR. HURNEY:  I apologize.  I thought I was --

25      THE COURT:  Let's sort it out before we start the

Harrison - Cross

```
1   cross.
2        (Counsel and the clerk conferred privately off the
3   record.)
4            THE COURT:  All right.  Are we ready to resume?
5            MR. LOVETT:  Yes, Your Honor.
6            THE COURT:  Okay.  Mr. Lovett, go ahead.
7                        CROSS EXAMINATION
8   BY MR. LOVETT:
9   Q.   Good afternoon, Mr. Harrison.  How are you today?
10  A.   Good.  How are you?
11  Q.   Let's talk a little bit about the schedule.  Mr. Hurney
12  asked you about the two-and-a-half-year schedule.
13  A.   Yes.
14  Q.   That is a schedule -- I guess now the cat is out of the
15  bag and we're no longer trying to have any confidentiality
16  from settlement negotiations; is that right?
17           MR. HURNEY:  I actually think you introduced it.  We
18  could talk about the engineer-to-engineer stuff.  I wasn't
19  planning to talk about any of the discussions that counsel had
20  with respect to settlement.  I thought we were struggling --
21           MR. LOVETT:  I wasn't going to talk about any of our
22  settlement stuff.  Don't worry about that in terms of this
23  schedule and the cost estimates.  You won't object to my
24  questions?
25           MR. HURNEY:  I'll have to listen to them first.
```

Harrison - Cross

1    BY MR. LOVETT:

2    Q.    Okay.  So this schedule was worked out at a meeting, I

3    think you testified, with Dr. Koon, three or four members of

4    the CH2M Hill staff, and a bunch of lawyers, right?

5    A.    Correct.

6    Q.    And during the meeting, the lawyers generally sat there

7    and let -- I mean at least during this part of the meeting --

8    and let the engineers work on this schedule, right?

9    A.    Correct.

10   Q.    And as I recall, Dr. Koon had a much shorter schedule in

11   mind in the beginning, and you all had a longer schedule in

12   mind at the beginning; is that right?

13   A.    Correct.

14   Q.    And there were discussions, and I believe -- if this is

15   wrong, tell me.  But Dr. Koon persuaded Mr. Shively and you

16   that the schedule could be shortened and tasks could be

17   performed concurrently that may not originally have been in

18   your schedule planned to be performed concurrently; is that

19   right?

20   A.    Yes, there were some --

21          THE REPORTER:  I'm sorry.  I didn't hear you.

22          THE WITNESS:  There were some areas identified that

23   we could tighten the schedule.

24   BY MR. LOVETT:

25   Q.    And I don't think that was part of a compromise position

Harrison - Cross

1    at that point, was it?  That was just engineers talking about

2    how to shorten the schedule, right?

3    A.    Correct.

4    Q.    And it's my understanding that at the end of the meeting,

5    CH2M Hill concluded that it could install the FBR project at

6    Apogee -- centralized FBR project at Apogee in this time

7    period if asked to.

8    A.    We believed that we could if we could address some of

9    these unexpected things that, you know, you don't know until

10   you get there.

11   Q.    And you have those in any project, right?

12   A.    Right, and that's why we build a contingency.  In our --

13   Bill Shively's impression, this two and a half years doesn't

14   include that.

15   Q.    It does?

16   A.    Does not.

17   Q.    Does not?  Well, I thought that during the discussions,

18   that we said several times -- I think Mr. Shively or Mr. Sandy

19   or yourself -- I can't remember who now -- said, "Well, we

20   need a couple of months here to make sure that -- for any

21   contingencies."  And I think Dr. Koon said, "I don't know if

22   you really need them, but it's okay."  Do you remember --

23   A.    No.

24   Q.    You don't remember that?

25   A.    There was no contingencies used in that schedule.

Harrison - Cross

1    Q.   Do you remember what Dr. Koon's proposal was?

2    A.   I believe it was two years.

3    Q.   Is that 106 weeks, maybe?

4    A.   That sounds right, yes.

5    Q.   And I think that based on what you've heard in the

6    meetings with you all, he testified in length in that to 110

7    weeks during this hearing.  Were you here for that testimony?

8    A.   No, I wasn't.

9    Q.   Now, this schedule has a lot of different points or dates

10   at which projects are started and concluded and so forth.  So

11   if the Court --

12   A.   Do you mean this schedule up here?

13   Q.   Yes.  No, I'm sorry, the schedule -- the two-and-a-half-

14   year schedule that is Exhibit 62 -- 63?

15        THE COURT:  63.

16   BY MR. LOVETT:

17   Q.   63.  I'm sorry.  That schedule.  There are timelines and

18   dates by which certain tasks are accomplished, right?

19   A.   Correct.

20   Q.   And if the Court were to enter an order compelling

21   compliance with a schedule such as this, it could base -- it

22   could judge progress on the project by comparing these time-

23   lines to what's actually happening on the ground; is that

24   right?

25   A.   Yes.

1    Q.   Looking at this schedule now, do you have any particular

2    concerns about the timeline?

3    A.   Again, I think in my mind if things go as planned and

4    there aren't any of these unexpected events related to

5    permitting or special findings in the geotechnical evaluation,

6    that this could be achieved.

7    Q.   CH2M Hill does fast-track projects from time to time,

8    doesn't it?

9    A.   I expect so, yes.

10   Q.   Does it have a different team to do fast-track projects,

11   or would you be the team assigned to that?

12   A.   It hasn't been defined yet, but there's probably a role

13   for the existing team, but I'm sure we would be adding others.

14   Q.   If you go to a fast-track schedule, you would add others,

15   right?

16   A.   Particularly from the construction end and that type of

17   thing.

18   Q.   Would this qualify -- this two and a half years do you

19   think qualifies as a fast-track project?

20   A.   I do, yeah.  For an example, we're doing things like

21   pilot study in parallel with preliminary engineering.  So

22   we're doing the design before kind of having all the answers.

23   Q.   But I think that was pointed out that that's not a

24   problem because you don't need those answers yet to do the

25   preliminary work, right?

1   A.   We can do it -- the bulk of it and modify it if the

2   findings showed that we needed to change it.

3   Q.   This is a reasonable schedule, isn't it?  That's all I'm

4   trying to point out.  It's a schedule that your engineers

5   agreed to in a meeting.

6   A.   Agreed to with the contingency.

7   Q.   I don't remember any -- the contingency has come since

8   the meeting, hasn't it?

9   A.   I'm sorry?

10   Q.   The contingency that you're stating today is since the

11   meeting.  It wasn't something that was stated during the

12   meeting, was it?

13   A.   I don't recall if it was.

14   Q.   Let's look at the exhibits that Mr. Hurney took you

15   through first.  Joint Exhibit 2, which is the basis of design

16   memorandum --

17   A.   Yes.

18   Q.   -- that was produced on January 19, 2009; is that right?

19   A.   Yes.

20   Q.   And I'll turn your attention to page 9, which is the

21   recommendation section.  In January -- so the

22   recommendation -- do you see that page?

23   A.   Yes.

24   Q.   So in January of 2009 you recommended that Patriot

25   install appropriate flow monitoring and sampling equipment

Harrison - Cross

1    near to better define the basis of design for three

2    outfalls -- for the three outfalls of concern.  Is that a

3    recommendation?

4    A.    Yes.

5    Q.    Was that recommendation followed?

6    A.    Other than the storm water study at the Hobet site, not

7    to my knowledge.

8    Q.    This recommendation is to understand the flow at the

9    Apogee sites, isn't it?

10   A.    Yes.

11   Q.    That was not undertaken?

12   A.    Not to my knowledge.

13   Q.    And then you go on to say, "This will be crucial for

14   properly sizing equalization capacity to manage storm flows

15   and associated treatment systems."  Do you see that?

16   A.    Yes.

17   Q.    CH2M Hill been tasked with any equalization projects by

18   Patriot?

19   A.    No.

20   Q.    And as you said, that really can't be properly done until

21   the flows are better defined, right?

22   A.    It would decrease the uncertainty in sizing.

23   Q.    And then you -- "In addition, CH2M Hill recommends

24   collection of discrete sample selenium concentrations and

25   other constituents of concern."  Do you see that, the second

Harrison - Cross

1   paragraph?

2   A.   Yes.

3   Q.   And did Patriot start doing that yet?

4   A.   I expect that they have a number of these parameters as

5   part of their monthly DMR monitoring.

6   Q.   You knew that at the time of the report.  You're not

7   asking for more DMRs, are you?

8   A.   That would increase the certainty around the selenium

9   concentrations.

10  Q.   Let me understand.  I thought that this was the

11  recommendation that they do the storm flow monitoring project

12  that they're doing at Hobet that you just testified about.  Is

13  that not what this is?

14  A.   This is not quite the same thing.

15  Q.   Okay.  What's different about it?

16  A.   The project we're working on at Hobet really looks at

17  trying to understand the correlation between selenium and

18  storm flow.

19  Q.   I thought that's what this says.  "This data collection

20  is recommended in order to develop correlations of storm flow

21  and selenium concentration."

22  A.   I'm sorry.  Yes, that's right.

23  Q.   Okay.  So that is the project that's going on at Hobet

24  now, right?

25  A.   That's correct.

Harrison - Cross

1    Q.   And that started in April, right, of 2010?

2    A.   The field work portion of it.  Discussions were in August

3    to start talking about that project.

4    Q.   Do you know why there was such a long delay between this

5    January 19, 2009 recommendation and the actual undertaking of

6    the project?

7    A.   I didn't have discussions with Patriot on that.

8    Q.   And in your deposition, you said you never knew that

9    Patriot had a compliance date of April 2010; is that right?

10   A.   Yeah, we weren't brought into specific discussions on

11   strategy.

12   Q.   Right.  And you never knew of any earlier specific

13   deadlines that this Court had set for compliance.  You never

14   knew those compliance dates either, did you?

15   A.   I knew they were in discussions, in litigation and dates

16   associated with it, but not specifically.

17            MR. LOVETT:  May I approach?

18            THE COURT:  Yes, you may.

19   BY MR. LOVETT:

20   Q.   Joint Exhibit 14.  Have you seen this before?

21   A.   Yes, I have.

22   Q.   And it's a reprint of an article of which you're a

23   co-author; is that right?

24   A.   That's correct.

25   Q.   This is from the SME annual meeting earlier this year?

Harrison - Cross

1   A.   That's correct.

2   Q.   And what's SME?

3   A.   I'm drawing a blank.

4   Q.   Society of Mining Engineers?

5   A.   Uh-huh.

6   Q.   Now, as I understand it, CH2M Hill has not been tasked

7   with any responsibilities regarding ZVI.

8   A.   Other than to incorporate the sizing basis and cost basis

9   into our conceptual evaluations.

10  Q.   You haven't analyzed any reports about ZVI's

11  effectiveness, have you?

12  A.   No, I haven't.

13  Q.   You don't know of any data that's really been compiled in

14  a systematic way to show whether ZVI is effectively treating

15  selenium to the water quality standard or not, do you?

16  A.   I don't at the Patriot sites.

17          THE REPORTER:  I'm sorry.  I didn't hear that.

18          THE WITNESS:  I don't at the Patriot's sites.

19  BY MR. LOVETT:

20  Q.   On page 3, your article, under the heading "Biological

21  anoxic and anaerobic heterotrophic attached growth" section --

22  do you see that?

23  A.   Yes, I do.

24  Q.   Second sentence.  It says, "Two ZVI configurations were

25  evaluated:  ShipShaper and MATRIC."

Harrison - Cross

1    A.    Uh-huh.

2    Q.    It says, "Each is in the early development stages."

3    A.    That's correct.

4    Q.    Is that still correct?

5    A.    Though I haven't been involved, I understand they've

6    tried new things, optimization of their systems, but we

7    haven't been involved with that.

8    Q.    So as far as you know, it's still correct.

9    A.    I don't know otherwise.  Yes.

10   Q.    Okay.  And in the conclusion of the paper on page 4, you

11   say that the ZVI technology offered by ShipShaper was

12   demonstrated in limited pilot studies to be effective for

13   selenium removal under low flow concentrations.

14         Do you see that?  It's the first sentence.

15   A.    Under the Conclusions paragraph?

16   Q.    Yeah, the first sentence.

17   A.    Yes.

18   Q.    That's not to say that it's been effective for removing

19   selenium to 5 parts per billion or less on a consistent basis,

20   is it?

21   A.    I don't have the data to say that.

22   Q.    Okay.  And then you say, "It is infeasible for practical

23   application for larger flows, such as 800 gallons per minute."

24   Is that still your opinion?

25   A.    Again, I don't know the recent improvements that have

1    been told on the kinetics, but I don't have information to

2    conflict that.

3    Q.    Okay.  Well, you don't think that you could go out and

4    install a ZVI system for 800 gallons per minute and make that

5    work, do you?

6    A.    Not necessarily 800 gallons a minute, but I -- it

7    should be effective for, you know, flows of 100 gallons a

8    minute.

9    Q.    But just to remove selenium, not to necessarily remove

10   selenium to 5 parts per billion, right?

11   A.    I understand that there are facilities that have done

12   that.

13   Q.    Have you seen any data or reports substantiating that?

14   A.    I believe that there may be reference to that in the

15   North American Metals Council.

16   Q.    At what site is that?

17   A.    I'm sorry?

18   Q.    At what site?

19   A.    I understand that it's at a Monsanto site.

20   Q.    Oh, a Monsanto site.  Nothing having to do with mining.

21   A.    I believe it's phosphate mining, but I'm not positive of

22   that.

23   Q.    Were ShipShaper or MATRIC involved with that?

24   A.    I don't know.

25   Q.    Okay.  And it says in the second paragraph -- let me take

Harrison - Cross

1    you to the last sentence of that.  "Capital and O&M costs are

2    significantly higher than for most of the other alternatives,

3    and the technology requires a very large footprint."  Is that

4    right?

5    A.    Based on the kinetics information they gave us, this

6    would've been probably late -- early 2009.

7    Q.    And you don't have anything since then, do you?

8    A.    No, I don't.

9    Q.    And then you say, "The ZVI technology offered by MATRIC

10   was tested only in a laboratory-scale system and is reported

11   to be effective for selenium removal."

12         Again, that's just removal of selenium, but not to any

13   particular limit, right?

14   A.    Yeah, I don't have the data on that.

15   Q.    "It was not demonstrated in full-scale at high flow

16   rates.  CH2M Hill believes that the system is not yet

17   engineered for full-scale application for the flows required,

18   and there are many unknowns for full-scale application, such

19   as hydraulic issues in the channel, plugging of media with

20   precipitates and influent solids resulting in overflows in the

21   channel," and so forth, right?

22   A.    Correct.

23   Q.    And you don't have any data since this to contradict

24   that, right?

25   A.    We haven't been involved, no.

Harrison - Cross

1   Q.   But you have been involved in testing every other system

2   that is being considered by Patriot at this time, right?

3   A.   The only -- VSEP and the FBR are the only pilot studies

4   we've been involved in.

5   Q.   You've had some on the ABMet pilot too, haven't you?

6   A.   We were asked to do a cost estimate based on data they

7   provided us to implement that at a full-scale.

8   Q.   Now, in your deposition you testified that reverse

9   osmosis -- I'm going to shift gears on you.  You don't have to

10  look at that anymore.  You're welcome to, but --

11            MR. HURNEY:  Your Honor, I object.  I did not go

12  into technologies with him.  I limited his testimony to the

13  projects that were done and when they were performed.

14            MR. LOVETT:  I think you took him to Table --

15            MR. HURNEY:  I just identified --

16            MR. LOVETT:  You took him to Table 1, E1, of the

17  Selenium Conceptual Treatment Alternatives Evaluation, which

18  is a list of all the alternatives, including ZVI and RO and so

19  forth.

20            MR. HURNEY:  Correct.  And I just asked him to

21  identify them.  I didn't go into detail with him about them,

22  offering his opinions or testimony about the system and how it

23  worked.

24            THE COURT:  What do you intend to ask him about?

25            MR. LOVETT:  Very quickly I'm going to ask him if he

Harrison - Cross

1    thinks these alternatives -- I've just asked him about ZVI,

2    and I plan to ask him if he thinks the other alternatives

3    listed here are viable treatment alternatives for the Patriot

4    site.

5            MR. HURNEY:  Withdrawn.

6            THE COURT:  All right.  Go ahead.

7            MR. HURNEY:  Sorry, Joe.

8    BY MR. LOVETT:

9    Q.    RO-BC-BX, Alternative 2.  Is that reverse osmosis?

10   A.    I'm sorry.  What are you looking at?

11   Q.    I'm sorry.  I'm on page 3.

12           THE COURT:  Which exhibit?

13           MR. LOVETT:  Joint 5.  Selenium Conceptual

14   Treatment.  It's the December -- I assume the January 26, 2009

15   alternatives document.

16           THE WITNESS:  I don't have that.

17           MR. LOVETT:  Oh, you don't have that anymore?  I

18   thought you would have memorized this by now.

19           THE COURT:  What page?

20           MR. LOVETT:  Page 3, I think.  Yes, 3.

21   BY MR. LOVETT:

22   Q.    You've seen that Table E1 many times now in this case,

23   haven't you?

24   A.    Yes.

25   Q.    Okay.  So there are several alternatives, and we just

1    talked about ZVI ShipShaper, ZVI MATRIC, and so forth, and I

2    was asking you about RO.  RO is a very expensive treatment

3    technology, right?

4    A.    In this application, yes.

5    Q.    And as I understand it, it may have some problems with

6    fouling and scaling if appropriate pretreatment isn't

7    concluded; is that right?

8    A.    That's correct.

9    Q.    Nevertheless, with appropriate pretreatment, there's no

10   question that RO would achieve levels well below 5 parts per

11   billion for removal of selenium in these applications; is that

12   right?

13   A.    We would expect if you design and operate them properly,

14   they should be able to achieve that.

15   Q.    How low can it go?

16   A.    I'm not a membrane technologist.

17   Q.    And then there's Alternative 3A, ABMet.

18   A.    Right.

19   Q.    That's the GE technology, right?

20   A.    That's correct.

21   Q.    And, again, that's less expensive and much less expensive

22   than RO but more expensive than the FBR, right?

23   A.    That's correct.

24   Q.    And I think that the ABMet pilot was also successful at

25   removing to significantly below 5 parts per billion; is that

Harrison - Cross

1  right?

2  A.   I did see that in the report.

3  Q.   And so it was the opinion of CH2M Hill that ABMet would

4  be an effective treatment technology in the applications at

5  issue at Apogee?

6  A.   One of the challenges with the ABMet is that its

7  footprint is much, much bigger than an FBR.

8  Q.   Uh-huh.

9        THE REPORTER:  I'm sorry.  You need to speak up.

10        THE WITNESS:  I'm sorry, ma'am.  The ABMet system

11  had a much higher footprint --

12        MR. LOVETT:  Right.

13        THE WITNESS:  -- so you would have to excavate a

14  much larger area to install it.

15  BY MR. LOVETT:

16  Q.   How much larger of a footprint?  Is it twice as big?

17  I --

18  A.   I submit two to three times as big.

19  Q.   Okay.  So it would require much more excavation.

20  A.   That's correct.

21  Q.   But once the excavation was done, it would treat the

22  selenium to --

23  A.   Yes.  And the one concern about that report, that they

24  didn't evaluate the other byproducts that are generated --

25  Q.   Right.

Harrison - Cross

1   A.   -- like the BOD and so forth.  So that would be important

2   to understand so you don't create another problem.

3   Q.   But those would be technical details that should be

4   worked out without too much difficulty, right?

5   A.   That should be able to be worked out.

6   Q.   As I understand it, the reason that CH2M Hill doesn't

7   recommend ABMet is because of cost, basically because of cost

8   and footprint; is that right?

9   A.   Yeah.  Technologists could speak better than I, but those

10   are two of the issues.

11   Q.   Okay.  Alternative 3B is the FBR, right?

12   A.   That's correct.

13   Q.   And that's what you're actually recommending now that

14   Patriot use, right?

15   A.   That's correct.

16   Q.   And the FBR -- CH2M Hill is confident that the FBR will

17   reduce selenium concentrations to below 5 parts per billion at

18   these mining applications for Patriot, right?

19   A.   Yeah, for defined flows and with the proper post

20   treatment and pretreatment.

21   Q.   Right.  I understand.  Do you know how much Patriot has

22   paid CH2M Hill since it retained it in 2008?

23   A.   Specifically for the selenium-related work?

24   Q.   Yes.

25   A.   It's on the order of $900,000, but we have contracted, I

Harrison - Cross

1   believe, on the order of a hundred and twenty-five -- or, I'm

2   sorry -- 1.25 million.

3   Q.    Into the future?

4   A.    Like for the storm water study and so forth that we're

5   still working on.

6   Q.    Now, as I understand it, CH2M Hill has been asked to

7   provide a proposal just on this past Monday --

8   A.    That's correct.

9   Q.    -- for installation of a ZVI system -- excuse me -- for

10   an FBR system?

11   A.    Yes.

12   Q.    And that's at Apogee or Apogee and Hobet 22?

13   A.    I believe it's -- it's for the three outfalls at Apogee.

14   There was not a Hobet request.

15   Q.    You still have no request for Hobet 22.

16   A.    That's correct.

17   Q.    Have you talked to them at all about Hobet 22?  Talked to

18   Patriot at all about treating the flow at Hobet 22?

19   A.    I believe other than it was brought up in the meetings

20   last week.

21   Q.    But that's it?

22   A.    Yes.

23   Q.    Okay.  And what have you been asked to provide a proposal

24   to do, to treat at a centralized system all the flow from the

25   three sites?

Harrison - Cross

1    A.    Yes, at Apogee.

2    Q.    And the design basis for that, is that the 25-year -- the

3    first flush of a 25-year storm?

4    A.    I don't recall specifically if we carved that out.

5    Q.    That's what you all have recommended, though, in your

6    January 2009 preliminary watershed flow estimation, right?

7    A.    I'm sorry.  Recommended what?

8    Q.    The design flow be based on the first flush of a 25-year

9    storm?

10   A.    It wasn't really a recommendation.  We were just trying

11   to understand the breadth of the potential problem and the

12   sizing issues.

13   Q.    Now, CH2M Hill is -- how many employees does CH2M Hill

14   have?

15   A.    Approximately 25,000.

16   Q.    And CH2M Hill could have, if asked, done pilots of VSEP

17   and FBR at the same time, couldn't it have?

18   A.    Well, there's a bit of overlap there at the end of the

19   VSEP and the start of --

20   Q.    But I'm saying if you had been asked, you could have

21   assigned -- you have enough staff and resources, if asked, to

22   do two pilot projects at once, right?

23   A.    Yes.

24   Q.    But you weren't asked, right?

25   A.    Not until later for the FBR.

Harrison - Cross

1    Q.    You weren't asked to do the FBR pilot before the VSEP

2    pilot, were you?

3    A.    No.

4    Q.    You weren't asked to do it while the VSEP pilot was going

5    on, right?

6    A.    I think there was a little bit of overlap.

7    Q.    But you weren't asked to start it in March of 2009, for

8    instance.

9    A.    No.

10   Q.    But you would have had the resources to do that had you

11   been asked?

12   A.    We likely could have found the resources.

13   Q.    Now, I see on the schedule, the first part of it is a

14   very short pilot, right?

15   A.    Yes.

16   Q.    And when I say the schedule, I mean the two-and-a-half-

17   year schedule that you all worked out.  What is that pilot

18   for?

19   A.    The pilot is designed to address the recommendations from

20   the FBR pilot study report.  Two of the fundamental issues

21   were the suspended solids that come out of the FBR unit have

22   selenium associated with them, and -- but we also then have to

23   go into a second process to do aerobic treatment --

24   Q.    Uh-huh.

25   A.    -- to grade BOD --

Harrison - Cross

1   Q.    Right.

2   A.    -- where we got a concern that we would reoxidize the

3   selenium and then we wouldn't be able to capture it in the

4   filter.  So that's part of the issue.

5   Q.    But you know that you'll be able to deal with it.  The

6   only question is, there are one or two ways that you could do

7   it, and the pilot will tell you which of the two ways to deal

8   with the problem, right?

9   A.    The pilot is intended to understand the appropriate

10  sizing and technology to address the problem.

11  Q.    Well, why didn't you do that when you had the pilot

12  project running?

13  A.    That was the scope of our project and commitment.

14  Q.    In other words, Patriot didn't ask you to do that.

15  A.    Ask us to do what?

16  Q.    To determine how to deal with the BOD and TSS issues that

17  you're raising here now.

18  A.    They did not.

19  Q.    It would have been much easier to have done it then

20  rather than now, right?

21  A.    It would have been more efficient.

22  Q.    Do you know why you weren't asked to do that at the time?

23  A.    No, I don't.

24  Q.    Now, you testified in response to one of Mr. Hurney's

25  questions when he asked you how much you all have been doing,

Harrison - Cross

1   you said, "We've closed a lot of data gaps between July 2008

2   and now."  Is that right?

3   A.   Yes.

4   Q.   Do you actually -- do you know if the Court's order

5   required closing of data gaps?  Were you assigned to close

6   data gaps?

7   A.   We were assigned to help them understand how to solve

8   selenium discharge issues.

9   Q.   Now, I know you weren't here before lunch, but a witness

10  here testified that Patriot's estimated selenium liability

11  allocated $1.3 million to install the capital.

12       I'm going to ask him if he thinks that they could

13  accomplish treatment at an outfall for $1.3 million.

14           THE COURT:  All right.  I'll allow it.

15  BY MR. LOVETT:

16  Q.   So what could you do if you were given $1.3 million to

17  treat the selenium at all three of these outfalls?

18  A.   I don't quite understand the question.

19  Q.   What treatment system could Patriot install at Apogee for

20  $1.3 million that would treat the discharge from these three

21  outfalls?

22  A.   Treat all the discharge?

23  Q.   Yes.

24  A.   I'm not aware of any that would treat all the --

25  Q.   That's a ridiculous underestimate of cost, right?

Harrison - Cross

1    A.    I don't -- I would need to understand the basis for it.

2    Q.    Okay.  Will a centralized system that you're designing

3    return the water to Mud Lick after treatment?

4    A.    We discussed that last week.

5    Q.    And I just wonder, is that still part of the plan?

6    A.    I believe it is.

7    Q.    So the quote that you're getting would return the water

8    to the streams from which it was taken.

9    A.    Correct.

10   Q.    How much of the project budget would you expect to be in

11   the first 25 percent of the project schedule?

12   A.    I believe 5, 5 percent, something like that.

13   Q.    5 percent of the --

14   A.    Yeah.

15   Q.    And what about in the second quarter?

16   A.    Probably 5 to 10.  And by quarter, you mean of the two

17   and a half years?

18   Q.    Yes, or the 110 weeks, whatever the schedule is.

19   A.    Yeah, 5 to 7 percent.

20   Q.    5 percent in the first quarter of that, 5 to 7 percent in

21   the second quarter?

22   A.    Yes.

23   Q.    What about the third?

24   A.    40 percent.

25   Q.    40?  And then the last?

Harrison - Cross/Redirect

1   A.    Whatever the difference is.

2   Q.    Okay.

3   A.    30 or a little less.

4   Q.    Okay.  The paper that you authored for the mining

5   engineers, was John McHale a co-author of that paper?

6   A.    Yes, and he -- he reviewed the abstract that we

7   developed.

8           MR. LOVETT:  That's all I have.  Thank you.

9           THE COURT:  All right.  Redirect?

10          MR. HURNEY:  Briefly, Your Honor.

11                  REDIRECT EXAMINATION

12  BY MR. HURNEY:

13  Q.    You were originally retained in July of -- end of

14  July 2008?

15  A.    That's right.

16  Q.    Okay.  If at some point around that time you'd been told

17  you had a deadline to have all three outfalls at Apogee in

18  compliance, would CH2M Hill have been able to design,

19  construct, commission, and build a system using FBR, RO, or

20  any other technology?

21  A.    And you're talking about how many months?

22  Q.    When you were hired in the Fall of -- when you were hired

23  in July or so of 2008, if you were immediately told that there

24  was a June 30th, 2009 deadline, would you have been able to

25  design, construct, commission, say, an FBR system?

Harrison - Redirect/Recross

1    A.    No, we wouldn't have.

2    Q.    If you had been told in, say, March of '09 that there was

3    a new deadline of April 5, 2010, would you have been able to

4    design, construct, commission an FBR system by that deadline?

5    A.    And, again, that's just over a year it looks like?

6    Q.    Yes.

7    A.    No, we wouldn't.

8    Q.    How about VSEP?

9    A.    No.

10   Q.    Is there any technology that you think CH2M Hill could

11   have put in in that deadline?

12   A.    No.

13          MR. HURNEY:   I don't have any further questions,

14   Your Honor.

15                      RECROSS EXAMINATION

16   BY MR. LOVETT:

17   Q.    And so I guess that means that Patriot didn't seek your

18   advice about whether it could build a project between

19   March 2009 and April 2010, right?

20   A.    I don't recall ever being asked that.

21   Q.    As long as we're asking hypotheticals, if you'd been told

22   on March 30, 2009 that you had to install by March 30, 2011,

23   could you have done that?  Let me take it to March 2012, three

24   years.

25   A.    If we had three years to do this project?

Harrison - Recross

1    Q.   If on March 30, 2009 Patriot had come to CH2M Hill and

2    said, "We've got to get this done in three years.  It's just

3    imperative or, you know, we're going to face dire

4    consequences," could you have done that for them?

5    A.   That seems more reasonable.

6              MR. LOVETT:  Thank you.

7              THE COURT:  All right.  Any other questions?

8              MR. HURNEY:  No other questions, Your Honor.

9              THE COURT:  All right.  You may step down,

10   Mr. Harrison.

11        We'll take about a ten-minute recess.

12        (Recess from 3:15 p.m. to 3:35 p.m.)

13             THE COURT:  All right.  You may call your next

14   witness.

15             MR. HURNEY:  Yes, Your Honor.  At this time I would

16   call Thomas Sandy.

17             THE COURT:  Mr. Sandy, if you'll step up here, my

18   clerk will swear you in.

19         ARTHUR THOMAS SANDY, DEFENDANT'S WITNESS, SWORN

20             MR. HURNEY:  I have Mr. Sandy's CV, which was

21   inadvertently not supplied to the Court ahead of time.  I have

22   two copies.  I'd ask to have it marked at whatever the next

23   defendant's number is.

24             THE COURT:  All right.  That would be -- the last

25   number I had for the defendant's unilateral exhibit is 14.

Sandy - Direct

1   This would be 15.

2               MR. HURNEY:  Number 15.  I think that's --

3               THE COURT:  I think that's right.

4               MR. HURNEY:  I'll do a better job with my witness,

5   Your Honor.

6               THE COURT:  Actually, I think it's actually 11.

7   Let's make it 11.

8               MR. HURNEY:  May I proceed, Your Honor?

9               THE COURT:  Yes, go ahead.

10                      DIRECT EXAMINATION

11  BY MR. HURNEY:

12  Q.    Would you state your name.

13  A.    Arthur Thomas Sandy.

14  Q.    Where do you work?

15  A.    CH2M Hill.

16  Q.    And what is your position with CH2M Hill?

17  A.    I am the technology director for the industrial systems

18  business group.

19  Q.    What does that mean?

20  A.    I direct and administer the 500 technologists in our

21  business group related to the different markets that our

22  business group does work in.  So as an example, we have a

23  water market that does industrial water or wastewater, and I

24  direct people to projects to make sure we have the right

25  technologists.  I also help with best practices tools and

Sandy - Direct

1    approaches to delivering projects.

2    Q.    Mr. Sandy, I'd like to hand to you what has been marked

3    as Defendant's Exhibit 11.   Could you look at that document

4    for a minute and tell me what it is.

5    A.    This is my long resume.

6    Q.    I had Tim Harrison on the stand and he had a two-pager.

7    Do you also have a short resume?

8    A.    I do.

9    Q.    All right.   So we have your long one.   I'd like to first

10   talk to you about your educational background.   Where did you

11   go to college?

12   A.    I went to school at West Virginia University.

13   Q.    Okay.   And did you graduate?

14   A.    Yes, I did.

15   Q.    What year?

16   A.    1984 with a bachelors of arts in chemistry and in 1987

17   with a masters of science in engineering.

18   Q.    All right.   Do you have any special concentration with

19   your masters of science in engineering?

20   A.    I did.   I focused primarily on industrial water/waste-

21   water.

22   Q.    All right.   After you graduated in 1987, I take it you

23   went to work.

24   A.    I did.

25   Q.    And where did you --

Sandy - Direct

1    A.    I was fortunate to get a job at CH2M Hill in Seattle,

2    Washington.

3    Q.    All right.  When you started with CH2M Hill, what was

4    your position?

5    A.    I was a project engineer assigned to our industrial

6    water/wastewater group.

7    Q.    Could you tell us a little bit about what that means, an

8    example of a project or a description of what kind of work you

9    did?

10   A.    Yes.  As an example, as a project engineer we would

11   support some of our subject-matter experts and industry

12   experts in delivering solutions to technical issues that our

13   clients would have.  We would also support, design, and

14   construction of infrastructure projects related to industrial

15   water/wastewater.

16   Q.    What is -- I think we've kind of talked about this term

17   all week, but what exactly is industrial wastewater?

18   A.    It's just merely a differentiation between municipal

19   wastewater, municipal wastewater being sanitary wastewater.

20   In our company we've separated the practice of technology from

21   municipal to industrial.  So we would do industrial water/

22   wastewater work for the chemical industry, the petrochemical

23   industry, the mining industry, food industry, forest products

24   industry.

25         So we focus primarily on industrial water/wastewater.  It

Sandy - Direct

1    takes a subtly different skill set because of the uniqueness

2    of the problems associated with each industry related to

3    water/wastewater treatment.

4    Q.    How long were you in Seattle with CH2M Hill?

5    A.    I was in Seattle approximately five years.

6    Q.    Were you an engineer the entire time?

7    A.    I was.

8    Q.    As an engineer, I take it you're doing the actual design,

9    design work for wastewater treatment systems?

10   A.    Yes.

11   Q.    Operating as part of a team?

12   A.    Yes.

13   Q.    All right.  Now, you were in Seattle for five years.  Did

14   you move somewhere else with CH2M Hill?

15   A.    Yes.

16   Q.    And where did you go?

17   A.    Charlotte, North Carolina.

18   Q.    And that's where you live today?

19   A.    Yes.

20   Q.    All right.  Could you describe for us the position that

21   you had when you started with CH2M Hill in Charlotte?

22   A.    Yes.  I was more of a mid-level technologist.  I took a

23   temporary duty assignment to Charlotte to work on several

24   design projects related to synthetic/organic chemical fibers

25   industries in that area.  We were designing four wastewater

Sandy - Direct

1    treatment plants, and so I was -- I moved to support those

2    design projects.

3    Q.   Okay.  You're currently -- your current position as

4    principal technologist, is that -- did you have a couple of

5    ladders of promotion to get to that position?

6    A.   Yes.  We -- as Tim had said earlier, Tim Harrison, that

7    within CH2M Hill there's different career paths you can

8    pursue.  We have a technology career path, we have a project

9    delivery career path, as well as we've got a line management,

10   business development career path.  And so I actually -- I'm in

11   the project -- certified project manager, but I also focus

12   more on technology.  So I've pursued the technology career

13   path.  And as you get to a certain level, there's senior,

14   principal and fellow technologists, which is sort of the

15   highest ranking technologists we have, and I am a principal

16   technologist.

17   Q.   You've reached the top of the CH2M Hill pecking order in

18   terms of --

19   A.   Not quite.  A fellow technologist would be the top of the

20   pecking order, but as an example, in our company we have less

21   than 50 fellow technologists in a company of almost 20-some

22   thousand people.  So there's very few people that attain that

23   position.

24   Q.   I believe Mr. Harrison testified that you -- when you do

25   a project, you have a project manager and you would always

Sandy - Direct

1  have a technologist assigned to the project; is that correct?

2  A.   We do.   For project delivery, we assign a senior

3  technical consultant to every project.   And that role, it

4  parallels very much with the project manager role, but the

5  role of the senior technologist is really to support delivery

6  from the technical side to make sure we're providing the right

7  technical solutions.   And that role specifically related to

8  quality is we are responsible for reviewing, checking, and

9  verifying the technical work that's done for projects.

10 Q.   Okay.   Can you give me some examples of projects in which

11 you have been the principal or other technologist on?   We

12 know -- other than this particular project, but give us an

13 idea of a couple of other things you've worked on.

14 A.   Just recently or --

15 Q.   Sure, just an example.

16 A.   I am a senior technical consultant on a -- was a senior

17 technical consultant on a coal gasification project where we

18 were asked to develop a conceptual design for the

19 water/wastewater treatment for a petro and coal gasification

20 facility in Southern California.

21      So with that role, I was responsible for making sure that

22 we prescribed the right water treatment processes for the feed

23 water as well as the wastewater treatment for the gray water

24 from the gasification process.

25 Q.   When you said you picked technologies, like in this case

Sandy - Direct

1    we've been talking about RO and other things, is that your

2    part of the case, is to decide which technologies will work in

3    a given application?

4    A.    In part, yes.

5    Q.    And what other responsibilities do you have?

6    A.    Well, beyond picking the technology, we generally will

7    ask subject-matter experts to -- if it's an area that we're

8    not familiar with, to support a project.  So if we need, say,

9    as an example, a reverse osmosis expert, we will have a

10   subject-matter expert help support the project of which I'll

11   be involved in.  But beyond just picking the right team and

12   making sure we have the right people, I generally get involved

13   in tools and practices, making sure that we're really applying

14   the best practices standards of practice that would be

15   accepted in the industry.

16   Q.    And is that the role that you are taking in the projects

17   that CH2M Hill has performed and is recommending for Patriot

18   Coal?

19   A.    Yes.

20   Q.    Your CV suggests that you are a professional engineer in

21   a number of states.  What does that mean?

22   A.    I'm licensed to stamp drawings, permits, where required,

23   where there's a requisite for that, in the states of

24   Washington, North Carolina, and South Carolina.

25   Q.    Are you a member of any industry groups related to your

Sandy - Direct

1   field?

2   A.   Yes, I am.

3   Q.   And what groups are those?

4   A.   I am a member -- an active member of the Air and Waste

5   Management Association and the Water Environment Federation.

6   Q.   What is the Air and Waste Management Association?

7   A.   It's a professional association of scientists and

8   engineers that focus on, just as the name implies, air, solid

9   waste, and water/wastewater and management thereof.

10   Q.   There's been some -- I think admitted into evidence is a

11   document from the NAMC.

12   A.   Yes.  That would be the North American Metals Council.

13   Q.   Okay.  Are you involved with that group?

14   A.   Yes.

15   Q.   And what is your involvement with that group?

16   A.   CH2M Hill was contracted to do a project for the North

17   American Metals Council, and I was the senior technical

18   consultant for the work we did.

19   Q.   Were you a co-author of their report on selenium

20   treatment alternatives?

21   A.   Yes, I was.

22   Q.   And have you also authored other papers on selenium

23   treatment alternatives?

24   A.   Yes.

25   Q.   Including one related to the use of various technologies

Sandy - Direct

1    in the coal industry in West Virginia?

2    A.   Yes.

3              MR. HURNEY:  Your Honor, at this time I would move

4    that Mr. Sandy be recognized as an expert in environmental

5    engineering with experience in wastewater management and

6    project management.

7              THE COURT:  All right.  You may proceed.

8              MR. HURNEY:  Thank you, Your Honor.

9    BY MR. HURNEY:

10   Q.   All right.  Mr. Sandy, I want to -- we haven't -- were

11   you involved with the -- when Patriot first retained CH2M

12   Hill?

13   A.   Yes.

14   Q.   And could you tell the Court how you became involved.

15   A.   I was contacted by John McHale and asked if CH2M Hill

16   could respond to help them do an evaluation, a high-level

17   evaluation of selenium treatment technologies.

18   Q.   Okay.  And -- okay.  I was looking for a document.  So

19   you got the initial phone call from John McHale, or you called

20   him?

21   A.   Yes.

22   Q.   Okay.  Once they got in contact, what did CH2M Hill do?

23   A.   Well, what I did was talk to John about the context of

24   the project.  You know, from a business standpoint, we want to

25   make sure that we understand how they're procuring it, and we

Sandy - Direct

1    do some kind of -- go through a decision process to decide

2    whether to pursue it.  So I talked to John to basically

3    qualify what he wanted done and how they were planning on

4    procuring the work.  And then I engaged our project delivery

5    director and some of our business development people to work

6    on putting together a proposal or ultimately making a more

7    formal decision on whether we should pursue the work or not.

8    Q.    Okay.  And ultimately did you all decide to take on the

9    project?

10   A.    Yes.

11   Q.    Okay.  And did you become the technical director for the

12   project?

13   A.    I was the senior technical consultant.

14   Q.    Were you involved in the January 26th report that

15   reviewed available technology?

16   A.    Yes.

17   Q.    Do you have a copy of that with you?  Did you bring a

18   copy with you to the stand?

19   A.    I do not.

20   Q.    Let me ask you if -- I'm going to hand you what has been

21   marked as Exhibit 5 and ask you if this is the January report

22   that discussed various treatment alternatives for Patriot

23   Coal.

24   A.    Yes, it is.

25        MR. HURNEY:  Okay.  And, Your Honor, this is Joint

Sandy - Direct

1    5, which I believe has been admitted.

2          THE COURT:   It has.

3    BY MR. HURNEY:

4    Q.   Mr. Sandy, earlier there was another document that was

5    provided to Patriot in November of 2008, and that's a

6    screening level.  Do you see that document?

7    A.   Yes.

8    Q.   And that's Document Number 3, correct?  Exhibit Number 3?

9    Look on the front page for the number of the exhibit.

10   A.   This is Exhibit 3, and I was just -- there's --

11   Q.   Appear to be some other stuff there?

12   A.   Yes.

13   Q.   I just wanted to ask you generally, was Exhibit 3 kind of

14   the first pass at available technologies, kind of a -- I think

15   Tim Harrison described it as a high-level review.

16   A.   Well, this isn't -- this is the regulatory analysis.  So

17   this is not that document.

18   Q.   Okay.  I'm sorry.

19   A.   That's why I was -- this says screening level, but it's

20   really the -- it's in part one of the four things that we did

21   in the project after we did the screening analysis.

22   Q.   What I was trying to do is I talked to Tim Harrison about

23   the various projects that you guys performed, and what I would

24   like to do with you is to focus on your portion of the

25   project, which I believe is the technology.  Is that fair?

Sandy - Direct

1    A.    Yes.

2    Q.    Okay.  So if you would look at Exhibit 5, which is the

3    conceptual treatment alternatives, is this the document in

4    which CH2M Hill reviewed the available technology and

5    described it to Patriot?

6    A.    No.

7    Q.    Okay.  Is there such a document?

8    A.    Yes.

9    Q.    Are you looking at 5?

10   A.    We did a conceptual -- this was more the focused

11   treatment.  So the conceptual evaluation we looked at a longer

12   list.

13   Q.    Oh, okay.

14   A.    And the conceptual evaluation really focused on

15   technologies that we thought were feasible based on the new

16   information we got from the different outfalls as we were

17   sampling.

18   Q.    Okay.  Well, let me ask you to look at Exhibit 5.

19   A.    Okay.

20   Q.    Okay.  That was January 26, 2009.  What is this document?

21   A.    This is the conceptual alternative analysis for selenium

22   treatment technologies as they would apply to the water that

23   we characterized at the Apogee site.

24   Q.    Okay.  Did you -- and you chose Outfall Number 2?

25   A.    That's the 800 -- yes, we picked that outfall because it

Sandy - Direct

1    was sort of the median of the -- in terms of flow rates.

2    Q.    Now, let me ask you, in this document, as I look through

3    it, it appears on page 3 that you cost out a number of

4    different treatment options, correct?

5    A.    Yes.

6    Q.    Okay.  Now, and then as you go through the document, for

7    example, on page 6 you describe an overview of pertinent

8    reduction mechanisms.

9    A.    Yes.

10   Q.    Correct?  All right.  Now, just -- I just want to have an

11   overview of the different types of treatment that CH2M Hill

12   thought -- is it fair to say thought might be applicable to --

13   for use at these outfalls at Patriot?

14   A.    Yes.

15   Q.    Okay.  When you talk about chemical treatment, what kind

16   of systems are you referring to?

17   A.    Well, we're referring to systems that would in some way

18   either chemically adsorb or reduce the selenium.  And so in

19   this document, we in particular focused on zero valent iron

20   because it's a viable technology that -- to reduce selenate.

21   So it works through several different chemical mechanisms.  So

22   there's actually a reduction that can go on with zero valent

23   iron.  There's actually adsorption that goes on with zero

24   valent iron.  And so there's a couple mechanisms that

25   actually -- there's actually three separate pathways that

Sandy - Direct

1    selenate and selenite can get reduced to elemental selenium

2    with zero valent iron, so --

3    Q.    We've had testimony this week related to separate systems

4    that were referred to as either ShipShaper, GMT, and Liberty/

5    MATRIC.  Are you familiar generally with those systems?

6    A.    Generally, yes.

7    Q.    Okay.  You all -- CH2M Hill was not involved in the

8    piloting or operation of those systems; is that correct?

9    A.    Yes.

10   Q.    Okay.  Did you review those systems, however, in terms of

11   your January 26, 2009 report?

12   A.    We were given information on the systems at the time of

13   their development.

14   Q.    Okay.

15   A.    So we took that information and then had to assess, you

16   know, how would we put one of these in full-scale, so --

17   Q.    It's true -- you've also described the strengths and

18   weaknesses -- you described the strengths and weaknesses of

19   ZVI in this report, correct?

20   A.    We did, yes.

21   Q.    And you described ZVI as a potential technology in a

22   paper you wrote for the -- for a mining association meeting,

23   correct?

24   A.    Yes.

25   Q.    Okay.  And you also included it in the paper which you

Sandy - Direct

1    participated for the NAMC, correct?

2    A.    Yes.

3    Q.    Is it fair to say that ZVI is a technology that can be

4    used for the removal of selenium?

5    A.    Yes.

6    Q.    Okay.  It was referred to by Dr. Koon as a fledgling

7    technology.  Do you believe that ZVI is a fledgling

8    technology?

9    A.    Yes.  You know, if you define fledgling as -- how I would

10   define fledgling in that context is I think what Dr. Koon was

11   implying is that it's in the state of development.  And,

12   frankly, all these technologies are fledgling technologies,

13   whether it be the biological technologies or the reverse

14   osmosis, in the sense that we are trying to treat selenium to

15   low levels which has never been done in full-scale in this

16   industry at this scale.  And we are applying technologies that

17   albeit have been tried in other applications that aren't

18   exactly this.  So they're all really fledgling technologies in

19   the sense that there's some development required to understand

20   how they will perform and what you need to do to make them

21   treat down to these low levels.

22   Q.    For example, reverse osmosis is a technique that has been

23   used in wastewater treatment for quite sometime?

24   A.    Yes.

25   Q.    Is it -- is it one that you are adapting or -- well, let

Sandy - Direct

1   me ask this question to make it clearer.  Put selenium aside.

2   What do you use RO to remove?  What kind of things does RO

3   remove from water?

4   A.   RO is typically used for taking, you know, ions out of

5   water that can't be maybe treated otherwise, or in the case of

6   probably more common use would be desalinization for drinking

7   water as an example, where you're trying to remove salts from

8   water.

9   Q.   And it does it by forcing water through filters?

10  A.   It does through membranes.

11  Q.   Filters, membranes?

12  A.   Right.

13  Q.   Are you aware of the use of ZVI to remove selenium in

14  applications outside of the coal industry?

15  A.   Yes.

16  Q.   Okay.  And where's it being used?

17  A.   It's being used in the phosphate mining industry in

18  Idaho.

19  Q.   Now, I believe your conclusion of that ZVI is that while

20  it removes selenium, you question -- you question whether a

21  passive system can be used at high levels of 800 gallons per

22  minute and above?

23  A.   Correct, yes.

24  Q.   And -- but in terms of treatment of -- first of all,

25  adequate for treatment of low flows under a hundred gallons

Sandy - Direct

1   per minute?

2   A.   Yes.   A passive treatment with the right steps being done

3   is part of the process.   In any of these technologies, you

4   have to purposefully control the environment to make the

5   science or the science behind the mechanism that reduces the

6   selenium work.   So with the right pH and the right mixing and

7   mass transfer, you know, there's -- zero valent iron has a

8   potential to treat down to these levels.

9   Q.   It is -- although at the end -- and I believe at the end

10  of the day in January 2009, within the limitations that -- and

11  I've used broadly -- needs work, that was a technology you

12  thought should be continued for evaluation?

13  A.   Yes, we -- that was our recommendation, was, you know,

14  without being involved firsthand in what they were doing, was,

15  okay, you're obviously into development; continue to develop

16  that.

17  Q.   Now, let me ask, could you describe for the Court -- you

18  kind of went into RO.   We talked about ZVI.   Am I correct ZVI

19  works by the chemical reaction between the water when it's in

20  contact with the steel wool or the iron?

21  A.   Yes, in part.   There's actually -- with zero valent iron,

22  there's actually three chemical mechanisms that go on, there's

23  three things that happen, basically.   There's basic iron as

24  it's exposed to water with oxygen, it will rust.   And so in

25  the process, that's the first thing that happens, is you have

Sandy - Direct

1    to remove all the oxygen first.  And then what that does is

2    the remaining iron is then there free to potentially react

3    with the selenium.

4        So the first thing that you need to reduce selenate to

5    elemental selenium is you need what's called green rust.  And

6    it's a complex iron that's formed in this steady state

7    conditions with water and oxygen.  So green rust in iron will

8    reduce selenate to elemental selenium.

9        In the process of the oxidation of iron, you also produce

10   ferric iron, which is Fe +2, and ferrous iron, which is -- or

11   ferric iron is Fe +3 -- excuse me -- and ferrous iron, which

12   is Fe +2; and ferric iron at the right pH will reduce selenate

13   to selenite.  Or, excuse me.  Ferrous iron at the right pH

14   will reduce selenate to selenite.  And then ferrous iron at

15   the right pH will reduce or adsorb the selenium, the selenite.

16       So when you have zero valent iron, those three things are

17   what's going on, and you have to control the pH to keep -- so

18   what you would do is stage that so that you can maintain a

19   lower pH to get your green rust.  And if you're successful in

20   doing that, then it's possible to reduce all the selenate to

21   elemental selenium.

22       In the event you can't keep the pH that low, because what

23   happens is you actually produce hydrogen ions -- really, zero

24   valent iron was used, first, to try to understand how you

25   could make hydrogen.  And so what happens is immediately when

Sandy - Direct

1   you expose it to water, you actually raise the pH.  So you
2   have to control the pH low to keep green rust.  And then if
3   you -- you know, whatever iron is left, you still have the
4   potential to remove selenite and selenate through either an
5   adsorption or reduction process.
6       So those are the things that go on, and you can engineer
7   around that to make those reactions happen as you want them to
8   in the water environment.
9   Q.   Okay.  How does -- let me switch over to -- you talked
10  briefly about RO, the membrane technologies.  How do they
11  work?
12  A.   Well, there's an array of membranes with different what
13  they call cutoff sizes for sizes of molecules.  And you could
14  actually go up to a nano filter to remove selenate, but what
15  happens there is you pick a membrane that lets certain things
16  pass through it or not based on its size.  And in the case of
17  RO, typically it will remove all the ions.  So you end up in
18  the permeate having water that's void of any ions generally.
19      Now, if you pick a bigger, wider RO membrane, then that
20  will let more things go through.  Ultimately you can go to
21  nano membranes, and that will, you know, let even more things
22  through.  So basically you pump water through above the
23  osmotic pressure and you separate ions from water and you
24  create a permeate and a reject.  And the reject is where
25  you're -- the things you don't want are.  And then you have to

Sandy - Direct

1    manage the reject in a reverse osmosis system.

2         So in the case of selenium, you know, most membranes will

3    give you 75 to 90 percent recovery.  On 100 gallons per

4    minute, you may have to manage 25 gallons per minute of

5    reject.  So that's why reverse osmosis doesn't necessarily

6    completely solve the selenium removal problem, because you

7    still have a big flow of reject that you have to manage that

8    still has selenium in it, so --

9    Q.   Do you also have to manage the permeate?

10   A.   You do.  And you typically have to blend that because if

11   you pick a real high cutoff membrane, you create this water

12   that's devoid of ions, and you need what's known as an

13   isotonic solution to support, you know, aquatic life, aquatic

14   freshwater life.  So what we would normally do is blend some

15   of the water and reconstitute it before you put it in the

16   stream.

17   Q.   Now, if you put the water straight in the stream, it

18   would be -- it would kill the fish?

19   A.   It could, yes.

20   Q.   All right.  Let me switch and ask you to talk about

21   biologic systems.  And we've talked -- we've talked about

22   ABMet and we've talked about fluidized bed reactors.

23        In general, how do biologic systems work?

24   A.   Well, the -- what the concept here is that we are -- we

25   are taking what's known as a heterotrophic population of

Sandy - Direct

1    microbes that will grow and reproduce in the absence of oxygen

2    by obtaining their energy from carbon, which would be known as

3    the electron donor.  And so what they need is an electron

4    acceptor because oxygen is normally used in an aerobic

5    environment for heterotrophic bugs to grow and reproduce.

6        So, you know, the classic example would be denitrifi-

7    cation or nitrate in municipal wastewater is -- is really what

8    you're doing is you're adding a carbon source in the absence

9    of oxygen where the bugs then will use the nitrate to remove

10   it.  But what's really different here with selenium is in the

11   case of nitrate, you actually create nitrogen gas.  So that's

12   generally purged out of the water.

13       With selenium, if you go through this same process,

14   selenium exists as selenate and selenite.  Those are oxy-

15   anions, just like nitrate, and they act as the terminal

16   electron acceptor.  And what happens in this case is the

17   selenium actually gets reduced, so it's still in the

18   environment as reduced selenium, and so we've done the job of

19   reducing the selenate and selenite.  So we have to carefully

20   manage the biology because they form these nano particles that

21   are reduced selenium.  We don't want to reaerate those and

22   reoxidize those.

23       So that's what's so unique about applying the ABMet and

24   the FBR process in this application.  FBR has been used for

25   nitrate removal and for chlorate removal but never in

Sandy - Direct

1    selenium -- never for selenium.  ABMet really is just a
2    variant on an anaerobic filter that's been used for years.
3    Some people know it as a trickling filter.  It's a downflow
4    filter, but it was really produced by a company of
5    microbiologists that recognized how unique and complicated it
6    was to biologically remove selenium.
7    Q.    That's it.  Did you in your role as a technical person on
8    this project -- first of all, did you participate or review
9    the VSEP pilot that was performed?
10   A.    Yes, I participated; and, yes, I reviewed.
11   Q.    Okay.  What was the -- what was the conclusion of CH --
12   well, let me -- what was -- what was CH2M Hill's conclusion as
13   to whether VSEP was a viable technology for use in this
14   environment?
15   A.    As -- as prescribed by VSEP, their technology wouldn't
16   work based on their pilot tests.
17   Q.    Okay.
18   A.    But -- but we felt that it's a variant of a reverse
19   osmosis technology.  There's other variants of RO, and -- and
20   so there's a whole dog's breakfast or mix of RO technologies.
21   We felt that it could be engineered much like more of a
22   conventional RO to work, but in the pilot testing, what
23   happened was they ended up having membrane fouling issues that
24   compromised their ability to maintain the flux, the amount of
25   water that you push through the membrane to keep the permeate

Sandy - Direct

1    that you need.  And then over time what was happening is they

2    were bleeding selenium, because there was so much scale on the

3    membranes, that the membranes were fouling irreversibly.  And

4    so if you would have put in their system as they prescribed,

5    in a month's time you would have violated the selenium limit

6    in the permeate.

7    Q.    In your January 26, 2009 treatment alternative

8    evaluation, which is Exhibit 5, am I correct that you

9    recommended the piloting of an FBR system?

10   A.    I believe we did.

11   Q.    Okay.

12   A.    Yes, we did --

13   Q.    Okay.

14   A.    -- on page 3.

15   Q.    All right.  And did CH2M Hill actually perform a pilot of

16   an FBR system?

17   A.    Yes, we did.

18   Q.    Did you participate in that pilot?

19   A.    Yes.

20   Q.    Did you participate in the review of the efficacy of FBR

21   as shown by that pilot?

22   A.    Yes.

23   Q.    What was the -- what was the conclusion of CH2M Hill as

24   to FBR as a viable technology to employ in the treatment of

25   water at the outfalls at Apogee Mine?

Sandy - Direct

1    A.    As a core selenium removal process, we felt that it would

2    meet the 4.7 microgram per liter with the right post treatment

3    of the biological solids.

4    Q.    Okay.  You did not pilot -- your pilot was -- Patriot

5    didn't have you continue the pilot on the biological solids?

6    A.    Right.  We focused mainly on, is that technology capable

7    of meeting a 4.7 microgram-per-liter limit on --

8    Q.    On any of the other pilots, did any of the other pilots

9    focus on handling the permeate and the waste, or did they all

10   just focus on whether or not you could achieve permit

11   compliance?

12   A.    They all focused on permit compliance with the exception

13   of the VSEP work where we looked at on paper how would you

14   manage the reject, but we didn't do any pilot testing to

15   validate or verify those concepts.

16   Q.    Okay.  So is it fair to say, then, in terms of pilots of

17   RO and ABMet -- and those were done by GE?

18   A.    Yes.

19   Q.    Okay.  And did you review both of those --

20   A.    No --

21   Q.    -- at sometime?

22   A.    -- not in detail.

23   Q.    Okay.  I just wondered if in your final -- it's my

24   understanding the recommendation at this time from CH2M Hill

25   to Patriot is a fluidized bed reactor.

Sandy - Direct

1   A.   Yes.

2   Q.   Okay.  Did you -- in terms of picking that over RO, did

3   you look at all at the GE RO pilot?

4   A.   No, other than one of our other technologists who did

5   look at it said that it fouled; they had fouling issues.

6   Q.   How about -- how did you pick FBR over ABMet?

7   A.   We picked that based on footprint and then some of the

8   pretreatment issues that you would have with the ABMet

9   process.  So it has the least complex system to manage

10  selenium, meaning that the ABMet, it again acts as a filter,

11  so we have a potential for suspended solids that could filter

12  out in the ABMet process.  And what that means, then, in order

13  to maintain the mass transfer in the reactor, you would have

14  to periodically backwash the ABMet systems, which is what they

15  do in the power industry.  So you need big tanks to backwash

16  these filters.

17       They also have gassing issues.  So you have to de-gas the

18  beds periodically, which disrupts the continuous treatment.

19  There's -- you know, instead of continually sloughing the

20  microbes, periodically you have to backwash the beds to

21  purposefully slough the microbes off.  So what all this means,

22  bigger footprint, more complexity, and more challenges to

23  operate.

24  Q.   Some of the testimony has been that FBR is less expensive

25  than ABMet.  Why is that?

Sandy - Direct

1  A.   It's in part because of the reactor efficiency more than

2  anything.  The mass transfer is greater with the fluidized bed

3  reactor than it is a static bed, trickling filter, or, in this

4  case, ABMet.  They have a static bed carbon that supports the

5  bio growth, so you get better mass transfer, and that means a

6  smaller footprint and a more efficient process.

7  Q.   Is it fair to say that after review of chemical,

8  membrane, and biologic systems, that CH2M Hill centered on FBR

9  as being the most appropriate application for this

10 environment?

11 A.   Yes.

12 Q.   And there's been testimony yesterday and today suggesting

13 that Patriot has contacted CH2M Hill and asked them to move

14 forward with the next step of providing some cost estimates

15 and preliminary design as it relates to constructing a

16 fluidized bed reactor at the three outfalls at Apogee.  Is

17 that your understanding?

18 A.   Yes.

19 Q.   And is that work in process?

20 A.   Yes.

21 Q.   I'd like to hand you now Exhibit Number 4 and ask you

22 what that is.

23 A.   This report is titled Preliminary Watershed Flow

24 Estimation with Diversion and Equalization Analysis-Patriot

25 Coal, Apogee Site, Ruffner Mine for Outfalls 001, 002, and

Sandy - Direct

1    003.

2    Q.    Okay.  This is another report on January 26, 2009.  I

3    believe there were three reports issued in that -- either that

4    day or that week?

5    A.    Yes.

6    Q.    Okay.  What is -- what is the -- could you describe

7    generally what this report is telling us or what this report

8    was telling Patriot Coal?

9    A.    Yes.  This report was establishing what would be the base

10   flow out of each of these outfalls and then looking at the

11   potential water flows at defined rain events.  You know, we

12   needed a flow number for basis of sizing and design.

13   Q.    Can you look at page -- the second page of the report.  I

14   just want to -- we've had -- we've been discussing flow all

15   week, I think.

16   A.    Yes.

17   Q.    And I just want to understand what some of these terms

18   mean, and I don't know that we've asked anybody that.  Let's

19   use Outfall Number 1 as our example in page Table E-1, all

20   right?

21   A.    Yes.

22   Q.    And am I correct that Outfall 1 is Slab Fork, which is

23   the largest of the Apogee outlets?

24   A.    Yes.

25   Q.    Okay.  It says here that annual average base flow is

Sandy - Direct

1   750 gallons per minute.

2   A.    Yes.

3   Q.    Okay.  What does that mean?

4   A.    That was the annual average flow reported at the

5   discharge monitoring location or the weir that they measured

6   flow at or the control device in 2008 with the data that we

7   had to do this study.  So that would include, you know -- you

8   know, wet and dry weather events.

9   Q.    Did you review -- do you know who performed the analysis

10  to come up with these numbers?  Do you have folks at CH2M Hill

11  who did that?

12  A.    We did.  We assigned what we would call some water

13  resource engineers, who are subject-matter experts in the

14  understanding of water flow in watersheds.

15  Q.    Okay.  Now, the number next to that is 1600 gallons per

16  minute, and it is in a column that says Design Average Flow.

17  Would you explain that number?

18  A.    The water resource engineers when they looked at the rain

19  events that had happened from the period of 2006 through 2008

20  recognized that 2007 was an abnormally dry year.  So they felt

21  that that would influence the rain -- the base flow that they

22  were looking at in 2008, even though in 2008 the rainfall was

23  close to the average, which is somewhere around 46 inches.  So

24  in the Charleston area, Logan area, it's between 43 and

25  46 inches is what we would call an average rain event.

Sandy - Direct

1        So what they wanted to do was establish a safety factor

2   to the base flow that had been recorded at these outfalls.

3   And so, you know, the 1600 would represent the annual average

4   flow of, say, 45 or 46 inches over each of those watersheds,

5   in this case 001, added to the flows.  So it's a conservative

6   estimate of what the flows would be to compensate for the

7   concern about the previous year of dry weather.

8   Q.    Okay.  And in shorthand, would that be the base flow plus

9   the average rainfall?

10  A.    Yes.

11  Q.    Is that a fair characterization?

12  A.    Yes.

13  Q.    Okay.  Now, you have columns for 1-, 10-, 25-, and

14  100-year storms.  Where does that information come from?

15  A.    These storm events are -- they are -- they're put

16  together by the U. S. Geological Survey, and they are

17  estimates of rain events in this geography.  And so we took a

18  standard, you know, pulled information from the USGS out on a

19  1-year, 10-year, 25-year, and 100-year storm, and they're

20  estimates of how much rain you could get.  The worst case rain

21  event in 24 hours in one year would be what we would call a

22  1-year storm.

23  Q.    Table E-3 on page 3 --

24  A.    Yes.

25  Q.    -- talks about the need for additional volume in the

Sandy - Direct

1    event of a 25-year, 24-hour storm, and you used the term first

2    flush.  What does first flush mean as it relates to a storm

3    event?

4    A.   Well, there's a -- if you go to page 26, there's a curve

5    that shows this storm hydrograph, so if you wanted to see

6    that, but basically what happens is when it rains in a

7    watershed at times zero, it takes a while for the rain to

8    actually manifest itself in the discharge.  And so over a

9    period of time, it eventually does happen.  And then it not

10   only begins to increase, but then it spikes, and the spike

11   generally is what the storm water engineers would call the

12   first flush.

13   Q.   Okay.  Does Table E-2 -- I'm trying to understand.  I

14   look at a 25-year storm.  It's 438,500 gallons per minute,

15   which seems to me to be a whopping amount of water.  Is there

16   someplace that translates that into gallons per minute?

17   A.   Say your question again.

18   Q.   Or that is gallons per minute.  Okay.  I'm sorry.

19   A.   What -- what -- okay.

20   Q.   You can tell my confusion.  So in a 25-year storm, you're

21   talking about 438,500 gallons per minute.  And that's an

22   estimated calculation?

23   A.   Yes, that would be the -- yeah, that would be the

24   estimate based off of a storm hydrograph.

25   Q.   Okay.  Now, look at page 10.

Sandy - Direct

1    A.    Okay.

2    Q.    There is a graph on page 10.

3    A.    Yes.

4    Q.    Can you tell me, what is this graph and what does it tell

5    us?

6    A.    This is really an EPA -- well, if you go to -- it's

7    really the USEPA's basins -- comes from the USEPA basins

8    program, which really is a hydrograph that -- where they

9    monitor the rainfall exceedances so they keep track of the

10   rain over time.

11        So this represents 26 years of rain collection data in

12   this area that the EPA would, you know, describe to use to try

13   to predict how much rainwater to treat.

14   Q.    Would rainfall for Charleston be applicable to the area

15   of these mines?

16   A.    Yes.

17   Q.    Okay.  Help me understand this curve.  And let me -- if

18   it would be helpful, if you want to step over, and I've got

19   some writing I want to show.  What does it mean?  I mean

20   explain how this curve works and what it means in terms of

21   historical rainfall.

22   A.    Okay.  Let's see here.  So I guess the best way to

23   explain it --

24   Q.    Can you just go around to the other side so the judge can

25   see you?

Sandy - Direct

1   A.   Oh, yeah, sure.  Sorry.

2   Q.   He's got a bad shoulder.

3   A.   If you go to page 9, you know, the 1-year, 24-hour rain

4   event is 2.2 inches, okay?  So as an example, in this -- in 26

5   years, if you go over to this graph, this is 1, 2.  So this is

6   2.2 inches.  So in 26 years there was less than five-tenths of

7   a percent chance that they had a 1-year rain event.

8   (Indicating)

9   Q.   You make reference in the report to 10- and 25- -- 10-

10  and 25-year storms.  Based on historical data, have we had any

11  of those storms in Charleston?

12  A.   In 26 years -- in 26 years they have never had a 10-year

13  rain event, because this is basically 3.4 inches.  And a

14  3.63-inch rain represents a theoretical 10-year rain event.

15  And that's on, I guess, page 9.  We have the rainfall depth.

16  Q.   So looking at page 3 of your report --

17  A.   Uh-huh.

18  Q.   -- and based on this data, if you designed the system to

19  your design average flow at Outfall 001 --

20  A.   Yes.

21  Q.   -- what percentage of water would you capture based on

22  historical data?

23  A.   With modifications to the lagoon so that we could

24  control, you know -- because if we have, I think, on the -- we

25  have on -- let's say for Outfall 001 we actually have

Sandy - Direct

```
 1   available 41 acre feet, we could -- if you design this for
 2   750 gallons per minute and then we build volume into the pond,
 3   then we would control all the flows through a theoretical 10-
 4   year storm event, which we said didn't happen on the 26 years.
 5   Q.   So would you catch all the water -- how -- what percent
 6   of the time?
 7   A.   We would treat all the water.
 8   Q.   Okay.  What if you designed it --
 9   A.   But that's as long as you can vary the volume in the
10   impoundment, the three impoundments already there.
11   Q.   So, in other words, when you talk about a 25-year storm
12   and having a 60-foot dam and all, if you look at historical
13   data, do you think you could design this with modifications to
14   existing ponds?
15   A.   For a 25-year storm event?
16   Q.   No, no, no.  I'm saying -- bad question.  You talked
17   about needing a 60-foot dam at Outfall 001 for a 25-year storm
18   event.
19   A.   Yes.
20   Q.   But if history proves -- based on the historical data, if
21   you designed it at 750 gallons per minute, how much water
22   would you capture based on historical data if you could modify
23   the ponds?
24   A.   We would capture all the water in that 26-year rain.
25   Q.   What if you -- what if you went to your design average
```

Sandy - Direct

1    flow?  First of all --

2    A.   We would capture more water than we would theoretically

3    need.  You know, again, that's the conservatism that our storm

4    water guys put in the number.

5    Q.   So at some level, if there's a 25-year storm, you have

6    runover of a system, correct?

7    A.   Yeah.  I mean we arbitrarily talk about a 25-year rain

8    event because, you know, typically for most urban watersheds

9    or industrial watersheds, they're typically -- you typically

10   want to handle the first 20 -- 10 to 20 percent of the rain

11   event.  And I guess if it's defined in here, I'll tell you

12   what -- it's explained why we picked -- why that's a starting

13   point to look at.  But it's not the end-all.

14        What we would try to do is see if that's representative

15   of what actually happens and then work with the regulators to

16   permit, you know, what makes sense given the real data, so --

17   Q.   And you've come to these conclusions based on the data

18   that we've described.  Will the rainwater study further refine

19   that data?

20   A.   No.  It will verify the response curve to help calibrate

21   the mile.  So it will tell you, you know -- it will give us a

22   better understanding of how much -- what runoff coefficients

23   to use and how quick the water comes out, but it's still the

24   same footprint.  The study was really looking at the potential

25   for the dilution effect on the selenium as a function of the

Sandy - Direct

1    rain event.

2    Q.   A couple of questions.  I think Dr. Koon testified

3    yesterday that -- and I think essentially that looking at

4    25-year -- or first flush of 25-year storms is not applicable

5    in anything other than an urban setting.  Do you agree with

6    that?

7    A.   It's not applicable?

8    Q.   Correct.  It wouldn't be an applicable in this setting.

9    A.   To look at a 25-year rain event?

10   Q.   To look at capturing the first flush.  Just doesn't

11   apply.

12   A.   Repeat the question again.  I'm --

13   Q.   I'll move on.  I'll withdraw that.  One question.  I want

14   to be clear.  The 750 gallon per minute, I thought that that

15   came from DMRs and historical data.  Is that -- is that -- was

16   that measured or was that DMRs and historical data?

17   A.   It was measured and put into discharge monitoring

18   reports, as I understand it.

19          MR. HURNEY:  Okay.  Your Honor, I have no further

20   questions.

21          THE COURT:  All right.  Mr. Lovett?

22                    CROSS EXAMINATION

23   BY MR. LOVETT:

24   Q.   Hello again, Mr. Sandy.  How are you?

25   A.   Good.  How are you?

Sandy - Cross

1    Q.   Let's work backwards here.  You should have before you I

2    guess the preliminary watershed flow estimation that CH2M Hill

3    prepared?

4    A.   Sure.

5    Q.   Let's start with this curve --

6    A.   Okay.

7    Q.   -- on page 10.  I notice that's from 1970 to 1996; is

8    that right?

9    A.   That is correct.

10   Q.   What's happened since 1996?

11   A.   I don't know.

12   Q.   Was there a flood in West Virginia in 2008?

13   A.   I don't know.

14   Q.   2001 I mean.

15   A.   I don't know.

16   Q.   I mean why would CH2M Hill have put a curve in here that

17   stopped in 1996?

18   A.   I don't know exactly.  I mean an analogy would be, you

19   know, I do -- we do air permitting, and generally the

20   regulatory authority have canned sets of meteorological data

21   that they would accept, that they validated the data and

22   verified.  So I'm being presumptuous here, but likely EPA

23   hasn't verified and validated the data since that period,

24   which, you know -- and we wouldn't want to use a dataset that

25   we couldn't get EPA or the DEP to buy into, so --

Sandy - Cross

1    Q.   But you don't know if EPA has verified new data.

2    A.   I don't.  Our storm water water resources people would

3    know.

4    Q.   And they're not here to testify, are they?

5    A.   They are not.

6    Q.   And as I understand the definition of a 25-year storm, it

7    doesn't mean it occurs once every 25 years, does it?

8    A.    It's an arbitrary event, and that is the intent based on

9    a bunch of statistics and Monte Carlo simulations, but they're

10   all more or less an estimate of some kind of a rain event, and

11   they just try to put them in categories based on these

12   simulations.

13   Q.   It happens, doesn't it, that you have two 25-year storms

14   within 10 or 15 years of each other?

15   A.   It could.

16   Q.   And it does, right?

17   A.    It didn't in this dataset --

18   Q.   I understand it happens all the time all over the world.

19   A.   I don't know if it does all over the world.  I don't

20   know, but it is a possibility.  It's probable.

21   Q.   And it's just as likely that you wouldn't have a 25-year

22   rain event in a 25- or 26-year period, right?

23   A.   Yeah, yeah.  This is probability and statistics, so --

24   Q.   So when permitters design permits, they don't -- they

25   base it on what the estimate -- just as your waste -- just as

Sandy - Cross

1   your study does, bases it on the 25-year storm event numbers,

2   the 10-year storm event numbers, and so forth, right?

3   A.   Yeah, they would, but, you know, if you showed them this

4   curve and we went through this analysis and said, well, we

5   haven't had a 25-year rain event, you know, the probability is

6   low, and, you know, we can handle these more probable rain

7   events and treat 99.95 percent of the flow, we've been able to

8   permit facilities to do that.

9   Q.   Does the fact that you haven't had a 25-year rain event

10  in 25 years mean that it's less likely you're going to have a

11  25-year rain event next year?

12  A.   Could you repeat --

13  Q.   Would the fact that you have not had a 25-year rain event

14  in the last 25 years make it likely that you're not going to

15  have one next year?

16  A.   I don't know.  You're sort of getting out of my

17  bailiwick.

18  Q.   The only reason I'm asking is because you testified about

19  this or I wouldn't have asked you about it.

20  A.   Testified about --

21  Q.   The curve here and the meaning of it.

22  A.   Oh, okay.  You know, if you look at that data, you know,

23  I can speak to the data there, and it basically shows that

24  there wasn't a rain event in that magnitude, so --

25  Q.   If you were told that there was a 100-year flood with

Sandy - Cross

1    8 inches of rain on July 1, 2001 in the Guyandotte watershed,

2    would that change your estimation, your testimony relating to

3    this curve and its usefulness for this case?

4    A.    A 100-year flood?

5    Q.    Yeah.

6    A.    An 8-inch rain?  I'm not familiar enough with the

7    watershed to know how Rum Creek impacts the Guyandotte, so I

8    really wouldn't know.  I mean, you know, if the rain is

9    flashy -- and we say that in the report, so you can have a

10   really concentrated rain event happen in one part of the

11   watershed and not the other and that may have been what

12   contributed to the flood, but, again, I'm speculating, because

13   I don't know the details.

14   Q.    Okay.  Let's look at the tables on pages 2 and 3 of the

15   report.

16   A.    Exhibit 4; is that right?

17   Q.    Yes.

18   A.    Okay.

19   Q.    Now, I think you just said it was Rum Creek, but it's not

20   Rum Creek, is it?  It's the Mud River watershed, right?

21   A.    I think, yeah, ultimately Rum Creek goes into Mud River,

22   yes.

23   Q.    Now, as I understand it, your -- what department -- I

24   can't remember the name of the department that you said

25   performed this study.

Sandy - Cross

1    A.    It's our water resource engineers.

2    Q.    Water resource engineers.  Your water resource engineers

3    concluded that a 25-year storm would produce 438,500 gallons

4    per minute, right?

5    A.    Yes.

6    Q.    And I think that if you follow that down to the next --

7    does that work out to be equalized -- if you equalize that

8    flow, what would you have to treat over the year?  Do you

9    know?

10   A.    Well, if you go to Table E-2, the -- can I pull my

11   calculator out?

12   Q.    Yeah.

13   A.    I can better explain, I think.

14   Q.    Is it E-4 that tells us, or am I mistaken?

15   A.    Well, let me clarify.  E-1 really is the peak

16   instantaneous flow.

17   Q.    Okay.  I see.

18   A.    So if you go to that curve with the spike in it --

19   Q.    Right.

20   A.    -- that 438,500 gallons per minute, that would be the

21   flow rate right when the thing peaks out, okay?

22   Q.    It's a higher --

23   A.    Well, it's the highest instantaneous flow rate during the

24   twenty -- as the water runs off.

25   Q.    Okay.

Sandy - Cross

1   A.    So in E-2, the -- to your 25-year storm event, we

2   estimate that the total runoff, if we collected every drop,

3   based on the modeling and the assumptions about what happens

4   in the water, would be 54.1 million gallons.

5   Q.    Okay.

6   A.    Okay.  And then if you go to table E-4, which I think is

7   where you were trying to go --

8   Q.    You're right.

9   A.    -- is we've said, okay, what did CH2M Hill say if we were

10  going to put in an impoundment to handle the first flush,

11  which we feel, you know, of any rain event, that's generally

12  where we would design a system.  So in this case we looked at

13  a 25-year rain event and said, okay, what would the first

14  flush require, and we would predict we need about 30 million

15  gallons.  And then the design maximum flow of 4000 is based

16  off of, okay, what would we have to pump that water out of

17  that tank or out of this impoundment so that we could make

18  room for another rain event.

19       So the estimate is in six and a half days to move

20  30 million gallons, we would have to make provisions for

21  4000 gallons per minute.  So that's what those numbers mean,

22  as I understand it.

23  Q.    So at all three outfalls for that first flush --

24  A.    Uh-huh.

25  Q.    -- you have 5150 gallons per minute, right, if you add

Sandy - Cross

1    the three up on E-4, Table E-4?

2    A.   Oh, if you took 4000, let me just -- I'm not real good

3    with numbers off my head.  So theoretically if, you know, we

4    felt that that was what needed to be designed for, that those

5    would add up to that volume.

6    Q.   And as I recall from your deposition, you think that

7    treating for the first flush of a 25-year storm is the kind of

8    thing that regulators require fairly regularly across the

9    country.

10   A.   Well, there's in some cases precedent set around that,

11   but it's generally a starting point to look at what seems

12   reasonable given the statistics about these rain events.  And

13   so as an example, like in Ohio, they would probably -- you

14   know, they've let mining companies get by with a 1- or a

15   10-year rain event.

16   Q.   For a water quality based effluent limit?

17   A.   Yes, yes, as I understand it.

18   Q.   How do you understand it?  Have you been involved in a

19   project in Ohio where --

20   A.   No, I have not, but based on our discussions last week,

21   we went back and, you know, trying to better understand this,

22   we tore into where has precedent been set.  So it varies

23   anywhere in any state based on, you know, a lot of different

24   considerations.  So I don't think there's a set rule.

25   Q.   Well, as I understand, the rule is the operator has to

Sandy - Cross

1    treat all of its effluent to the water quality standard,

2    right?

3    A.    Yes, as I understand in NPDES permitting.

4    Q.    And the only way to be able to bypass any flow from a

5    water quality based effluent limitation outfall is to say that

6    during that rain event, the water will contain selenium, in

7    this case, below 4.7 parts per billion; is that right?

8    A.    That is correct.

9    Q.    That would be true of a 100-year event, wouldn't it?

10   A.    Yes.

11   Q.    So in order to convince the DEP to reduce the amount of

12   flow that would have to be treated, the operator would have to

13   show DEP at those rain events the water would not be in

14   violation of the permit.

15   A.    Yes.  That's why we were doing the storm water study, to

16   look at the dilution effects --

17   Q.    Right.

18   A.    -- of the different watersheds, so --

19   Q.    So based on the fact we don't have that study yet, a

20   25-year first flush may let a lot of water through that, in

21   fact, violates the permit, right?

22   A.    Yes.

23   Q.    Let me see if I've finished with this document and we can

24   move on.

25   A.    Okay.

Sandy - Cross

1    Q.    I just want to make sure I had.

2    A.    Right.

3    Q.    Well, do you know -- you know, don't you, that Jackson &

4    Kelly had prepared for this case another estimation of flows

5    from a Mr. Thacker?  Is that right?

6    A.    Yes, I'm aware of it.  I didn't read the deposition, but

7    I'm aware of it, yes.

8    Q.    Have you seen the report?

9    A.    I have not seen the report, but a colleague of ours read

10   the report and a water resource person to explain it to us, so

11   yes.

12   Q.    Do you understand that it predicted much higher flows

13   than you did?

14   A.    Yes, but the reason it did was they looked at icing

15   events, so they assumed that with the ground frozen and it

16   rained, that the water would run off at a much greater rate;

17   and when that would happen, we wouldn't expect any selenium to

18   be in the water from the surface runoff because it's generally

19   representative of a snow and ice event.  And as I understand

20   it, that's really used more for design of dams and not

21   necessarily what we would use for trying to predict water

22   quality and water treatment.

23   Q.    Okay.  I'm not going to go to the snow and ice.  I think

24   it's late in the day.

25   A.    But that's the answer to the question based on our water

Sandy - Cross

1   resource guys looking at it.

2   Q.    So based on your review, your water resource guys' review

3   of that, you still stand by your January 26 report, right?

4   A.    Yes.   These are best estimates we have, so --

5   Q.    Okay.   Let's go to the Joint 11, which is the Metals

6   Council paper that you -- do you have one of these up there?

7   (Indicating)

8   A.    I'm not sure.

9         MR. LOVETT:   May I approach?

10        THE COURT:   You may.

11  BY MR. LOVETT:

12  Q.    Were you involved in the preparation of this report?

13  A.    Yes.

14  Q.    When was it submitted?

15  A.    June 2010.

16  Q.    And the North American Metals Council is a trade group;

17  is that right?

18  A.    Yes.

19  Q.    Who else helped you prepare this?

20  A.    Our project manager was Cindy DiSante.

21  Q.    Uh-huh.

22  A.    And then we had subject-matter experts like Tom Higgins,

23  Harmony Rathnum (phonetic), Jamal Chamas (phonetic).   They're

24  listed, I think, here in the credits.

25  Q.    That's fine.   Are they all from CH2M Hill?

Sandy - Cross

1    A.    They are, yes.

2    Q.    Okay.   I just want to look at some of these technologies

3    quickly.

4    A.    Sure.

5    Q.    Let's turn to page VIII.   There are charts --

6    A.    Over in the big table in the executive summary?

7    Q.    Yes.

8    A.    Okay.

9    Q.    That's right at the front, isn't it?

10   A.    Yes.

11   Q.    Okay.   So I want to just talk about the technology that

12   you and Mr. Hurney talked about.   The first one is ABMet,

13   right?

14   A.    Yes.

15   Q.    And the column with the Development Stage for Selenium

16   Removal, you say -- have you found the page?   I'm sorry.

17   A.    Did you say VIII?

18   Q.    Yes.   Am I wrong?   It says Table ES-1, Technology

19   Summary.   It has ABMet as the first one.

20   A.    It's the very first one, that's right.   We put them in

21   alphabetically.   All right.   Yeah, I'm sorry.

22   Q.    Do you see it?

23   A.    Yeah.   Sorry.

24   Q.    And there you say ABMet is development stage at full-

25   scale for selenium removal, right?

Sandy - Cross

 1   A.   Yes.

 2   Q.   And that's what the GE pilot showed, too, isn't it?

 3   A.   Yes.  This is full-scale, though, as it applies really

 4   mainly in the power industry, because that's where their big

 5   systems are at, so --

 6   Q.   It's used in the power industry full-scale, right?

 7   A.   Right.

 8   Q.   Has not yet been used at coal mining full-scale.

 9   A.   Yes, that's correct.

10   Q.   But it's been shown to remove below 5 parts per billion

11   on a consistent basis, hasn't it?

12   A.   Yes, that's correct.

13   Q.   And the pilot here showed that, didn't it?

14   A.   Yes.

15   Q.   Do you know what levels it can get selenium to?

16   A.   No, I don't.

17   Q.   Okay.  Would it be reasonable to think it could get to a

18   non-detect level?

19   A.   Yes, potentially with, you know, with -- you know, we'd

20   have to add a lot of, you know, carbon, but it's a potential.

21   It's possible.

22   Q.   And if the -- you know, we had testimony from a

23   biological expert in the case that the standard could go to as

24   low as 2.6 parts per billion in the future.

25   A.   Uh-huh.

638

Sandy - Cross

1    Q.    If it went to 2.6 parts per billion, I guess the ABMet
2    could be modified to handle that; is that right?
3    A.    Yes.   It would be more of a -- you'd have to add more
4    chemicals, but yes, that would be the way you would get to
5    lower levels.   And you may have to operate it at longer HRTC,
6    may have to add more ABMet reactors.
7    Q.    Could the FBR get there too?
8    A.    Yes, with similar modifications.
9    Q.    Okay.   And RO as well, I guess.
10   A.    Yes.
11   Q.    All right.   Now, I'll flip over to page XV, the fluidized
12   bed reactor summary.
13   A.    Okay.   Sure.
14   Q.    Do you see that?
15   A.    Yes, I'm there.
16   Q.    And you have Development Stage for Selenium Removal,
17   Pilot, right?
18   A.    Yes.
19   Q.    And that was before the pilot study here was completed --
20   A.    Yes.
21   Q.    -- is that right?   Would you leave that in the same
22   category now or would you change it?
23   A.    Well, theoretically until we have a full-scale system in,
24   we'd leave it pilot, but yeah, you know, so --
25   Q.    But you know it's going to work now, right?

Sandy - Cross

1    A.    Yes.

2    Q.    So it would be reasonable to --

3    A.    For 4.7 it will work.

4    Q.    For 4.7?

5    A.    Yes, with the right post treatment.

6    Q.    I understand.  So it's a little bit -- it's really beyond

7    pilot-scale at this point.  It's ready to go, right?

8    A.    Yes.

9    Q.    And as I understand it, you said that these technologies

10   were fledgling because they hadn't been used yet in the coal

11   industry, right?

12   A.    Well, I would say all industries, because they haven't

13   been used for selenium reduction.  I mean ABMet was developed

14   for selenium reduction, but I was referring to just the

15   concept of attached growth biological treatment.

16   Q.    Okay.  But ABMet I thought -- you say it's ready for

17   full-scale.  It's used full-scale.  It's certainly beyond the

18   fledgling stage now, except that it hasn't yet been applied to

19   coal mining, right?

20   A.    Right, yes.

21   Q.    And the FBR, though it's never been used on a full-scale

22   system for selenium, has been used in a full-scale system for

23   a lot of other pollutants, right?

24   A.    Right, but they're different pollutants.  That's not a

25   fair extrapolation.

Sandy - Cross

1    Q.   I didn't mean -- but one of the pollutants you testified

2    in your deposition -- I can't remember which one --

3    A.   Perchlorate.

4    Q.   Yeah, okay.  So that's very similar to selenium, right?

5    A.   It's similar, but it's not, because what happens when

6    perchlorates reduce, it forms chloride, which is soluble.  So

7    you don't have to worry about whether it gets reoxidized or

8    capturing it.

9    Q.   I understand, but you can --

10   A.   It's not harmful at that point, but selenium is.

11   Q.   But you can handle the reoxidation of selenium without

12   any problem in an FBR system, right?

13   A.   Well, as we discussed in the deposition, we need to

14   verify and do some more pilot testing around that.

15   Q.   Not -- but pilot testing isn't to tell you whether you

16   can do it.  It's to decide which of one or two methods to

17   adopt.

18   A.   Right, how we would keep it from being --

19   Q.   Right.  So you don't have any doubt about that.

20   A.   Right, but we're still developing technology.

21   Q.   Okay.  Let's move to RO.  That's on page XVIII.  I have

22   to think back to --

23   A.   Uh-huh.

24   Q.   -- high school.  It's 18.

25   A.   Right.

Sandy - Cross

1    Q.    Reverse osmosis you say there, developmental stage for
2    selenium removal at full-scale.
3    A.    Right.
4    Q.    And I understand that it's probably too expensive to use,
5    if ABMet and FBR were as well, but reverse osmosis is a full-
6    scale proven selenium-removal technology, right?
7    A.    Right.   In this case I believe it was a 100-gallon-per-
8    minute system.   It's not, you know -- but, yeah, there's a
9    full-scale system that's not without scale issues and
10   operating issues and whatnot, but there is a system out there.
11   Q.    But those are pretreatment issues that can be adjusted
12   and taken care of, right?
13   A.    Yes.
14   Q.    You have no reason to doubt that with enough money, one
15   could design an RO system that would remove selenium from --
16   A.    Yes.
17   Q.    -- 3000 gallons per minute, right?
18   A.    Yes.
19   Q.    Okay.   Now, let's go to XX, or 20, and look at the ZVI.
20   A.    Okay.
21   Q.    You have ZVI listed as pilot-scale, right?
22   A.    Yes.
23   Q.    Now, the difference -- so we had ABMet at full-scale, we
24   had RO full-scale, we had FBR pilot, but it's moved up in the
25   world since then it sounds like and is close to getting its

Sandy - Cross

1    license to be a full-scale --

2    A.    Yes.

3    Q.    -- pilot.  I mean a full-scale technology.

4    A.    Yes.

5    Q.    And then for disadvantages for ZVI, I notice you list

6    several.  You say it has not been proven full-scale

7    treatment -- in full-scale treatment and at higher selenium

8    concentrations.

9         Are these higher selenium concentrations that we're

10   finding at the Apogee Mine?

11   A.    No, I think this is really more in reference to what you

12   might have in the power industry, meaning that in the power

13   industry, you could actually have as much as parts per

14   million.  So you go out of the parts per billion level, so you

15   can get up into really higher concentrations, so -- and no one

16   has really tried that technology where you've had milligrams

17   per liter, which would be parts per million, versus micrograms

18   per liter, which would be parts per billion, so --

19   Q.    You're talking about higher --

20   A.    Yeah, I'm talking about high, high; yeah.

21   Q.    Okay.  Now, ZVI, though, has other disadvantages

22   associated with it there I see.

23   A.    Yes.

24   Q.    I know you haven't been involved in the MATRIC and

25   Liberty pilots --

Sandy - Cross

1    A.    Uh-huh.

2    Q.    -- or MATRIC and ShipShaper pilots, but are you aware of

3    any data that show that they can consistently reduce selenium

4    below 5 parts per billion?

5    A.    I really haven't seen any of the data.  No, I understand

6    from some conversations, you know, with John McHale that the

7    systems are treating down -- Titanic now to below 4.7, but I

8    haven't seen the data to support that.

9    Q.    And I think Mr. McHale said it's not consistently; is

10   that right?  Is that your understanding of what --

11   A.    Well, he said the last couple of months he thought that,

12   you know -- but I haven't seen the data.  I mean he said in

13   the last few months he's had good results, so --

14   Q.    That's all he said, good results?  You don't have the

15   data?

16   A.    Well, I'm assuming.  I'm presuming, yeah.

17   Q.    And then you said I think in -- I think Mr. Harrison also

18   said there was a mine treatment, some -- is that a phosphate

19   mine?

20   A.    Yeah, that's a small-flow phosphate mine in Idaho.

21   Q.    And is that what's referenced on page 4-47 here?

22   A.    In this big document?

23   Q.    Huh?

24   A.    In this big document?

25   Q.    Yeah, in the big -- the one that you wrote, your 4-47,

Sandy - Cross

1    the Metals Conference document.

2    A.    Oh, the Society of Metallurgical Mine Engineers?

3    Q.    No.  I'm sorry.  Maybe I'm -- yeah, the North American --

4    A.    North American Metals Council, okay.

5    Q.    The one you were just looking at.  It's the same

6    document.  4-47.  It's about a third of the way through the

7    document.

8    A.    Yeah.

9    Q.    Do you see that?

10   A.    No, these are different, Joe.  The Golder Study, that's

11   actually a -- that's a different study.

12   Q.    Okay.  Well, that study in any event shows that effluent

13   concentrations of selenium were not consistently below the

14   regulatory limit of 5 milligrams per liter -- or micrograms

15   per liter for this pilot system.

16   A.    Yes.  It said it varied from 5 to 14, but that's not the

17   Monsanto Study that -- so --

18   Q.    So it didn't work, did it?

19   A.    Well, in this case the pilot test they did said that the

20   selenium varied from 5 to 14, and I'm not familiar with all

21   the details of whether it was configured as a passive system

22   or how they tried to control the environment to make that

23   work.  But, yeah, if 5 is the metric, then at times they must

24   have been over 5.

25   Q.    Okay.  And you didn't put any -- you don't have any story

Sandy - Cross

1    of success in this June document, do you, for ZVI getting to

2    below 5 parts per billion?

3         Did I say ZVI?  That's what I meant to say.

4    A.    I mean if -- I'd have to -- I'd be speculating, but if

5    you -- I mean I don't know exactly.  I'd have to go back and

6    read or talk to the people that put the case studies together,

7    but, you know, based on this one page, this implies that the

8    concentrations, you know, range from 5 to 14 in one study, 12

9    to 22 in another --

10   Q.    We have testimony from a lot of witnesses, but I haven't

11   seen a single piece of paper that shows me the result from a

12   ZVI study showing consistent reduction below 5 parts per

13   billion.  Do you know where I could find that?

14   A.    No.

15   Q.    So you think you can design, build, and commission an FBR

16   system within about two and a half years, right?

17   A.    With the schedule contingency.

18   Q.    Do you think that it would be -- that you could design

19   and build, commission a ZVI system within two and a half years

20   that would meet the water quality limit at all the Apogee

21   outfalls?

22   A.    No, not without pilot testing.

23   Q.    A lot more -- a lot of engineering too, right?

24   A.    Development work, yes.

25   Q.    Really, in terms of fledgling, the playing field isn't

Sandy - Cross

1    like there are fledglings and non-fledglings.  There are

2    levels and degrees within what you're calling fledgling

3    technology, right?

4    A.   Yeah, I mean there's levels of -- but, you know, in the

5    case of Titanic where they have these systems, which we

6    haven't looked at, they're small enough flows, you know, there

7    may be a way to -- there may be a simple remedy, but we

8    haven't been asked to look at it, so --

9    Q.   You don't have any idea, right?

10   A.   I don't.

11           THE COURT:  Well, to be clear about it, you've

12   actually proposed the Titanic flow be delivered to a

13   centralized fluidized bed reactor treatment facility to be

14   constructed at Slab Fork.

15           THE WITNESS:  Yes, sir.  Yes.

16           THE COURT:  While I'm on that, I want to clarify

17   something as well.  I understood Mr. McHale to say that I

18   guess in this last few weeks when your company made this

19   report and recommended FBR at the facility, that you provided

20   him some sort of an estimate -- maybe it was one of these

21   Class 5 estimates -- of somewhere around $40 million for a

22   centralized system?

23           THE WITNESS:  Yes.

24           THE COURT:  Did I understand that right?

25           THE WITNESS:  Yes.

Sandy - Cross

1          THE COURT:  And then if you went with individualized

2   systems at these three outfalls, the cost would be higher,

3   around 46 million.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  And those are Class 5 estimates?

6          THE WITNESS:  Yes, they're -- they're -- yes.

7          THE COURT:  Well, then, let me ask you this, then.

8   In several of these evaluation reports that you've got charts

9   that compare the expected capital cost for all of these

10  different treatment alternatives, it seemed to me that

11  routinely the FBR treatment capital cost estimate was much

12  lower than that at a particular -- I think those were at

13  individual outfalls, but yet this amount for a centralized or

14  for three individualized FBR facilities now is much higher.

15     Do you know what I'm talking about?

16         THE WITNESS:  Yeah, I do.  The -- first of all, the

17  estimates that we did in the FBR report were for different

18  flows.  So that's probably what creates -- so you couldn't add

19  those and get to the two thousand --

20         THE COURT:  What flow, what flow capacity are you

21  expecting to be able to treat with the centralized facility

22  that you --

23         THE WITNESS:  The 40 million estimate was based off

24  of the, I think, 2200 gallons per minute, which would be in

25  the storm water document, what we call the design.

Sandy - Cross

1           THE COURT:  Design flow for all three?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  Thank you.  That's what I thought.

4           THE WITNESS:  And the reason -- the reason that

5    there was some escalation is when -- when we spent last week

6    working on the schedule and better understood where we were

7    going to put that and knew more about, okay, this is how we'd

8    really begin to do it, we actually went and added -- we

9    changed the factors in the estimates to account for, you know,

10   some of the complexities of having to move rock and those

11   kinds of things.  So that actually added to the cost --

12          THE COURT:  Sure.

13          THE WITNESS:  -- compared to what -- and then we

14   included in there conveyance systems, you know, pumping and

15   piping.  So we had to make some assumptions, and so, you know,

16   we did those very quickly, but, you know, as we learned more,

17   we changed the cost estimates to reflect what we know.

18          THE COURT:  All right.  Thank you.

19   BY MR. LOVETT:

20   Q.   I think you said at page 97 of your deposition that FBR

21   is the appropriate technology to treat Apogee's outfalls.

22   That's your opinion, right?

23   A.   Yes.

24   Q.   I want to go -- I was going to go to the question the

25   judge asked you about the $40 million system.

Sandy - Cross

1    A.    Uh-huh.

2    Q.    Let me follow up.

3    A.    Sure.

4    Q.    I think you've answered most of those questions.  As I

5    understand it, you have preliminarily estimated the cost of

6    $40 million to treat 2100 gallons per minute?

7    A.    Yeah, whatever the additive of the sixteen hundred

8    and --

9    Q.    Sixteen, four, and one.

10   A.    Rough numbers, twenty-one, twenty-two hundred.

11   Q.    And that's the average flow, right?

12   A.    That would be the design flow.  That's our -- with our

13   safety factor in it.  So that's a higher flow.

14   Q.    And you weren't here for Dr. Koon's testimony, but he

15   testified that he thought, I believe, that based on your

16   calculations, that if you had to treat 5150 there, that would

17   cost approximately $60 million total installed cost.

18         Does that sound reasonable to you, in the ballpark?

19   A.    I don't know how you could really extrapolate to that,

20   because you can do some parametric estimating where you apply

21   some factors to extrapolate, but you've got to be real careful

22   when you get out of certain flow ranges.  So I would want to

23   sit down and, you know, look at the estimate as we did, and

24   you would change some of the factors and we would change some

25   of the equipment costs.  So you can't just do a direct

Sandy - Cross

1    extrapolation, and I'm not even sure if that's what he did.

2    So anyway --

3    Q.    That was an unfair question.

4    A.    -- you've got to be careful on extrapolating, Joe.

5    Q.    Sure.  Okay.  Now, the estimates that you're giving, the

6    $40 million for the centralized system, that does not include

7    equalization that may be necessary, right?

8    A.    It includes modifications to the existing impoundments to

9    be able to handle all these flows that we talked about in the

10   ground, and so --

11   Q.    And do you believe in --

12            THE COURT:  Wait a minute.  All of the flows you've

13   talked about in the graph, give me something more specific,

14   because we've talked about flows that you don't really

15   anticipate that are also demonstrated in some of these graphs.

16            THE WITNESS:  Right.  If you go back and look at

17   the -- let's say the 1-year rain event.

18            THE COURT:  Right.

19            THE WITNESS:  If we modified the impoundment, we

20   would be able to treat all the 1-year rain events, and that

21   would on that graph represent 99.95 percent of all the rain

22   based on that historical thought.

23   BY MR. LOVETT:

24   Q.    On the graph it would represent -- if that graph is up to

25   date, but a new graph could show something different, right?

Sandy - Cross

1   A.   Yes.

2   Q.   If 5150 or a higher number had to be treated, do you

3   think that there is the equalization volume at Outfall 1

4   currently to accomplish that?

5   A.   No.  We would have to make major modifications or, you

6   know, change the approach of where we treated this to account

7   for the volumes that would be required.

8   Q.   And I think that your flow report says you would need a

9   60-foot impoundment at Outfall 1 to do that; is that right?

10  A.   Well, that was just theoretically we said, you know, you

11  need a 60-foot, you know, basin wall, basically.

12  Q.   Right.

13  A.   And I don't know how many acres of impoundment, but you'd

14  need a big reservoir, and without -- I'm not a geotechnical

15  engineer or a structural engineer that knows the dam policies,

16  but you get into at these higher impoundment sizes dam issues.

17  And so that was the intent of putting that number in there, to

18  say, you know, okay, given this geography, that's a pretty big

19  impoundment, and with that goes a lot of challenges and

20  engineering issues.

21  Q.   Well, you'd have to get an MSHA permit, right?

22  A.   Yes, as I understand it.

23  Q.   And I think that's probably a main concern, isn't it?

24  A.   That would be -- yeah, that would be one of them, beyond

25  just the engineering and the issues with the land and, you

Sandy - Cross

1    know, all of the -- I mean it would just -- it would all

2    snowball.  It would be complicated.

3    Q.    Okay.  How many -- and Mr. McHale testified -- you may

4    have spoken with him about this -- that he thought he could

5    fit two or three more impoundments perhaps above the lowest

6    pond at Outfall 1 now, you know --

7    A.    I know what you're talking about, yes.

8    Q.    Have you looked into that at all?

9    A.    We have not, no.

10   Q.    Do you know what the potential is for equalization there

11   without building a dam if you expanded the pond?

12   A.    If we fixed the pond so we varied the level, we could

13   handle up to a 10-year rain event.  We would treat all the

14   water.

15   Q.    Without an impoundment?

16   A.    Without an impoundment.

17   Q.    How much water is that?  What would the capacity of that

18   system be?

19   A.    Oh, it would be 1600 gallons per minute or less, I mean

20   because we can store the water and still toll it off.

21   Q.    A 10-year rain event is more than 1600 gallons, isn't it?

22   A.    Well, a 10-year rain event requires 38 million gallons or

23   a hundred and -- maybe I misspoke here.

24   Q.    When you're talking about -- just so I understand, are

25   you at Table E-1 again of Exhibit 4?

Sandy - Cross

1    A.    Yeah, let me clarify.

2    Q.    Okay.

3    A.    The available volume in three impoundments at Outfall 001

4    is 40 acre feet.

5    Q.    Currently, right?

6    A.    Currently.

7    Q.    Yeah.

8    A.    And so it could not handle a 10-year storm.  I misspoke.

9    Q.    Okay.  But --

10   A.    I was assuming --

11   Q.    I understand, but you could add to that capacity by

12   building ponds of less than 20 acre feet in series there and

13   greatly increase the storage capacity without having to build

14   a dam, right?

15   A.    Yes, up to some level.

16   Q.    Okay.  Do you know what level?

17   A.    No, I don't, but you could theoretically, yes.

18   Q.    As I understand the regulatory scheme -- and I just know

19   this from discussions I think maybe with you and others --

20   A.    Uh-huh.

21   Q.    -- up to 20 acre feet, typically you don't need to get an

22   MSHA permit for that kind of a pond; is that right?

23   A.    I don't remember the thresholds, but I --

24   Q.    And I don't think that's an ironclad rule.  I think it --

25   A.    Okay.

Sandy - Cross

1    Q.   In your deposition you testified that you didn't know

2    until your deposition, I guess, that there was an April 2010

3    deadline for compliance; is that right?

4    A.   Yes.

5    Q.   That's right?  You didn't know?

6    A.   I did not know.

7    Q.   And you didn't know of any other deadlines for compliance

8    in this or other cases.

9    A.   No.

10   Q.   I know they're expensive, but you could also use tanks to

11   store the flow, couldn't you?

12   A.   You could.

13   Q.   And do I recall that they're about a million dollars per

14   gallon just for the tank?

15   A.   About a dollar per gallon, and then installed, you know,

16   multiply by three.  So in rough numbers, you know, to install

17   a million-gallon tank, it may take $3 million, in rough

18   numbers, yes.

19            MR. LOVETT:  One minute, Your Honor.

20   BY MR. LOVETT:

21   Q.   On the graph on page 10 of Joint 4, Exhibit 4 --

22   A.   Okay.  Page 10.

23   Q.   It's that graph, the EPA graph.

24   A.   You like that graph.

25   Q.   Well, I never saw it until today.  It's not been an issue

Sandy - Cross

1   in any deposition or anything, so -- now, I think -- did you

2   use USGS data for the rest of the report?

3   A.   I believe that the peak -- that the hydrographs were from

4   the USGS, I believe, but --

5   Q.   And it's true, isn't it, that the historical basis for

6   rainfall analysis is less accurate than using the

7   statistically based USGS values?

8   A.   I don't know the answer to that question, Joe.

9   Q.   Okay.

10  A.   Our storm water guys would, but I -- I'm sorry.

11          MR. LOVETT:  Fair enough.  I think I'm finished,

12  Your Honor.

13          THE COURT:  Questions from the audience.

14          MR. LOVETT:  That's all I have.  Thank you.

15  BY THE COURT:

16  Q.   Let me ask you a little bit more about the flow studies.

17  I understood your colleague, Mr. Harrison, testified recently

18  Patriot has commissioned your company to do an evaluation of

19  the flows in particular to determine the concentration of

20  selenium in these storm events or higher flow amounts.

21  A.   Yes.

22  Q.   As I understand it, you all picked one of the outfalls at

23  Hobet --

24  A.   Yes.

25  Q.   -- to do that.  What is the expected duration of that

Sandy - by the Court

1    study?  How long do you think that's going to take?  Do you

2    know what is planned?

3    A.    I don't know the exact details, Judge, but I believe it

4    was around a six-month study, and Tim would know --

5    Q.    Okay.

6    A.    -- because he planned the project, so --

7    Q.    Well, I understood -- and if you can answer this, fine --

8    that one of the reasons, perhaps the primary reason that

9    that's being conducted is to determine whether or not there's

10   a fair argument for treating less than these maximum potential

11   flows that can be expected from storm events.

12   A.    Yes, because we want to understand the concentration of

13   selenium in response to this -- you know, we think there's

14   some dilutional effect with this big rain.

15   Q.    All right.

16   A.    So that is really the primary focus of that.

17   Q.    And you agree that's an important factor to measure or

18   know as you design the treatment system, because that's really

19   what's going to tell you whether or not you can get by with

20   treating volumes per minute that are less --

21   A.    Right.

22   Q.    -- than in some of these potential storm events, for

23   example.

24   A.    Yes.  I mean we would want that data to be able to sit

25   down with EPA or DEP and say, you know, here's the data that

Sandy - by the Court

1    shows that that really happens.

2    Q.   We've had a fair amount of testimony about the proposed

3    schedule and the schedule that apparently was fashioned in

4    consultation with Dr. Koon --

5    A.   Yes.

6    Q.   -- that would propose about a two-and-a-half-year time

7    period.  Is this study of the flows going to be conducted in

8    sufficient time to allow as part of the design of this

9    treatment facility consideration of whatever the findings are

10   from this flow study?  In other words, are you going to have

11   this flow study done in time to be able to plug that into this

12   two-and-a-half-year time frame?

13   A.   Yes, I understand.  Yeah.  And I'm not averting your

14   question, but it's really if we get the right rain and it's

15   so -- the duration or the success of the studies --

16   Q.   Right.

17   A.   And so we have gotten one rain event this past week, and

18   they haven't completed --

19   Q.   We might be having another one now.

20   A.   Right.  I heard that.  I thought someone was mad at me in

21   the room, but the -- so if we get the right data, we wouldn't

22   do the study any longer than we needed to --

23   Q.   Right.

24   A.   -- to do that, but it may take longer if we don't have

25   the right data.

Sandy - Redirect

1          MR. LOVETT:  Your Honor, I understand from

2    depositions and from Mr. Harrison that the study is a year-

3    long study.  Is that -- you don't know?

4          THE WITNESS:  Yes, I thought it was six months, but

5    if it's a year -- Tim?  It's a year?  Okay.

6          MR. LOVETT:  And it started in April of 2010, so it

7    will be finished in April of 2011.

8          THE REPORTER:  I'm sorry.  I couldn't hear that.

9          MR. LOVETT:  It started in April of 2010, so it will

10   be completed in April of 2011.

11         THE WITNESS:  Okay.

12         THE COURT:  All right.  Any redirect?

13                    REDIRECT EXAMINATION

14   BY MR. HURNEY:

15   Q.   If CH2M Hill had been told in March of 2009 that they had

16   to build a system to place Patriot in compliance no later than

17   August -- or April 5th of 2010, regardless of what technology

18   you selected, would you all have taken the job?

19   A.   So we were asked March of 2009 to have something in in

20   April of 2010 --

21   Q.   Possible?

22   A.   -- not knowing anything, or, you know --

23   Q.   Based on what you knew at that time, could you have built

24   a system that would have put them in compliance --

25   A.   No.  No.

Sandy - Redirect

1    Q.   Despite the reference to a 100-year rain --

2    A.   Yes.

3    Q.   -- based on your review of the information contained in

4    your report, if you built a system to base flow, would you

5    still, based on your estimation, still treat almost all of the

6    water, treat all the water most of the time if you built to

7    the base level?  And then the same question if you built to

8    the design level.

9    A.   So you're saying -- you talked about a 100-year flow --

10   Q.   I'm trying to put aside, you know, the fact that you

11   might have a 100-year storm.  Despite that, I mean is it your

12   estimation that if you built to either the base flow or your

13   design flow, that that would -- with the modifications that

14   you discussed, that that would treat all of the -- you know,

15   virtually all the water 98 percent of the time?

16   A.   Yes, based on the historical rain events that were -- if

17   you go back to the graph that we've talked about, but

18   that's -- so yes.

19   Q.   And I mean does anybody build for a 100-year storm?

20   A.   I have not worked on a project where I have done that,

21   but that doesn't -- I don't, you know.

22   Q.   Have you ever heard of it?

23   A.   We have not done that in our business group in my 23

24   years that I'm aware of, so --

25        MR. HURNEY:  I don't have any further questions.

Sandy - Recross

1        THE COURT:  All right.  Anything else?

2        MR. LOVETT:  Just one.

3                 RECROSS EXAMINATION

4  BY MR. LOVETT:

5  Q.    You haven't built for a 100-year storm?

6  A.    Have not.

7  Q.    Have you built for a 25-year storm?

8  A.    We have.

9  Q.    And the first flush of a 25-year storm is much less than

10 a 25-year storm, right?

11 A.    Right.  We built for some that are one or no.  We, you

12 know -- I mean really it's a function of what makes sense to

13 be in compliance with the water quality requirements.

14 Q.    I understand this is a water quality based effluent.

15 A.    Right.

16 Q.    It makes a difference, right?

17 A.    Well, it is different, but we've done -- we've had other

18 water quality based effluents where we've put in a system

19 where, you know, we just -- annual average rain, but it's a

20 function of the site and, you know, so --

21 Q.    And whether the permit would be violated in a 1- -- in a

22 5-year rain event or not, right?

23 A.    Right, or what the regulatory, you know, whoever is

24 working with us on the permit, is really their interpretation

25 and what can be --

```
 1              MR. LOVETT:  Thank you.

 2              THE WITNESS:  Uh-huh.

 3              THE COURT:  All right.  Anything else?

 4              MR. HURNEY:  No, sir.

 5              THE COURT:  All right.  Sir, you're excused.  Thank

 6    you.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  All right.  It's time to adjourn.  We're

 9    going to adjourn until 9:00 a.m. tomorrow.  I'd like to see

10    counsel in the conference room for a few minutes before we

11    leave.  We'll adjourn until 9:00 a.m. tomorrow.

12         (Proceedings adjourned at 5:24 p.m.)

13

14

15

16

17

18

19

20

21         I, Teresa M. Ruffner, certify that the foregoing is a

22    correct transcript from the record of proceedings in the

23    above-entitled matter.

24         s/Teresa M. Ruffner              November 29, 2010

25    _____    _____
```